UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EDGAR HERNANDEZ and FREDIS ALFARO, for
and on behalf of all others similarly situated,                         09-CIV-4812
                                                                        (ARR)(RER)
                Plaintiffs,

    v.

NJK CONTRACTORS, INC., NICK HATZIS, and
KOSTAS GEORGIADIS,

                Defendants.
------------------------------------------------------------------------x


## DEFENDANTS' PRE-TRIAL MEMORANDUM OF LAW


Chris Georgoulis, Esq.
Monica Barron, Esq.
GEORGOULIS PLLC
Attorneys for Defendants
120 Wall Street, Suite 1803
New York, New York 10005
(212) 425-7854

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF THE CASE ...............................................................................................2

ARGUMENT

    POINT I

        PLAINTIFFS HAVE NOT MET THEIR INITIAL BURDENS OF PROOF
        UNDER THE FAIR LABOR STANDARDS ACT ................................................4

    POINT II

        EVEN IF THE COURT WERE TO FIND THAT SOME PLAINTIFFS HAD
        MET THEIR INITIAL BURDENS OF PROOF UNDER THE FAIR LABOR
        STANDARDS ACT, DEFENDANTS HAVE SUFFICIENT EVIDENCE TO
        NEGATE THE REASONABLE INFERENCE DRAWN IN FAVOR OF THOSE
        PLAINTIFFS ..........................................................................................................9

    POINT III

        PLAINTIFFS' CLAIMS FOR OVERTIME BASED UPON TRAVEL TIME TO
        AND FROM VARIOUS PROJECT SITES ARE NOT COMPENSABLE
        PURSUANT TO THE PORTAL TO PORTAL ACT............................................10

# TABLE OF AUTHORITIES

Addison v. Reitman Blacktop, Inc.
No. 10 Civ. 1435, 2011 U.S. Dist. LEXIS 106150 (E.D.N.Y. 2011)..................................4

Anderson v. Mt. Clemens Pottery Co.
328 U.S. 680 (1946)..............................................................................................5-6, 9

Callier v. Superior Bldg. Servs.
2010 U.S. Dist. LEXIS 140232 (E.D.N.Y. 2010).......................................................7

Cesario v. BNI Constr., Inc.
No. 07 Civ. 8545, 2008 U.S. Dist. LEXIS 103155 (S.D.N.Y. 2008)..................................4

Doo Nam Yang v. ACBL Corp.
427 F. Supp. 2d 327 (S.D.N.Y. 2005)..........................................................................5

Galvin v. National Biscuit Co.
82 F. Supp. 535 (S.D.N.Y. 1949).................................................................................11

Gunawan v. Sake Sushi Rest.,
No. 09 Civ. 5018, 2011 U.S. Dist. LEXIS 96639 (E.D.N.Y. 2011).....................................12

Kavanagh v. Grand Union Co.
192 F.3d 269 (2d Cir. 1999).........................................................................................11

Keun-Jae Moon v. Joon Gab Kwon
248 F. Supp. 2d 201 (S.D.N.Y. 2002)...........................................................................9

Reich v. New York City Transit Auth.
45 F.3d 646 (2d Cir. 1995)...........................................................................................11

Reich v. Southern New England Telecommunications Corp.,
121 F.3d 58 (2d Cir. 1997)............................................................................................5

Singh v. City of New York
524 F.3d 361 (2d Cir. 2008)......................................................................................11-12

Solis v. Sec. Credit Sys.
08 Civ. 267, 2011 U.S. Dist. LEXIS 27613 (W.D.N.Y. 2011)..................................5-6, 9

Vega ex rel. Trevino v. Gasper
36 F.3d 417 (5th Cir. 1994).......................................................................................12-13

STATUTES:

29 C.F.R. § 778.104..................................................................................................5

29 U.S.C. § 254(a) ...................................................................................................11

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
EDGAR HERNANDEZ and FREDIS ALFARO, for
and on behalf of all others similarly situated,

                              Plaintiffs,

     v.

NJK CONTRACTORS, INC., NICK HATZIS, and
KOSTAS GEORGIADIS,

                              Defendants.
-------------------------------------------------------------------------x

09-CIV-4812
(ARR)(RER)

## DEFENDANTS' PRE-TRIAL MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

Defendants NJK Contractors, Inc. ("NJK"), Nick Hatzis, and Kostas Georgiadis (collectively, "defendants") respectfully submit this Pre-Trial Memorandum of Lawas against plaintiffs Edgar Hernandez, Fredis Alfaro, Jose M. Agustin, Francisco Rafael Cetino, Wilfredo Lazo, Miguel A. Melgar, Nelson Melgar, and Gustavo Top's (collectively, "plaintiffs") as required by the Court's Trial Management Order dated January 16, 2014.

Defendants have consistently disputed plaintiffs' allegations with respect to their hours worked, their dates worked, wages paid and type of work that they performed. During the litigation of this matter, defendants never alleged that their document production represented a complete accounting of plaintiffs' work performed on behalf of NJK -- and nor will they do so at trial. Furthermore, defendants do not dispute that certain plaintiffs did not receive overtime wages on rare occasions. But a trial is required with respect to the exaggerated nature of plaintiffs' claims for unpaid wages.

## STATEMENT OF THE CASE

NJK is a small, family-owned company that performs roofing-construction work on private and public projects. Defendant Nick Hatzis is the President and co-owner of NJK and defendant Kostas Georgiadis is the Vice President and co-owner of NJK. The public projects performed by NJK were federally and state-funded projects. NJK's work is seasonal, because its work is restricted by the inclement weather conditions; and its workers perform considerably less work, and at times no work, during the winter when it is cold and non-winter months when there is precipitation. In addition, NJK's work is not consistent throughout the year; and there are periods of time when NJK simply has no work and, therefore, does not employ any workers during this "down time."

On November 5, 2009, plaintiffs, former employees of NJK, filed their Complaint against defendants based on their allegations that they were owed unpaid wages.[1] Plaintiffs allege, among other things, that they routinely worked approximately 70-84 hours per week during the relevant time period,[2] and according to their Supplemental Rule 26 Disclosures, dated August 2, 2013, plaintiffs allege that they are owed $554,111.74 for unpaid wages with liquidated damages.

There are numerous internal inconsistencies, however, among plaintiffs' own statements and their documentary evidence in which plaintiffs' varying approximations of hours worked are "typically" 50-84 hours per week. Plaintiff Hernandez was the only plaintiff to produce any type of document – a calendar -- that indicates the hours he purports to have worked during the applicable time period. But Hernandez's Calendar clearly indicates that he did not work overtime except for a small amount of hours.

---

[1] On January 5, 2011, plaintiffs filed their Amended Complaint.

[2] Plaintiffs performed no work in 2009. Accordingly, the relevant time period with respect to plaintiffs' claims is November 5, 2003 to December 31, 2008.

Furthermore, whereas defendants concede that plaintiffs performed work on behalf of NJK during certain time periods, the employment dates are in dispute, and defendants have produced evidence demonstrating that no work was in fact performed on inclement weather days. Defendants have produced 5,942 pages of documents in this action in response to plaintiffs' document demands which have included, but not limited to, the following documents: contracts or purchase orders, prevailing wage schedules, internal payroll reports, certified payrolls, paycheck stubs, daily reports, quarterly combined withholding forms, Quarterly Federal Tax Returns, W-2s, and delivery receipts.

In addition, four (4) large redwelds containing NJK's bank statements during the relevant time periods were produced.[3] The bank statements are critical because plaintiffs have stated that they were paid by check only with respect to their wages and, therefore, the bank statements will indicate the dates when plaintiffs worked, as well as the times when plaintiffs did not work.

Furthermore, the documentary evidence provided by defendants demonstrates that several plaintiffs were provided significant bonuses during their employment by NJK. During the relevant times herein, NJK paid Hernandez $14,000.00 in bonuses, Alfaro $1,100.00 in bonuses, Cetino $2,500 in bonuses, Agustin $1,400.00 in bonuses, and Nelson Melgar $1,000.00 in bonuses.

Additionally, NJK provided free transportation to and from the project sites located in upstate New York, Long Island, Staten Island and New Jersey where there was limited or no access to public transportation. This transportation was provided by NJK as a convenience to its workers who would otherwise have to manage the commute to and from work using alternative and costly means. The workers did not perform any work during these commutes.

---

[3] Bank statements include copies of checks.

Finally, plaintiffs who worked on the Green Haven Correctional Facility, a project which lasted approximately four (4) months, stayed in a motel while they worked on the project, and the motel expenses were paid completely by NJK Contractors.

The vast majority of plaintiffs' overtime claims are based on their travel time to and from the various project sites, which were located in areas such as upstate New York, New Jersey and Long Island. Plaintiffs have attempted to classify their travel time as work time by alleging that they were required to load and unload tools and equipment in the company vehicle at the beginning and at the end of each work day. But this is not supported by the evidence.

Accordingly, most, if not all plaintiffs have failed to demonstrate that they have in fact performed work for which they were improperly compensated and the amount and extent of that work as a matter of just and reasonable inference. Even assuming that any plaintiffs were to meet that initial burden, defendants have sufficient evidence of the precise amount of work performed or sufficient evidence to negate the reasonableness of the inference to be drawn from the plaintiffs' evidence.

**POINT I**

**PLAINTIFFS HAVE NOT MET THEIR INITIAL BURDENS OF PROOF UNDER THE FAIR LABOR STANDARDS ACT**

In cases concerning claims for unpaid wages, as in this case, liability and damages are inextricably intertwined. Liability and damages both need to be determined on a day-to-day and plaintiff-by-plaintiff basis because "a new cause of action accrues with each payday following an allegedly unlawful pay period." Addison v. Reitman Blacktop, Inc., No. 10 Civ. 1435, 2011 U.S. Dist. LEXIS 106150, at *16-17 (E.D.N.Y. 2011); 29 C.F.R. § 790.21(b); see also Cesario v. BNI Constr., Inc., No. 07 Civ. 8545, 2008 U.S. Dist. LEXIS 103155, at *7 (S.D.N.Y. 2008) ("Because plaintiffs' weekly hours fluctuated from week to week, and because of the principle

that [e]ach workweek stands alone under the FLSA, 29 C.F.R. § 778.104, plaintiffs' hourly pay rate is determined separately depending upon the numbers of hours worked per week.") (internal quotations omitted).

Even if this Court were to find that a particular plaintiff did not receive overtime wages for a particular hour, day or week, such a finding would not establish that that particular plaintiff had worked other hours that he claims or that he was not paid overtime wages for other hours. Thus, individualized proof of liability will be required for each particular plaintiff for every hour that he claims he was not paid overtime wages.

As explained by the Second Circuit, although the courts have not precisely defined the elements of a claim for overtime compensation under the Fair Labor Standards Act, the plaintiff "has the initial burden to 'produce sufficient evidence to establish that the employees have in fact performed work for which they were improperly compensated, <u>and</u> produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" <u>Solis v. Sec. Credit Sys.</u>, 08 Civ. 267, 2011 U.S. Dist. LEXIS 27613, at *9-10 (W.D.N.Y. 2011) (emphasis added) (citing <u>Reich v. Southern New England Telecommunications Corp.</u>, 121 F.3d 58, 67 (2d Cir. 1997)); <u>see also</u> <u>Doo Nam Yang v. ACBL Corp.</u>, 427 F. Supp. 2d 327, 331-32 (S.D.N.Y. 2005) ("[A] plaintiff seeking to recover under the Fair Labor Standards action must show insufficient payment for hours worked.")

After the plaintiff has met his initial burden, the burden then shifts to the employer "to come forward with evidence of the precise amount of work performed <u>or</u> with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." <u>Solis</u>, No. 08 Civ. 267, 2011 U.S. Dist. LEXIS 27613, at *9-10 (emphasis added) (quoting <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687-88 (1946)). Only when the employer fails to

produce such evidence, may the court award damages to the employee, even though the result be only approximate. Id.

With respect to plaintiffs' claims for unpaid wages in the instant action, the critical issues are when the workday started and ended, the time periods when plaintiffs performed work on behalf of NJK, and the classification of work performed by each plaintiff on each date -- all of which are disputed by defendants and defendants' claims are supported by the documentary evidence. Additionally, the majority of plaintiffs' overtime claims are based on their travel time to and from the various project sites, which as discussed below in Point II, is not compensable as work time according to the evidence and controlling law.

Moreover, there are numerous internal inconsistencies among plaintiffs' own statements and documentary evidence in which plaintiffs' varying approximations of overtime hours are "typically" 50-84 hours per week, thus precluding a reasonable inference in their favor. For instance, the Amended Complaint alleges plaintiffs typically worked 70-84 hours per week, i.e., started work at 6:00 a.m. and stopped work at 8:00 p.m., whereas Plaintiffs' Affidavits state that plaintiffs typically worked 50-60 hours per week. (See Lusher Decl. Exhs. A-F.)[4] Elsewhere in plaintiffs' motion for partial summary judgment they allege they routinely worked anywhere from 50-72 per week, i.e., between ten and twelve (10-12) hours per day, five to six (5-6) days per week. (Barron Decl. Exh. F: Plaintiffs' Rule 56.1 Statement ¶ 47.)[5] [6]

Indeed, plaintiff Hernandez was the only plaintiff to produce any type of document that indicates the hours he purports to have worked during the applicable time period. However,

---

[4] Declaration of LaDonna Lusher in Support of Plaintiffs' Motion in Limine, dated February 3, 2014.

[5] Declaration of Monica Barron in Opposition to Plaintiffs' Motion in Limine, dated February 11, 2014.

[6] Plaintiffs' Rule 56.1 Statement ¶ 47 cites the Plaintiffs' Affidavits in support that plaintiffs worked between ten (10) and twelve (12) hours a day, but Plaintiffs' Affidavits do not state this. Plaintiffs Affidavits merely state that they "typically worked no less than ten (10) hours per day." (Barron Decl. Exh. F.)

plaintiff Hernandez's allegations are contradicted by the Hernandez Calendar. Hernandez alleged that he worked "50-60 hours each week at *all* projects." (See Barron Decl. Exh. B, at No. 2, emphasis added.) But according to Hernandez's own records, there were months when he performed no work or little work. For instance, the Hernandez Calendar indicates that there were three (3) months when Hernandez performed no work: January 2004, May 2004, and June 2008. (See Barron Decl. Exh. B.) The Hernandez Calendar also indicates that there were approximately thirty (30) months when Hernandez worked less than 10 days in any given month: January, February, and November 2003; February to June 2004; January, February, March, August, and December 2005; February and June 2006; February, March, April May, October, and December 2007; January, May, June, and July 2008. (See Barron Decl. Exh. B.)

The Hernandez Calendar also demonstrates that there were approximately 270 days (or 9 months) when no work was performed because of inclement weather conditions; there were only nine (9) occasions when Hernandez worked more than five (5) consecutive days; plaintiffs never worked more than ten (10) hours in a day; and there were significant periods of time when NJK performed no work. Finally, Hernandez's Calendar clearly indicates that he did not work overtime except for a small amount of hours and that he did not consider the travel time to and from the project sites as part of his work day.

Accordingly, plaintiffs' own documentary evidence contradicts their allegations that they "typically" worked 50-84 hours per week. See Callier v. Superior Bldg. Servs., 2010 U.S. Dist. LEXIS 140232, at *15 (E.D.N.Y. 2010) ("Although courts generally extend plaintiffs the benefit of the doubt when it comes to their recollections of hours worked in the absence of documentation, courts need not blindly accept allegations patently out of line with other evidence.")

Defendants also dispute the alleged end and start work dates of plaintiffs Alfaro, Cetino, Miguel Melgar, Agustin, Top, and Nelson Melgar. The discrepancies are as follows:

a. Alfaro was employed from March 6, 2002 until October 31, 2008 on a limited basis. Plaintiffs allege that Alfaro worked "on and off" from approximately 2001 until summer 2008.

b. Cetino was employed sporadically from prior to 2000 to September 14, 2005. Plaintiffs allege Cetino was employed from approximately October 1993 until June 2007.

c. Miguel Melgar was employed from July 16, 2007 until November 17, 2008. Plaintiffs allege Miguel Melgar was employed from approximately April 2007 until December 2008.

d. Agustin was employed from April 16, 2001 until March 26, 2004 on a limited basis. Plaintiffs allege Agustin was employed "on and off" from approximately 1998 until 2005.

e. Top was employed from September 2001 until December 2003 on a limited basis. Plaintiffs allege Top was employed from approximately 1999 until December 2005.

f. Nelson Melgar was employed from October 9, 2006 until November 17, 2008. Plaintiffs allege Nelson Melgar was employed from approximately June 2006 until December 2008.

(Barron Decl. Exh. H: Hatzis Init. Decl. ¶ 57.)

Furthermore, NJK's work is not consistent throughout the year; and there are periods of time when NJK simply has no work and, therefore, does not employ any workers during this down time. (Barron Decl. Exh. H: Hatzis Init. Aff. ¶¶ 15-16.) In addition, it is undisputed that NJK's work is seasonal work, because its work is restricted by the inclement weather conditions; and its workers perform considerably less work, and at times no work, during the winter months and non-winter months when it rained. (Barron Decl. Exh. H: Hatzis Aff. ¶ 14.) Specifically, Plaintiffs' Affidavits state that they "worked less hours and days during the winter," but they failed to provide an approximation with respect to the number of days they did not work because of inclement weather conditions.

The Dormitory Authority State of New York Daily Construction Reports also indicate that there days when NJK performed no work because of inclement weather conditions. (Barron Decl. Exh. L: DASNY Reports)[7] See Keun-Jae Moon v. Joon Gab Kwon, 248 F. Supp. 2d 201, 220 (S.D.N.Y. 2002) (judicial notice of cold weather months was taken from the beginning of November to end of March in determining work hours concerning seasonal work.)

## POINT II

### EVEN IF THE COURT WERE TO FIND THAT SOME PLAINTIFFS HAD MET THEIR INITIAL BURDENS OF PROOF UNDER THE FAIR LABOR STANDARDS ACT, DEFENDANTS HAVE SUFFICIENT EVIDENCE TO NEGATE THE REASONABLE INFERENCE DRAWN IN FAVOR OF THOSE PLAINTIFFS

Even if the Court were to find that some plaintiffs had met their initial burdens of proof under the FLSA, defendants have sufficient evidence "to negative the reasonableness of the inference to be drawn from the employee's evidence." Solis, supra, at *9-10 (quoting Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946)).

Defendants have produced 5,942 pages of documents in this action in response to plaintiffs' document demands which have included, but not limited to, the following documents: contracts or purchase orders, prevailing wage schedules, internal payroll reports, certified payrolls, paycheck stubs, daily reports, quarterly combined withholding forms, Quarterly Federal Tax Returns, W-2s, and delivery receipts.

In addition, four (4) large redwelds containing NJK's bank statements during the relevant time periods were produced. NJK paid plaintiffs' wages via a company check or Paychex (NJK's payroll service), and they were never paid in cash. The plaintiffs have also stated that they were paid by check only. Given that they were never paid in cash, NJK's bank statements

---

[7] See Bates-stamped nos. 005286, 005304, 005308, 005309, 005311, 005084, 005092, 005095, 005096, 005256, 005255, 005216

- 9 -

are critical because they prove the times when plaintiffs worked as well as the times when they did not work, despite any allegations to the contrary by plaintiffs.

Furthermore, the documentary evidence provided by defendants demonstrates that several plaintiffs were provided significant bonuses during their employment by NJK. During the relevant times herein, NJK paid Hernandez $14,000.00 in bonuses, Alfaro $1,100.00 in bonuses, Cetino $2,500 in bonuses, Agustin $1,400.00 in bonuses, and Nelson Melgar $1,000.00 in bonuses. Additionally, NJK provided free transportation to and from the project sites located in upstate New York, Long Island, Staten Island and New Jersey where there was limited or no access to public transportation. This transportation was provided by NJK as a convenience to its workers who would otherwise have to manage the commute to and from work using alternative and costly means.

Finally, plaintiffs who worked on the Green Haven Correctional Facility, a project which lasted approximately four (4) months, stayed in a motel while they worked on the project, and the motel expenses were paid completely by NJK Contractors.

Accordingly, even if some plaintiffs were able to meet their initial burden of proof, defendants have more than sufficient evidence to negate the reasonable inference to be drawn from plaintiffs' submissions.

## POINT III

### PLAINTIFFS' CLAIMS FOR OVERTIME BASED UPON TRAVEL TIME TO AND FROM VARIOUS PROJECT SITES ARE NOT COMPENSABLE PURSUANT TO THE <u>PORTAL TO PORTAL ACT</u>

The vast majority of Plaintiffs' overtime claims are based on their travel time to and from the various project sites, which were located in areas such as upstate New York, New Jersey and Long Island. Plaintiffs have attempted to classify their travel time as work time by alleging that

they were required to load and unload tools and equipment in the company vehicle at the beginning and at the end of each work day. But this is not supported by the documentary evidence nor the controlling law.

Defendants are not required to pay overtime compensation based on plaintiffs' travel time to and from the various project sites. *See* 29 U.S.C. § 254. The Portal-to-Portal Act provides that an employer is not liable under the FLSA for failure to pay an employee overtime compensation for "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform." 29 U.S.C. § 254(a).

The purpose of the Portal-to-Portal Act was to narrow the definition of compensable work under the FLSA and "relieve employers of the obligation to pay for time spent in so called portal-to-portal, non-productive activities which neither they nor their employees had considered by custom or contract to be compensable." Galvin v. National Biscuit Co., 82 F. Supp. 535, 537 (S.D.N.Y. 1949); see also Reich v. New York City Transit Auth., 45 F.3d 646, 649 (2d Cir. 1995) (Portal-to-Portal Act "was intended to relieve employers from liability for preliminaries, most of them relatively effortless, that were thought to fall outside the conventional expectations and customs of compensation.")

Accordingly, under the Portal-to-Portal Act, courts have consistently held that commute time is not compensable. Kavanagh v. Grand Union Co., 192 F.3d 269, 272-273 (2d Cir. 1999) (explaining that employers are not required to compensate employees for their "normal travel" commute time, and the term "normal travel" is a "subjective standard defined by what is usual within the confines of a particular employment relationship" and "does not represent an objective standard of how far most workers commute or how far they may reasonably be expected to commute."); Singh v. City of New York, 524 F.3d 361, 368 (2d Cir. 2008) (finding that

employee's commute time was not compensable under the FLSA because it was "materially unaltered" and he was able to do whatever he choose to do, such as read, listen to music, or eat.); Vega ex rel. Trevino v. Gasper, 36 F.3d 417, 425 (5th Cir. 1994) (farm workers' travel time to work sites, which was sometimes as long as two hours, was not compensable because the workers were not required to use the employer's buses, merely received work assignments and pay rates while traveling on the buses, and they did not load tools.)

Contrary to plaintiffs' claims, the work day did not start at 6:00 a.m. when the workers arrived to NJK's warehouse/storefront, and the work day did not end at 8:00 p.m. Gunawan v. Sake Sushi Rest., No. 09 Civ. 5018, 2011 U.S. Dist. LEXIS 96639, at *12 (E.D.N.Y. 2011) ("issue of wages paid for hours worked is essentially one of credibility.")

NJK utilized trailers or some type of storage facility and/or 8 foot temporary fence panel enclosures to store its tools, supplies, materials and equipment, which were physically located on the projects where NJK performed its work, which is the practice and custom in the industry. When secure storage containers or storage rooms were not furnished to NJK by the owners, NJK rented them. In addition, the materials and supplies used by NJK would be shipped directly to the various projects where they would be stored in the storage containers.

As described in the Affidavits of Hatzis, Agolli and Enamorado, NJK provided the transportation to the project sites to its workers as a benefit. (Barron Decl. Exh. H: Hatzis Aff. ¶¶ 63-65; Barron Decl. Exh. J: Agolli Aff. ¶¶ 28-32; Exh. K: Enamorado Aff. ¶¶ 24-25.) NJK's workers gathered each morning at NJK's warehouse/storefront and commuted together to the various project sites in NJK's company vans. (Barron Decl. Exh. J: Agolli Aff. ¶ 32; Exh. K: Enamorado Aff. ¶ 24.) NJK's warehouse/storefront is located in the area known as Sunset Park, which is extensively served by public transportation services: three (3) subway lines and five (5)

bus lines service the area. (Barron Decl. Exh. H: Hatzis Aff. ¶ 64.) NJK's workers were neither instructed nor required to meet at NJK's warehouse/storefront at the start and end of the day. (Barron Decl. Exh. H: Hatzis Aff. ¶ 67; Exh. J: Agolli Aff. ¶ 30; Exh. K: Enamorado Aff. ¶ 28.) The workers had the option to use or not use the transportation provided by NJK. (Barron Decl. H: Hatzis Aff. ¶ 67; Exh. J: Agolli Aff. ¶ 30-31.) See, e.g., Vega, supra at 425 (travel time was not compensable where it was "ordinary to-work or from work travel," and the workers performed no work prior to or riding in NJK's company vans, and were not required to use the vans). In particular, the Agolli Affidavit states that Agolli opted not to use the transportation for approximately six (6) months and drove his own car to the project sites during that time. (Exh. J: Agolli Aff. ¶ 31.) Agolli also states that on occasion when he drove NJK's company van, he would sometimes make stops and pick up workers if they lived enroute from NJK's warehouse/storefront to the project site. (Barron Decl. Exh. J: Agolli Aff. ¶ 36.)

During the commute time, there were no instructions given to the workers from NJK's supervisors; and no work was performed during the commute. (Barron Decl. Exh. J: Agolli Aff. ¶ 37; Exh. K: Enamorado Aff. ¶ 28.) Plaintiffs' Affidavits do not allege there was any work performed during the commute or any instructions given. In fact, all the plaintiffs at times would sleep during the commute. (Barron Decl. Exh. H: Agolli Aff. ¶ 37.)

In addition, some plaintiffs who worked at Correctional Facility -- a project which lasted approximately four (4) months and is located approximately sixty miles north of New York City -- stayed in a motel during the time that they performed work on the project. (Hatzis Aff. ¶ 75.) The motel was located conveniently next to the Correctional Facility and the motel expenses were paid completely by NJK, and there were no deductions from plaintiffs' pay to cover the

motel expenses. (Agolli Aff. ¶ 40.) Accordingly, while plaintiffs worked at the Correctional Facility, the travel time to and from the project site would not take up to two (2) hours to reach.

Moreover, when NJK's workers took the benefit of the transportation provided by NJK, they were not required to pay for their transportation expenses, which included tolls and gas, and of course they saved the cost of using public transportation. (Hatzis Aff. ¶ 65, Agolli ¶ 29.) In other words, transportation to and from the project sites was provided by NJK as a benefit to its workers who would otherwise have to manage the travel using alternative and costly means.

Accordingly, the travel time to and from the various project sites is not compensable, and as such, most of plaintiffs' overtime claims are invalid.

Dated:   New York, New York
         February 11, 2014

                              GEORGOULIS PLLC

                        By: _____s/_____
                              Chris Georgoulis (CG-5094)
                              Monica Barron (MB-2973)
                              120 Wall Street, 18th Floor
                              New York, New York 10005
                              Tel. no. (212) 425-7854
                              Fax no. (212) 422-5360
                              *Attorneys for Defendants NJK Contractors, Inc.,*
                              *Nick Hatzis, and Kostas Georgiadis*