498

```
1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
2

3      - - - - - - - - - - - - -   X

4     EDGAR HERNANDEZ, ET AL,      :
                                        09 CV 4812
5              Plaintiffs         :

6
                -against-          :
7                                      United States Courthouse
                                       Brooklyn, New York
8     NJK CONTRACTORS, INC, ET AL :
                                       February 28, 2014
9              Defendants.        :     9:45 o'clock a.m.

10     - - - - - - - - - - - - -   X

11
                   TRANSCRIPT OF TRIAL
12             BEFORE THE HONORABLE RAMON E. REYES, JR.
                   UNITED STATES MAGISTRATE JUDGE
13

14    APPEARANCES:

15
      For the Plaintiffs:          MICHAEL BAUMAN, ESQ.
16                                 LaDONNA LUSHER, ESQ.
                                   LEONOR H. COYLE, ESQ.
17                                 VIRGINIA & AMBINDER, LLP
                                   111 Broadway
18                                 New York, N.Y. 10006

19
      For the Defendants:          CHRIS GEORGOULIS, ESQ.
20                                 MONICA BARRON, ESQ.
                                   120 Wall Street
21                                 New York, N.Y. 10005

22
      Court Reporter:              Gene Rudolph
23                                 225 Cadman Plaza East
                                   Brooklyn, New York
24                                 (718) 613-2538

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer-aided transcription.
```

GR      OCR      CM      CRR      CSR

499

1            THE COURT:  Okay.  Let's get going.

2            MS. LUSHER:  Your Honor, in response to yesterday

3    the defendants gave you these copies of these descriptions of

4    roofer and laborer from the US Labor of Statistics.  I think

5    we made them defendant's R and S.

6            THE COURT:  Correct.

7            MS. LUSHER:  We actually have a copy of the Local 8

8    CBA that's referred to.  If you look at exhibits --

9            THE COURT:  That's referred to in what?

10           MS. LUSHER:  In the prevailing wage schedules and

11   preamble.  It talks about how you have to refer to the

12   collective bargaining agreement for the jurisdiction of the

13   union.  They refer to Local 8 for the counties that these

14   projects were held.  This also talks about the jurisdiction as

15   well.  It also has a description of roofer in it.

16           Actually, what it is, it describes the type of work

17   that's covered by the collective bargaining agreement that the

18   comptroller looks at to decide which -- if the roofing

19   prevailing wage rate applies.

20           We would like to offer this into evidence in

21   response to the defendant's description that they got from US

22   Department of Labor.

23           MR. GEORGOULIS:  May I be heard, Judge?

24           THE COURT:  Of course.

25           MR. GEORGOULIS:  It is not a government document.

1   It's something that should have been done affirmatively on the

2   plaintiff's case as part of their burden.  They should have

3   called an expert, either a union rep, to talk about what a

4   roofer does as opposed to what a laborer does.  They didn't do

5   that.

6           They do this for a living, Judge.  All these cases,

7   you read the cases.  Experts are brought if for this exact

8   purpose.  They didn't do it.  This is not a government

9   document.  It doesn't come in under 90 -- 902(5).  This is a

10  collective bargaining agreement by a private enterprise, a

11  union.  It is not a government document.

12          MS. LUSHER:  Your Honor, in the government document

13  that's printed by the comptroller's office in New York State

14  Department of Labor, I am just trying to find the preamble in

15  here.  It refers throughout in the preamble about how you have

16  to refer to this document to know the wage rate.  That is what

17  they base the wage rate on.  It is what is contained in this

18  collective bargaining agreement.

19          The jurisdictions also are the same as far as New

20  York City and as far as the counties for Dutchess County, for

21  example, that we looked at yesterday which is also contained

22  in here.  It is contained in the schedule.

23          The comptroller, if you call the comptroller's

24  office, if you have a question as to what is supposed to

25  apply, this is what they give you, they send you this.

1          I agree with counsel, it is not a government

2   document itself but it is referred to in the government

3   document and it is also under 901(a)(4), which talks about the

4   self authentication of a document, it says, distinctive

5   characteristics and the like, the appearance, content,

6   substance, internal patterns and other distinctive

7   characteristics of the item taken together with all other

8   circumstances.

9          We fell that this document falls under that rule of

10  evidence.

11          MR. GEORGOULIS:  Your Honor, on these kinds of cases

12  one of the arguments that's always made and one of the areas

13  of dispute with regard to classification is, who has

14  jurisdiction.  Because it is based on a percentage of -- on

15  certain locality.  They do surveys every, I don't know, three,

16  four years, to determine what should be applicable.  There

17  is -- there are disputes with regard to jurisdictions.

18  Sometimes they have project labor agreements.  There are all

19  sorts of things that come out of this.  There are certain

20  overlapping jurisdictions with regard to, as I showed in the

21  comptroller's wage schedule about demolition.  If you read

22  that whole paragraph, it talks about the demolition of the

23  roof.  There are always issues about well, is that a roofer's

24  work, a laborer's work.  There are all sorts of controversy

25  with regard to this.

502

1          In almost every case, where this is an issue,

2     classification is an issue, an expert is called, usually by

3     both sides, and it's a battle of experts as to what is the

4     actual jurisdiction for that locality.

5          Counsel now on the last day of trial is bringing up

6     a substantive exhibit that it needs, that she needs to make

7     her case, in the last minute.  It's not fair to be blind-sided

8     like this.  I am preparing a case based on the exhibit list

9     and what she has shown.

10         THE COURT:  Do you know what we are fighting over?

11    A few dollars.

12         MR. GEORGOULIS:  Right.

13         THE COURT:  The difference between the roofer's and

14    the laborer's wage is, at most, taking into account

15    supplementals, at most five bucks per hour.  It's not going to

16    make that much of a difference.  Not going to.

17         MR. GEORGOULIS:  Your Honor, this might be the --

18         THE COURT:  That book that you just held up, what

19    year is that?

20         MS. LUSHER:  2005 to 2009, Your Honor.

21         THE COURT:  All right.  That doesn't cover the

22    entire period.

23         MS. LUSHER:  It doesn't cover the entire period but

24    I will just say that on Exhibit 3 on page 77, just an example,

25    when you go to the roofer prevailing wage rate, this way

503

1   throughout, it says at the bottom, local number eight.  That's

2   what it is referring to.  The preamble to all of these

3   prevailing wage schedules says that because there may be

4   issues or questions, that contractors are required to call the

5   comptroller's office if you do have any questions to find out

6   which jurisdiction does apply.  That's what's referred to.

7        What happens is the comptroller's office then looks

8   at this because it is Local 8's jurisdiction.  They refer to

9   this to see what work is covered.

10        The only reason that I am bringing this up now is

11   because counsel has made such a huge deal out of tearing up a

12   roof being demolition.  In prevailing wages you do have

13   different classifications for work that the unions do fight

14   over.  But this specifically says that tearing up a roof is --

15   falls under the jurisdiction of roofer's work.  That's the

16   reason we raise it.  It is because it is part of their

17   defense.

18        MR. GEORGOULIS:  Your Honor, I was going to suggest

19   at the end of the day, but I think it might be an appropriate

20   time, you had said, can you convince me about filing proposed

21   findings of facts and conclusions of law.  I think that one of

22   the things that I was going to suggest at the end of this

23   trial because there are so many of these kinds of issues, and

24   there are three different kinds of claims, and there are

25   certain facts testified to, breach of contract obviously with

504

1   classification, there is New York overtime, there is the FLSA

2   component and we've had so much testimony and some

3   inconsistent testimony and all these kinds of things, I think

4   it would be virtually impossible for the Court -- I withdraw

5   it.  It would be so much easier for the Court to have the

6   benefit of the -- we've ordered the transcript -- the benefit

7   of references to the transcript with regard to each issue of

8   damage and, of course, some legal issues that each side has

9   with regard to this case that would be appropriately briefed

10  and the Court would have time to review and make its decision

11  based on both facts and law as proposed by each side.  I

12  think -- we could probably waive summations too if we do that.

13          THE COURT:  All right.  I will receive that in

14  evidence.

15          MS. LUSHER:  Okay.

16          THE COURT:  Give it what weight it deserves.

17          MS. LUSHER:  Pardon?

18          THE COURT:  I will give it what weight it deserves.

19          MS. LUSHER:  Okay.

20          MR. GEORGOULIS:  Of course, my objection.

21          THE COURT:  I don't want the entire document.  I

22  want the cover page.

23          MR. GEORGOULIS:  Do I get a copy?

24          THE COURT:  Yes, absolutely.

25          MS. LUSHER:  I'm sorry.

505

1          THE COURT:  You know what, we can make a copy of

2    this and use a copy of the exhibit, not the original.

3          THE LAW CLERK:  Okay.

4          THE COURT:  All pages.

5          MR. GEORGOULIS:  Your Honor, are you in agreement,

6    that we are going to have findings of fact?

7          THE COURT:  Most likely; but I haven't made up my

8    mind.

9          MR. GEORGOULIS:  Okay.  Thank you.

10         What's that exhibit number?

11         THE COURT:  Yes.  What exhibit number is it?

12         MR. BAUMAN:  73 for plaintiffs, I think.  Or do we

13   have another one?

14         MS. LUSHER:  73.

15         THE COURT:  We can make copies later.

16         (Marked.)

17         THE COURT:  73 is received, Local 8, Collective

18   Bargaining Agreement.

19         Okay, Mr. Bauman, you can continue.

20         MR. BAUMAN:  Thank you, Your Honor.

21         (Continued on next page.)

22

23

24

25

1          (Kostas Georgiadis, having been previously duly

2     sworn, resumes the witness stand and testifies as follows,

3     through and interpreter.)

4     DIRECT EXAMINATION

5     BY MR. BAUMAN:   (Continues)

6     Q     Good morning, Mr. Georgiadis.

7     A     Good morning, sir.

8     Q     Did you discuss your testimony with anyone overnight?

9     A     No.

10    Q     Now, do you recall we finished up yesterday we were

11    reviewing a series of contracts and bidding specifications on

12    several jobs?

13           Would you agree, sir, that there were many other

14    jobs for the relevant period beyond what these contracts

15    showed?

16    A     Only the federal jobs.

17           MR. GEORGOULIS:   No.  I will stipulate to that,

18    500,000 I said yesterday.  Remember I was going to go back and

19    check.  That each year they grossed over 500,000.

20           MR. BAUMAN:   Thank you.

21    Q     I want to make sure you understand.  I am not asking

22    about the federal jobs or the state jobs.  I am asking you

23    whether there were many more jobs other than the contracts

24    that we reviewed yesterday.

25    A     No.  Maybe one or two small private jobs.

Georgiadis - direct - Bauman                507

1    Q    We reviewed a list with Mr. Hatzis yesterday of

2    approximately 25 jobs.

3    A    I want to understand the question correctly.  We are

4    speaking about the period between 2003 and 2008?

5    Q    Right.

6    A    Okay.  That's all we're talking about.  When I speak you

7    need to hear me clearly.

8    Q    Were there many more jobs than the contracts we reviewed

9    yesterday for the period --

10   A    Yes.

11   Q    Thank you.

12   A    Yes.  Can I just say something?  I would like to say like

13   two, three words and then you, you know.

14        MR. GEORGOULIS:  Judge, what he's trying to say,

15   when he has a long answer, it gets lost in the translation.

16   He would like to stop, have it translated and continue.

17   That's what he is requesting.

18        THE COURT:  I think that's fair.

19        MR. BAUMAN:  That's fine.

20        THE WITNESS:  Thank you.

21   Q    Did you have anything to add, sir?

22   A    No.

23   Q    Okay.  Do you recall yesterday we discussed the concept

24   of prevailing wages?

25   A    Yes.

1    Q    Have you in your experience with NJK ever actually looked

2    at a prevailing wage schedule?

3    A    No.  No, because I know of it.  I know what it is and I

4    always put more.  But, no, I don't look at it.

5    Q    What do you mean, you always put more?

6    A    When I do the estimate of the job.

7    Q    I see.

8         So you estimate the job assuming you'll have to pay

9    that wage, is that what you are saying?

10   A    Yes, and always more.  Because many things have an effect

11   in the -- in the labor.

12   Q    Okay.  In your time at NJK, I think you testified that

13   you -- your office prepared certified payroll documents, is

14   that correct?

15   A    Yes.

16   Q    Did those come preprinted from the owner of the job?

17   A    Through my wife.

18        THE COURT:  Slow down.

19        MR. BAUMAN:  I'm sorry.

20   Q    Through your wife.  Okay.

21        But your wife is there I think you testified one or

22   two days a week and you're there more than that, correct?

23   A    Yes, of course.  But she also works on Saturdays and

24   Fridays, Sundays.

25   Q    She works Sundays too?

Georgiadis - direct - Bauman                    509

1   A    Everybody knows that I'm in the office alone working

2   there for many hours.  Everyone knows this.  And I deal with

3   the biddings because we all need work.

4   Q    Okay.  Sir, I want you to focus on the question.

5        Certified payroll reports, do they come to you from

6   the owner of the job preprinted with information or do you

7   have to fill out all of it?

8   A    I have to ask my wife.  I don't know.

9   Q    Okay.

10  A    I'm not good on the computer other than the work that I

11  do on the computer.  Otherwise, I don't use the computer.

12  Q    Okay, sir.  I would like to show you a few documents now.

13  We will be looking at Exhibit 53.  We will be looking at

14  Exhibit 17.

15       Sir, if you look at these two documents, they both

16  have been entered into evidence.  If you would turn to on

17  Exhibit 17 page 41?  If you will turn on exhibit -- sorry.  Go

18  ahead.  Catch up.

19       THE INTERPRETER:  Page 41?

20       MR. BAUMAN:  Yes.

21  Q    I'm sorry.  Page 42.

22       Do you recognize what's on page 42, sir?

23  A    It has to do with the date June 28, 2014?

24  Q    I'm sorry.  I am looking at the middle check on page 42.

25       Are you in Exhibit 17, sir?

Georgiadis - direct - Bauman                    510

1    A     This -- it starts with page 53.

2    Q     No.  It's the other document, sir.  I am going to be

3    asking you to look at both documents.

4          Are you with me now, sir?  Exhibit 17, page 42?

5    A     Yes.

6    Q     You see the middle section?

7    A     Yes.

8    Q     Can you tell me what that is?

9    A     It looks like a paycheck.

10   Q     Is that a paycheck for Edgar Hernandez reflecting a rate

11   of $23.25 per hour?

12   A     Yes.

13   Q     That's for the week ending July 18, 2004, correct?

14   A     Where do you see that?  I don't see it.  I see July 23rd.

15   Q     Week ending 7/18/2004.

16         THE INTERPRETER:  My mistake.  I said 7/28.  That

17   was my mistake.  Sorry.

18   Q     You see that, sir?

19   A     Yes.

20   Q     Does that check reflect that Mr. Hernandez received an

21   hourly rate of 23.25 for that week ending?

22   A     Yes.

23   Q     Let me ask you to turn to Exhibit 53, at your side there.

24   Go to page 184.

25         Are you with me, sir, page 184?

Georgiadis - direct - Bauman                    511

1   A    Yes.

2   Q    Do you recognize that document?

3   A    Yes.

4   Q    Is that a certified payroll report that you signed?

5   A    Yes.

6   Q    Okay.  Is that for the week ending July 18, 2004?

7   A    Yes.

8   Q    According to that, does it say that you paid Edgar

9   Hernandez 35.20 per hour?

10           MR. GEORGOULIS:  Judge, I have a terrible copy.

11           THE COURT:  Me too.

12           MR. GEORGOULIS:  I think it looks like a two.

13  Q    Even if it is a two, does it say that -- that you paid a

14  wage of 25.20 per hour?

15           MR. GEORGOULIS:  Judge, before -- if you look

16  further up, doesn't it look like a two on the others further

17  up?

18           MR. BAUMAN:  That's fine.  That's fine.  If it's a

19  two, it's a two.

20           MR. GEORGOULIS:  We have to get it straight on the

21  record.

22           THE COURT:  Yes.  It looks -- I am the trier of

23  fact.  I will figure it out.

24           MR. GEORGOULIS:  Okay.

25  Q    Mr. Georgiadis, does that reflect, in that column, that

GR      OCR      CM      CRR      CSR

Georgiadis - direct - Bauman                    512

1   you paid Mr. Hernandez 25.20 per hour as a rate of pay in that

2   week?

3   A    Are you talking --

4   Q    I am talking about the certified.

5   A    Wait, please.

6         If that's what you say, it's probably like that,

7   although I cannot see it clearly.

8   Q    That's a different rate than was reflected on his check,

9   correct?

10  A    Yes, it seems that way.

11  Q    Doesn't the next column, the supplemental benefits on the

12  certified payroll, doesn't that show that you paid additional

13  amounts to Mr. Hernandez?

14  A    That's what it shows.

15  Q    Those amounts are not reflected Ted on his check, are

16  they?

17  A    I can't see the amount that is here.  As far as the

18  certified payroll for what I paid Hernandez, I cannot see the

19  number clearly.

20  Q    I am not asking about certified payroll, sir.

21  A    It looks like it might be four-eighty-eight.

22  Q    I was asking you about the check, sir.

23        Is there anything on the check reflecting any

24  additional payment to Hernandez beyond the 23.25 per hour?

25  A    He's -- he's referring to the check, not the payroll.

GR      OCR      CM      CRR      CSR

Georgiadis - direct - Bauman                   513

1  Q    I am referring to the check, sir.

2           MR. BAUMAN:  Can you tell me what he said?

3           THE INTERPRETER:  Yes.  He was talking about the

4  check.  If you can please talk slowly so we can understand.

5           MR. GEORGOULIS:  But he's actually speaking to the

6  interpreter, not to you.

7           MR. BAUMAN:  Okay.

8  A    I'm saying, that attorney -- I'm telling you that the

9  attorney is referring to the check, not to the certified

10 payroll.

11 Q    And the witness is correct.

12          So other than the 23.25 hourly rate, is there

13 anything else indicated having been paid to Mr. Hernandez on

14 that check?

15 A    I will tell you the following.  I never actually did the

16 payroll but I do know that they received with taxes an

17 additional check sometimes and if a mistake was made I'll say

18 it.

19 Q    Shouldn't the certified payroll match the -- match your

20 internal payroll exactly?

21 A    It has to be the same and even more.  I understand that.

22 Q    Okay.  So you -- sorry.

23 A    Like I said, we might have made a mistake.  My wife might

24 have made a mistake.

25 Q    Well, let's turn to the next page in each document.

1          If you look at page 43, top check reflects a pay

2     rate for Mr. Hernandez 23.25 per hour for week ending July 25,

3     2004.

4          Do you see that?

5          THE INTERPRETER:  Did you say July 25th?  I'm sorry.

6          MR. BAUMAN:  July 25th.

7     Q    Do you see that, sir?

8     A    The above check, yes, the one on top.

9     Q    If you go to page 185 in the certified payrolls, that's

10    the certified payroll week ending July 26, 2004, and again

11    that copy, but I believe I see rate of $25.20 as well as

12    supplemental benefits required for that week.

13         Do you see that?

14    A    I saw it.  I see it and I will repeat to the respective

15    court, I will repeat the same thing.

16    Q    The --

17    A    That I myself do not prepare the payroll and I don't have

18    the knowledge as far as the accounting aspect of it is

19    concerned.  And I will explain again the same thing, that if a

20    mistake was made I will admit to it.

21    Q    You signed these documents, don't you?

22    A    Yes, but this doesn't have a signature.

23    Q    Okay.

24    A    But usually I did sign them.  I can't say I didn't.  I

25    don't want to put the responsibility on somebody else.  A lot

1   of times we make a mistake in the payroll and then we subject

2   them to the owner to correct them because mistakes are made.

3   I'm talking about mathematical error.  Then we do them over

4   because throughout the years --

5            MR. GEORGOULIS:  Your Honor, could we have that

6   question answered?

7   A    This one could be one of those errors or it could not be.

8   Q    Shouldn't the hourly rate on the check be the same as the

9   hourly rate on the certified payroll?

10           THE COURT:  Objection sustained.

11           Move on.

12           MR. BAUMAN:  Your Honor, I have about 20 or 25 of

13   these just off the top.  Should I proceed through all of them?

14           THE COURT:  If Mr. Bauman were to show you other

15   examples where the certified payrolls for Mr. Hernandez don't

16   match up with the checks that your company gave Mr. Hernandez,

17   would your answer be the same for each one?

18           THE WITNESS:  Well, if they don't match, how can I

19   say the opposite?

20           MR. GEORGOULIS:  He also said yes in that sentence,

21   Judge.

22           THE WITNESS:  Except there is something that I want

23   to say, and I have another point of view about this, is that

24   there was another check in addition to this one.  I will

25   always try to -- I will accept my mistake if I made a mistake.

Georgiadis - direct - Bauman                516

1   I just don't want to make the judge and the Court be losing --
2   wasting their time.
3           THE COURT:  I will assume that the answer would be
4   the same to all of the examples that you would show.
5           MR. BAUMAN:  Very well.
6           Thank you.
7           MR. GEORGOULIS:  I would stipulate to that.
8           THE COURT:  If the checks, both checks that were
9   issued to Mr. Hernandez or the other plaintiffs were given are
10  less than what the certified payroll shows, there would be an
11  amount owed.
12          MR. BAUMAN:  Very well.
13          THE WITNESS:  Can I put this back?
14          MR. BAUMAN:  Sure.
15  Q    One thing I noted, Mr. Georgiadis, even if there are five
16  or ten or 20 of these discrepancies, was the rate on the
17  actual check, as far as you know, ever higher than the
18  certified payroll or was it always lower?
19  A    I would like to hear the question again.
20  Q    Did you ever make these errors to the benefit of the
21  employees?
22          THE COURT:  I will sustain the objection.
23          It is what it is.  We have the checks.  We have the
24  payrolls.  We will look at it.  We will do the math.
25          MR. BAUMAN:  One of the issues here as well, Your

Georgiadis - direct - Bauman                517

1    Honor, as we pointed out yesterday, the documents are not

2    complete and we did credit, as you will hear from Ms. Gardoka,

3    we did credit the defendant for whatever was paid.  That's

4    where that comes out.

5    Q    I would like you to stay with exhibit -- I'm sorry.

6    Withdrawn.

7              Look at Exhibit 16.

8              THE COURT:  16?

9              MR. BAUMAN:  Yes.

10   Q    Let's look at, for example, page 16 -- Exhibit 16, page

11   16.

12             MR. GEORGOULIS:  What page?  I'm sorry.

13             MR. BAUMAN:  16.

14   Q    Do you see the check at the bottom of page 16 or the

15   document at the bottom of page 16 which reflects an amount of

16   $260 paid?

17   A    Yes.

18   Q    Can you tell what that was for?

19   A    I think this is very old so how can I say what it was?

20   Q    Shouldn't any check made to an employee have deductions

21   taken from it?

22             MR. GEORGOULIS:  Objection, Your Honor.

23             I don't think Christmas bonuses are subject -- I

24   don't know.  I don't think --

25             THE COURT:  Do you practice tax law?

Georgiadis - direct - Bauman                    518

1          MR. GEORGOULIS:  No.

2          MR. BAUMAN:  My bonuses were subjected to tax

3    deductions.

4          THE COURT:  They certainly do have deductions taken

5    out.

6          MR. GEORGOULIS:  I'm sorry.

7          THE COURT:  Income from whatever source derived gets

8    taxed.  That's the general rule.

9          MR. GEORGOULIS:  Okay.

10          THE COURT:  Ask your questions.

11   A    What if this was something I wanted to give to someone

12   who I regarded in high standards?

13   Q    A gift?

14   A    Yes.

15   Q    Okay.  Let's turn to page 19.  There are two checks, one

16   for $360 and one for $473, one in the end of March, one

17   beginning of April of 2000 -- I believe this is 2005 but the

18   date is cut off.  Appears to be 2005.

19          What were these?

20   A    If I say I remember I'll be lying.

21   Q    But, again, could these have been gifts?

22          MR. GEORGOULIS:  Objection.

23          He says he doesn't remember, Judge.  He doesn't

24   know.

25          THE COURT:  Move on.

GR      OCR      CM      CRR      CSR

Georgiadis - direct - Bauman                    519

1    A    This is like if you have good relations with your people,

2    it's like something personal or like family.  And I'm not able

3    to say it.  It's completely personal.  In other words, it's

4    given on a personal basis.  Given completely on a personal

5    basis.  But even if that's the case, I don't remember.

6    Q    Okay.  Let's turn back to page 15.  Look at the --

7              MR. GEORGOULIS:  Page?

8              MR. BAUMAN:  15, the same exhibit.

9    Q    Now, as you understand it, sir, when would an employee be

10   entitled to receive overtime?

11   A    When he works over the regular amount of hours that you

12   are supposed to work by law.

13   Q    How many?

14   A    When the person works over the amount of time that the

15   law says is the working hours, legal working hours.

16   Q    How many hours?

17   A    You mean, how many hours is the basic day?

18   Q    How many hours before the worker earns overtime?

19   A    Over the regular, like over the eight hours or over the

20   seven hours.  I can't recall if it's one hour or two hours or

21   three hours.  I can't remember.  Overtime was not something

22   that took place on a daily basis.

23   Q    Sir, you've owned a small business for over 20 years.

24   You don't know how many hours is the threshold for overtime?

25   A    I'm not sure if I understood correctly.  But what would

Georgiadis - direct - Bauman                    520

1    be considered overtime over the regular amount of hours?

2    Eight hours is the regular hour shift.  If that's what he's

3    asking.

4    Q    Would you agree that if someone worked over 40 hours in a

5    week they would get overtime for the hours beyond 40?

6    A    In a week's time or in five days?

7    Q    Either.

8    A    It would be overtime.

9    Q    Thank you.

10            Look at the check at the bottom of the page.

11            This is a check for Mr. Cetino for the pay period

12   December 13th to December 19, 2004?

13            THE COURT:  What exhibit?

14            MR. BAUMAN:  This is Exhibit 16, page 15.

15   Q    Do you see that check, sir?

16   A    Yes.

17   Q    Do you see how many hours Mr. Cetino worked in that pay

18   period?

19   A    I think 45.

20   Q    Should he have received overtime for some hours there?

21            MR. GEORGOULIS:  Objection, not to counsel's

22   question but to the start of the question from the

23   interpreter.  She is not saying the same thing he just said.

24   Can we ask it again?

25            THE COURT:  Please.

GR      OCR      CM      CRR      CSR

Georgiadis - direct - Bauman                    521

1          MR. GEORGOULIS:  And we would get a different

2    answer, Judge.

3          THE COURT:  Please.  Ask the question.

4          MR. BAUMAN:  I am not sure where we lost him.

5          THE INTERPRETER:  You --

6          THE COURT:  Read back the question, please.

7          (Read.)

8           THE INTERPRETER:  That's what I asked.

9    A    Yes, he should have, yes.

10   Q    Did he?

11   A    Okay.  Yes, he did.  He did get paid.

12         MR. GEORGOULIS:  Objection, Judge.

13         We need a side bar.  That's just not what he's

14   saying.  This is a problem.

15         THE COURT:  Repeat the question.

16         MR. GEORGOULIS:  He said yes, he should have.  It is

17   not what she's saying.  I don't want to get upset.  This is

18   important.

19         THE INTERPRETER:  He said yes, he did.

20         MR. GEORGOULIS:  Yes, he should have.  It is

21   different.

22         THE COURT:  Did he receive overtime on this check?

23         THE WITNESS:  He received the 45 hours but not the

24   way that the law says it.

25         THE COURT:  So you admit that in this check he was

1    not paid the proper overtime rate?

2            THE WITNESS:  No.  But many times I gave a check to

3    some of the people that I had high regard for, many of them.

4    But what the judge is saying is correct.  He wasn't paid what

5    he -- what he was supposed to get paid but he got paid for

6    45 hours.

7    Q    That's straight time, correct?

8    A    Exactly.

9    Q    Turn to Exhibit 18, please.  Exhibit 18 --

10   A    What page?

11           THE COURT:  Before you ask that question, I would

12   like to ask a question.

13           Mr. Georgiadis, you said yesterday that your wife

14   was an accountant.  Is that correct?

15           THE WITNESS:  She is not licensed but she have lot

16   of experience.  She work with construction.  She not licensed.

17   I'm sorry.

18           THE COURT:  That's okay.  That was my question.

19           THE WITNESS:  I'm not clear.  I'm very sorry.

20           THE COURT:  That was my question.  The next question

21   is whether she is a certified public accountant.

22           THE WITNESS:  Not certified but she has experience,

23   30 years.  I'm very sorry.

24           THE COURT:  That's okay.

25

1    EXAMINATION CONTINUES

2    BY  MR. BAUMAN:

3    Q    Just following up on the question of overtime, did NJK

4    ever pay time-and-a-half for hours over 40?

5    A    Surely, they did pay but that's something that right now

6    I cannot think of.  Remember -- I cannot remember.  I can't

7    even help myself or anyone.  That's my problem.

8    Q    We will be reviewing a lot of checks, sir.  If you see a

9    check where there is overtime paid, I ask you to point it out

10   to me.

11   A    Well, at other jobs I'm not disagreeing with the attorney

12   at all.  It could be so for other jobs though.  Let's

13   continue.  Let's go.

14   Q    Okay.  Did NJK pay overtime hours for work on Saturdays?

15   Overtime, time-and-a-half for Saturday work?

16   A    I would like to go a little back.  Excuse me first but I

17   would like -- are we going to go to page 19?

18   Q    I'm sorry.  Which exhibit are you in?

19   A    We're on Exhibit 18.  Are we going to turn to a page?

20   Q    I am getting to that, sir.  I will ask the questions.

21        Thank you.

22   A    I'm sorry.

23   Q    That's all right.

24        Did you answer the question about Saturday overtime?

25   A    Well, we didn't work on Saturdays very often because they

GR       OCR       CM       CRR       CSR

Georgiadis - direct - Bauman                524

1    didn't allow us to work on Saturdays, whether it was public or

2    private.  So we don't -- so we won't be wasting the time of

3    the Court and of the respective judge, I will answer directly.

4              It is my previous question, no, he didn't get paid

5    for Saturday.

6              MR. GEORGOULIS:  Overtime.

7    A    Overtime.  But the Saturdays were very few and Sundays

8    were even less.  And if we worked on a Saturday or Sunday, it

9    would be usually because we want to complete the job so we

10   don't get a penalty.

11   Q    Okay.  Return now to Exhibit 18, please.

12             Exhibit 18 is a group of Nelson Melgar's pay stubs?

13   A    Yes.

14   Q    You can review this, if you want.  This is 17 or 18

15   pages.

16             Each of these checks or stubs seems to be a round

17   interim with no deductions.

18             Can you explain that?

19   A    Surely, I'm not able to explain this.  Again I will

20   repeat about the time, I am not able to explain it.  If it's a

21   mistake, it's a mistake.  I'm responsible for the mistake.

22   Q    Will you fix it?

23             THE COURT:  Sustained.

24             I'll fix it, if there was a mistake.

25             MR. GEORGOULIS:  Judge, this is a math problem.  We

1  conceded this.

2  Q    Let me ask you to turn to page 12, sir.

3          Are you there, sir?

4  A    Yes.

5  Q    Would you look at the middle number?

6          Do you see where it says, for the week -- rather,

7  the check dated August 23, 2008, 51.3 hours; do you see that?

8  A    Yes.

9  Q    Would you agree then, even under NJK's accounting of the

10  hours, that Mr. Melgar this particular week worked

11  sufficiently to be paid overtime?

12  A    I will repeat it again.  That he definitely was paid his

13  51 hours but he didn't get paid like the way the attorney is

14  saying.  He didn't get paid straight overtime.  I didn't

15  understand the question.  You didn't understand from me.

16          Just calm down, calm down.

17          MR. GEORGOULIS:  He's talking to the interpreter.

18          THE COURT:  I know.

19  A    The 51 hours were paid.  The terminology that he used

20  about straight overtime, I will say to, I agree with him, he

21  did not get paid for.  I would just like to see though for

22  which job is this check.

23  Q    That would be in your records, would it not?

24  A    I will explain it again so we don't lose time or waste

25  time to the -- for the respective court doesn't lose the time,

Georgiadis - direct - Bauman                526

1   I will explain it again.

2          Generally, what is reflected here on this check,

3   there is no meaning to it but I will just say it.  If it is a

4   private job, they were not paid straight overtime.  But they

5   were definitely paid more than what the rate says.

6   Q    I'm sorry.  Would you repeat that?

7          THE INTERPRETER:  They did not get paid straight

8   overtime but they were paid definitely more than what the rate

9   says.

10  Q    Sir --

11  A    If it's a private job.

12  Q    I don't want to waste your time or my time.  But I can

13  tell you that 51 point --

14  A    I'm sorry.

15  Q    51.3 hours times $25 equals $1282.50.

16         MR. GEORGOULIS:  He's saying that he didn't pay

17  overtime, Judge.  He said that.

18         THE COURT:  Yes, he said that.  He also said he paid

19  more than the regular rate, in essence.

20         Look, checks collection -- if you are going to go

21  through this for each check, you don't need to.

22         MR. BAUMAN:  Right.

23         Your Honor, actually, I have just examples to show

24  the shoddy bookkeeping, the shoddy recordkeeping.

25         THE COURT:  You've already made that point.

Georgiadis - direct - Bauman                    527

1   Q    Sir, isn't it so this was actually the Green Haven job?

2   A    If this is -- if this is the Green Haven job, then it is

3   a mistake.  We don't even need to discuss it.

4   Q    Why don't we need to discuss it?

5        MR. GEORGOULIS:  It's a Greek phrase, Judge.

6   A    Because it's a public job.  It was my mistake.  It was

7   our mistake.

8   Q    Okay.  Very well.

9        Similarly, to what we said before, to save the

10  Court's time, I can take you through the remaining ten pages

11  of this document and show you other checks with no deductions.

12  Will your testimony be the same?

13  A    Again, I don't want to be wasting anybody's time.  Just

14  if the attorney shows me the ten pages that he's saying, I

15  have no problem with accepting, admitting my mistake.  But if

16  it was a private job, then he was definitely getting paid two,

17  three, or four times more than what the rate is on the private

18  one.

19       MR. GEORGOULIS:  He's referring to minimum wage,

20  Judge.

21  Q    Sir, if you turn to page 13?

22       Again, here are three more checks, in round numbers?

23       THE COURT:  Page 13?

24       MR. BAUMAN:  Page 13 of Exhibit 18.

25  A    This copy is clear.  They all are.

Case 1:09-cv-04812-RER   Document 113   Filed 03/24/14   Page 31 of 168 PageID #: 3938

1   Q     Shouldn't there be deductions from these checks?

2           THE COURT:  Sustained.

3           Your point is made.

4           MR. BAUMAN:  But he -- I asked him a moment ago,

5   Your Honor, whether his answer would be the same if I showed

6   him ten more.  He said you have to show them to me.

7           MR. GEORGOULIS:  No, no, he didn't say that.

8           THE COURT:  I understood him to say that his answer

9   would be the same.

10          MR. GEORGOULIS:  Yes.  He did say that.

11          MR. BAUMAN:  I thought he said his answer would be

12  the same if I showed them.

13          MR. GEORGOULIS:  I will stipulate to that for the

14  record.

15  Q     Let's turn to Exhibit 19.

16  A     What page?

17  Q     Give me a moment.

18          I would -- I can do the same thing with you as we

19  did with the previous document, sir.  There is a group of 12

20  pages of checks with no deductions.  Would your answer be the

21  same?

22          MR. GEORGOULIS:  I'd stipulate that they would be

23  the same, Judge.

24          THE COURT:  The same with respect to Exhibit 20?

25          MR. BAUMAN:  19, 19.

1          THE COURT:  No.  19 and 20?

2          MR. GEORGOULIS:  20 and -- yes, 21 too.

3          THE COURT:  21.  All right.

4          MR. GEORGOULIS:  I think that's it?

5          THE COURT:  So stipulated.

6          MR. BAUMAN:  Okay.

7   Q    As to Exhibit 20, sir, these are Gustavo Top's stubs and

8   he testified that he was paid a daily rate.  I believe either

9   you or Mr. Hatzis said he was paid an hourly rate.

10         Can you tell me whether on any of these checks there

11  is a reference to an hourly rate?

12  A    We never paid by the day.  We paid by the hour.

13  Q    Is there any reference on those checks, on Mr. Top's

14  checks, to an hourly rate?

15  A    No, I don't see here it saying that he's paid by the

16  hour.  But I think we are now talking about 2000, the year

17  2000.  I don't remember.

18  Q    These checks, sir, are for 2003, I believe.

19  A    You see what I see here?  Oh, he's --

20         THE INTERPRETER:  He's talking to me but I'm saying

21  he can't just tell me.  He has to tell everybody.

22         Okay.  Thank you.

23  Q    Look at the upper right hand of each check?

24         TH INTERPRETER:  He's looking at the date --

25  Q    Look at the upper right of each check.

Georgiadis - direct - Bauman                    530

1    A    I'm sorry.

2            Yes, you are right.

3    Q    All right.  Let's move on to Exhibit 24.

4            Let me clear out those books and bring you a

5    different book.

6            (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

531

BY MR. BAUMAN:

Q    Sir, are you with me at Exhibit 4?

A    Yes, sir.

Q    If you would turn to page -- start at page 624.  We looked at these before.  Do you recognize that document?

A    Well, no, because it's a long time.  But can I just look through it a little bit?

Q    Just that one page?

        (Pause.)

A    I was trying to see which job it is and which year.

Q    It says --

A    The numbers are not clearly shown, but now, I can see which job it is.

Q    Do you see where it says Edgar Hernandez worked thirty-two hours for the week ending June 13, 2004.

        THE INTERPRETER:  He's asking me to see if I can find that date that you just said.  Is that okay.

A    Because I cannot see.  I cannot see.  It is not clear.

        THE INTERPRETER:  I can't see it, either.

Q    June 13, 2004.

        Sir, do you see Edgar Hernandez's line.

A    Yes.

Q    Do you see there are four entries for him of eight hours apiece?

532

A     Yes.

Q     Do you see in fact one of those days was a Saturday?

A     Yes.

Q     Now, if you go to the next page, page 7, can you tell me what this document is?

A     This document is the daily filling in that my partner writes in the hours that they have worked.

Q     So, on this document, does it reflect that Hernandez worked twenty-four hours in that week?

A     Yes.

Q     So, shouldn't the hours on the internal sheet be the same as the hours on the certified?

A     I would like to say something on this.

Q     Okay.

A     It's many years, but I know what happened, which happened oftentimes.  First of all, this handwriting is my handwriting, and the reason for this is the following:  It's very simple. I'll be brief.  My partner lives very close to Freehold, maybe a fifteen- to twenty-minute distance, and in order not to come to Brooklyn, he would oftentimes call me and just say to me -- tell me.  And I could tell, because this is my handwriting. This is not his handwriting, this is mine.

       I just want to add, a lot of times when it was for a Saturday, we would put it over to the next week.  But then again, if it was a mistake, I'll accept my mistake also very

1   easily.

2   Q    Would the employee be paid based on that internal

3   document?

4   A    Yes.

5   Q    So, again, the internal document results in the employee

6   being paid less that than the certified payroll would have

7   been?

8           MR. GEORGOULIS:  Objection.  The testimony is, hours

9   are submitted on Fridays.  He's talking about Saturday.  He

10  said it goes to the next week.

11          THE COURT:  Overruled.

12          You created a record of numerous inconsistencies

13  between the certified payrolls, the internal hours of

14  counting, and the checks.

15          At this point, isn't it -- and the defendants don't

16  really dispute these inconsistencies, and said that there are

17  mistakes.  Isn't it at this point a calculation, a math

18  exercise?

19          MR. BAUMAN:  If everyone stipulates to that, that's

20  fine.  Until this week, this is the first we ever heard of

21  that.  As you heard in counsel's opening, we had no case.  We

22  were going to move for sanctions.  Suddenly, they are

23  admitting all kinds of mistakes.  That's a slightly different

24  posture.  That's why we're prepared to go through this

25  exercise.

534

1        If everyone would stipulate the recordkeeping is

2   shoddy and there are all kind of inconsistencies, of course, I

3   agree.

4        In addition, your Honor, to be clear here, as we've

5   discussed previously, you know, Judge Ross granted the

6   plaintiffs a burden shift in this case.  We're at a point now

7   where we have to show you the basis for our reasonable

8   estimate, and it's on the defendant to rebut that.  So, if

9   it's accepted at this point that we have done that, we'll

10  proceed.

11        MR. GEORGOULIS:  May I respond, your Honor?

12        THE COURT:  Yes.

13        MR. GEORGOULIS:  As to my opening, consistent with

14  my opening, I said there were errors and stuff and

15  inconsistencies.  In referencing to what I was talking about

16  with the sanctions, and we've seen it on record, when somebody

17  says he worked there from 2003 to 2008 on all those

18  documentations, declarations and answers to interrogatories,

19  and at least three witnesses on the stand changed that to a

20  much shorter time, that's what I was referencing.  In fact,

21  when we were giving examples, if you find 20,000 versus

22  30,000, and going back and forth, that's what I was

23  referencing.  In fact, that's proven to be true with regard to

24  the testimony that's in the record.

25        I agree with the Court.  It's now really a math

535

1   problem.  We all have to go back and figure out.  We have

2   evidence, we have documents, we have testimony, and it's going

3   to be a math problem, plain and simple.  It's going to be a

4   calculation as to what each person did, because, as the Court

5   knows, you should get paid for every hour you worked.

6           I don't think anybody, this Court or anybody else,

7   would suggest that somebody should get paid for a period of

8   time when they didn't work, and that's what our argument has

9   been from day one.  And we have produced those bank statements

10   which resulted in the change of testimony and the change of

11   calculation from one number to a much lower number, because of

12   those bank statements.

13           MS. LUSHER:  Should I respond?

14           THE COURT:  It's your case.

15           MS. LUSHER:  As I said before, we gave them credit

16   for the checks that were produced after discovery, because we

17   acknowledged that there were payments made, and any time they

18   can show there are payments made, we are ready to give that

19   credit.  The calculations were done that way.

20           As far as the differences between the

21   interrogatories and what they testified to, we actually

22   submitted affidavits in support of the motion for summary

23   judgment, where they had to change the time period worked,

24   because this has been a long time ago, and they are trying to

25   do the best they can.

536

1        It's actually funny that counsel wants to argue

2   sanctions, because each plaintiff has reduced the amount of

3   time they worked from the beginning of interrogatories, so the

4   calculation has gone down as far as the time period that they

5   have worked.  I think it shows that they are being honest and

6   they are doing the best they can with their memories.

7        As discovery has come in and we've seen more

8   paperwork, including these checks, sometimes it jogs their

9   memory it was 2004, it was not 2005.  That's how the change in

10  the calculations with the dates have come.

11       And Ms. Gardoka is here, we can address with her the

12  Rule 26 to the pretrial calculations.  I'm happy to speak on

13  that, too, as to the difference in those.

14       THE COURT:  Mr. Bauman, with counsel's concession

15  that this is at this point a math problem, can you truncate

16  your questioning?

17       MR. BAUMAN:  Absolutely, your Honor.  What I would

18  like to do vis-à-vis Exhibit 24, you may notice we prepared a

19  chart which details the various discrepancies contained in

20  Exhibit 24.  With the Court's consent, I would move that that

21  be admitted as a summary.

22       MR. GEORGOULIS:  I object to the chart, your Honor.

23  I don't have any objection as to the balance of the exhibit.

24  The chart was prepared for litigation purposes.  It serves no

25  other purpose.

537

1          THE COURT:  I'll receive Exhibit 24 in evidence,

2   including the chart, and I'll do my due diligence and look and

3   make sure the chart is accurate.  It's merely a summary of the

4   differences in the documents.  It's a summary.  If it contains

5   incorrect information, I may not give it any weight and

6   actually look at the documents myself and make my own chart.

7          MR. GEORGOULIS:  We'll comment on that in post

8   findings of fact.

9          (So marked.)

10          THE INTERPRETER:  The witness understood everything

11   that was said, and he said yes.

12          MR. BAUMAN:  Your Honor, I have nothing further.

13          THE COURT:  Do you want to take a break?

14          MR. GEORGOULIS:  I have no questions, your Honor,

15   but I want a break.

16          THE COURT:  You have no questions?

17          MR. GEORGOULIS:  No questions.

18          THE COURT:  All right.

19          Take a break.

20          MR. BAUMAN:  Before the break, are Mr. Enamorado and

21   Agolli, are they here now?  We had assumed they were going to

22   go after --

23          MR. GEORGOULIS:  We discussed it afterwards.  I

24   ordered the Spanish interpreter right after lunch.

25          MR. BAUMAN:  We had assumed they were going next.

538

1   How long of a break are we taking, until the afternoon?  We

2   had thought she was going at the end of the case.

3            MR. GEORGOULIS:  Ms. Gardoka is his case.

4            THE COURT:  We'll take a break and hear from

5   Ms. Gardoka.

6            MS. LUSHER:  How long of a break, your Honor?

7            THE COURT:  Fifteen minutes.

8            (Recess.)

9            (In open court.)

10           THE COURT:  Please be seated.

11           MS. LUSHER:  We were going to call Ms. Gardoka.

12           Before we do, I wanted to explain that the

13  prevailing wage schedules we submitted were the New York City

14  controller prevailing wage schedules.

15           Part of the reason of that was that it's the same

16  jurisdiction as a lot of several other counties where these

17  jobs were performed.  When you go through the rate that is in

18  the New York City wage schedule, it actually ends up being

19  ten, twenty cents lower than if you pulled the prevailing wage

20  schedule for Dutchess County, for example.

21           It ends up being that when the calculations were

22  done, they amount to a little bit less.  There's only one

23  period -- that was in 2008 to 2009 -- where Nassau County and

24  Suffolk County, for about a couple of months, were bumped up a

25  little bit higher, the New York City rate was bumped up a

539

1    little bit higher, and an addendum came out in October and

2    that was fixed.  By far, the New York City rates always amount

3    to less than what it would be if we had used the New York

4    Department of Labor rates for whatever county it was in.

5            Does that make sense?

6            THE COURT:  I heard what you said.

7            MS. LUSHER:  Okay.

8            MR. GEORGOULIS:  Your Honor, the whole point of the

9    1006, Federal Rule 1006, it's to facilitate, help the Court to

10   a writing.  It has to reflect there is some writing and some

11   summary of a writing.

12           Here, we're getting counsel to tell us, Well, it's a

13   little different here, and this year might be a little

14   different.  So, what's the purpose of having this computation

15   sheet, which, of course, when I get a chance to cross, we'll

16   see a lot more of those inconsistencies and things, that it

17   doesn't serve it's intended purpose under 1006.  Just what

18   counsel said, I think that is sufficient to reject the

19   exhibit.

20           MS. LUSHER:  Again, it's so minimal.  It's like ten

21   cents, the difference.  We would absolutely amend it with the

22   actual rate from that county, if your Honor would insist, and

23   it would be a government record that, we would submit, should

24   be brought into evidence, if that's what your Honor were to

25   decide.

540

1          THE COURT:  Let's bring up Ms. Gardoka and hear what

2     she has to say.

3          MR. BAUMAN:  The plaintiffs call Isabel Gardoka.

4     I S A B E L    G A R D O K A,

5               having been duly sworn, was examined and

6                    testified as follows:

7          THE COURT:  Please be seated.

8     DIRECT EXAMINATION

9     BY MR. BAUMAN:

10    Q    Good morning, Ms. Gardoka.

11    A    Good morning.

12    Q    Are you currently employed?

13    A    Yes, I am.

14    Q    By whom are you employed?

15    A    By a law office of Virginia & Ambinder.

16    Q    How long have you been employed there?

17    A    Two and a half years.

18    Q    What's your educational background?

19    A    I'm currently a student at Borough of Manhattan Community

20    College.

21    Q    What are you majoring in?

22    A    Accounting.

23    Q    What do you do for Virginia & Ambinder?

24    A    I am a paralegal.  Most of the time, I'm doing spread

25    sheets.

541

1  Q    When you say you are doing spread sheets, can you explain

2  to the Court what that means?

3  A    Yes.  I have to do damage calculations for unpaid

4  overtime, unpaid minimum wages, unpaid prevailing wage rates.

5  Q    Before we get into the specifics in this case, generally

6  speaking, what sorts of documents do you review in preparing

7  those spread sheets?

8  A    Very often, I have to review checks, time sheets,

9  certified payrolls, sign-in logs, affidavits and intakes.

10 Q    Can you explain what an intake is?

11 A    Yes.  This is a sheet with all questions about what kind

12 of work a plaintiff performs and how much he was paid, how

13 long he worked there and how much he was paid.

14 Q    So, this is a document that a potential plaintiff fills

15 out?

16 A    Yes.

17 Q    How many of these spread sheets have you prepared in your

18 time at Virginia & Ambinder?

19 A    It's hard to say, but it's over 150 spread sheets.  I

20 think it's around 200.

21 Q    Between 150 and 200?

22 A    Yes.

23 Q    As far as you know, have any of your spread sheets been

24 used at trials?

25          MR. GEORGOULIS:  Objection.

542

```
1              THE COURT:  Overruled.

2    A    Yes.

3    Q    And how many times has that happened?

4    A    Once.

5    Q    And generally speaking, you look at the documents, what

6    are you looking for?

7    A    Depends what attorney says to me what I should look for,

8    but most of the time, I have to check how many hours the

9    plaintiff worked and how much he was paid, and how long he

10   worked at this company.

11   Q    Of the 150 to 200 times you've done spread sheets, how

12   many of those involved prevailing wages, approximately?

13   A    I would say over sixty to seventy percent.

14   Q    Once you collate or collect the information that you are

15   looking for, what do you do with it?

16   A    First, I have to copy all information from all documents,

17   the chart that they have to prepare, by myself.  And then I

18   talk to attorneys, and they are giving me instructions what

19   kind of damage calculations they want me to prepare.

20              And sometimes I have to just apply the minimum wage

21   rates, and calculate the hours that they worked, and sometimes

22   they have to apply the prevailing wage rates.  Basically, I

23   have to calculate how much the plaintiff earned during a week,

24   and I use checks to give them a credit if we do have checks or

25   certified payrolls, and I have to calculate the amount owed
```

543

1    for every week that he worked there.

2    Q    And as a general rule, do you always give credits back to

3    the employer for any evidence of payments being made?

4    A    Yes.

5    Q    Now, in this case, what sorts of documents did you

6    review?

7    A    In this case, I reviewed my own logs, international

8    payrolls, certified payrolls, calendars, pay stubs and checks.

9    Q    Were those documents received from both the defendants

10   and plaintiffs?

11   A    Yes.

12   Q    Did any of those documents give you a day-by-day

13   description of what was going on with NJK?

14   A    Most of them, yes.

15           THE COURT:  The calendar that you referred to, is

16   that what we have been calling the Hernandez calendar?

17           THE WITNESS:  Yes.

18   Q    Now, there's been testimony at the trial regarding

19   affidavits and interrogatories.  Did you review the

20   interrogatories in this case?

21   A    No, I didn't.

22   Q    Did you review any of the affidavits in this case?

23   A    Yes, I did.

24   Q    Do you know which ones you reviewed?

25   A    I'm not sure from which date it was, but it was like the

544

1    most updated affidavits, I believe from the summer.

2    Q    This past summer?

3    A    Yes.

4    Q    Was that after all of the bank records had been received

5    from the defendant?

6    A    I believe so.

7    Q    Now, we'll get into the chart in a moment, but generally

8    speaking, did you-- generally speaking, if there were no

9    documents for a particular time, if there were no bank

10   documents or internal payrolls, was there anything else that

11   you can use?

12   A    Yes.  I used calendars, calendars to calculate how many

13   hours a plaintiff worked.  And also if we didn't have a

14   separate payroll or internal payroll and we didn't have the

15   gross pay for this week, I calculated the credit for the

16   defendant.  I was told to assume that a plaintiff was paid for

17   this week.

18   Q    You're saying if there were no documents -- let me make

19   sure I'm clear.  If there were no documents, you assume the

20   plaintiff was paid for the week?

21   A    I didn't assume that.  I was told to do -- calculate the

22   amount paid that he probably was paid, but we don't have any

23   records for it.

24   Q    So, the approach you took here is that if there were no

25   records, you put the plaintiff down as having been paid for a

545

1    given week; correct?

2    A    Yes.

3    Q    And you base that on the -- did you base that on the rate

4    that the plaintiff said he was paid?

5    A    Yes, the rate that he said, or sometimes taken from the

6    document that we had, because some of the checks showed the

7    rate, so I used these rates.

8    Q    So, you were using rates often that were provided by the

9    defendant?

10   A    Yes.

11   Q    Now, did you include travel time or any other additional

12   time beyond time that was actually spent at the job site?

13   A    Yes.  I was told to include two additional hours for

14   every day that they worked for NJK.

15   Q    Did you deduct time for anything, either for lunch or

16   coffee breaks or anything like that?

17   A    No.  I was told to assume that these hours that were on

18   that document are the hours that they actually worked.

19   Q    So, just for an example, if someone showed up as being

20   paid for eight hours in a day, you would --

21   A    Use eight hours.

22   Q    But then plus the two hours?

23   A    Yes.

24   Q    Why don't we take a look at what's been marked as Exhibit

25   3.  That's right in front of you?

Georgiadis - voir dire - Georgoulis            546

1           Before we get into the meat of the document, can you

2      tell the Court what the coversheet is.

3      A     This is the summary of the damage calculations that I

4      prepared.

5      Q     Now, each number in the white area, would that match up

6      with the number in one of the backup sheets?

7      A     Yes.

8      Q     So, why don't we flip over to page two.

9                 MR. GEORGOULIS:  I object to any questions from the

10     document.  May I take this witness on voir dire?

11                THE COURT:  Sure.

12     VOIR DIRE EXAMINATION

13     BY MR. GEORGOULIS:

14     Q     Good morning, Ms. Gardoka.

15     A     Good morning.

16     Q     Were you ever given a one-page summary sheet outlining

17     the damages for each plaintiff?

18                MR. BAUMAN:  Can we get a time frame, your Honor?

19                MR. GEORGOULIS:  The disclosure, the Rule 26

20     disclosure.

21                MR. BAUMAN:  Your Honor, this seems to be for

22     cross-examination, not for voir dire.

23                THE COURT:  I'm permitting him to voir dire.

24                Prior to her preparation of --

25                MR. GEORGOULIS:  Yes.

Georgiadis - voir dire - Georgoulis                547

1         THE COURT:  Prior to your preparation of

2   Exhibit 23 --

3         MR. GEORGOULIS:  Can I just give her a hard copy?

4         THE COURT:  Yes.

5         MR. GEORGOULIS:  There you go.

6         THE COURT:  -- were you provided with that document?

7         THE WITNESS:  Yes.

8         THE COURT:  Yes, she was.

9         MR. GEORGOULIS:  Okay.

10  BY MR. GEORGOULIS:

11  Q    Isn't it a fact, Ms. Gardoka, in the spreadsheet that you

12  have before you, the one that you prepared, the damage

13  calculations is far in excess of the amount on the one-page

14  summary; isn't that correct?

15  A    This is not the same.  I mean, this summary doesn't

16  present the same amount as this chart that I prepared last

17  time.

18  Q    So, isn't it true, then, if you looked at this one-page

19  summary, that spreadsheet is not a backup for the $554,000

20  damage calculation on the one-page summary; isn't that

21  correct?

22        MR. BAUMAN:  Objection, your Honor.  I don't

23  understand the question.

24        THE COURT:  Do you understand the question?

25        THE WITNESS:  I understand it.  I can explain that.

Georgiadis - voir dire - Georgoulis          548

1  A    These calculations were prepared, I believe, in August

2  2013.

3  Q    When you say "these," what are you referring to?

4        THE COURT:  The one page.

5  A    The one page, yes.

6        And I was told when I was doing these damage

7  calculations to apply twenty-five percent for liquidated

8  damages, and you don't have an interest here, also.

9        THE COURT:  So, the one-page summary that you are

10  looking at, you prepared this?

11        THE WITNESS:  Yes.

12        THE COURT:  Okay.

13  Q    Ms. Gardoka, isn't it a fact that you made certain

14  assumptions in preparing your spreadsheet?

15  A    I didn't do -- I didn't make any assumptions.  All

16  assumptions were prepared by attorneys.

17  Q    I'll rephrase my question.  In preparing your

18  spreadsheet, you didn't solely look at a document and post

19  some information on your spreadsheet; you were given certain

20  information to assume; isn't that correct?

21  A    I mean, yes, I took information from documents and I used

22  it, but in some cases, like liquidated damages, you don't have

23  any information on documents how much it is.  So, attorneys

24  told me, yes.

25  Q    Isn't it a fact that for many weeks, you assumed a

Georgiadis - voir dire - Georgoulis                549

1    number, you gave a credit for employees when you didn't see a

2    bank statement or something?  You just assumed that because

3    that person worked or you assumed that he worked, you assumed

4    that he also got paid; correct?

5    A    Yes.

6    Q    So then, you didn't have any underlying information, like

7    a payroll report, a certified payroll, internal payroll or a

8    pay stub for many of the entries, you just assumed that --

9    because you were told -- that, yes, they worked these weeks,

10   so they must have gotten paid; correct?

11   A    Yes.

12   Q    You could have also made that other assumption that

13   because they didn't -- they were not on the internal payroll

14   and they were not on a certified and there was no check for

15   them, that maybe they didn't work; you could have made that

16   assumption, as well, but you weren't told to do that?

17   A    I think you should ask about that attorneys, not me,

18   because I am not --

19   Q    Just try to answer the question, if you can.  If you

20   don't know, say, I don't know.

21   A    My job is not to making any assumption.  My job is just

22   to make damage calculations.

23   Q    Okay.  But you didn't make, though, damage calculations

24   from a set of documents, you used external information from

25   attorneys; isn't that correct?

Georgiadis - voir dire - Georgoulis        550

1  A    That's correct.

2  Q    And one of the other things you said that you looked at

3  -- typically, you look at intakes.  Did you look at intakes

4  here?

5  A    I believe so, yes.

6  Q    Do you have them with you?

7  A    No.

8         MR. GEORGOULIS:  Your Honor, I would imagine I'd be

9  entitled to see those intakes, especially if the plaintiffs

10  want that spreadsheet in evidence.

11  A    But I'm to do this damage calculation --

12  Q    There's no question, Ms. Gardoka, before you right now.

13         THE COURT:  Yes.

14  Q    Now, do you actually speak to the employees?

15  A    Before I have done these damage calculations?

16  Q    Yes.

17  A    The last ones?

18  Q    This one with the spreadsheet that you prepared, did you

19  speak to any of the eight employees listed?

20         THE COURT:  The large spreadsheet.

21  Q    The spreadsheet is the same names.  Did you speak to any

22  of the people listed on your spread sheet?

23         THE COURT:  The large one.

24  A    I was not attending the meeting with these clients.  But

25  I didn't speak to them.

ANTHONY M. MANCUSO,  CSR  OFFICIAL COURT REPORTER

1   Q     How many meetings did you attend?

2   A     At least two.

3   Q     You attended two meetings, and then you looked at

4   affidavits?

5   A     Yes.

6   Q     And you looked at, I think you said, the latest

7   affidavits, which I believe would have been 2012; is that

8   correct?

9   A     I think 2013.

10  Q     2013.  Okay.  Like what period of time in 2013, if you

11  know?

12  A     I think I looked at them during August 2013, but I have

13  no idea when they were prepared.

14  Q     Now, if we looked at your big spreadsheet -- let's kind

15  of go over this a little bit?

16          On page six of -- there's a Bates stamp on the

17  document.  Do you see that?

18  A     Yes.

19  Q     Page six.  Do you see the information identified as pay

20  stub information, and then which has about five or six or

21  seven columns, and then there are about four or five columns

22  to the right of it that says "Information from checks produced

23  by defendants"; do you see that?

24  A     Yes.

25  Q     Correct me if I'm wrong:  You looked at what the

Georgiadis - voir dire - Georgoulis          552

1  defendants provided in terms of pay stubs; correct, and

2  checks, and then you also then had access to the bank

3  statements of the defendants; correct?

4  A    Actually, that's information from checks produced by

5  defendants.

6  Q    Right.

7  A    This is the statements that I think defendants produced.

8  Q    Right.  That's what I am saying.  So, that's it.  If you

9  didn't have the information from the defendants, you

10  supplemented it with the information from the bank statements,

11  and then you were able to show which weeks they actually got

12  paid; correct?

13  A    Yes.  But on checks --

14  Q    That's your answer.

15          THE COURT:  No.  Let her explain.

16  A    Checks, very often they don't have dates.  We were not

17  sure for which week ending this was.

18  Q    Can we go to Mr. Cetino's sheet on page 0015, the seventh

19  column.  Do you see that, Mrs. Gardoka?

20  A    Yes.

21  Q    Again, you took the same process as you did with

22  Mr. Hernandez; correct?

23  A    Yes.

24  Q    If you go down to the bottom of the page, you have

25  Mr. Cetino's last check on September 16, 2005; correct?

Georgiadis - voir dire - Georgoulis          553

1    A    Yes.

2    Q    Okay.  Anything after that period of time is based on

3    assumption; isn't that correct?  You had no check information,

4    no payroll information and no pay stub information; isn't that

5    correct?

6    A    I just wanted to make sure.  That's not correct.

7    Q    Okay.  Tell me why it's not correct.

8    A    If you go to page 17, you have the data for Francisco

9    Cetino.

10   Q    When you give him credit on page 17, credit --

11   A    I'm sorry.  I was wrong.  I'm sorry.

12   Q    Okay.  Was I accurate in my description, in my question,

13   that the last question was on or about 9-16-2005?

14   A    Yes.  It looks like that's the last check.

15              (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

1  Q    So, when you gave somebody credit, you were assuming they

2  worked, correct?  Or you were told that assume that this

3  gentleman worked for a period of time, correct?

4  A    Depends.  Because sometimes we had loss and-- I'm sorry,

5  internal payrolls and we didn't have a check.  So, we don't

6  know how much he was paid for this week.  So, I also got

7  credit for this week.  Even though we didn't have any check.

8  Q    But, so you just used a number, you used a number-- you

9  didn't know for sure that he worked and in fact-- let me

10 finish my question.

11        If you looked at those affidavits, let's say for a

12 Mr. Alfaro, where he says, he worked in the affidavit from a

13 certain date to a beginning date, to an end date.  You used

14 that information to do your calculations, is that right?

15 A    I'm saying that if we had--

16 Q    Can you answer my question please.

17        MR. BAUMAN:  Objection, Your Honor.

18        THE COURT:  Overruled.  Sustained.  You can answer

19 the question.

20 A    Can you repeat your question.

21 Q    Sure.

22        You used the affidavit of the employees, according

23 to your testimony, in your preparation of the spreadsheet.

24 So, if an employee in the affidavit said he worked from 2003

25 to 2007, you would assume that that was accurate information,

Gardoka - Voir Dire - Georgoulis                      555

1    correct?

2    A    Yes.  I don't remember if they have changed their-- if

3    they were changing their --

4    Q    Their story?

5              MR. BAUMAN:  Objection.

6              THE COURT:  Sustained.

7    A    No, I know that this clients were-- had problems with

8    remember which period of time they worked.  But I was trying

9    to use affidavits to cover time that they were saying that

10   they worked there, so to do the damage calculation.

11   Q    When did you first prepare this document?

12   A    First damages calculations in this case, I prepared in

13   2012, I believe.

14   Q    2012.

15             Do you know that this spreadsheet was produced on

16   the eve of trial?

17   A    This spreadsheet?

18             MR. BAUMAN:  Objection.  Can we clarify which

19   document we are talking about.

20   A    Yes.

21   Q    I'm sorry.

22             The spreadsheet is the one with the multiple pages

23   and the summary sheet is the single page, I'm sorry.

24             So when I talk about the spreadsheet --

25             THE COURT:  When did you prepare this spreadsheet?

1           THE WITNESS:  February 2014.

2           THE COURT:  When did you prepare the summary sheet?

3           THE WITNESS:  August of 2013.

4           THE COURT:  Did you prepare other damage calculations?

5           THE WITNESS:  For settlement proposal only, yes, in

6    2012, I believe.

7    BY MR. GEORGOULIS:

8    Q    So then at the time you prepared this spreadsheet, you

9    knew about the changes in the testimony from the-- not the

10   testimony, the position of the employees relative to the time

11   periods they worked?

12   A    I know that they changed their-- that they changed the

13   time period that they worked.  I remember that we had-- that

14   some of the clients, I don't remember which one, said that,

15   yes, first of all, first he said that he worked a little bit

16   longer, but then he tried to remember, his best.  And he said

17   that he actually worked a little bit shorter.

18   Q    So, the differences, those changes are not incorporated

19   for several employees, in this spreadsheet, isn't that

20   correct?  I take you to Mr. Santino, if you want or look at

21   Mr. Alfaro?

22   A    I don't understand your question.

23   Q    Well, if they went-- if-- if an employee, let's take, I

24   think it was Mr. Alfaro, at some point and don't-- I won't

25   swear to the dates off the top of my head, Judge, I believe he

1  had said, he had worked from '03 to '07.

2          And, at some point he then said, here in court, that

3  he only worked through '05.  Was that information known to you?

4  A    No.

5  Q    Prior to today?

6  A    No.

7  Q    So that's never been told to you?

8  A    No.

9  Q    And?

10 A    I mean I did this calculations in February-- in February

11 like two, three weeks ago, so if he changed his mind

12 yesterday, I didn't have a chance to know about it.

13 Q    As far as you know, as far as you know, as of February,

14 whatever day in February you prepared it, as far as you know,

15 as of that date, you didn't know of any of the changes made in

16 the statements of the dates of employees of the plaintiff-- on

17 of some of them.

18          Withdrawn.  It is so awkward I will say it.

19          When you prepared this, you assumed the information

20 that was already in the affidavits was still accurate, correct?

21 A    Yes.

22 Q    And, how far back did you have access to the bank

23 statements and checks of the defendants NJK?

24 A    I mean I don't know for how long back, but I did the

25 calculations since November 2003.  So if we had --

1          THE COURT:  I think the question is different.

2          MR. GEORGOULIS:  Yes.

3          THE COURT:  Ask it again.

4    Q    Sorry if it was unclear.

5          You looked at certain bank statements and checks

6    from NJK.  When did you first have them in your possession to

7    review?

8    A    Bank statements, I believe during the summer, 2013.

9    Q    Ms. Gardoka, can you just take the first page of the

10   summary sheet and the first page of the spreadsheet and put

11   them side by side so I can ask you a couple of questions.

12         I would imagine the only thing that you did not

13   know, correct me if I am wrong, that you didn't know, in

14   preparing these sheets, at any given time was the exact amount

15   of interest, because interest accrues on a daily basis or a

16   monthly basis, or whatever, correct?

17   A    No -- yes.

18   Q    So --

19         MR. BAUMAN:  Excuse me.  Before we proceed with the

20   summary, can I ask it be put up on the screen.  We don't have

21   sufficient copies.  Thank you.

22         It was on the screen a moment ago.

23         MR. GEORGOULIS:  I forgot the question, can it be

24   read back?

25         THE COURT:  Yes.

Gardoka - Direct - Bauman                    559

1           (Appropriate testimony read back by Reporter.)

2    Q    Did you understand the question?

3    A    Yes.

4    Q    So, what is the answer to the question, yes or no?

5    A    Actually, in this damage calculations, they showed to-- I

6    change also the liquidated damages.  Before I was told to

7    apply 25 percent and then for a trial, I was told to change it

8    for 25 percent for that first three years of the time that

9    they worked there, and 100 percent for the last three years

10   that they worked there.

11   Q    So you made some substantive changes in February of this

12   year, with regard to the calculation of these damages, isn't

13   that correct?

14   A    It is only about the liquidated damages, yes.

15           MR. GEORGOULIS:  Your Honor, based on her testimony,

16   I would renew my objection to the introduction of this exhibit

17   under Rule 1006, as it certainly shows that it doesn't-- it

18   doesn't comply with the rule in terms of giving this Court--

19           THE COURT:  I hear you.

20           MR. GEORGOULIS:  You know I --

21           THE COURT:  Do you want to continue Mr. Bauman.

22           MR. BAUMAN:  Yes, Your Honor.

23   DIRECT EXAMINATION BY MR. BAUMAN:

24   Q    Just following up on a couple of things that counsel

25   asked you a moment ago, Ms. Gardoka.

1          When you went from the summary sheet we were looking

2     at to finalizing the larger document, that we are looking at

3     now at trial, didn't you also find that there previously had

4     been checks inputted twice?

5     A    Yes, that's correct.

6     Q    So was that corrected from this document to the new

7     document?

8     A    No.  The newest spreadsheet is more accurate because I

9     found that some of the checks were entered twice to the

10    spreadsheet.

11         Also, before, I used a New York City Comptroller

12    rates to the damage calculations.  In this damage calculation,

13    I used New Jersey rates for the projects that they worked in

14    New Jersey.

15    Q    And weren't also some manual logs that were not included

16    in the previous estimate?

17    A    Yes. Before I did this final damage calculation, I

18    reviewed every single document and I made sure that everything

19    is in this spreadsheet and I have found some manual logs that

20    hadn't been entered to the spreadsheet so I did this.

21    Q    And those changes, I just mentioned those would all be

22    changes that went to the benefit of the defendant; is that

23    correct?

24         MR. GEORGOULIS:  I object to the leading nature of

25    all the questions.  Every one is a leading question.

Gardoka - Direct - Bauman                    561

1          THE COURT:  Overruled.

2  A     Yes.

3          THE COURT:  Can I ask you a question?

4          THE WITNESS:  Yes.

5          THE COURT:  On the big spreadsheet, I will call it

6  that.  Column R, FLSA liquidated damages at 100 percent.

7          THE WITNESS:  Yes.

8          THE COURT:  That was an instruction you received

9  from the attorneys?

10          THE WITNESS:  Yes.

11          THE COURT:  In this-- we have heard some testimony

12  in the trial that Jose Agustin was known in the company as

13  Jose Agustin Castaneda, and we have seen some checks written

14  to Jose Castaneda.

15          Did you use those as a credit when compiling the

16  numbers for Mr. Agustin in row eight?

17          THE WITNESS:  Unfortunately I didn't know these

18  checks are for him.  But it is very simple to apply this

19  checks to-- to insert these checks to this damages

20  calculations and I will be more than happy to do it.

21          THE COURT:  Okay.

22          On columns D, as in David, and M as in Mary.

23          THE WITNESS:  Yes.

24          THE COURT:  They are both amounts earned for unpaid

25  hours.

Gardoka - Direct - Bauman                    562

1        THE WITNESS:  Yes.

2        THE COURT:  Are those amounts earned for unpaid

3   hours for both the prevailing wage and the private projects?

4        THE WITNESS:  No, these columns represent numbers

5   for unpaid two additional hours for every day that they worked.

6        THE COURT:  So it in fact it would be-- for example

7   Mr. Hernandez, he worked sometime on prevailing wage projects,

8   we see in column B.

9        THE WITNESS: Yes.

10       THE COURT:  And sometimes on private project in

11  column C.

12       THE WITNESS:  Yes.

13       THE COURT:  Now, column D is the additional two

14  hours he worked each day regardless of whether it was a

15  prevailing wage or a private project, correct?

16       THE WITNESS:  Yes.  And we used rates from the

17  checks to calculate how much he should be paid for these

18  hours.  So if he was paid regularly for private project $28

19  per hours, I used $28 per hour to calculate the amount owed

20  for this unpaid 2 hours.

21       THE COURT:  If he was paid for argument's sake $32

22  per hour, on a prevailing wage project, you would add $64 to

23  that column?

24       THE WITNESS:  No.

25       THE COURT:  For each day?

1              THE WITNESS:  No.

2              For additional hours -- when they worked on the shop

3    or travel time, LaDonna told me to use the lower rate to

4    calculate the amount.  Because they actually didn't work on

5    the prevailing wage project during these two hours, they

6    worked on the shop.

7              Do you understand?

8              THE COURT:  I understand what you are saying.  I got

9    it.

10             Now, if you look at the row for Nelson Melgar.

11             THE WITNESS:  Yes.

12             THE COURT:  I have to refer to my notes on this.

13   Actually, I have to refer to the backup and I have to find the

14   page.

15             MR. GEORGOULIS:  It was yesterday, Your Honor.

16             MR. BAUMAN:  It begins at 33.

17             THE COURT:  If you look at pages 33, 34, and 35 and

18   36, it appears that the period of time that Mr. Melgar worked,

19   the earliest I see on those individual pages, is July of 2006.

20             THE WITNESS:  That's wrong, Your Honor, I'm sorry.

21   But the easiest way to look at this spreadsheet is to see side

22   by side, page 33 and 34.

23             THE COURT:  Yes.

24             THE WITNESS:  And, as you can see they are all row 6.

25             THE COURT:  Row 6.

Gardoka - Direct - Bauman                    564

1              THE WITNESS:  For Nelson Melgar.

2              THE COURT:  Yes.

3              THE WITNESS:  On page 33.  And on page 34, this is

4       the continuation of this page.

5              THE COURT:  I see.

6              THE WITNESS:  So, he actually had checks for this

7       week, but we didn't have any internal payrolls and --

8              THE COURT:  But, so if you look at this chart, tell

9       me when the first period of time-- the oldest period of time

10      if you will, that he is getting credit for working.

11             THE WITNESS:  We are sure, 100 percent, that he

12      worked since October 19th--

13             MR. GEORGOULIS:  Objection, move to strike.

14             THE COURT:  Overruled.

15             THE WITNESS:  2006.  Because we have checks for him.

16             THE COURT:  He testified that he first started

17      working for NJK in 2006.  2006 would be-- if there is

18      willfulness, within the FLSA period.

19             THE WITNESS:  Yes, but we split it for two periods.

20      So, the FLSA was calculated from August 2007.

21             I want to make it clear.

22             THE COURT:  What I am getting at is, on the first

23      page.

24             THE WITNESS:  Yes.

25             THE COURT:  I'm trying to figure out the methodology

RB        OCR

1    here.

2              THE WITNESS:  Yes.

3              THE COURT:  The first page, routine, you have damage

4    calculations for the New York State period for Mr. Melgar and

5    the earned wages for prevailing wage products, 83,000.

6              THE WITNESS:  Sorry, on which page are you on?

7              THE COURT:  The first page.  The summary page.

8              THE WITNESS:  Yes.

9              THE COURT:  So, column B, $83,826.11 for prevailing

10   wage projects during the New York State period.

11             THE WITNESS:  Yes.

12             THE COURT:  Would that be the New York State period

13   exclusive of the FLSA period or the New York State period that

14   is part of the FLSA period because we know FLSA goes back two

15   years, maybe three, but that is also part of the New York

16   State period.

17             THE WITNESS:  That is exclusive.  Separated.

18             THE COURT:  If he didn't work prior to 2006, which

19   is assume that is part of the FLSA period, how does he have

20   $83,000 in damages?

21             MS. LUSHER:  Well, he opted in, in August something

22   2010.  So I think that is what she is talking about the

23   calculation.

24             THE COURT:  You are missing my point.

25             He testified that the first time he ever worked for

- C O L L O Q U Y -                    566

1    them was in 2006, which is within the FLSA period.  He didn't

2    work before that.  He didn't work in any period only covered

3    by the New York State.

4                THE WITNESS:  Yeah--

5                THE COURT:  He just did not, there is no evidence of

6    that.  I want to know if routine, column B is $83,000 that he

7    made outside of the FLSA period, exclusively within the New

8    York State period, where does that come from?

9                THE WITNESS:  This is based on the documents that

10   they produced to us.

11               THE COURT:  But the only documents say that he

12   worked in 2006.  Which is not exclusively the New York State

13   period.

14               All right.  I'm not accepting this.  It is nothing

15   that you did wrong.  Don't think I'm scolding you or anything

16   because I am not.

17               There are too many many questions about this, way

18   way too many many questions about this, both methodology, and

19   content.

20               It is not firmly within Rule 1006.

21               I will tell you a couple of things, we have already

22   gone through them.  But, you know on the one hand, I think

23   this Nelson Melgar example, over counting what he made, on the

24   other hand, you have liquidated damages for the FLSA period in

25   column R, at 100 percent, and actually it should be

- C O L L O Q U Y -                    567

1   125 percent.  Because you get both FLSA liquidated damages and

2   New York State liquidated damages within the FLSA period.  If

3   you look at the decisions that I have written on this, it is

4   very clear.  Okay.

5           So, what we are going to do is not accept this.

6   But, you will have the opportunity, both sides, since we have

7   agreed that there were mistakes made, to submit proposed

8   damage calculations at some point including-- in addition to

9   proposed findings of facts and conclusions of law and then

10  comment on each side's proposed damage calculations.

11          So, you can in essence, you have another shot at

12  this and it is not limited to a-- it wouldn't be limited to

13  just a compilation, a summary of documents.  It will be a

14  summary of evidence.  And what I'm planning on doing or what I

15  am thinking about doing is at the end of the trial perhaps

16  later today, tell you where I'm going and what I'm thinking

17  about ruling as far as findings of facts are concerned.

18          I still want to hear from Mr. Enamorado and Mr.

19  Agolli, but I have an idea of what certain discrete issues are

20  going to be, how they are going to be resolved.

21          You will have the benefit of that and you can try to

22  convince me I am wrong by citing to the evidence.  If you do,

23  fine, if you don't, then you will have to sort of include my

24  initial findings in your proposed damage calculations.  Okay.

25          If you have any more questions, you may.

- C O L L O Q U Y -                 568

1           MR. BAUMAN:  All my questions are going to be about

2      this document, so there is no purpose.

3           THE COURT:  Thank you very much.

4           I don't think you did anything wrong.

5           THE WITNESS:  Thank you.

6           (Witness excused.)

7           THE COURT:  Let's break for lunch and 2 o'clock.

8           MR. GEORGOULIS:  Your Honor, one housekeeping matter.

9           THE COURT:  Sure.

10          MR. GEORGOULIS:  If you remember, I had Ms. Coyle

11     on my witness list, I don't want to call her.  I would accept

12     a stipulation that the information that she took down was

13     provided to her by the affiant or whoever signed the-- whoever

14     gave her the information, and the answers to the

15     interrogatories, and that she to the best of her knowledge,

16     accurately posted it in the-- included it in the answers to

17     the interrogatories and that is all I would want from that.

18     Otherwise, I need to call her.

19          You can think about it.

20          THE COURT:  He is not trying to get you in trouble.

21          MR. GEORGOULIS:  That is the reason why I am doing

22     this.

23          MS. COYLE:  I can state everything on the

24     interrogatories is information that was put in by me as it was

25     told exactly by the plaintiffs.

- C O L L O Q U Y -                    569

1          MR. GEORGOULIS:  That is all I want.

2          THE COURT:  Okay.

3          MR. GEORGOULIS:  Thank you.

4          THE COURT:  So, all we have is Mr. Agolli and Mr.

5   Enamorado, we can get them done if we start at two.

6          MR. GEORGOULIS:  Right.  I probably have, I would

7   guess, Judge, 35 to 45 minutes for each on direct.

8          THE COURT:  Wonderful.

9          MR. BAUMAN:  Your Honor, I should point out, we

10  would like to very briefly do rebuttal on the issue of the

11  roofers task, the roofer work.  We have been advised two of

12  the plaintiffs are actually now members of the roofer's union

13  and they can testify regarding what members of the roofer's

14  union themselves do on a roof.

15          This was an issue as to whether these men were

16  roofers or laborers.

17          MR. GEORGOULIS:  That should have been disclosed.

18          THE COURT:  That is rebuttal.

19          MR. GEORGOULIS:  It is not, Judge.  Totally new

20  information.  Yes, it is.

21          THE COURT:  It is-- I think the argument is, it is

22  part of the plaintiff's case in chief.

23          MR. GEORGOULIS:  Right.

24          THE COURT:  To establish.

25          MR. GEORGOULIS:  And that wasn't done and it should

- C O L L O Q U Y -                    570

1   not be done on rebuttal.

2           THE COURT:  I will think about that.

3           MR. GEORGOULIS:  You said 2 o'clock.

4           THE COURT:  Yes, please.

5           MS. LUSHER:  Your Honor, I'm not really trying not

6   to be thinking, I want to make sure I understand.

7           If Mr. Melgar had opted in on 2010, I think what we

8   calculated for FLSA went back to 2007.  If he worked in 2006,

9   we would have done calculations for him under the New York

10  State period.

11          THE COURT:  But he worked, the first --

12          MS. LUSHER:  I want to know what I am missing,

13  something.

14          THE COURT:  The first checks you have in 2006 for

15  him are what month?

16          MR. GEORGOULIS:  October.

17          MS. LUSHER:  They were October.

18          THE COURT:  So that is within the non FLSA period,

19  right?

20          MS. LUSHER:  Correct.

21          THE COURT:  To October, he worked from October to

22  when?  When did the FLSA period start?

23          MS. LUSHER:  He opted in in August 2010.  So it was

24  calculated three years prior to that.

25          THE COURT:  To August 2007.

- C O L L O Q U Y -                    571

1        So from October 2006 to August 2007 you have checks

2   and evidence of $83,000 in prevailing wage.

3        MS. LUSHER:  It wasn't.  It is the calculation what

4   he would have been owed had he -- for the jobs he worked on,

5   for the hours he worked.

6        MR. GEORGOULIS:  This is supposed to make your life

7   easier this document not harder.

8        THE COURT:  I find that hard to believe based on the

9   evidence that I have seen.  If I am wrong, that is fine.

10       I thought that he was only within the FLSA -- he

11  only worked within the FLSA period.  He opted in in 2010, August.

12       MS. LUSHER:  Correct.

13       THE COURT:  That goes back to August 2007.

14       MS. LUSHER:  Right.

15       I want to, if we are going to redo this, I want to

16  make sure I understand.

17       THE COURT:  I mean-- maybe there is a very brief

18  period of time he was in New York State only period, but I

19  just don't see it as $83,000.

20       MS. LUSHER:  We will go back and check the

21  calculations.

22       THE COURT:  All right.

23       (Lunch recess taken.)

24

25

572

1              A F T E R N O O N        S E S S I O N

2          THE COURT:  Okay.  Mr. Bauman, you had intended on

3    calling who or recalling who?

4          MR. BAUMAN:  Recall two of the plaintiffs,

5    Mr. Alfaro and Mr. Centino for very brief testimony regarding

6    their membership in Local 8 of the roofers union.

7          THE COURT:  When did they become members of Local 8.

8          MR. BAUMAN:  2008.

9          MR. GEORGOULIS:  When in 2008 actually?

10         MR. BAUMAN:  That's a fair question.  I don't know

11   when in the calendar year in 2008.

12         MS. COYLE:  They both became members of the union in

13   June of 2008.

14         THE COURT:  Mr. Alfaro?

15         MR. BAUMAN:  Fredis Alfaro.

16         THE COURT:  And Mr. Cetino?

17         MR. BAUMAN:  Yes.

18         MR. GEORGOULIS:  Your Honor, my initial objection

19   this morning, but, in addition, we are talking about testimony

20   that might be within what, a couple of months of the period of

21   alleged underpayments.  What kind of --

22         THE COURT:  Mr. Cetino worked for 2005?

23         MR. BAUMAN:  I believe that's right, Your Honor.

24         But the point of the testimony is not -- it's to

25   show that, A, the Local 8 collective bargaining agreement is

GR      OCR      CM      CRR      CSR

573

1    referenced in the prevailing wage schedule, going all the way

2    back to the period.  We have the collective bargaining

3    agreement.  We offered that this morning, which describes

4    what's covered work under that agreement, and as the document

5    is referenced in the prevailing wage schedule.  This would

6    sort of tie that together by producing a member of Local 8 to

7    discuss what work is done by members of Local 8.

8              Granted, it is not exactly in the same period but

9    this work hasn't changed.  This has been the work --

10             THE COURT:  I am not going to allow it.  These

11   gentlemen were called.  This is part of the plaintiffs'

12   burden.  It should have been gone into already.  I don't think

13   it's going to add much.  They testified as to what they did.

14             I am going to give credit to the collective

15   bargaining agreement.  I will give credit to the collective

16   bargaining agreement.  The only thing that could add is they

17   became members of the union in 2008.  That doesn't change

18   anything, I don't think.

19             MR. BAUMAN:  Fine.

20             THE COURT:  I am not going to allow it.

21             MR. BAUMAN:  Fine.

22             THE COURT:  Other than that, do you have any other

23   witnesses?

24             MR. BAUMAN:  We have nothing further, Your Honor.

25             THE COURT:  Okay.

Enamorado - direct - Georgoulis                    574

1          MR. BAUMAN:  That would have been for rebuttal, in

2    any event.

3          MR. GEORGOULIS:  May I call my witness?

4          THE COURT:  Yes.

5          MR. GEORGOULIS:  Mr. Enamorado, please.

6          The examination by interpreter, Your Honor.

7          THE COURT:  Mr. Interpreter, are you a certified

8    interpreter?

9          THE INTERPRETER:  Yes, Your Honor.

10         THE COURT:  What is your name?

11         THE INTERPRETER:  My name is Abel Doce, Spanish

12   interpreter.  That's A-B-E-L D-O-C-E.

13         THE COURT:  Please raise your right hand.

14         (The interpreter duly sworn/affirmed by the Court.)

15         THE COURT:  Mr. Enamorado, please stand.  Raise your

16   right hand.

17         (The witness, Hugo Enamorado, is duly sworn/affirmed

18   by the Court through the interpreter.)

19         THE COURT:  Please be seated.

20   DIRECT EXAMINATION

21   BY MR. GEORGOULIS:

22   Q    Good afternoon, Mr. Enamorado.

23         Are you currently employed?

24   A    No.

25   Q    When I say are you currently -- do you still work for a

GR        OCR        CM        CRR        CSR

Enamorado - direct - Georgoulis                575

1    company?

2    A    Oh, yes.

3    Q    Who do you work for?

4    A    NJK.

5    Q    Is the reason that you are not working now because it is

6    wintertime?

7    A    Yes.

8    Q    How long have you worked for NJK?

9    A    For the last 20 years.

10   Q    Approximately when did you start?

11   A    Like in '92, '93.

12   Q    Who are your employers, their names?

13   A    The ones who when we began or right now?

14   Q    Now.

15   A    Right now, only Mr. Hernandez.  It was right now, right

16   now only -- only I am there myself.

17   Q    Mr. Enamorado, I am not interested in the employees.

18            Your bosses, who are your bosses?

19   A    Oh, the bosses?

20   Q    Yes.

21   A    Kostas Georgiadis and Nick Hatzis.

22   Q    Mr. Enamorado, are there any of the plaintiffs who are in

23   this case, did they start out with you at NJK or work for a

24   long time at NJK?

25   A    No, right now, at this moment, no.

GR     OCR     CM     CRR     CSR

Enamorado - direct - Georgoulis                    576

1   Q    Okay.  How about back in '92, '95, in those years, any of

2   them work with you back in those years?

3   A    That I remember, Hernandez.  In '90, during that period,

4   only he was with me.

5   Q    How about afterwards, in the nineties?

6        How about Mr. Cetino, when did he start working for

7   NJK?  Approximately?

8   A    He stopped working in 2005.  So he was there like in --

9   he was there like maybe for some ten to 12 years with

10  ourselves.

11  Q    Okay.  And anybody else from the plaintiffs work at least

12  ten years for the company, or approximately?

13  A    Have they worked in the last ten years or have they

14  worked?

15  Q    No.  I will withdraw it and move on.

16       Mr. Enamorado, what kind of work does the company

17  do?

18  A    Roofing.

19  Q    What kind of roofing systems have you installed?

20  A    The sheetrock -- oh, shingles, PTA -- BTA and -- oh, EPDM

21  and Touchdown.

22  Q    Torch?

23  A    Torching.

24  Q    I think the Court knows.

25       Mr. Enamorado, does the company have an office?

Enamorado - direct - Georgoulis                577

1   A    Yes.

2   Q    Where is the office located?

3   A    It's in Bay Seventh, 50, at Brooklyn.

4   Q    Okay.  What about the 50th Street, you mean?

5   A    No.  The number of the office.

6   Q    Bay Seventh Street, is that right?

7   A    Yes.

8   Q    Does it also have a shop or a little warehouse it

9   maintains?

10  A    Yes.

11  Q    Where is that located?

12  A    That's on 35th, between -- on Fourth Avenue and --

13  between Third and Fourth Avenues.

14  Q    Okay.  Mr. Enamorado, I am going to ask you questions

15  about a certain period of time.  Specifically, between the

16  years -- the end of 2003 until the end of 2008.  Okay?

17  A    Okay.

18  Q    Only that period of time.  Okay?

19  A    Okay.

20  Q    Now, how many people -- how many workers would generally

21  work on a typical job during that period of time?

22  A    From 10 to 15.

23  Q    Okay.  When you started a typical day, where would you

24  start your day?

25            MR. BAUMAN:  Objection, Your Honor.

GR      OCR      CM      CRR      CSR

Enamorado - direct - Georgoulis          578

1          Your order was that the testimony be within the four

2    corners of the affidavit.  I don't believe that was answered

3    in the affidavit.  I may be wrong, my reading of it this

4    morning.

5          THE COURT:  I don't have the affidavit in front of

6    me.  Can you direct me to where it is?

7          MR. BAUMAN:  I don't have the one with the docket

8    number.

9          MS. LUSHER:  I believe it's going to be like 65.

10         THE COURT:  09-4812.

11         MR. GEORGOULIS:  Judge, how about paragraph 11?

12         THE COURT:  All right.  I will overrule the

13   objection.

14   Q    Mr. Enamorado, could you tell us, on a typical day, where

15   would you meet?

16         What would you do to start your day?

17   A    For us to go to work?

18   Q    Yes.

19   A    At the shop at 36th, yes.

20   Q    What would you do there in the morning?

21   A    We waited for the van in order for them to transport us

22   to work.

23   Q    What time would you generally meet?

24   A    At 6:00 o'clock in the morning.

25   Q    What would happen after you met at 6:00 o'clock in the

GR      OCR      CM      CRR      CSR

1   morning?

2        You said you would leave to go the job site.  How

3   many people would generally show up?

4   A   We would get into the van and then we would go to work.

5   Q   Did you have to -- I don't want to talk about the move

6   day or mobilization or demobilization.  I only want to talk

7   about after a project started.

8        Would you have to load materials from the shop?

9        MR. BAUMAN:  Objection, Your Honor, leading, and

10  again going outside the four corners of the affidavit.  Not

11  what it says.

12       MR. GEORGOULIS:  Judge, there has to be a little

13  leeway in terms of impeachment purposes as well.

14       MR. BAUMAN:  He is trying to impeach his own

15  witness?

16       MR. GEORGOULIS:  No.  I am trying to impeach your

17  witnesses.

18       THE COURT:  It is not impeachment.

19       MR. GEORGOULIS:  I'm sorry.

20       THE COURT:  I will give you some leeway.  Keep it to

21  the affidavit as much as you can.

22  Q   Did you have to load any materials in the morning on a

23  typical day from the shop?

24  A   No.

25  Q   Okay.

Enamorado - direct - Georgoulis                 580

1   A    No.

2   Q    Mr. Enamorado, how long did it take typically to go to a

3   project site?

4   A    Some jobs -- sometimes the jobs are an hour away,

5   sometimes the jobs are an hour-and-a-half, an hour,

6   hour-and-a-half away.

7   Q    Did you have to -- withdrawn.

8        Did you ever have occasion to drive the company van?

9   A    Yes.

10  Q    You drove it in the morning to the job site?

11  A    Yes. Sometimes, yes.

12  Q    Did you also drive it back from the job site?

13  A    Yes.

14  Q    Were there other drivers from NJK who drive the van as

15  well?

16  A    Yes.

17  Q    When you drove back, did you drive the employees back as

18  well?

19  A    Yes.

20  Q    Where would you drive them on the way home or on the way

21  back from the job site?

22        MR. BAUMAN:  Again, objection, Your Honor.

23        I don't know how much leeway, where the line is

24  going to be drawn.  But this, while interesting, is not within

25  the four corners of the affidavit.  It is not within five

GR     OCR     CM     CRR     CSR

Enamorado - direct - Georgoulis                581

1   yards of the four corners of the affidavit.

2          THE COURT:  I hear you but I will allow it.

3          MR. BAUMAN:  Okay.

4          THE COURT:  Don't take that as license to --

5          MR. GEORGOULIS:  No, Judge, I am not taking anything

6   as a license.

7          I forgot my question.

8          THE COURT:  Read it back, please.

9          (Record read.)

10  A    I would leave them, for example, a block way from their

11  homes.

12  Q    Did you do that every day when you drove the van?

13  A    When it was my turn to drive, yes.

14  Q    Would you have, except for the demobilization day, would

15  you ever bring materials back to the job from the job site?

16  A    No.

17  Q    Did you have occasion to drive your own car to these jobs

18  or your own vehicle to the job sites?

19  A    Yes.

20  Q    How often did you do that?

21  A    I did that for a long time.

22  Q    Now, Mr. Enamorado, why would you do that?  Why did you

23  do that?

24  A    Firstly, because they smoke a lot and I have asthma and I

25  can't be inside the van.

Enamorado - direct - Georgoulis                582

1    Q    Mr. Enamorado, materials that were used for the roofing

2    systems, how did that get to the job site?

3    A    That was done by the delivery.

4    Q    Material delivered directly by trucks to the job site?

5    A    Yes.

6    Q    Did NJK have any storage containers at the job sites?

7    A    Yes.

8    Q    Would they store the materials in the containers?

9    A    Not all.

10   Q    Where would they store the materials?

11   A    Sometimes up top, on the roofs.

12   Q    What about tools, were tools stored at the job site?

13   A    We would put them in a box on the roof.

14   Q    What kind of tools would you have?

15   A    A screwhand, a hammer drill, hammers, regular screws.

16   Q    Did you also have tools like shovels and axes and

17   whatever else you would need for your work?

18   A    Yes.

19   Q    Where would they be stored?

20   A    We would leave them on the roofs.

21   Q    Okay.  Now, when you started a project, when you first

22   started a project, first day, what would you do?

23   A    Okay.  When we began the work?

24   Q    Yes.

25   A    We would all go to the shop.  We would load the tools on,

Enamorado - direct - Georgoulis                    583

1   for example, like a cutter, the tools that were needed for

2   demolition, for example.

3   Q    What would you do?

4   A    We would mount them on to carts.  We would bring them to

5   the van and then bring them to the job site.

6   Q    Was that little trailer that was in the back of the van?

7   A    Yes.

8   Q    Okay.  You did that for the start of every job?

9   A    Yes.

10  Q    When the job finished, what would you do?

11  A    We would bring them back to the shop, again the same.

12  Q    How long, generally, would something like that take,

13  let's say in -- when you start a job, how long would it take

14  to take the tools from the shop and go to the job and store

15  the tools at the job site?

16       How long would that generally take, how many hours?

17  A    All day long.

18  Q    Okay.  How about on the way back?

19  A    Also, the same.

20  Q    Okay.  Now, what kind of work -- again only from 2003 to

21  2008 -- what kind of work did you do?

22  A    Roofing.

23  Q    Okay.  Can you tell me what that means?  Give us an idea

24  of the actual roofing work, the tasks, that you did.

25  A    We would do demolitions and then we would put the roofs

Enamorado - direct - Georgoulis                    584

1    back on.

2    Q    Okay.  Let's just go through a first day of the job.  You

3    go up to the roof and you are ready to start work.  You say

4    you do demolition.

5              Does everybody do a little demolition?

6    A    Yes.

7    Q    Then what happens after you have done some demolition?

8    Tell me what you do as a roofer.

9    A    We would install the insulation and then we would put the

10   OLEO, the rubber, then we install the rubber.

11   Q    First of all, how many roofers did NJK employee who

12   installed roofs during that period of time, approximately?

13             THE COURT:  Sustained.

14             It is outside the scope of the affidavit, far

15   outside the scope of the affidavit.

16   Q    Now, when you were doing roofing work, were there people

17   doing demolition work?

18   A    Will you please repeat the question.

19   Q    Yes.

20             When you started to install and you did the

21   demolition, what would happen to the debris from the

22   demolition?

23   A    We would -- oh, we would throw it down to the container.

24   Q    When you throw it down, was there a chute of some kind?

25   A    Sometimes there was chute and sometimes there was a hoist

Enamorado - direct - Georgoulis                    585

1    machine.

2    Q    Were there any NJK workers on the ground?

3    A    Yes.

4    Q    How many people would generally be on the ground?

5    A    Sometimes two.

6    Q    Where would the debris go?

7         Where would they put the debris?

8    A    To the container.

9    Q    How big were those containers?

10   A    Thirty yards.

11   Q    Were there other people bringing the -- were --

12   withdrawn.

13        The people on the ground, there were also other

14   people on the roof removing the debris, correct?

15   A    Working, yes.

16        THE COURT:  Including yourself?

17        THE WITNESS:  Yes.

18        THE COURT:  Did you ever work on the ground as one

19   of those two guys?

20        THE WITNESS:  Almost never, no.  No.

21        MR. GEORGOULIS:  Now, I am just collecting the

22   affidavit, Judge, so I don't go too far astray.  I need a

23   minute.

24        THE COURT:  It is a good idea.

25        (Pause.)

Enamorado - direct - Georgoulis                    586

1    Q    Once you arrived at the job site, what time would you

2    generally start working?

3    A    If we were far away, like at 8:00 o'clock.  If we were

4    close by, at 7:00 o'clock.

5    Q    What time -- how many hours of work would -- after you

6    get to the job site, when you are at the site, how many hours

7    of work would you do once you started?

8    A    Normally, like eight hours.

9    Q    Now, were there times when the weather impacted your

10   work?

11   A    Yes.

12   Q    Tell us how it impacted your work.

13   A    Well, when it rained, for example, we would have to stay

14   a little bit later, then we would stay later.

15   Q    What about if it rained earlier in the day, what would

16   you do?

17   A    No.  Then we would go home.

18   Q    Mr. Enamorado, when you were working, did you get any

19   breaks, lunch break?

20   A    Yes.

21   Q    How long?

22   A    Twenty minutes in the morning and then half an hour for

23   lunch.

24   Q    Were you paid by check?

25   A    Yes.

GR      OCR      CM      CRR      CSR

Enamorado - direct - Georgoulis                587

1   Q    Were you ever paid by cash?

2   A    No.

3   Q    You know enter Hernandez a long time, correct?

4   A    Yes.

5   Q    What kind of work from 2003 to 2008 did he perform?

6        MR. BAUMAN:  Your Honor, I object.

7        I think that's again outside the scope.

8        MR. GEORGOULIS:  I don't know if that is.  I don't

9   think so, Judge.

10       MR. BAUMAN:  He never says in the affidavit what

11  Mr. -- if I may finish?  He never says in the affidavit what

12  Mr. Hernandez did.  He says that some workers were roofers,

13  some workers were laborers.

14       MR. GEORGOULIS:  Paragraph four, he says he read

15  their affidavits.

16       THE COURT:  What was the question he was trying to

17  ask?

18       (Record read.)

19       MR. GEORGOULIS:  Mr. Hernandez.

20       THE COURT:  I will sustain the objection.

21       THE INTERPRETER:  He may answer, Judge?

22       THE COURT:  No.

23  Q    Mr. Enamorado, were you paid for every hour that you

24  worked for NJK by check?

25  A    Yes.

GR      OCR      CM      CRR      CSR

Enamorado - direct - Georgoulis          588

1   Q    Now, let's talk about the weather but not for one

2   particular day but overall.

3          Did you lose a lot of days during the year because

4   of weather?

5   A    Yes.

6   Q    Mr. Enamorado, back to the -- in the mornings when you

7   went to the shop, not on the first day when you take the

8   tools, but on the other days, was the shop open?

9   A    No.

10  Q    Now, was anybody -- any of the NJK employees required to

11  pay for their own transportation, when they rode in the

12  company vans?

13         MR. GEORGOULIS:  Paragraph 25, Your Honor.

14  A    No.

15  Q    Okay.  When you drove your car, when you -- because you

16  didn't want to be in the car with the smoke, you drove your

17  own car, did you pay your own gas and tolls?

18  A    No.  The tolls and the gas I would pay myself.

19  Q    Do you know whether or not the plaintiffs, the people who

20  worked with you and who are in this case, whether or not they

21  loaded materials every day at the shop in the morning at 6:00

22  o'clock into the van?

23         MR. GEORGOULIS:  That's paragraph 27, Judge.

24  A    No.

25  Q    Were you ever told by someone from NJK you had to take

GR      OCR      CM      CRR      CSR

Enamorado - direct - Georgoulis                    589

1   the van to work or did you have the option to use your own

2   car?

3   A    No, no one told me anything.

4   Q    Did you work at the prison in Green Haven?

5   A    Yes.

6   Q    Did you stay in a motel?

7   A    Yes.

8   Q    When you worked at Green Haven, was there a

9   security -- did you have to go through security?

10            MR. BAUMAN:  Objection, Your Honor.

11            THE COURT:  Beyond the scope of the affidavit?

12            MR. BAUMAN:  Yes.  The affidavit talks about they

13   stayed in a hotel and stops there and NJK picked up the hotel

14   expenses.

15            MR. GEORGOULIS:  Your Honor, can I just submit the

16   affidavit as evidence?

17            MR. BAUMAN:  I think it's already on the record as

18   an attachment to the summary judgment motion.

19            THE COURT:  Yes.

20            MR. GEORGOULIS:  Judge, a little leeway.  This is

21   not -- my God.

22            THE COURT:  All right.  Go ahead.

23            MR. GEORGOULIS:  I forgot my question again.

24            THE COURT:  Security at Green Haven.

25   Q    Did you go through security in the mornings?

Enamorado - direct - Georgoulis                 590

1    A    Yes.

2    Q    Approximately how long did that take?

3    A    Like some 30 minutes.

4    Q    Okay.  The same thing on the way out?

5    A    Yes.

6    Q    You were working on the roof at the Green Haven facility,

7    correct?

8    A    Yes.

9    Q    How many hours of actual roof work did you do once you

10   got inside?

11   A    At the prison?

12   Q    At the prison, yes.

13   A    You cannot be more than seven hours when there.

14        MR. GEORGOULIS:  Your Honor, can I just have a chat

15   with my associate?

16        THE COURT:  Yes.

17        MR. GEORGOULIS:  Thank you.

18        Actually, my partner.

19        (Pause.)

20   Q    Mr. Enamorado, how old are you, sir?

21   A    Fifty-six.

22   Q    When you were driving the employees to a project, let's

23   say the project took an hour or so get to, what were they

24   doing in the van?

25   A    We would talk or maybe sleep.

GR      OCR      CM      CRR      CSR

591

1          MR. GEORGOULIS:  I have nothing further, Judge.

2          MR. BAUMAN:  About two minutes, Your Honor?

3          THE COURT:  Sure.

4          MR. GEORGOULIS:  Can we have five, Judge?

5          THE COURT:  Sure.

6          MR. GEORGOULIS:  Thank you.

7          (Recess taken.)

8          (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Enamorado - Cross - Bauman                    592

1           THE COURT:  Go ahead.

2           MR. BAUMAN:  Thank you.

3    CROSS EXAMINATION BY MR. BAUMAN:

4    Q     Afternoon, Mr. Enamorado.

5           Is NJK paying you for your testimony today?

6    A     No.

7    Q     How much during the period from 2003 to 2008 were you

8    being paid by NJK?

9           MR. GEORGOULIS:  Objection, beyond the scope of direct.

10          THE COURT:  Overruled.

11   A     If it is a federal job, $61 with 80 cents, around there.

12   Q     What about if it is not a federal job?

13   A     If it is a private job, it is maybe from 25 to $30 per hour.

14   Q     Now, you testified I believe that you have been at NJK

15   for 20 or so years, how long have you been a roofer?

16   A     I began learning.

17   Q     When?

18   A     When I began, and then two or three years afterwards, I

19   began as a roofer.

20   Q     So, are you saying that you started as a roofer at NJK

21   after three years at NJK?

22   A     When we began, we didn't know about roofing and then we

23   began to learn and then-- then we became roofers.

24   Q     Was this all at NJK?

25   A     Yes.

Enamorado - Cross - Bauman                    593

1    Q    Now, you were there about the same time, same amount of
2    time as Mr. Hernandez; is that correct?
3    A    I have a little bit more time than he.
4    Q    Isn't it true that Mr. Hernandez started in 1993?
5    A    I don't know the exact year that he began, but yes, he
6    has about 15 years there.
7    Q    Was he a roofer?
8            MR. GEORGOULIS:  Objection, Judge.  I tried to ask
9    the question about Hernandez and he objected.  You sustained
10   it.
11           THE COURT:  So you both asked the same question.
12           MR. GEORGOULIS:  You sustained.
13           THE COURT:  Yes, so you both want to know the answer.
14           He can answer the question, overruled.
15           INTERPRETER:  Question please.
16           (Testimony was read back by the Reporter.).
17   A    He began at the same time as myself.
18   Q    Is he a roofer?
19           MR. GEORGOULIS:  Objection, when?
20   A    Right now.
21           What is the question you are asking me?
22   Q    During the period of this case from 2003 to 2008, was Mr.
23   Hernandez a roofer?
24   A    No, he began the same as myself, but after the years, he
25   became a roofer.

1            THE COURT:  So.

2   Q    So he was a roofer?

3   A    Yes.

4   Q    Now, did Mr. Satino work with you for a long time at NJK?

5   A    Yes.

6            MR. GEORGOULIS:  Same objection, Judge.  I didn't

7   really want-- I never asked that question.

8            THE COURT:  Overruled.

9   Q    Approximately how long did he work with you at NJK?

10  A    Ten to 12 years, around there.

11  Q    During the period of this lawsuit, between 2003 and 2008,

12  was Mr. Satino a roofer at NJK?

13  A    I don't know if they have him-- if they had him as a

14  laborer or a roofer.

15  Q    He was working side by side with you was he not?

16  A    Yes.

17  Q    And he started out the same time as you did he not?

18  A    How so, did he begin at the same time.

19  Q    He started in 1993, the same time as you, did he not?

20  A    No.

21  Q    When did you start?

22  A    I have 20 years, exactly, I don't know when he began.  I

23  don't know exactly.

24  Q    When do you think he began?

25           MR. GEORGOULIS:  Objection.

Enamorado - Cross - Bauman                    595

1          THE COURT:  Sustained.  That is sustained.

2    Q    You testified a bit about people being on the ground and

3    people being on the roof.  Isn't it true that there was only

4    one person on the roof and it was always almost always

5    somebody named Lambro?

6               One person on the ground and that person was Lambro,

7    almost always?

8    A    Lambro?

9    Q    Yes.

10   A    Yes, there was a Lambro working before, but he is not

11   there any more.

12   Q    Period of 2003 to 2008, was he working there?

13   A    I don't remember.

14   Q    Isn't it true that there was one person on the ground

15   typically and everybody else was on the roof?

16   A    Yes, there was always someone on the ground.

17   Q    One person, correct?

18   A    That would depend, sometimes there would be one,

19   sometimes there would be two, it would depend on the debris,

20   the garbage.

21   Q    Isn't it true, sir, when you worked with any of these

22   gentlemen or any of the plaintiffs in this case, they were

23   always on the roof with you?

24   A    Yes.

25   Q    You testified a little while ago that you didn't like to

1  ride in the van, because many of the fellow workers were

2  smokers and it irritated your asthma, do you recall that

3  testimony?

4  A    Yes.

5  Q    Now, is it also true or at least 20 years, you have been

6  a roofer?

7  A    Yes, I'm a roofer.

8  Q    As a roofer, don't you work with asbestos?

9          MR. GEORGOULIS:  Objection, Your Honor.  What does

10  that have to do with anything that I asked?

11          MR. BAUMAN:  Your Honor, this has to do with the

12  claim that Mr. Enamorado didn't ride with the others because

13  he was irritated by smoke, but not by the toxic fumes on the

14  roof for asbestos or tar.

15          MR. GEORGOULIS:  That is that the argument he didn't

16  work there for 20 years there.

17          THE COURT:  So what?

18          MR. BAUMAN:  It goes to credibility of the witness.

19  It doesn't make sense.

20          THE COURT:  Just one second.

21          (Pause.)

22          THE COURT:  I will sustain the objection.

23  Q    Now, sir, you also testified that because of the smoke

24  bothering you, you drove yourself to a lot of work, a lot of

25  the work sites, do you recall that testimony?

1   A    Yes, but when I worked, I used a mask.

2   Q    That wasn't my question.  That answers the previous

3   question, which the Judge has already stricken.  So let's move

4   on.

5          THE COURT:  No, I sustained the objection, but that

6   answer still applies to your question.  It may not be

7   responsive, but it is on the record.

8          MR. BAUMAN:  Thank you.  I got an answer after all.

9   Q    Mr. Enamorado, I think you testified that you drove

10  yourself to work often because of the smoke bothering you in

11  the van, do you remember that?

12  A    Yes.

13  Q    So you were driving yourself to work on your own, how do

14  you know what the other workers were doing back at the shop?

15  A    Because I know how the company moves.

16  Q    You know how the company moves?

17  A    Yes.

18  Q    So you can tell me right now what somebody is doing at

19  the shop?

20  A    It is obvious that we are not working right now.

21  Q    If this were May or June and the company was working, you

22  could tell me what somebody was doing in the shop while you

23  are sitting here in court?

24          MR. GEORGOULIS:  Objection.

25          THE COURT:  Overruled.

1  A    In the shop there is no one, every one is at the roof.

2  Q    But I asked you, sir, is this -- listen closely.

3       You said, that you drove yourself to work.  I think

4  your exact words were, for a long time.  If you were driving

5  yourself to the job site, how would you know what the other

6  employees were doing at the shop in the van and whether they

7  were loading it or not?

8  A    Because one day before the boss tells me what he needs

9  for tomorrow's day and then the company has two vans.  One to

10 transport workers to work, and then the other one to transport

11 materials to work.

12      And, almost always, I'm the one who picks up the

13 materials.

14 Q    Who loads the materials?

15 A    If you need something at the shop for example, if you

16 need some plywood or some wood, just small things.

17 Q    Who loads those small things?

18 A    Myself, I do them.

19 Q    So you are there at 6:00 a.m. loading a van?

20 A    Yes, sir.

21 Q    So, you are the only one who is loading the van at

22 6:00 a.m. and the others weren't?

23 A    Because the other ones are coming in the other van to go

24 to the work, to the job site.

25 Q    Isn't the van at the shop at 6:00 a.m.?

Enamorado - Cross - Bauman                    599

1   A    Yes.

2   Q    So, they get there and they jump in the van and you load

3   the other van?

4   A    Yes, I stay at the shop.  I load the materials and they

5   go onto the job site.

6   Q    Did you-- you testified earlier, you are a roofer, we

7   know you have done it for a long time.  Do you know how to

8   read architectural drawings?

9   A    The plans, a little bit.  There is always a foreman at

10  the job.

11         MR. GEORGOULIS:  I object, this is way beyond the

12  scope.

13         THE COURT:  Sustained.

14         MR. BAUMAN:  What was the objection?

15         THE COURT:  Beyond the scope.

16         MR. BAUMAN:  Arguable.

17         THE COURT:  Let's move on.

18  Q    Sir, did you recently run into Mr. Gustavo Top at the

19  bakery?

20  A    Yes.

21  Q    What did you discuss with him?

22  A    Nothing.

23  Q    Nothing?

24  A    We didn't speak about anything.  I didn't tell him

25  anything bad.  We just spoke normally.

```
                Enamorado - Cross - Bauman                600
```

1   Q    What did you speak about?

2             MR. GEORGOULIS:  Objection.

3             THE COURT:  Overruled.

4   A    I greeted him.

5   Q    Then what?

6   A    That's all.

7   Q    Isn't it true that you discussed that the company would

8   file for bankruptcy if they lost this case?

9             MR. GEORGOULIS:  Objection, Judge.

10            THE COURT:  Overruled.

11  A    No.

12  Q    No?

13            Did you discuss anything about the status of the

14  company?

15  A    No.

16  Q    No, you just said, hello, and that was it?

17  A    We only spoke and that's it.

18  Q    What did you speak about?

19  A    We greeted, he picked up a woman who worked there at the

20  job and that's it.  We just greeted.

21  Q    Didn't you discuss that the company was concerned about

22  the plaintiff's immigration status?

23  A    No.

24            MR. BAUMAN:  We have nothing further Your Honor.

25            THE COURT:  Redirect?

1        MR. GEORGOULIS:  Yes, sir.

2    REDIRECT EXAMINATION BY MR. GEORGOULIS:

3    Q    Mr. Enamorado, between the years 2003, and 2008, did Mr.

4    Hernandez do any laborer's work?  Edgar Hernandez, did he do

5    some laborer work at all?

6    A    No, only roofing.

7    Q    When you drove the van, I only want to know when you

8    drove the van.  The van that transported people, did you have

9    to take materials outside of the shop on a daily basis?

10   A    No.

11   Q    Now, when you said that you have to pick up some small

12   materials, where would you pick them up from?

13   A    Okay, I would go to the shop or I would go to Home Depot

14   and get supplies.

15   Q    How often did that happen?

16   A    That could be maybe one or two times per week.

17        MR. GEORGOULIS:  Nothing further Your Honor.

18        MR. BAUMAN:  We have nothing Your Honor.

19        THE COURT:  Thank you Mr. Enamorado.  You are excused.

20        (Witness excused.)

21        MR. GEORGOULIS:  Can I call my next witness, Judge?

22        THE COURT:  Yes, please.

23        MR. GEORGOULIS:  He is outside.

24   MIKELJAN  AGOLLI, having been first duly sworn, took the stand

25   and testified as follows:

1  DIRECT EXAMINATION BY MR. GEORGOULIS:

2  Q    Good afternoon, Mr. Agolli.

3  A    Good afternoon.

4  Q    Are you currently employed?

5  A    Yes, I am.

6  Q    By whom are you employed?

7  A    By NYPD.

8  Q    What do you do for the NYPD?

9  A    I'm a police officer.

10  Q    How long have you been a police officer?

11  A    Since July 2011.

12  Q    Where specifically or what area do you work?

13  A    Currently I work at the 68th Precinct in Brooklyn.

14  Q    Where is that located?

15  A    That is in Bay Ridge, Brooklyn.

16  Q    And, prior to being a police officer-- let me just-- just

17  give us your educational background first.

18  A    I have an associate's degree from Kingsborough Community

19  College and I'm going for my bachelor's, two classes away from

20  my bachelor's at John Jay.

21  Q    Where were you born?

22  A    In Albania.

23  Q    When did you come to this country?

24  A    2002, May, 2002.

25  Q    Are you an American citizen?

Agolli - Direct - Georgoulis                   603

1    A    Yes, I am.

2    Q    And, prior to working for the Police Department, who did

3    you work for?

4    A    I worked for-- I don't remember the name of the tiling

5    company then I start working since 2002 for NJK contractors.

6    Q    And when you started with NJK, how old were you?

7    A    18 to 19.

8    Q    And, when you started, what were you hired to do?

9    A    Labor work.

10   Q    When you say, labor work, can you just give us a brief

11   description as to what you did?

12   A    Basically demolition the old roofs, you know, taking the

13   garbage, you know, in the dumpster, helping the roofers, you

14   know, bring in all the equipment that they needed.  They were

15   asking, I would bring it closer to them.  Whatever I was asked

16   for.

17   Q    And, you say you started in 2002, with NJK?

18   A    Yes.

19   Q    When did you leave NJK approximately?

20   A    I had to resign from NJK as soon as I got the call from

21   the academy, which was in 2011.

22   Q    And, I'm going to you to focus in on the time period, the

23   end of 2003, November, December, 2003, through the end of 2008.

24   A    Okay.

25   Q    First of all, what kind of a company is NJK?

Agolli - Direct - Georgoulis                    604

1   A    It is a roofing company.

2   Q    And, what types of roofs do they install?

3   A    We have different roofs, hot roof, a tar, rubber which is

4   a cold roof, shingle, different roofs.

5   Q    And, who are the owners of NJK?

6   A    My knowledge Kostas and Nick.

7   Q    Nick Hatzis?

8   A    And Kostas Georgiadis.

9   Q    And, did any of them work at any of the project sites?

10  A    Nick did.

11  Q    And was he the supervisor at the site?

12  A    Yes, he was.

13  Q    And you say you first started as a laborer, how long did

14  you work as a laborer?

15  A    The first year, I was there for really a short time.  I

16  don't remember the exact month, I think I started in November

17  or December.

18  Q    Of '02?

19  A    Of '02, yes.  Then I was cut because there was no more

20  work, the winter came.  So, then I started the 2003-year,

21  around spring, whenever the weather was good.

22  Q    And some point in time, did your status as a worker,

23  meaning as a laborer, change to something else?

24  A    Yes, it did, but over the years.

25  Q    Tell me what did it change to?

1    A    Well, you know, I learned a job as years passed, I

2    learned the job and became a roofer.

3    Q    As a roofer what did you do?

4    A    The main purpose of the roofer is, you know, to make, you

5    know, to make the job correctly, you know, how to do the job

6    basically.  You ask, you have your helpers, they bring all the

7    stuff they need for you so you can do the job.

8    Q    You say do the job, are you installing the roof?

9    A    Yes, installing the roofs.

10   Q    At any given time, how many people worked in terms of a

11   crew of laborers and roofers during the period of time, 2003

12   through 2008?

13   A    The most we had that I remember was 15, 16, that I

14   remember.  The most that we had.

15   Q    And, just describe the facilities of NJK?

16   A    What do you mean the facilities?

17   Q    Did it have an office.

18   A    Yes, it did.

19   Q    Where was that office located?

20   A    That was 50 Bay 7th Street in Brooklyn.

21   Q    Did you have occasion to visit that office?

22   A    Only on Fridays when I had to drive the workers to pick

23   up their checks.

24   Q    And, when you say, drive, were you one of the drivers of

25   the company van?

1  A    Yes, I was.

2  Q    And, how many years did you do that?

3  A    I don't remember that exactly.

4  Q    Were you one of the regular drivers during the period of

5  2003 to 2008?

6  A    2003, I didn't have a license yet.  So I don't remember

7  exactly what, you know, what time I started.  It was after

8  that.

9  Q    When you-- what color-- what kind of a van was it?

10 A    There were two vans, but the one that I drove the most

11 was a red van, a passenger van.

12 Q    Can you just physically describe the passenger van?

13 A    The passenger van is, you know, you have two seats in

14 front, a driver and the passenger on the right.  It is all

15 seats all the way through.  You can fit around twelve

16 passengers in the van.

17 Q    So there is kind of like sofa seats throughout the rest

18 of it?

19 A    Yes.

20 Q    What color was it?

21 A    Red.

22         MR. BAUMAN:  I note my objection, this is outside of

23 the scope.

24         MR. GEORGOULIS:  Judge.

25         MR. BAUMAN:  I am not sure what the color of the van

Agolli - Direct - Georgoulis                607

1   matters.

2           THE COURT:  Overruled.

3   Q    Mr. Agolli, when you were driving the van, can you

4   describe the first meeting on a typical day.  I'm not talking

5   about move day or mobilization day.  The regular work day

6   where would you meet the employees?

7   A    Well, some of the employees, they were en route, because

8   I used to take the van at my house.

9   Q    Where did you live at that time?

10  A    365, 88th Street if I remember correctly -- and, in Bay

11  Ridge.

12           If someone was on my route, I used to pick them up.

13  I used to pick them up on my route.  You know I would stop

14  there and pick them up.

15  Q    On your route to where?

16  A    To the-- where the NJK store warehouse is.

17  Q    And where was that?

18  A    That was on 37th Street and Third Avenue.

19  Q    And, how many people would you pick up before you got

20  there?

21  A    Three, four, five, depending on different days.

22  Q    So once you get to the site approximately what time would

23  that be typically?

24  A    Typically, every one has to be there by six.

25  Q    Why was it so important to be there at six?

1  A    We had-- because most of the jobs that we worked, they

2  were far away.

3  Q    What did that mean?

4  A    That means that we had to leave before traffic.  So we

5  had to pick up, I had to pick up the workers, and drive to the

6  job site.

7  Q    When you picked up the workers at the shop, were there

8  other workers there waiting or coming?

9  A    Yes.

10 Q    How long would you generally wait if somebody wasn't there?

11 A    We would call, you know, we call, because -- and see,

12 call them and say, you coming today.  Some overslept, we could

13 wait or just pick him up.

14 Q    And did that happen often, that waiting?

15 A    Waiting, not very often, but it happened.

16 Q    How long would you typically wait?

17 A    15, 20 minutes.

18 Q    And then you would leave if he didn't show up?

19 A    Yes.

20 Q    Did that happen on occasion where people didn't show up?

21 A    That's true.

22 Q    And?

23 A    I had to leave, I could not wait more than fifteen,

24 twenty minutes.

25 Q    Then you would go?

1    A    I will go, yes.

2    Q    And when you got there, was the shop open typically?

3    A    No.

4    Q    Did you have keys to the shop?

5    A    Yes, I did.

6    Q    So, who else had keys to the shop?

7    A    There was Nico, there was --

8    Q    Nico the owner?

9    A    The owner, Nico, Yani.

10   Q    Who is that?

11   A    Yani is the brother of Kostas.

12   Q    Anybody else?

13   A    And Kosos(ph).

14   Q    Now, you take the people--

15   A    I'm sorry and Julio too. Hugo --

16   Q    Hugo Enamorado?

17   A    Yeah.

18   Q    He had a key?

19   A    Yes.  We call him Julio.

20   Q    How often, during the time of 2003 to 2008, how often did

21   he drive the van if you know?

22   A    He drove regularly, but I can't say how often exactly.

23   Q    Was there a time where you did not drive the van and go

24   to job sites on your own?

25   A    Yes, I did.

1   Q    When was that?

2   A    That was when I was going to school.

3   Q    What school?

4   A    Kingsborough Community College.

5   Q    And, how would you get to the job sites?

6   A    I would drive my own vehicle.

7   Q    Did NJK pay your expenses for driving?

8   A    No, they did not.

9   Q    You paid them on your own?

10  A    Yes.

11  Q    So, now, when typically -- how long would it take -- I

12  know it has to do with where the job is, typically how long

13  would it take in the morning to get to a project?

14  A    Depends on the job.

15  Q    Give me a range.

16  A    Let's say if it was Long Island it will take more than an

17  hour.

18  Q    How about if it was in Mammoth, New Jersey, how long

19  would that take?

20  A    Again an hour, hour and a half, depending on traffic.

21  Q    And, did you drive to both those sites?

22  A    Yes.

23  Q    Now, once you get to the site, what would you do?

24  A    First thing we have to change because roofing is very

25  dirty work.  We have change clothes.

                        RB        OCR

1  Q    Where would you change clothes?

2  A    We have-- the facilities we have, we have a fence,

3  sometimes we had a trailers where we keep our tools.  We would

4  put our clothes inside there and we change inside the trailer.

5  Q    Did there-- were there any facilities or job sites that

6  where the owner gave you any rooms or storage areas where you

7  could put materials, tools or changing?

8  A    Yes, trailers.  Sometimes we put the tools on the roof,

9  just leave them there.

10 Q    How about, storage facilities, as part of the structure

11 inside, let's say a building, would any owner give you a room

12 for example?

13 A    That was in Starret City, yes, there were rooms.

14 Q    Now, so once you started work, let's say first day on the

15 job, you are already mobilized, you are there to work.  Tell

16 me what happens next, the process, what would you first do to

17 start a roofing job?

18 A    We start bringing the tools that we need for the

19 demolition, start doing demolition.

20 Q    Would everybody initially start doing demolition?

21 A    Yes.

22 Q    Then what happens next?

23 A    Next we have a coffee break around twenty minutes.

24 Q    After the initial demolition, were any of the crew split

25 in any way in terms of roofers?

1   A    Yes.

2   Q    And laborers?

3   A    Yes.

4   Q    How did that work?

5   A    Well, depends, you know, who was the supervisor at that,

6   you know, at that site would say, you going to do this job,

7   you are going to do this job.  Basically some people have to

8   bring all the equipment that we needed for the jobs, some

9   people had to clean, some people had to take the garbage out

10  of the container, there were many many things going on at the

11  same time.

12  Q    Again, it is hard to envision, but with regard to a

13  demolition of a roof, what kind of debris is generated with

14  regard to a typical roof job in terms of size?

15  A    Sorry?

16  Q    In terms of size?

17  A    It is large.  It is a lot of garbage, a lot of dust.

18  Q    Now, did you have to keep the facilities -- clean?

19  A    Yes.

20  Q    And who would typically do that work?

21  A    The laborers.

22  Q    And, would the laborers also remove the debris?

23  A    Yes.

24  Q    And, at some point in time, when your day would come to

25  an end, tell me what you would do, just before it is quitting

1  time.  Was there any procedure for cleaning up or anything

2  like that?

3  A    The roofers, basically they make safety, we call safety.

4  So let's say it rains tonight, the water is not going to go

5  through to the new roof or the building.

6         The laborers, what they do is, they have to cover

7  all the materials that we have open.  They have to put tools

8  in the, you know, if we have a trailer, they put it in the

9  trailer.  If you have to put them on the roof, we put them on

10 the roof.

11 Q    Then, you would leave?

12 A    Yes.

13 Q    And you get in the van?

14 A    Ah-hum, right.

15 Q    Tell me when you were driving the van, and you just

16 completed a day's work and everybody, all the employees are in

17 the van, tell me what you would do?

18 A    First I stop for a drink first, you know, ask everyone

19 get a drink and any deli if it was close.

20 Q    A soft drink?

21        THE COURT:  A non alcoholic drink.

22        THE WITNESS:  Non alcoholic drink of course.

23        And then drive, you know, drive through traffic.

24 Q    Now, once you drive back to Brooklyn?

25 A    Yes.

1  Q    Typically, what would you do once you got into the boro

2  of Brooklyn, tell me?

3  A    Well, depends who-- which workers I had with me.

4  Q    Okay.

5  A    Depends where did they live.  So I would drop them off

6  one by one, toward my way.

7  Q    Let's say, if you were coming from New Jersey?

8  A    If someone lived in Staten Island, I would just take

9  whatever exit they live close or where the boss was closer,

10 just leave them there.

11 Q    Did there come a time when you would leave people, other

12 than at their homes, let's say a train station or subway

13 station at times?

14 A    That was almost every day.

15 Q    So everybody would be dropped off in one form or another?

16 A    Yes.

17 Q    Would you ever take the whole crew back to the shop at

18 the end of the day?

19 A    Not really.  Just if I had a reason, I would go in the shop.

20 Q    You.  How about the crew?

21 A    You know, the whole, everybody.  If we had a reason to go

22 there.  But most of the time we didn't have a reason to go in

23 the shop.

24 Q    So, did you ever-- so you have now started a job.  The

25 materials and tools are at the job, and it is ongoing.  Did

1   you have occasion to load up all the tools and bring them back

2   to the shop, and then bring them back the next morning and

3   continue on any particular project?

4   A    Absolutely not.

5   Q    Never happened?

6   A    Never happened.

7   Q    Now you worked with some of the people in the courtroom

8   today?

9   A    Yes, I did.

10  Q    Mr. Hernandez, you worked with?

11  A    Yes.

12  Q    You worked with him throughout the time?

13  A    Yes, I did.

14  Q    You observed him working.  You worked side by side at

15  times?

16  A    Yes.

17  Q    Can you describe some of the tasks that you saw him

18  perform between 2003 and 2008?

19  A    I have seen him perform the job as a laborer and as a

20  roofer.

21  Q    If you had to guess in terms of how much of each, what

22  would you say?

23         THE COURT:  Sustained.

24         MR. BAUMAN:  Thank you.

25  Q    Well, is there any period of time where let's say from

1  2003, through 2008, where he was either exclusively a laborer

2  or exclusively as a roofer if you remember?

3          MR. BAUMAN:  Objection, Your Honor.  I probably let

4  this go on too long.  I think what we were arguing about

5  earlier today was about the legal definition of what a roofer

6  does and the legal definition of what a laborer does.  So long

7  as we understand that we are using this as the witness'

8  understanding of a laborer or what an NJK laborer, labeled as

9  a laborer, as opposed to what the definition of a laborer is,

10  by the city, state, collective bargaining agreement, United

11  States government, whatever the case might be.

12          I want to note my objection to the extent that any

13  of his discussion of laborer versus roofer rolls over into a

14  legal argument or legal analysis.

15          MR. GEORGOULIS:  I'm not trying to solicit any legal

16  answer.

17          THE COURT:  Nor could Officer Agolli give one.

18          MR. GEORGOULIS:  Right.

19          I want to know what he observed in terms of-- let me

20  rephrase the question, Judge.

21  Q    When you say you observed people working as laborers and

22  roofers.  Instead of using those tags, I would rather you tell

23  us what you observed Mr. Hernandez doing, actually tasks.

24  Tell me what you observed him performing.  What kind of work?

25  A    I have seen him, you know, demolition roofs.  You know,

1  taking the garbage out of the container.  Working at the

2  hoist.  I have seen him put the roof together as a roofer.  I

3  have seen him doing all those things.

4  Q    Now, if-- in 2003, I-- forget 2003.  Let's start from

5  2004.  You are working full time at NJK, correct?

6  A    Yes.

7  Q    Mr. Hernandez is also working full time?

8  A    Yes.

9  Q    When I say, full time, weather permitting?

10 A    Weather permitting.

11 Q    So now --

12         THE COURT:  Let me ask you a question first.

13         In 2004, were you a roofer at that point?

14         THE WITNESS:  No, I wasn't.

15         THE COURT:  Okay.

16         When did you become a roofer given your

17 understanding of what that title is?

18         THE WITNESS:  It took me at least two or

19 three years.

20         THE COURT:  You started you said at the tail end of

21 2002?

22         THE WITNESS:  Yes.

23         THE COURT:  Then they did not have work for you and

24 then you came back.

25         THE WITNESS:  I was the newest in the company at

Agolli - Direct - Georgoulis                618

1   that time so I was stopped.  I was the first one, for my guess

2   to get stopped as soon as the weather.

3        THE COURT:  So maybe sometime in given this time

4   line, sometime in 2005, 2006, you became a roofer?

5        THE WITNESS:  Yes.  I don't remember exactly.

6   BY MR. GEORGOULIS:

7   Q    Mr. Agolli, so, okay

8   A    Six years.

9   Q    During the time before you became a roofer, let's say,

10  2005/2006, for argument's sake, during that period of time, if

11  you can remember from '03 until you became a roofer, was Mr.

12  Hernandez working as a roofer or doing laborer work as you

13  have previously described?

14  A    He has done labor and roofer as I mentioned before.

15  Q    But specifically before you became a roofer, did Mr.

16  Hernandez work as a roofer?

17  A    I have seen work side by side, you know with me.  So he

18  was a laborer I guess.  On those jobs that I have seen that I

19  mentioned.  I seen him, you know.

20  Q    Mr. Agolli, what were-- on a typical day, how many

21  hours-- once you get to the site, once you stop traveling, you

22  are at the site, you have finished changing clothes and you

23  start working.  How many hours would you spend doing roofing

24  work either demolition or installation?

25  A    No more than eight hours.

Agolli - Direct - Georgoulis                    619

1   Q    And, just tell us, the events, if you had bad weather

2   during the course of the day, what would happen?

3   A    We would just, whatever we had open, we had to close,

4   make it safe as soon as possible.  Not make the roof, you know

5   good as we do on a typical day and leave, leave, you know,

6   leave early, and get paid the full day of that day.

7   Q    Did you lose a lot of time during the course of a year,

8   because of weather?

9   A    Yes, we did.

10  Q    And, what kind of weather events would prevent you from

11  working?

12  A    Rain, snow, too windy.  If it is too windy we can't work.

13  Q    What about too cold?

14  A    The same thing, we can't work.

15  Q    Were there years where you didn't work, because NJK

16  didn't have any work?

17  A    Yes, after 2008.  It was, you know, jobs weren't the same

18  as it was before.

19  Q    So in 2008, there was less work than it was previous

20  years?

21  A    Yes.

22  Q    In previous years, you were very busy?

23  A    Yes.

24  Q    And, typically would you work on one or more jobs in any

25  given day?

1  A    No, not typically.

2  Q    But you would occasionally?

3  A    Occasionally.  We say by the question, you say if I

4  working two different jobs.

5  Q    No.

6       Did NJK have two jobs going on at the same time?

7  A    Yes, sometimes.

8  Q    Now, did you get paid by check or cash?

9  A    Check.

10  Q    Always?

11  A    Always.

12  Q    Did you get paid for every hour that you worked?

13  A    Yes, I did.

14  Q    How frequently were you paid, was it once a week, once

15  every two weeks?

16  A    Every-- let's say the check of this week, we get it next

17  Friday.

18  Q    Mr. Agolli, do you know Mr. Alfaro?

19  A    Freddie?

20  Q    Yes?

21  A    Yes.

22  Q    And, do you recall when you were there working, let's say

23  from 2003 to 2008, was he always there during those years?

24  A    No, he left the company.  He went to work somewhere else.

25  Q    Do you remember approximately when that was, using your

Agolli - Direct - Georgoulis            621

1    employment dates as a guide?

2    A    He was there, I think for a year or two maybe.  I'm not

3    sure about, you know, exactly the dates and the years.

4    Q    I don't know if I asked you this question, but, typically

5    what day-- what time of the day would you guys stop working

6    and start the clean up process to leave the site?

7    A    Stop working was around three.  The clean, the process is

8    the same as work.  So you work all the time.  We stop work at

9    3:30 or four depending what time we start working.

10   Q    So some days you start later in the morning than others?

11   A    Depending on the traffic.

12   Q    What if you worked a Brooklyn job, would you meet a

13   little later in the morning?

14   A    Yes, we did.

15            MR. GEORGOULIS:  Your Honor, let me check I am

16   almost done.

17            THE COURT:  Yes.

18            (Pause.)

19   Q    Mr. Agolli, I asked you about the regular work day.  What

20   about-- what would happen at the start of each project?

21   A    The start of a project, we had typically we had the move

22   in date, a mobilization date.  Depends on what kind of type of

23   roofing it was.

24            We had to bring those tools at that job site,

25   basically five or six people we bring, we had to go into the

1    warehouse, we have a trailer which we load with all the tools

2    that we needed there, and take it to the job site.

3    Q    When you say a trailer, one of the tailers, you can hook

4    up to a van?

5    A    Yes.

6    Q    Would you hook it up to the van?

7    A    That's correct.

8    Q    So now you load the-- load the tools into the van.  How

9    long would that take if you took all the tools.  You have four

10   or five guys, how long would it take to load the van?

11   A    Typically half hour, 45 minutes.

12   Q    That is all the tools for a particular job with four or

13   five people?

14   A    Yes.

15   Q    So now, you leave, you go to the site, let's say it is

16   two hours away.  Tell us what you would do?

17   A    We drive to the site, we, you know, we go sometimes they

18   had other trailer where we can put the tools in.

19   Q    You say-- who would that be?

20   A    NJK.

21        There was a fencing order, we had to fence the area

22   where we put our tools.  And then if everything was secured,

23   we just leave the tools there and leave.

24   Q    Would you do actual roof work the first day?

25   A    No.

Agolli - Direct - Georgoulis                    623

1    Q     So, then you would secure the area, and then you would

2    leave?

3    A     Yes.  Typically we work like a half day and getting paid

4    the whole day on the move day, basically.

5    Q     Let's talk about the demolition day, when you finish a

6    job, what would happen?

7    A     Those two, you know, every tools that we had there, we

8    had to bring them back to the warehouse.

9    Q     Now, would that happen-- would there be a designated move

10   day or you would finish the job, if you happened to work a

11   couple of hours and then take the stuff back, how did that

12   work?

13   A     Most of the time we had finished everything, the

14   inspection was passed and then we take everything back to the

15   shop.

16   Q     How long would it take you to take your tools, and load

17   them up in the van from the site, wouldn't that take a little

18   longer or not?

19   A     Like I said, like an hour.  If every one --

20   Q     On the way back?

21   A     On the way back, yeah.

22   Q     If you have tools on the roof?

23   A     Of course.

24   Q     Now, you talked about inspection.  What-- would there be

25   a roofing manufacturer's inspection?

1   A    Of course.

2   Q    That happened on all the jobs?

3   A    All the jobs.

4   Q    And the inspectors would always come and check the

5   installation of the roof?

6   A    Yes, during the job and at the end to see how the job was

7   done.

8   Q    So, the inspector would come periodically?

9   A    Yes.

10  Q    That happened on every job?

11  A    On every job that I did.

12  Q    So now, on that demo day, you are going back to the shop

13  at 37th Street?

14  A    Yes.

15  Q    And, you are unloading everything?

16  A    Unloading everything unless we have another job right

17  away, we would take that, you know, take the tools to that

18  job.  I don't remember-- that happened once that I remember.

19  Q    So how long would it take to unload the tools and put

20  them away?

21  A    An hour, hour and a half.

22  Q    And you would have designated areas for certain things so

23  you find them easily on the next job?

24  A    Yes.

25  Q    Those materials that we are talking about, the roofing

1  materials, were they shipped directly to the site?

2  A    Yes, they were shipped directly from the manufacturer.

3  That was the delivery day, we called it.

4  Q    Would that include all kind of materials, screws, stuff,

5  everything needed for the roof?

6  A    All of them.

7  Q    Could you use different materials for other roofing

8  systems on a particular roof?

9  A    No, we couldn't.  That is why they used to do the

10 inspection so we don't use any other materials.

11         MR. BAUMAN:  Your Honor, we have not objected.  This

12 is really outside of the scope.

13         THE COURT:  I don't know that it is necessary.

14         MR. GEORGOULIS:  I'm done, Judge.

15         THE COURT:  Mr. Agolli, let me ask you a question.

16         THE WITNESS:  Yes.

17         THE COURT:  If you were to take the typical roofing

18 job that you do, all the work that needs to be done, how much

19 of the work is done by laborers, how much is done by roofers?

20         THE WITNESS:  Most of the job is done by laborers.

21         THE COURT:  Percentage wise?

22         THE WITNESS:  75 percent, I would say.

23         THE COURT:  And, people who are roofers, like when

24 you became a roofer, you did laborer work too, correct?

25         THE WITNESS:  Of course, yes.

1          THE COURT:  All right.

2          MR. BAUMAN:  We have two minutes, Your Honor?

3          THE COURT:  Yes.

4          MR. GEORGOULIS:  Can we make it five?

5          THE COURT:  Yes.

6          (Whereupon, a recess was taken.)

7          THE COURT:  Okay.

8          MR. BAUMAN:  Thank you, Your Honor.

9   CROSS EXAMINATION BY MR. BAUMAN:

10  Q    Afternoon, Mr. Agolli.

11  A    Good afternoon.

12  Q    On your direct examination by counsel, you were asked

13  about inspectors, do you recall that?

14  A    Yes.

15  Q    I want to be clear, you were talking bought the

16  manufacturer's inspector, is that who you were talking about?

17  A    Manufacturer's.

18  Q    Any other inspectors ever on any of the job sites?

19  A    Yes, there was a school, someplace state inspector used

20  to come and check the job.

21  Q    And were you ever asked to sign any documents by any

22  inspector on the job?

23  A    I don't remember.

24  Q    Do you recall West Point in particular, were you asked to

25  sign any of the documents on the job?

Agolli - Cross - Bauman                    627

1   A    I wasn't -- I worked in West Point but I don't remember

2   signing any documents there.

3   Q    Were you ever asked by any of the bosses at NJK to tell

4   anything to an inspector or sign a document for an inspector?

5   A    To tell anything, what do you mean by that?

6   Q    To tell them what you were paid?

7   A    No, no.  I was told by them that we are going to have--

8   inspector will come, show them whatever they need to show them

9   on the job.  But at that point I was just a laborer.  That was

10  I think that was in 2003, from what I remember.  It was other

11  people who were doing that job.  I don't think I spoke English

12  then.

13  Q    Were you asked by the inspector how much you were paid?

14  A    I don't remember that.

15  Q    Do you remember anything the inspector asked you?

16  A    On that particular year?

17  Q    Yeah.

18  A    I don't remember, it was early, I think 2003, when I

19  first started working there.

20  Q    Do you remember any other state inspector or federal

21  inspectors at any other job?

22  A    I don't remember.

23  Q    However, you remember what the plaintiffs did ten years

24  ago?

25        MR. GEORGOULIS:  Objection.

Agolli - Cross - Bauman                          628

1   A    We worked every day.

2   Q    Okay.

3         THE COURT:  Overruled.

4   Q    You testified that you thought that about 75 percent of

5   the work is done by the, "laborers".

6   A    That's true.

7   Q    If 75 percent of the work is done by the "laborers", who

8   builds the roof?

9   A    The roofer.  You bringing everything for them.  They have

10  already right there.

11  Q    So, is this an example of the old--

12  A    You can't have ten roofers at the same job.

13  Q    Is this an old adage about destruction being taking

14  longer than building or because I always thought it was the

15  opposite.

16        THE COURT:  Sustained.

17  A    I'm sorry.

18        MR. GEORGOULIS:  Objection.

19        MR. BAUMAN:  Understand.

20  Q    I always thought building took longer than demolishing?

21        MR. GEORGOULIS:  Objection what he thinks.

22        THE COURT:  Sustained.

23  Q    Doesn't it take longer to--

24  A    I can't explain to you.

25  Q    Why are you testifying?

Agolli - Cross - Bauman                              629

1    A    I am testifying, you are saying--

2              MR. GEORGOULIS:  Objection to the argumentative

3    nature of the questions.

4              THE COURT:  Overruled.

5    A    I am testifying, saying that building the roof takes, you

6    know, takes less time than preparing it.  That is what I say.

7    Q    All the people who you have viewed as roofers, also did

8    the demolition work; isn't that right?

9    A    That's correct.

10   Q    And did you ever-- have you ever read a legal definition

11   of what a laborer's job was or a roofer's job was?

12             MR. GEORGOULIS:  Objection.

13   A    No.

14             THE COURT:  Overruled.

15   Q    You are just using these terms and they were used on the

16   job by your bosses and colleagues, correct?

17   A    I never heard my boss explain to me, but I know what the

18   roofer is.

19   Q    Do you know?

20   A    For the job.

21   Q    I'm sorry, from the job?

22   A    From the job, yes.

23   Q    So that is the way it is used at your former employer,

24   correct?

25   A    Ah-hum.

Agolli - Cross - Bauman                          630

1   Q     You have to answer.

2   A     That's correct.

3   Q     Now, I think you testified, it wasn't entirely clear, the

4   time frame of this, you testified that at certain points, you

5   drove yourself to job sites directly rather than reporting to

6   the garage; is that correct?

7   A     That's correct.

8   Q     Was that in your own vehicle?

9   A     My own vehicle.

10  Q     For approximately how long was that?

11  A     A year.

12  Q     Can you estimate what year that was?

13  A     I can't say exactly what year.  The time I was in

14  college.

15  Q     Was it between 2003 and 2008?

16  A     I can't say what year it was.

17  Q     When were you in college?

18  A     From-- I started going to school, I was going for English

19  first and then I went to college.  I started in 2006, going to

20  school.

21  Q     So it had to have been after 2006, correct?

22  A     Yes.

23  Q     So, for that one year, how could you have known what the

24  plaintiffs were doing in the morning if you were driving

25  yourself to work, to the project?

Agolli - Cross - Bauman                    631

1    A    Because that is every day.  That is what we do every day.

2    Q    Is that the kind of deduction you were taught at the

3    police academy?

4              MR. GEORGOULIS:  Objection, Judge.

5              THE COURT:  Sustained.

6    Q    You just know because you just know, is that what you are

7    telling us?

8              MR. GEORGOULIS:  Objection.

9    A    Those are every day, that is how the day went.  Going to

10   the warehouse, pick up the employers and go to the job site.

11   Q    But for this one year, you weren't doing that, you were

12   going directly to the job site, correct.

13             THE COURT:  Sustained, let's move on.

14             THE WITNESS:  That's correct.

15   Q    You said you were going to Kingsborough, I believe you

16   said, Kingsborough Community and John Jay; is that right?

17   A    That's correct.

18   Q    Were you going to John Jay while you at NJK still?

19   A    No.

20   Q    That was after, put aside John Jay.

21             You were going to Kingsborough Community from 2006,

22   was that--

23   A    I didn't say 2006.  I was going to school for English

24   first and then started college.

25   Q    When did you start college?

Agolli - Cross - Bauman                    632

1   A    I think exactly -- I don't remember the year.  I think it
2   was 2007 or 2008.  I don't remember exactly the year.
3   Q    So, you don't remember when you started college, but you
4   remember what Mr. Hernandez did twelve years ago; is that
5   correct?
6              MR. GEORGOULIS:  Objection.
7              THE COURT:  Overruled.
8   A    Twelve years ago?
9   Q    Yes.  You don't remember when you started college?
10  A    No.
11  Q    Do you remember when you graduated from college?
12  A    No.
13  Q    No.
14              Isn't it true you have not graduated from college?
15  A    Sorry?
16  Q    Isn't it true you have not graduated?
17  A    I graduated from Kingsborough.
18  Q    Not from John Jay?
19  A    Not yet.
20  Q    Do you remember when you might graduate?
21              THE COURT:  Sustained.
22              MR. GEORGOULIS:  Objection.
23              THE COURT:  It is irrelevant.
24  Q    Do you remember what you were paid at NJK?
25  A    What I was paid?  No, I don't remember.

Agolli - Cross - Bauman                           633

1    Q     You don't remember what you were paid?

2    A     No.

3    Q     Do you recall whether while you were in school, whether

4    it was English school or Kingsborough Community College, do

5    you recall whether you worked a full day at NJK and then went

6    to school?

7    A     I worked full days, yes.

8    Q     You went to school at night?

9    A     Yes.

10   Q     What time did you have to be at school?

11   A     What time?

12   Q     Yeah.

13   A     I finished at four, so I-- the English started at six.

14   The ESL class started at six.

15             Exactly the college class was, I know it was after

16   five, I don't remember exactly the time.

17   Q     Those days you go directly from the job site to school,

18   you would not go back to the garage?

19   A     To the garage, we never drove to the garage.

20   Q     After the job ended, you leave and go to school directly?

21   A     Yes.

22   Q     So, during those times, you don't know whether the

23   plaintiffs went back to the shop, do you?

24   A     At those times, no.

25   Q     Now, to the extent that you gave rides to your coworkers,

Agolli - Cross - Bauman                    634

1   after work, you testified that you dropped them off home or

2   close to home; is that right?

3   A    That's correct.

4   Q    Isn't it true that with regard to the plaintiffs, if you

5   ever gave them rides after work, you would just drop them back

6   at the shop?

7   A    No.

8   Q    You took them home?

9   A    I would drop them off for example, Nica, I used to drop

10  him off, Prospect Park is, I think in the 40s, one of the

11  streets.  He used to live between Fifth and Sixth Avenue, I

12  dropped him right on the street.

13  Q    Who is Nica?

14  A    Mr. Hernandez.

15  Q    That is the nickname?

16  A    Yes.

17          And, Mr. Freedie, I used to drop him off close to

18  59th Street because he used to live on 4th Avenue.  He used to

19  live there, close.

20  Q    Now, during the time at NJK, didn't you complain to your

21  coworkers about not getting paid overtime?

22  A    Not getting paid overtime?

23  Q    Yeah.

24  A    No.

25  Q    Never complained?

Agolli - Cross - Bauman                          635

1  A    We complained -- at every job you complain.  It is a hard

2  work.  You complain about your coworkers, your boss, you

3  complain about everybody.  If I had anything, I would go to

4  the office and tell them.  You got to pay me.

5  Q    Did they?

6  A    Of course they did.

7  Q    Every time?

8  A    Every time.

9  Q    Now, isn't it true that you had two cousins who also

10 worked at NJK?

11 A    That's true.

12 Q    And, do you know when they left NJK?

13 A    I don't remember exactly.

14 Q    Isn't it true that they each received approximately

15 $20,000 settlement of wage claims?

16      MR. GEORGOULIS:  Objection.

17 A    How would I know that?

18 Q    They are your cousins, maybe you talked to them.

19      MR. GEORGOULIS:  Objection.  What does that have to

20 do with anything, Your Honor?

21      THE COURT:  Sustained.

22      MR. GEORGOULIS:  Move to strike.

23      THE COURT:  Granted.

24      MR. BAUMAN:  His answer was also, I don't know.  So

25 there is nothing to strike.

- C O L L O Q U Y -                     636

1            I have nothing further Your Honor.

2            MR. GEORGOULIS:  Nothing further.

3            THE COURT:  Thank you officer.

4            (Witness excused.)

5            THE COURT:  Do you have any further witnesses?

6            MR. GEORGOULIS:  No, Your Honor.

7            We have some housekeeping if you recall, the

8    exhibits.

9            THE COURT:  Certainly.

10           Why don't you tell me each, the exhibits you want to

11   offer that have not yet been offered.

12           MR. BAUMAN:  I believe everything we sought to get

13   in is in.

14           MR. GEORGOULIS:  Judge, can we have five minutes to

15   review them because there is quite a bit.

16           THE COURT:  Yes.

17           Why don't you do this, why don't you make your list,

18   let them know so that we can talk about objections, if there

19   are any.

20           This is what has been received and then we will run

21   through it in fifteen minutes.

22           MR. GEORGOULIS:  Very well.

23           MR. BAUMAN:  Okay.

24           (Recess taken.)

25

637

1          THE COURT:  All right.  Have you come up with a list

2    of the exhibits that you want to offer?

3          MS. LUSHER:  We actually --

4          MR. GEORGOULIS:  I don't think we have much of -- we

5    were looking at the exhibits with --

6          THE COURT:  There is not much more that we need to

7    get in.

8          MR. GEORGOULIS:  I just have a couple of little

9    things that were -- some exhibits that were not objected to

10   that were part of the exhibit list.

11         THE COURT:  All right.

12         MS. BARRON:  It is C-1 through C-5, the plaintiff

13   subpoenas to the governmental --

14         THE COURT:  C-1 through five?

15         MR. BAUMAN:  No objection, Your Honor.

16         THE COURT:  All right.  Received.

17         (Marked.)

18         MS. BARRON:  E, plaintiff's Rule 26 disclosures

19   dated January 28, 2010.

20         THE COURT:  E as in Edward?

21         MS. BARRON:  Yes, Your Honor.

22         MR. BAUMAN:  No objection.

23         THE COURT:  Received.

24         (Marked.)

25         MS. BARRON:  Exhibit H.

GR       OCR       CM       CRR       CSR

1           MR. BAUMAN:  I'm sorry, Your Honor.  If I may, if

2    the defendants want to put in the original disclosures, they

3    should also put in the supplemental disclosures.

4           MS. BARRON:  They are already in.

5           MR. BAUMAN:  My mistake.

6           THE COURT:  H?

7           MS. BARRON:  H.

8           THE COURT:  Which is?

9           MS. BARRON:  Sampling of invoices and correspondence

10   pertaining to NJK's use of storage facilities on the

11   individual project sites.

12          MR. BAUMAN:  Those we have an objection to, Your

13   Honor.

14          THE COURT:  Being?

15          MR. BAUMAN:  We didn't object to their admissibility

16   or their relevance, but they were never sponsored, never any

17   examination about what they were, what their meaning was, what

18   their significance was, etcetera.  Just because they are

19   potentially admissible doesn't mean they walk in.

20          MR. GEORGOULIS:  Judge, business records, they

21   weren't objected to.  I thought that's the whole point of

22   reaching agreement pretrial with regard to exhibits.

23          MR. BAUMAN:  My understanding is that's only as to

24   admissibility.  That's not -- that doesn't mean they don't

25   have to be sponsored and their significance has to be

1   displayed.  They are potentially relevant if there is a

2   witness to sponsor them.

3            THE COURT:  I will receive them and give them

4   whatever weight they deserve.

5            MS. LUSHER:  Some of them come from federal projects

6   and they have no relevance.

7            THE COURT:  Then they get no weight.

8            MS. LUSHER:  Okay.

9            MR. GEORGOULIS:  It doesn't bear at all to any

10  calculations, Judge.

11           THE COURT:  Okay.

12           (Marked.)

13           MS. BARRON:  Exhibit J, it's another sampling of

14  shipping and delivery receipts indicating NJK supplies were

15  delivered to the individual project sites.

16           MR. BAUMAN:  The same objection, Your Honor.

17           THE COURT:  The same ruling.

18           (Marked.)

19           MS. BARRON:  And exhibit O-2, O-4, O-5, O-6 and O-8,

20  which are the plaintiffs' affidavits and declarations that

21  were submitted in support of their motion for summary

22  judgment.

23           MR. BAUMAN:  No objection.

24           THE COURT:  Received.

25           (Marked.)

640

1            MS. BARRON:  And P-1 and P-2, which were -- P-1 is

2    plaintiffs' Rule 56.1 statement and P-2 are plaintiffs'

3    responses to defendant's 56.1 statement.

4            MR. BAUMAN:  Those are on the docket, Your Honor, so

5    there is no objection.

6            THE COURT:  All right.

7            (Marked.)

8            MR. GEORGOULIS:  Just one other -- there is ECF --

9    if it's on the docket, it's in.

10           THE COURT:  Yes.

11           MR. GEORGOULIS:  Fine.

12           THE COURT:  All right.

13           MR. BAUMAN:  From our end, Your Honor, amongst

14   defendant's exhibits, we thought but apparently they were not,

15   Exhibit D, NJK's bank statements were never admitted.  We

16   would like them --

17           THE COURT:  D?

18           MR. BAUMAN:  D.

19           THE COURT:  They are in.

20           MR. BAUMAN:  They are in.  The list that we were

21   given says they are not in.

22           THE COURT:  Second page.

23           MR. GEORGOULIS:  Second page.

24           MR. BAUMAN:  They got in somewhere else.  We don't

25   see it on the list we are given.  If they are in, great.

641

1          MR. GEORGOULIS:  Second page.

2          MR. BAUMAN:  I'm sorry.

3          MS. LUSHER:  It says admitted, no.

4          MR. BAUMAN:  In the column it says admitted, no.

5          MR. GEORGOULIS:  No objection, Judge.

6          THE COURT:  Received.

7          (Marked.)

8          THE COURT:  Good catch.  Thank you.

9          MR. BAUMAN:  As to plaintiffs' list, I believe

10   everything we wanted in has been admitted.

11          THE COURT:  Okay.

12          MR. BAUMAN:  Nothing additional.

13          MR. GEORGOULIS:  Whatever objections we've already

14   made are in obviously.

15          THE COURT:  Yes.

16          How long is it going to take you to do findings of

17   fact and conclusions of law?

18          MR. BAUMAN:  We were discussing this during one of

19   the breaks.  We have another couple of trials coming up so we

20   were hoping we could get 60 days.

21          MR. GEORGOULIS:  I have two trials as well, judge.

22          THE COURT:  That's a long time.  All right.  I will

23   take pity on you.

24          MR. BAUMAN:  Thank you.

25          THE COURT:  Let me look.  We are talking April 28th,

GR        OCR        CM        CRR        CSR

642

1    they are due.

2            I want you to take the following into account in

3    preparing your proposed findings of fact and conclusions of

4    law and damage calculations.

5            I am inclined to rule as follows, although I am

6    keeping an open mind until I see your proposed findings of

7    fact and conclusions of law.

8            Plaintiffs have proved by a preponderance of the

9    evidence that the average workday was from 6:00 o'clock am to

10   5:30 pm; that the time spent at the shop loading the van and

11   traveling to the work sites and the time spent coming back in

12   reverse is compensable time.

13           From that average workday must be deducted a half

14   hour for lunch, 15 minutes for coffee, and 15 minutes for

15   dressing and undressing.  That would leave an average workday

16   of ten-and-a-half hours.

17           The individual defendants, Mr. Hatzis and

18   Mr. Georgiadis, are liable as employers and that the issue of

19   prevailing wage classifications will be resolved as follows:

20           The plaintiffs have established that within three

21   years of their work life for NJK they became roofers; that of

22   the actual time on the roof, there is a 50/50 split between

23   laborer and roofer.  Half of the work is as a laborer, half of

24   it it's as a roofer.

25           MR. GEORGOULIS:  Your Honor, is that after the three

GR      OCR      CM      CRR      CSR

643

1    years?

2              THE COURT:  That's after the three years.

3              You are going to have to cite to the appropriate

4    laborer or roofer prevailing wage and there are several I

5    think for each.  It has to be the jurisdiction that's covered

6    by the project and the right classification.  I don't know how

7    you are going to do that.  If you can't do it to my

8    satisfaction, I will take the lowest prevailing wage rate for

9    that particular classification.  We are talking dollars here.

10   We are not talking a big difference.

11             I urge you to look at the case of Artica,

12   A-R-T-I-C-A, versus Battaglia.  It's actually -- is it J and R

13   Construction, is that it?  It's a Fair Labor Standards Act

14   prevailing wage multiplaintiff jury trial that I had and I

15   wrote on in this court, where issues went to start the running

16   of the interest calculation and all various issues are

17   discussed.  You should be able to find guidance there in

18   crafting your findings of fact and conclusions of law and your

19   proposed damage calculations.

20             Again, these are my preliminary findings.  If you

21   want to dissuade me from doing that, you are welcome to do it.

22             Excuse me.  J B Custom Masonry and Concrete.  There

23   are actually two cases.  One is an '09 case, one is a 2011.

24   They were put together.

25             Do you have the docket?

644

1           THE CLERK:  O9 CV 3796 and 11 CV 842.

2           THE COURT:  I will add one final thing.  I am likely

3   to find willfulness so the FLSA Statute of Limitations is

4   likely to be three years and, in addition, -- well, yes.

5           So there you have it.  I will look for your

6   submissions on the 28th of April.

7           Do you want to respond to each other's submissions?

8           MR. GEORGOULIS:  No.

9           MR. BAUMAN:  We don't need to, Your Honor, unless

10  you want.

11          THE COURT:  Unless I need further clarification.

12          MR. GEORGOULIS:  Judge, if you do that, just

13  obviously give us a little time.

14          Thank you.

15          THE COURT:  Okay.  All right.  Thank you, everyone.

16          MR. BAUMAN:  Your Honor, if I may?  I'm sorry.  One

17  last point.  I hate to be one of those one-more-thing guys.

18  One more thing.  In light of your preliminary ruling, we'd

19  request that the Court issue an order pursuant to CPLR 5229.

20          THE COURT:  CPLR doesn't apply here.

21          MR. BAUMAN:  Actually, it does for purposes of

22  enforcement of judgments, not that this is a judgment.

23          THE COURT:  It applies pursuant to local rules and

24  the Federal Rules.  You look to the state rules for

25  enforcement judgment.

GR      OCR      CM      CRR      CSR

645

1          MR. BAUMAN:  In essence, what the rule says is that

2     in the event that a court issues a preliminary order

3     suggesting that a finding will be forthcoming against a

4     defendant, the defendant can be directed to not dispose of

5     assets.

6          THE COURT:  What was it?  CPLR what?

7          MR. BAUMAN:  5229.

8          THE COURT:  Well, it says, before judgment is

9     entered upon motion of the party in whose favor a verdict or

10    decision has been rendered.  Verdict or decision has not been

11    rendered.

12         However, I will put the defendants on notice.  If

13    between now and the time a judgment is entered, if any assets

14    are dissipated, that will go a long way, or the defendants are

15    made insolvent, their fraudulent conveyance action would

16    likely be a slam dunk.

17         MR. GEORGOULIS:  Judge, they --

18         THE COURT:  They are not doing it.  I know.

19         MR. BAUMAN:  Thank you, Your Honor.

20         MS. LUSHER:  Thank you.

21         (Matter concludes.)

22

23

24

25

GR      OCR      CM      CRR      CSR

646

1                         I N D E X

2    W I T N E S S E S :

3     Kostas Georgiadis                              506

4     DIRECT EXAMINATION                             506

5     VOIR DIRE EXAMINATION                          546

6     DIRECT EXAMINATION BY MR. BAUMAN               559

7                                                    574

8     Hugo Enamorado

9     DIRECT EXAMINATION                             574

10    CROSS EXAMINATION BY MR. BAUMAN                592

11    REDIRECT EXAMINATION                           601

12                                                   601

13    MIKELJAN   AGOLLI

14    DIRECT EXAMINATION BY MR. GEORGOULIS           602

15

16   E X H I B I T S :

17    73                                             505

18    24                                             537

19    D                                              640

20    C-1 through C-5                                637

21    E                                              637

22    H                                              638

23    J                                              639

24    O-2, O-4, O-5, O-6 and O-8                     639

25    P-1 and P-2                                    640

GR      OCR      CM      CRR      CSR

## $

**$1282.50** [1] - 526:15
**$20,000** [1] - 635:15
**$23.25** [1] - 510:11
**$25** [1] - 526:15
**$25.20** [1] - 514:11
**$260** - 517:16
**$28** [2] - 562:18, 562:19
**$30** [1] - 592:13
**$32** [1] - 562:21
**$360** [1] - 518:16
**$473** [1] - 518:16
**$554,000** [1] - 547:19
**$61** [1] - 592:11
**$64** [1] - 562:22
**$83,000** [4] - 565:20, 566:6, 571:2, 571:19
**$83,826.11** [1] - 565:9

## '

**'02** [2] - 604:18, 604:19
**'03** [2] - 557:1, 618:11
**'05** [1] - 557:3
**'07** [1] - 557:1
**'09** [1] - 643:23
**'90** [1] - 576:3
**'92** [2] - 575:11, 576:1
**'93** [1] - 575:11
**'95** [1] - 576:1

## 0

**0015** [1] - 552:18
**09** [2] - 498:4, 644:1
**09-4812** [1] - 578:10

## 1

**10** [1] - 577:22
**100** [4] - 559:9, 561:6, 564:11, 566:25
**10005** [1] - 498:21
**10006** [1] - 498:18
**1006** [5] - 539:9, 539:17, 559:17, 566:20
**11** [2] - 578:11, 644:1
**111** [1] - 498:17
**12** [4] - 525:2, 528:19, 576:9, 594:10
**120** [1] - 498:20
**125** [1] - 567:1
**13** [5] - 527:21, 527:23, 527:24, 531:16, 531:21
**13th** [1] - 520:12
**15** [9] - 519:6, 519:8, 520:14, 577:22, 593:6, 605:13, 608:17, 642:14
**150** [3] - 541:19, 541:21, 542:11

**16** [11] - 517:7, 517:8, 517:10, 517:11, 517:13, 517:14, 517:15, 520:14, 552:25, 605:13
**17** [7] - 509:14, 509:17, 509:25, 510:4, 524:14, 553:8, 553:10
**18** [10] - 510:13, 511:6, 522:9, 523:19, 524:11, 524:12, 524:14, 527:24, 603:7
**184** [2] - 510:24, 510:25
**185** [1] - 514:9
**19** [8] - 518:15, 520:12, 523:17, 528:15, 528:25, 529:1, 603:7
**1993** [1] - 593:4, 594:19
**19th** [1] - 564:12

## 2

**2** [3] - 562:20, 568:7, 570:3
**20** [13] - 515:12, 516:16, 519:23, 528:24, 529:1, 529:2, 529:7, 575:9, 592:15, 594:22, 596:5, 596:16, 608:17
**20,000** [1] - 534:21
**200** [3] - 541:20, 541:21, 542:11
**2000** [3] - 518:17, 529:16, 529:17
**2002** [5] - 602:24, 603:5, 603:17, 617:21
**2003** [27] - 507:4, 529:18, 534:17, 554:24, 557:25, 577:16, 583:20, 587:5, 592:7, 593:22, 594:11, 595:12, 601:3, 603:23, 605:11, 606:5, 606:6, 609:20, 615:18, 616:1, 617:4, 620:23, 627:10, 627:18, 630:15
**2003-year** [1] - 604:20
**2004** [10] - 510:13, 511:6, 514:3, 514:10, 520:12, 531:16, 531:21, 536:9, 617:5, 617:13
**2005** [8] - 502:20, 518:17, 518:18, 536:9, 552:25, 572:22, 576:8, 618:4
**2005/2006** [1] - 618:10
**2006** [15] - 563:19, 564:15, 564:17, 565:18, 566:1, 566:12, 570:8, 570:14, 571:1, 618:4, 630:19, 630:21, 631:21, 631:23
**2007** [7] - 554:25, 564:20, 570:8, 570:25, 571:1, 571:13, 632:2
**2008** [28] - 507:4, 525:7, 534:17, 538:23, 572:8, 572:9, 572:11, 572:13, 573:17, 577:16, 583:21, 587:5, 592:7, 593:22, 594:11, 595:12, 601:3, 603:23, 605:12, 606:5, 609:20, 615:18, 616:1, 619:17, 619:19, 620:23, 630:15, 632:2
**2009** [2] - 502:20, 538:23
**2010** [5] - 565:22, 570:7, 570:23, 571:11, 637:19
**2011** [3] - 602:11, 603:21, 643:23
**2012** [4] - 551:7, 555:13, 555:14, 556:6
**2013** [7] - 548:2, 551:9, 551:10, 551:12, 556:3, 558:8
**2014** [3] - 498:8, 509:23, 556:1
**21** [2] - 529:2, 529:3

**225** [1] - 498:23
**23** [2] - 525:7, 547:2
**23.25** [4] - 510:21, 512:24, 513:12, 514:2
**23rd** [1] - 510:14
**24** [5] - 530:3, 536:18, 536:20, 537:1, 646:18
**25** [7] - 507:2, 514:2, 515:12, 559:7, 559:8, 588:13, 592:13
**25.20** [2] - 511:14, 512:1
**25th** [2] - 514:5, 514:6
**26** [4] - 514:10, 536:12, 546:19, 637:18
**27** [1] - 588:23
**28** [3] - 498:8, 509:23, 637:19
**28th** [2] - 641:25, 644:6

## 3

**3** [2] - 502:24, 545:25
**30** [2] - 522:23, 590:3
**30,000** [1] - 534:22
**33** [4] - 563:16, 563:17, 563:22, 564:3
**34** [3] - 563:16, 563:22, 564:3
**35** [2] - 563:17, 569:7
**35.20** [1] - 511:9
**35th** [1] - 577:12
**36** [1] - 563:18
**365** [1] - 607:10
**36th** [1] - 578:19
**3796** [1] - 644:1
**37th** [2] - 607:18, 624:13
**3:30** [1] - 621:9

## 4

**4** [1] - 531:3
**40** [3] - 520:4, 520:5, 523:4
**40s** [1] - 634:10
**41** [2] - 509:17, 509:19
**42** [4] - 509:21, 509:22, 509:24, 510:4
**43** [1] - 514:1
**45** [5] - 520:19, 521:23, 522:6, 569:7, 622:11
**4812** [1] - 498:4
**4th** [1] - 634:18

## 5

**50** [2] - 577:3, 605:20
**50/50** [1] - 642:22
**500,000** [2] - 506:18, 506:19
**505** [1] - 646:17
**506** [2] - 646:3, 646:4
**50th** [1] - 577:4
**51** [3] - 525:13, 525:19, 526:13
**51.3** [2] - 525:7, 526:15
**5229** [2] - 644:19, 645:7

**53** [3] - 509:13, 510:1, 510:23
**537** [1] - 646:18
**546** [1] - 646:5
**559** [1] - 646:6
**56.1** [2] - 640:2, 640:3
**574** [2] - 646:7, 646:9
**592** [1] - 646:10
**59th** [1] - 634:18
**5:30** [1] - 642:10

# 6

**6** [2] - 563:24, 563:25
**60** [1] - 641:20
**601** [2] - 646:11, 646:12
**602** [1] - 646:14
**613-2538** [1] - 498:24
**624** [1] - 531:5
**637** [2] - 646:20, 646:21
**638** [1] - 646:22
**639** [2] - 646:23, 646:24
**640** [2] - 646:19, 646:25
**65** [1] - 578:9
**68th** [1] - 602:13
**6:00** [7] - 578:24, 578:25, 588:21, 598:19, 598:22, 598:25, 642:9

# 7

**7** [1] - 532:4
**7/18/2004** [1] - 510:15
**7/28** [1] - 510:16
**718** [1] - 498:24
**73** [4] - 505:12, 505:14, 505:17, 646:17
**75** [3] - 625:22, 628:4, 628:7
**77** [1] - 502:24
**7:00** [1] - 586:4
**7th** [1] - 605:20

# 8

**8** [8] - 499:7, 499:13, 505:17, 572:6, 572:7, 572:25, 573:6, 573:7
**8's** [1] - 503:8
**80** [1] - 592:11
**83,000** [1] - 565:5
**842** [1] - 644:1
**88th** [1] - 607:10
**8:00** [1] - 586:3

# 9

**9-16-2005** [1] - 553:13
**90** [1] - 500:9
**901(a)(4** [1] - 501:3
**902(5)** [1] - 500:9
**9:45** [1] - 498:9

# A

**a.m** [4] - 498:9, 598:19, 598:22, 598:25
**Abel** [1] - 574:11
**ABEL** [1] - 574:12
**able** [5] - 519:2, 524:19, 524:20, 552:11, 643:17
**absolutely** [4] - 504:24, 536:17, 539:21, 615:4
**academy** [2] - 603:21, 631:3
**accept** [4] - 515:25, 532:25, 567:5, 568:11
**accepted** [1] - 534:9
**accepting** [2] - 527:15, 566:14
**access** [2] - 552:2, 557:22
**according** [2] - 511:8, 554:22
**account** [2] - 502:14, 642:2
**accountant** [2] - 522:14, 522:21
**accounting** [3] - 514:18, 525:9, 540:22
**accrues** [1] - 558:15
**accurate** [5] - 537:3, 553:12, 554:25, 557:20, 560:8
**accurately** [1] - 568:16
**acknowledged** [1] - 535:17
**Act** [1] - 643:13
**action** [1] - 645:15
**actual** [7] - 502:4, 516:17, 539:22, 583:24, 590:9, 622:24, 642:22
**adage** [1] - 628:13
**add** [6] - 507:21, 532:23, 562:22, 573:13, 573:16, 644:2
**addendum** [1] - 539:1
**addition** [5] - 515:24, 534:4, 567:8, 572:19, 644:4
**additional** [9] - 512:12, 512:24, 513:17, 545:11, 545:13, 562:5, 562:13, 563:2, 641:12
**address** [1] - 536:11
**admissibility** [2] - 638:15, 638:24
**admissible** [1] - 638:19
**admit** [2] - 514:20, 521:25
**admitted** [5] - 536:21, 640:15, 641:3, 641:4, 641:10
**admitting** [2] - 527:15, 533:23
**advised** [1] - 569:11
**affiant** [1] - 568:13
**affidavit** [18] - 554:12, 554:22, 554:24, 578:2, 578:3, 578:5, 579:10, 579:21, 580:25, 581:1, 584:14, 584:15, 585:22, 587:10, 587:11, 589:11, 589:12, 589:16
**affidavits** [12] - 535:22, 541:9, 543:19, 543:22, 544:1, 551:4, 551:7, 554:11, 555:9, 557:20, 587:15, 639:20
**affirmatively** [1] - 500:1
**afternoon** [7] - 538:1, 574:22, 592:4, 602:2, 602:3, 626:10, 626:11
**afterwards** [3] - 537:23, 576:5, 592:18
**ago** [9] - 528:4, 535:24, 557:11, 558:22, 559:25, 595:25, 627:24, 632:4,
632:8
**Agolli** [12] - 537:21, 567:19, 569:4, 602:2, 607:3, 616:17, 618:7, 618:20, 620:18, 621:19, 625:15, 626:10
**AGOLLI** [2] - 601:24, 646:13
**agree** [7] - 501:1, 506:13, 520:4, 525:9, 525:20, 534:3, 534:25
**agreed** [1] - 567:7
**agreement** [12] - 499:12, 499:17, 500:10, 500:18, 505:5, 572:25, 573:3, 573:4, 573:15, 573:16, 616:10, 638:22
**Agreement** [1] - 505:18
**agreements** [1] - 501:18
**Agustin** [3] - 561:12, 561:13, 561:16
**ah-hum** [2] - 613:14, 629:25
**ahead** [3] - 509:18, 589:22, 592:1
**aided** [1] - 498:25
**AL** [2] - 498:4, 498:8
**Albania** [1] - 602:22
**alcoholic** [2] - 613:21, 613:22
**Alfaro** [7] - 554:12, 556:21, 556:24, 572:5, 572:14, 572:15, 620:18
**alleged** [1] - 572:21
**allow** [4] - 524:1, 573:10, 573:20, 581:2
**almost** [7] - 502:1, 585:20, 595:4, 595:7, 598:12, 614:14, 621:16
**alone** [1] - 509:1
**Ambinder** [3] - 540:15, 540:23, 541:18
**AMBINDER** [1] - 498:17
**amend** [1] - 539:21
**American** [1] - 602:25
**amount** [17] - 512:17, 516:11, 517:15, 519:11, 519:14, 520:1, 536:2, 538:22, 539:2, 542:25, 544:22, 547:13, 547:16, 558:14, 562:19, 563:4, 593:1
**amounts** [4] - 512:13, 512:15, 561:24, 562:2
**analysis** [1] - 616:14
**answer** [23] - 507:15, 515:17, 516:3, 521:2, 523:24, 524:3, 528:5, 528:8, 528:11, 528:20, 549:19, 552:14, 554:16, 554:18, 559:4, 587:21, 593:13, 593:14, 597:6, 597:8, 616:16, 630:1, 635:24
**answered** [2] - 515:6, 578:2
**answers** [4] - 534:18, 568:14, 568:16, 597:2
**apiece** [1] - 531:25
**appearance** [1] - 501:5
**APPEARANCES** [1] - 498:14
**applicable** [1] - 501:16
**applies** [4] - 499:19, 597:6, 644:23
**apply** [8] - 500:25, 503:6, 542:20, 542:22, 548:7, 559:7, 561:18, 644:20
**approach** [1] - 544:24
**Appropriate** [1] - 559:1
**appropriate** [2] - 503:19, 643:3
**appropriately** [1] - 504:9
**April** [3] - 518:17, 641:25, 644:6

**architectural** [1] - 599:8
**area** [4] - 546:5, 602:12, 622:21, 623:1
**areas** [3] - 501:12, 611:6, 624:22
**arguable** [1] - 599:16
**argue** [1] - 536:1
**arguing** [1] - 616:4
**argument** [4] - 535:8, 569:21, 596:15, 616:14
**argument's** [2] - 562:21, 618:10
**argumentative** [1] - 629:2
**arguments** [1] - 501:12
**arrived** [1] - 586:1
**Artica** [1] - 643:11
**ARTICA** [1] - 643:12
**asbestos** [2] - 596:8, 596:14
**aside** [1] - 631:20
**aspect** [1] - 514:18
**assets** [2] - 645:5, 645:13
**associate** [1] - 590:15
**associate's** [1] - 602:18
**assume** [9] - 516:3, 544:16, 544:19, 544:21, 545:17, 548:20, 554:2, 554:25, 565:19
**assumed** [8] - 537:21, 537:25, 548:25, 549:2, 549:3, 549:8, 557:19
**assuming** [2] - 508:8, 551:4
**assumption** [4] - 549:12, 549:16, 549:21, 553:3
**assumptions** [3] - 548:14, 548:15, 548:16
**asthma** [2] - 581:24, 596:2
**astray** [1] - 585:22
**attachment** [1] - 589:18
**attend** [1] - 551:1
**attended** [1] - 551:3
**attending** [1] - 550:24
**attorney** [6] - 513:8, 513:9, 523:11, 525:13, 527:14, 542:7
**attorneys** [6] - 542:18, 548:16, 548:23, 549:17, 549:25, 561:9
**August** [11] - 525:7, 548:1, 551:12, 556:3, 564:20, 565:21, 570:23, 570:25, 571:1, 571:11, 571:13
**authentication** [1] - 501:4
**Avenue** [4] - 577:12, 607:18, 634:11, 634:18
**Avenues** [1] - 577:13
**average** [3] - 642:9, 642:13, 642:15
**awkward** [1] - 557:18
**axes** [1] - 582:16

## B

**bachelor's** [2] - 602:19, 602:20
**background** [2] - 540:18, 602:17
**backup** [3] - 546:6, 547:19, 563:13
**bad** [2] - 599:25, 619:1
**bakery** [1] - 599:19
**balance** [1] - 536:23

**bank** [11] - 535:9, 535:12, 544:4, 544:9, 549:2, 552:2, 552:10, 557:22, 558:5, 558:8, 640:15
**bankruptcy** [1] - 600:8
**bar** [1] - 521:13
**bargaining** [9] - 499:12, 499:17, 500:10, 500:18, 572:25, 573:2, 573:15, 573:16, 616:10
**Bargaining** [1] - 505:18
**BARRON** [11] - 498:20, 637:12, 637:18, 637:21, 637:25, 638:4, 638:7, 638:9, 639:13, 639:19, 640:1
**base** [3] - 501:17, 545:3
**based** [5] - 501:14, 502:8, 504:11, 533:2, 553:2, 559:15, 566:9, 571:8
**basic** [1] - 519:17
**basis** [7] - 519:4, 519:5, 519:22, 534:7, 558:15, 558:16, 601:9
**Bates** [1] - 551:16
**Battaglia** [1] - 643:12
**battle** [1] - 502:3
**Bauman** [5] - 505:19, 515:14, 536:14, 559:21, 572:2
**BAUMAN** [121] - 498:15, 505:12, 505:20, 506:5, 506:20, 507:19, 508:19, 509:20, 511:18, 513:2, 513:7, 514:6, 515:12, 516:5, 516:12, 516:14, 516:25, 517:9, 517:13, 518:2, 519:8, 520:14, 521:4, 523:2, 526:22, 527:24, 528:4, 528:11, 528:25, 529:6, 531:1, 533:19, 536:17, 537:12, 537:20, 537:25, 540:3, 540:9, 546:18, 546:21, 547:22, 554:17, 555:5, 555:18, 558:19, 559:22, 559:23, 563:16, 568:1, 569:9, 572:4, 572:8, 572:10, 572:15, 572:17, 572:23, 573:19, 573:21, 573:24, 574:1, 577:25, 578:7, 579:9, 579:14, 580:22, 581:3, 587:6, 587:10, 589:10, 589:12, 589:17, 591:2, 592:2, 592:3, 596:11, 596:18, 597:8, 599:14, 599:16, 600:24, 601:18, 606:22, 606:25, 615:24, 616:3, 625:11, 626:2, 626:8, 626:9, 628:19, 635:24, 636:12, 636:23, 637:15, 637:22, 638:1, 638:5, 638:12, 638:15, 638:23, 639:16, 639:23, 640:4, 640:13, 640:18, 640:20, 640:24, 641:2, 641:4, 641:9, 641:12, 641:18, 641:24, 644:9, 644:16, 644:21, 645:1, 645:7, 645:19, 646:6, 646:10
**Bay** [4] - 577:3, 602:15, 605:20, 607:10
**bay** [1] - 577:6
**bear** [1] - 639:9
**became** [11] - 572:12, 573:17, 592:23, 593:25, 605:2, 618:4, 618:9, 618:11, 618:15, 625:24, 642:21
**become** [2] - 572:7, 617:16
**BEFORE** [1] - 498:12
**began** [12] - 575:13, 582:23, 592:16, 592:18, 592:19, 592:22, 592:23, 593:5, 593:17, 593:24, 594:22, 594:24
**begin** [1] - 594:18

**beginning** [3] - 518:17, 536:3, 554:13
**begins** [1] - 563:16
**benefit** [5] - 504:6, 516:20, 560:22, 567:21
**benefits** [2] - 512:11, 514:12
**best** [4] - 535:25, 536:6, 556:16, 568:15
**between** [15] - 502:13, 507:4, 533:13, 535:20, 541:21, 577:12, 577:13, 577:15, 594:11, 601:3, 615:18, 630:15, 634:11, 642:22, 645:13
**beyond** [4] - 506:14, 512:24, 520:5, 545:12, 589:11, 592:9, 599:11, 599:15
**bidding** [1] - 506:11
**biddings** [1] - 509:3
**big** [4] - 551:14, 561:5, 585:9, 643:10
**bit** [12] - 531:8, 538:22, 538:25, 539:1, 551:15, 556:15, 556:17, 586:14, 593:3, 595:2, 599:9, 636:15
**blind** [1] - 502:7
**blind-sided** [1] - 502:7
**block** [1] - 581:10
**bonuses** [2] - 517:23, 518:2
**book** [2] - 502:18, 530:5
**bookkeeping** [1] - 526:24
**books** [1] - 530:4
**born** [1] - 602:21
**boro** [1] - 614:1
**Borough** [1] - 540:19
**boss** [4] - 598:8, 614:9, 629:17, 635:2
**bosses** [5] - 575:18, 575:19, 627:3, 629:16
**bothering** [2] - 596:24, 597:10
**bottom** [5] - 503:1, 517:14, 517:15, 520:10, 552:24
**bought** [1] - 626:15
**box** [1] - 582:13
**breach** [1] - 503:25
**break** [7] - 537:13, 537:15, 537:19, 537:20, 538:1, 538:4, 538:6, 568:7, 586:19, 611:23
**breaks** [3] - 545:16, 586:19, 641:19
**brief** [4] - 532:18, 571:17, 572:5, 603:10
**briefed** [1] - 504:9
**briefly** [1] - 569:10
**bring** [15] - 530:4, 540:1, 581:15, 583:4, 583:5, 583:11, 603:14, 603:15, 605:6, 612:8, 615:1, 615:2, 621:24, 621:25, 623:8
**bringing** [5] - 502:5, 503:10, 585:11, 611:18, 628:9
**Broadway** [1] - 498:17
**Brooklyn** [10] - 498:7, 498:23, 532:20, 577:3, 602:13, 602:15, 605:20, 613:24, 614:2, 621:12
**brother** [1] - 609:11
**brought** [2] - 500:7, 539:24
**BTA** [1] - 576:20

**bucks** [1] - 502:15
**building** [5] - 611:11, 613:5, 628:14, 628:20, 629:5
**builds** [1] - 628:8
**bumped** [2] - 538:24, 538:25
**burden** [3] - 500:2, 534:6, 573:12
**business** [2] - 519:23, 638:20
**busy** [1] - 619:22
**BY** [17] - 506:5, 523:2, 531:1, 540:9, 546:13, 547:10, 556:7, 559:23, 574:21, 592:3, 601:2, 602:1, 618:6, 626:9, 646:6, 646:10, 646:14

## C

**C-1** [3] - 637:12, 637:14, 646:20
**C-5** [2] - 637:12, 646:20
**Cadman** [1] - 498:23
**calculate** [8] - 542:21, 542:23, 542:25, 544:12, 544:21, 562:17, 562:19, 563:4
**calculated** [4] - 544:15, 564:20, 570:8, 570:24
**calculation** [13] - 533:17, 535:4, 535:11, 536:4, 547:20, 550:11, 555:10, 559:12, 560:12, 560:17, 565:23, 571:3, 643:16
**calculations** [30] - 535:19, 536:10, 536:12, 538:21, 541:3, 542:19, 546:3, 547:13, 548:1, 548:7, 549:22, 549:23, 550:15, 554:14, 555:12, 556:4, 557:10, 557:25, 559:5, 560:12, 561:20, 565:4, 567:8, 567:10, 567:24, 570:9, 571:21, 639:10, 642:4, 643:19
**calendar** [3] - 543:15, 543:16, 572:11
**calendars** [2] - 543:8, 544:12
**calm** [2] - 525:16
**cannot** [7] - 512:7, 512:18, 523:6, 531:19, 590:13
**car** [5] - 581:17, 588:15, 588:16, 588:17, 589:2
**carts** [1] - 583:4
**case** [26] - 500:2, 502:1, 502:7, 502:8, 504:9, 519:5, 533:21, 534:6, 535:14, 538:2, 538:3, 541:5, 543:5, 543:7, 543:20, 543:22, 555:12, 569:22, 575:23, 588:20, 593:22, 595:22, 600:8, 616:11, 643:11, 643:23
**cases** [5] - 500:6, 500:7, 501:11, 548:22, 643:23
**cash** [2] - 587:1, 620:8
**Castaneda** [2] - 561:13, 561:14
**catch** [2] - 509:18, 641:8
**CBA** [1] - 499:8
**Centino** [1] - 572:5
**cents** [2] - 538:19, 539:21, 592:11
**certain** [11] - 501:15, 501:19, 503:25, 548:13, 548:19, 554:13, 558:5, 567:19, 577:15, 624:22, 630:4
**certainly** [3] - 518:4, 559:17, 636:9

**certified** [26] - 508:13, 509:5, 511:4, 512:4, 512:12, 512:18, 512:20, 513:9, 513:19, 514:9, 514:10, 515:9, 515:15, 516:10, 516:18, 522:21, 522:22, 532:12, 533:6, 533:13, 541:9, 542:25, 543:8, 549:7, 549:14, 574:7
**Cetino** [4] - 520:11, 520:17, 553:9, 572:16, 572:22, 576:6
**Cetino's** [2] - 552:18, 552:25
**chance** [2] - 539:15, 557:12
**change** [13] - 535:10, 535:23, 536:9, 559:6, 559:7, 573:17, 604:23, 604:25, 610:24, 610:25, 611:1, 611:4
**changed** [6] - 534:19, 555:2, 556:12, 557:11, 573:9
**changes** [6] - 556:9, 556:18, 557:15, 559:11, 560:21, 560:22
**changing** [2] - 555:3, 611:7, 618:22
**characteristics** [2] - 501:5, 501:7
**chart** [10] - 536:19, 536:22, 536:24, 537:2, 537:3, 537:6, 542:17, 544:7, 547:16, 564:8
**chat** [1] - 590:14
**check** [49] - 506:19, 509:24, 510:20, 512:8, 512:15, 512:22, 512:23, 512:25, 513:1, 513:4, 513:9, 513:14, 513:17, 514:1, 514:8, 515:8, 515:24, 516:17, 517:14, 517:20, 520:10, 520:11, 520:15, 521:22, 521:25, 522:2, 523:9, 525:7, 525:22, 526:2, 526:21, 529:23, 529:25, 542:8, 549:14, 552:25, 553:3, 553:14, 554:5, 554:7, 571:20, 586:24, 587:24, 620:8, 620:9, 620:16, 621:15, 624:4, 626:20
**checks** [43] - 515:16, 516:8, 516:23, 518:15, 523:8, 524:16, 526:20, 527:11, 527:22, 528:1, 528:20, 529:10, 529:13, 529:14, 529:18, 533:14, 535:16, 536:8, 541:8, 542:24, 543:8, 545:6, 551:22, 552:2, 552:4, 552:13, 552:16, 557:23, 558:5, 560:4, 560:9, 561:13, 561:18, 561:19, 562:17, 564:6, 564:15, 570:14, 571:1, 605:23
**chief** [1] - 569:22
**CHRIS** [1] - 498:19
**Christmas** [1] - 517:23
**chute** [2] - 584:24, 584:25
**circumstances** [1] - 501:8
**cite** [1] - 643:3
**citing** [1] - 567:22
**citizen** [1] - 602:25
**city** [1] - 616:10
**City** [7] - 500:20, 538:13, 538:18, 538:25, 539:2, 560:11, 611:13
**claim** [1] - 596:12
**claims** [2] - 503:24, 635:15
**clarification** [1] - 644:11
**clarify** [1] - 555:18
**class** [2] - 633:14, 633:15
**classes** [1] - 602:19

**classification** [5] - 501:13, 502:2, 504:1, 643:6, 643:9
**classifications** [2] - 503:13, 642:19
**clean** [4] - 612:9, 612:18, 621:6, 621:7
**cleaning** [1] - 613:1
**clear** [10] - 522:19, 527:25, 530:4, 531:19, 534:4, 544:19, 564:21, 567:4, 626:15, 630:3
**clearly** [4] - 507:7, 512:7, 512:19, 531:13
**CLERK** [2] - 505:3, 644:1
**clients** [3] - 550:24, 555:7, 556:14
**close** [2] - 532:18, 586:4, 613:19, 614:9, 619:3, 634:2, 634:17, 634:19
**closely** [1] - 598:2
**closer** [2] - 603:15, 614:9
**clothes** [4] - 610:25, 611:1, 611:4, 618:22
**coffee** [3] - 545:16, 611:23, 642:14
**cold** [2] - 604:4, 619:13
**collate** [1] - 542:14
**colleagues** [1] - 629:16
**collect** [1] - 542:14
**collecting** [1] - 585:21
**collection** [1] - 526:20
**collective** [9] - 499:12, 499:17, 500:10, 500:18, 572:25, 573:2, 573:14, 573:15, 616:10
**Collective** [1] - 505:17
**College** [4] - 540:20, 602:19, 610:4, 633:4
**college** [10] - 630:14, 630:17, 630:19, 631:24, 631:25, 632:3, 632:9, 632:11, 632:14, 633:15
**color** [3] - 606:9, 606:20, 606:25
**column** [12] - 511:25, 512:11, 552:19, 561:6, 562:8, 562:11, 562:13, 562:23, 565:9, 566:6, 566:25, 641:4
**columns** [4] - 551:21, 561:22, 562:4
**coming** [6] - 598:23, 608:8, 608:12, 614:7, 641:19, 642:11
**comment** [2] - 537:7, 567:10
**Community** [6] - 540:19, 602:18, 610:4, 631:16, 631:21, 633:4
**company** [22] - 515:16, 542:10, 561:12, 575:1, 576:12, 576:16, 576:25, 580:8, 588:12, 597:15, 597:16, 597:21, 598:9, 600:7, 600:14, 600:21, 603:5, 603:25, 604:1, 605:25, 617:25, 620:24
**compensable** [1] - 642:12
**compilation** [1] - 567:13
**compiling** [1] - 561:15
**complain** [4] - 634:20, 635:1, 635:2, 635:3
**complained** [2] - 634:25, 635:1
**complete** [2] - 517:2, 524:9
**completed** [1] - 613:16
**completely** [2] - 519:3, 519:4
**comply** [1] - 559:18
**component** [1] - 504:2

**comptroller** [2] - 499:18, 500:23
**Comptroller** [1] - 560:11
**comptroller's** [5] - 500:13, 500:23, 501:21, 503:5, 503:7
**computation** [1] - 539:14
**computer** [4] - 498:25, 509:10, 509:11
**computer-aided** [1] - 498:25
**conceded** [1] - 525:1
**concept** [1] - 507:23
**concerned** [3] - 514:19, 567:17, 600:21
**concession** [1] - 536:14
**concludes** [1] - 645:21
**conclusions** [6] - 503:21, 567:9, 641:17, 642:3, 642:7, 643:18
**Concrete** [1] - 643:22
**consent** [1] - 536:20
**considered** [1] - 520:1
**consistent** [1] - 534:13
**construction** [1] - 522:16
**Construction** [1] - 643:13
**contained** [4] - 500:17, 500:21, 500:22, 536:19
**container** [4] - 584:23, 585:8, 612:10, 617:1
**containers** [3] - 582:6, 582:8, 585:9
**contains** [1] - 537:4
**content** [2] - 501:5, 566:19
**continuation** [1] - 564:4
**continue** [5] - 505:19, 507:16, 523:13, 559:21, 615:3
**continued** [1] - 553:15
**Continued** [3] - 505:21, 530:6, 591:8
**CONTINUES** [1] - 523:1
**Continues** [1] - 506:5
**contract** [1] - 503:25
**CONTRACTORS** [1] - 498:8
**contractors** [2] - 503:4, 603:5
**contracts** [4] - 506:11, 506:14, 506:23, 507:8
**controller** [1] - 538:14
**controversy** [1] - 501:24
**conveyance** [1] - 645:15
**convince** [2] - 503:20, 567:22
**copies** [3] - 499:3, 505:15, 558:21
**copy** [9] - 499:7, 504:23, 505:1, 505:2, 511:10, 514:11, 527:25, 542:16, 547:3
**corners** [4] - 578:2, 579:10, 580:25, 581:1
**correct** [62] - 499:6, 508:14, 508:22, 510:13, 512:9, 513:11, 515:2, 522:4, 522:7, 522:14, 545:1, 547:14, 547:21, 548:20, 549:4, 549:10, 549:25, 550:1, 551:8, 551:25, 552:1, 552:3, 552:12, 552:22, 552:25, 553:3, 553:5, 553:6, 553:7, 554:2, 554:3, 555:1, 556:20, 557:20, 558:13, 558:16, 559:13, 560:5, 560:23, 562:15, 570:20, 571:12, 585:14, 587:3, 590:7, 593:2, 595:17,

617:5, 622:7, 625:24, 629:9, 629:16, 629:24, 630:2, 630:6, 630:7, 630:21, 631:12, 631:14, 631:17, 632:5, 634:3
**corrected** [1] - 560:6
**correctly** [4] - 507:3, 519:25, 605:5, 607:10
**correspondence** [1] - 638:9
**counsel** [8] - 501:1, 502:5, 503:11, 536:1, 539:12, 539:18, 559:24, 626:12
**counsel's** [3] - 520:21, 533:21, 536:14
**counties** [3] - 499:13, 500:20, 538:16
**counting** [2] - 533:14, 566:23
**country** [1] - 602:23
**county** [2] - 539:4, 539:22
**County** [4] - 500:20, 538:20, 538:23, 538:24
**couple** [8] - 538:24, 558:11, 559:24, 566:21, 572:20, 623:11, 637:8, 641:19
**course** [13] - 499:24, 504:8, 504:20, 508:23, 534:2, 539:15, 613:22, 619:2, 619:7, 623:23, 624:1, 625:25, 635:6
**court** [7] - 514:15, 525:25, 538:9, 557:2, 597:23, 643:15, 645:2
**COURT** [279] - 498:1, 499:1, 499:6, 499:9, 499:24, 502:10, 502:13, 502:18, 502:21, 504:13, 504:16, 504:18, 504:21, 504:24, 505:1, 505:4, 505:7, 505:11, 505:15, 505:17, 507:18, 508:18, 511:11, 511:22, 515:10, 515:14, 516:3, 516:8, 516:22, 517:8, 517:25, 518:4, 518:7, 518:10, 518:25, 520:13, 520:25, 521:3, 521:6, 521:15, 521:22, 521:25, 522:11, 522:18, 522:20, 522:24, 524:23, 525:18, 526:18, 526:25, 527:23, 528:2, 528:8, 528:24, 529:1, 529:3, 529:5, 533:11, 534:12, 535:14, 536:14, 537:1, 537:13, 537:16, 537:18, 538:4, 538:7, 538:10, 539:6, 540:1, 540:7, 542:1, 543:15, 546:11, 546:23, 547:1, 547:4, 547:6, 547:8, 547:24, 548:4, 548:9, 548:12, 550:13, 550:20, 550:23, 552:15, 554:18, 555:6, 555:25, 556:2, 556:4, 558:1, 558:3, 558:25, 559:19, 559:21, 561:1, 561:3, 561:5, 561:8, 561:11, 561:21, 561:24, 562:2, 562:6, 562:10, 562:13, 562:21, 562:25, 563:8, 563:12, 563:17, 563:23, 563:25, 564:2, 564:5, 564:8, 564:14, 564:16, 564:22, 564:25, 565:3, 565:7, 565:9, 565:12, 565:18, 565:24, 566:5, 566:11, 568:3, 568:7, 568:9, 568:20, 569:2, 569:4, 569:8, 569:18, 569:21, 569:24, 570:2, 570:4, 570:11, 570:14, 570:18, 570:21, 570:25, 571:8, 571:13, 571:17, 571:22, 572:2, 572:7, 572:14, 572:16, 572:22, 573:10, 573:20, 573:22, 573:25, 574:4, 574:7, 574:10, 574:13, 574:15, 574:19, 578:5, 578:10, 578:12, 579:18, 579:20, 581:2, 581:4, 581:8, 584:13, 585:16,

585:18, 585:24, 587:16, 587:20, 587:22, 589:11, 589:19, 589:22, 589:24, 590:16, 591:3, 591:5, 592:1, 592:10, 593:11, 593:13, 594:1, 594:8, 595:1, 596:17, 596:20, 596:22, 597:5, 597:25, 599:13, 599:15, 599:17, 600:3, 600:10, 600:25, 601:19, 601:22, 607:2, 612:21, 615:23, 616:17, 617:12, 617:15, 617:20, 617:23, 618:3, 621:17, 625:13, 625:15, 625:17, 625:21, 626:1, 626:3, 626:5, 626:7, 628:3, 628:16, 628:22, 629:4, 629:14, 631:5, 631:13, 632:7, 632:21, 632:23, 635:21, 635:23, 636:3, 636:5, 636:9, 636:16, 637:1, 637:6, 637:11, 637:14, 637:16, 637:20, 637:23, 638:6, 638:8, 638:14, 639:3, 639:7, 639:11, 639:17, 639:24, 640:6, 640:10, 640:12, 640:17, 640:19, 640:22, 641:6, 641:8, 641:11, 641:15, 641:22, 641:25, 643:2, 644:2, 644:11, 644:15, 644:20, 644:23, 645:6, 645:8, 645:18
**Court** [17] - 498:22, 504:4, 504:5, 504:10, 516:1, 524:3, 534:25, 535:4, 535:6, 539:9, 541:2, 546:2, 559:18, 574:14, 574:18, 576:24, 644:19
**Court's** [2] - 527:10, 536:20
**Courthouse** [1] - 498:7
**courtroom** [1] - 615:7
**cousins** [2] - 635:9, 635:18
**cover** [5] - 502:21, 502:23, 504:22, 555:9, 613:6
**covered** [5] - 499:17, 503:9, 566:2, 573:4, 643:5
**coversheet** [1] - 546:2
**coworkers** [3] - 633:25, 634:21, 635:2
**Coyle** [1] - 568:10
**COYLE** [3] - 498:16, 568:23, 572:12
**CPLR** [3] - 644:19, 644:20, 645:6
**crafting** [1] - 643:18
**created** [1] - 533:12
**credibility** [1] - 596:18
**credit** [15] - 517:2, 517:3, 535:15, 535:19, 542:24, 544:15, 549:1, 553:10, 554:1, 554:7, 561:15, 564:10, 573:14, 573:15
**credits** [1] - 543:2
**crew** [4] - 605:11, 611:24, 614:17, 614:20
**cross** [2] - 539:15, 546:22
**CROSS** [3] - 592:3, 626:9, 646:10
**cross-examination** [1] - 546:22
**Custom** [1] - 643:22
**cut** [2] - 518:18, 604:19
**cutter** [1] - 583:1
**CV** [3] - 498:4, 644:1

## D

**D-O-C-E** [1] - 574:12
**daily** [5] - 519:22, 529:8, 532:6, 558:15, 601:9
**damage** [23] - 504:8, 541:3, 542:19, 546:3, 547:12, 547:20, 548:6, 549:22, 549:23, 550:11, 550:15, 555:10, 556:4, 559:5, 560:12, 560:17, 565:3, 567:8, 567:10, 567:24, 642:4, 643:19
**damages** [13] - 546:17, 548:8, 548:22, 555:12, 559:6, 559:12, 559:14, 561:6, 561:19, 565:20, 566:24, 567:1, 567:2
**data** [1] - 553:8
**date** [11] - 509:23, 518:18, 529:24, 531:18, 543:25, 554:13, 557:15, 621:22
**dated** [2] - 525:7, 637:19
**dates** [5] - 536:10, 552:16, 556:25, 557:16, 621:1, 621:3
**David** [1] - 561:22
**day's** [1] - 613:16
**day-by-day** [1] - 543:12
**days** [10] - 508:22, 520:6, 532:2, 588:3, 588:8, 607:21, 621:10, 633:7, 633:17, 641:20
**deal** [2] - 503:11, 509:2
**debris** [7] - 584:21, 585:6, 585:7, 585:14, 595:19, 612:13, 612:22
**December** [4] - 520:12, 603:23, 604:17
**decide** [2] - 499:18, 539:25
**decision** [3] - 504:10, 645:10
**decisions** [1] - 567:3
**declarations** [2] - 534:18, 639:20
**deduct** [1] - 545:15
**deducted** [1] - 642:13
**deduction** [1] - 631:2
**deductions** [7] - 517:20, 518:3, 518:4, 524:17, 527:11, 528:1, 528:20
**defendant** [8] - 517:3, 534:8, 544:5, 544:16, 545:9, 560:22, 645:4
**defendant's** [4] - 499:5, 499:21, 640:3, 640:14
**Defendants** [2] - 498:9, 498:19
**defendants** [14] - 499:3, 533:15, 543:9, 551:23, 552:1, 552:3, 552:5, 552:7, 552:9, 557:23, 638:2, 642:17, 645:12, 645:14
**defense** [1] - 503:17
**definitely** [4] - 525:12, 526:5, 526:8, 527:16
**definition** [4] - 616:5, 616:6, 616:9, 629:10
**degree** [1] - 602:18
**deli** [1] - 613:19
**delivered** [2] - 582:4, 639:15
**delivery** [3] - 582:3, 625:3, 639:14
**demo** [1] - 624:12
**demobilization** [2] - 579:6, 581:14
**demolishing** [1] - 628:20

**demolition** [20] - 501:21, 501:22, 503:12, 583:2, 584:4, 584:5, 584:7, 584:17, 584:21, 584:22, 603:12, 611:19, 611:20, 611:24, 612:13, 616:25, 618:24, 623:5, 629:8
**demolitions** [1] - 583:25
**Department** [4] - 499:22, 500:14, 539:4, 603:2
**Depot** [1] - 601:13
**derived** [1] - 518:7
**describe** [4] - 605:15, 606:12, 607:4, 615:17
**described** [1] - 618:13
**describes** [2] - 499:16, 573:3
**description** [5] - 499:15, 499:21, 543:13, 553:12, 603:11
**descriptions** [1] - 499:3
**deserve** [1] - 639:4
**deserves** [2] - 504:16, 504:18
**designated** [2] - 623:9, 624:22
**destruction** [1] - 628:13
**details** [1] - 536:19
**determine** [1] - 501:16
**difference** [4] - 502:13, 502:16, 536:13, 539:21, 643:10
**differences** [3] - 535:20, 537:4, 556:18
**different** [15] - 503:13, 503:24, 512:8, 521:1, 521:21, 530:5, 533:23, 539:13, 539:14, 558:1, 604:3, 604:4, 607:21, 620:4, 625:7
**diligence** [1] - 537:2
**dire** [3] - 546:10, 546:22, 546:23
**DIRE** [2] - 546:12, 646:5
**DIRECT** [9] - 506:4, 540:8, 559:23, 574:20, 602:1, 646:4, 646:6, 646:9, 646:14
**direct** [4] - 569:7, 578:6, 592:9, 626:12
**directed** [1] - 645:4
**directly** [8] - 524:3, 582:4, 625:1, 625:2, 630:5, 631:12, 633:17, 633:20
**dirty** [1] - 610:25
**disagreeing** [1] - 523:11
**disclosed** [1] - 569:17
**disclosure** [2] - 546:19, 546:20
**disclosures** [3] - 637:18, 638:2, 638:3
**discovery** [2] - 535:16, 536:7
**discrepancies** [2] - 516:16, 536:19
**discrete** [1] - 567:19
**discuss** [7] - 506:8, 527:3, 527:4, 573:7, 599:21, 600:13, 600:21
**discussed** [5] - 507:23, 534:5, 537:23, 600:7, 643:17
**discussing** [1] - 641:18
**discussion** [1] - 616:13
**displayed** [1] - 639:1
**dispose** [1] - 645:4
**dispute** [2] - 501:13, 533:16
**disputes** [1] - 501:17
**dissipated** [1] - 645:14

**dissuade** [1] - 643:21
**distance** [1] - 532:19
**distinctive** [2] - 501:4, 501:6
**DISTRICT** [2] - 498:1, 498:1
**Doce** [1] - 574:11
**docket** [4] - 578:7, 640:4, 640:9, 643:25
**document** [40] - 499:25, 500:9, 500:11, 500:12, 500:16, 501:2, 501:3, 501:4, 501:9, 504:21, 510:2, 511:2, 513:25, 517:15, 527:11, 528:19, 531:6, 532:5, 532:6, 532:8, 533:3, 533:5, 541:14, 545:6, 545:18, 546:1, 546:10, 547:6, 548:18, 551:17, 555:11, 555:19, 560:2, 560:6, 560:7, 560:18, 568:2, 571:7, 573:4, 627:4
**documentations** [1] - 534:18
**documents** [28] - 508:13, 509:12, 509:15, 510:3, 514:21, 517:1, 535:2, 537:4, 537:6, 541:6, 542:5, 542:16, 543:5, 543:9, 543:12, 544:9, 544:10, 544:18, 544:19, 548:21, 548:23, 549:24, 566:9, 566:11, 567:13, 626:21, 626:25, 627:2
**dollars** [2] - 502:11, 643:9
**done** [24] - 500:1, 534:9, 535:19, 538:22, 542:11, 550:15, 569:5, 569:25, 570:1, 570:9, 573:7, 582:3, 584:7, 599:7, 618:14, 621:16, 624:7, 625:14, 625:18, 625:19, 625:20, 628:5, 628:7
**down** [9] - 508:18, 525:16, 536:4, 544:25, 552:24, 568:12, 584:23, 584:24
**drawings** [1] - 599:8
**drawn** [1] - 580:24
**dressing** [1] - 642:15
**drill** [1] - 582:15
**drink** [5] - 613:18, 613:19, 613:20, 613:21, 613:22
**drive** [14] - 580:8, 580:12, 580:14, 580:17, 580:20, 581:13, 581:17, 605:22, 605:24, 608:5, 609:21, 609:23, 610:6, 610:21, 613:23, 613:24, 622:17
**driver** [1] - 606:14
**drivers** [3] - 580:14, 605:24, 606:4
**driving** [7] - 590:22, 597:13, 598:4, 607:3, 610:7, 613:15, 630:24
**drop** [5] - 614:5, 634:5, 634:9, 634:17
**dropped** [2] - 614:15, 634:1, 634:12
**drove** [14] - 580:10, 580:17, 581:12, 588:15, 588:16, 596:24, 597:9, 598:3, 607:1, 601:8, 606:10, 609:22, 630:5, 633:19
**due** [2] - 537:2, 642:1
**duly** [5] - 506:1, 540:5, 574:14, 574:17, 601:24
**dumpster** [1] - 603:13
**dunk** [1] - 645:16
**during** [24] - 542:23, 551:12, 558:8, 563:5, 565:10, 576:3, 577:21, 584:12, 588:3, 592:7, 593:22, 594:11, 605:11,

606:4, 609:20, 618:9, 618:10, 619:2, 619:7, 620:23, 624:6, 633:22, 634:20, 641:18
**dust** [1] - 612:17
**Dutchess** [2] - 500:20, 538:20

# E

**earliest** [1] - 563:19
**early** [2] - 619:6, 627:18
**earned** [4] - 542:23, 561:24, 562:2, 565:5
**earns** [1] - 519:18
**easier** [2] - 504:5, 571:7
**easiest** [1] - 563:21
**easily** [2] - 533:1, 624:23
**East** [1] - 498:23
**EASTERN** [1] - 498:1
**ECF** [1] - 640:8
**Edgar** [5] - 510:10, 511:8, 531:15, 531:22, 601:4
**EDGAR** [1] - 498:4
**educational** [2] - 540:18, 602:17
**Edward** [1] - 637:20
**effect** [1] - 508:10
**eight** [11] - 503:1, 512:21, 519:19, 520:2, 531:24, 545:20, 545:21, 550:19, 561:16, 586:8, 618:25
**eighty** [1] - 512:21
**either** [7] - 500:3, 520:7, 529:8, 531:20, 545:15, 616:1, 618:24
**employed** [6] - 540:12, 540:14, 540:16, 574:23, 602:4, 602:6
**employee** [7] - 517:20, 519:9, 533:2, 533:5, 554:24, 556:23, 584:11
**employees** [16] - 516:21, 549:1, 550:14, 550:19, 554:22, 556:10, 556:19, 557:16, 575:17, 580:17, 588:10, 590:22, 598:6, 607:6, 607:7, 613:16
**employer** [2] - 543:3, 629:23
**employers** [3] - 575:12, 631:10, 642:18
**employment** [1] - 621:1
**en** [1] - 607:7
**Enamorado** [27] - 537:20, 567:18, 569:5, 574:5, 574:15, 574:17, 574:22, 575:17, 575:22, 576:16, 576:25, 577:14, 578:14, 580:2, 581:22, 582:1, 586:18, 587:23, 588:6, 590:20, 592:4, 596:12, 597:9, 601:3, 601:19, 609:16, 646:8
**end** [15] - 503:19, 503:22, 518:16, 538:2, 554:13, 567:15, 577:16, 603:23, 612:25, 614:18, 617:20, 624:6, 640:13
**ended** [1] - 633:20
**ending** [8] - 510:13, 510:15, 510:21, 511:6, 514:2, 514:10, 531:16, 552:17
**ends** [2] - 538:18, 538:21

**enforcement** [1] - 644:22, 644:25
**English** [5] - 627:11, 630:18, 631:23, 633:4, 633:13
**enter** [1] - 587:3
**entered** [5] - 509:16, 560:9, 560:20, 645:9, 645:13
**enterprise** [1] - 500:10
**entire** [3] - 502:22, 502:23, 504:21
**entirely** [1] - 630:3
**entitled** [2] - 519:10, 550:9
**entries** [2] - 531:24, 549:8
**envision** [1] - 612:12
**EPDM** [1] - 576:20
**equals** [1] - 526:15
**equipment** [2] - 603:14, 612:8
**error** [1] - 515:3
**errors** [3] - 515:7, 516:20, 534:14
**ESL** [1] - 633:14
**especially** [1] - 550:9
**ESQ** [5] - 498:15, 498:16, 498:16, 498:19, 498:20
**essence** [2] - 526:19, 567:11, 645:1
**establish** [1] - 569:24
**established** [1] - 642:20
**estimate** [5] - 508:6, 508:8, 534:8, 560:16, 630:12
**ET** [2] - 498:4, 498:8
**etcetera** [1] - 638:18
**eve** [1] - 555:16
**event** [2] - 574:2, 645:2
**events** [2] - 619:1, 619:10
**evidence** [16] - 499:20, 501:10, 504:14, 509:16, 535:2, 537:1, 539:24, 543:3, 550:10, 566:5, 567:14, 567:22, 571:2, 571:9, 589:16, 642:9
**exact** [5] - 500:7, 558:14, 593:5, 598:4, 604:16
**exactly** [17] - 513:20, 522:8, 568:25, 573:8, 594:22, 594:23, 606:3, 606:7, 609:22, 618:5, 621:3, 630:13, 632:1, 632:2, 633:15, 633:16, 635:13
**examination** [4] - 546:22, 574:6, 626:12, 638:17
**EXAMINATION** [17] - 506:4, 523:1, 540:8, 546:12, 559:23, 574:20, 592:3, 601:2, 602:1, 626:9, 646:4, 646:5, 646:6, 646:9, 646:10, 646:11, 646:14
**examined** [1] - 540:5
**example** [15] - 500:21, 502:24, 517:10, 538:20, 545:19, 562:6, 566:23, 581:10, 583:1, 583:2, 586:13, 598:15, 611:12, 628:11, 634:9
**examples** [4] - 515:15, 516:4, 526:23, 534:21
**except** [2] - 515:22, 581:14
**excess** [1] - 547:13
**exclusive** [2] - 565:13, 565:17
**exclusively** [4] - 566:7, 566:12, 616:1, 616:2
**excuse** [3] - 523:16, 558:19, 643:22

**excused** [4] - 568:6, 601:19, 601:20, 636:4
**exercise** [2] - 533:18, 533:25
**exhibit** [25] - 502:6, 502:8, 505:2, 505:10, 505:11, 509:17, 510:4, 517:5, 519:8, 520:13, 523:18, 536:23, 539:19, 559:16, 637:10, 637:25, 639:19
**Exhibit** [27] - 502:24, 509:13, 509:14, 509:17, 509:25, 510:23, 517:7, 517:10, 520:14, 522:9, 523:19, 524:11, 524:12, 527:24, 528:15, 528:24, 529:7, 530:3, 531:3, 536:18, 536:20, 537:1, 545:24, 547:2, 639:13, 640:15
**exhibits** [4] - 499:8, 636:8, 636:10, 637:2, 637:5, 637:9, 638:22, 640:14
**exit** [1] - 614:9
**expenses** [2] - 589:14, 610:7
**experience** [3] - 508:1, 522:16, 522:22
**expert** [2] - 500:3, 502:2
**experts** [2] - 500:7, 502:3
**explain** [13] - 514:19, 524:18, 524:19, 524:20, 525:24, 526:1, 538:12, 541:1, 541:10, 547:25, 552:15, 628:24, 629:17
**extent** [2] - 616:12, 633:25
**external** [1] - 549:24

# F

**facilitate** [1] - 539:9
**facilities** [7] - 605:15, 605:16, 611:2, 611:5, 611:10, 612:18, 638:10
**facility** [1] - 590:6
**fact** [15] - 505:6, 511:23, 532:2, 534:20, 534:23, 537:8, 547:11, 548:13, 548:25, 554:9, 562:6, 641:17, 642:3, 642:7, 643:18
**facts** [5] - 503:21, 503:25, 504:11, 567:9, 567:17
**Fair** [1] - 643:13
**fair** [3] - 502:7, 507:18, 572:10
**falls** [2] - 501:9, 503:15
**family** [1] - 519:2
**far** [19] - 500:19, 500:20, 512:17, 514:18, 516:17, 535:20, 536:4, 539:2, 541:23, 547:13, 557:13, 557:14, 557:22, 567:17, 584:14, 585:22, 586:3, 608:2
**favor** [1] - 645:9
**February** [7] - 498:8, 556:1, 557:10, 557:13, 557:14, 559:11
**Federal** [2] - 539:9, 644:24
**federal** [6] - 506:16, 506:22, 592:11, 592:12, 627:20, 639:5
**fell** [1] - 501:9
**fellow** [1] - 596:1
**fence** [1] - 611:2, 622:21
**fencing** [1] - 622:21
**few** [3] - 502:11, 509:12, 524:7
**fifteen** [4] - 532:19, 538:7, 608:23,

636:21

**Fifth** [1] - 634:11
**fifty** [1] - 590:21
**fifty-six** [1] - 590:21
**fight** [1] - 503:13
**fighting** [1] - 502:10
**figure** [3] - 511:23, 535:1, 564:25
**file** [1] - 600:8
**filing** [1] - 503:20
**fill** [1] - 509:7
**filling** [1] - 532:6
**fills** [1] - 541:14
**final** [2] - 560:17, 644:2
**finalizing** [1] - 560:2
**findings** [11] - 503:21, 505:6, 537:8, 567:9, 567:17, 567:24, 641:16, 642:3, 642:6, 643:18, 643:20
**fine** [9] - 507:19, 511:18, 533:20, 567:23, 571:9, 573:19, 573:21, 640:11
**finish** [4] - 554:10, 587:11, 623:5, 623:10
**finished** [5] - 506:10, 583:10, 618:22, 623:13, 633:13
**firmly** [1] - 566:20
**first** [42] - 523:16, 532:16, 533:20, 542:16, 555:11, 555:12, 556:15, 558:6, 558:9, 558:10, 559:8, 564:9, 564:16, 564:22, 565:3, 565:7, 565:25, 570:11, 570:14, 582:21, 582:22, 584:2, 584:11, 588:7, 601:24, 602:17, 603:25, 604:13, 604:15, 607:4, 610:24, 611:14, 611:16, 613:18, 617:12, 618:1, 622:24, 627:19, 630:19, 631:24
**firstly** [1] - 581:24
**fit** [1] - 606:15
**five** [16] - 502:15, 516:15, 520:6, 548:7, 551:20, 551:21, 580:25, 591:4, 607:21, 621:25, 622:10, 622:13, 626:4, 633:16, 636:14, 637:14
**fix** [2] - 524:22, 524:24
**fixed** [1] - 539:2
**flip** [1] - 546:8
**FLSA** [19] - 504:1, 561:6, 564:18, 564:20, 565:13, 565:14, 565:19, 566:1, 566:7, 566:24, 567:1, 567:2, 570:8, 570:18, 570:22, 571:10, 571:11, 644:3
**focus** [2] - 509:4, 603:22
**following** [5] - 513:15, 523:3, 532:17, 559:24, 642:2
**follows** [5] - 506:2, 540:6, 601:25, 642:5, 642:19
**foreman** [1] - 599:9
**forget** [1] - 617:4
**forgot** [3] - 558:23, 581:7, 589:23
**form** [1] - 614:15
**former** [1] - 629:23
**forth** [1] - 534:22
**forthcoming** [1] - 645:3
**four** [16] - 501:16, 512:21, 527:17, 531:24, 532:9, 551:21, 578:1, 579:10,

580:25, 581:1, 587:14, 607:21, 621:9, 622:9, 622:12, 633:13
**four-eighty-eight** [1] - 512:21
**Fourth** [2] - 577:12, 577:13
**frame** [2] - 546:18, 630:4
**Francisco** [1] - 553:8
**fraudulent** [1] - 645:15
**Freddie** [1] - 620:19
**Fredis** [1] - 572:15
**Freedie** [1] - 634:17
**Freehold** [1] - 532:18
**frequently** [1] - 620:14
**Friday** [1] - 620:17
**Fridays** [3] - 508:24, 533:9, 605:22
**front** [3] - 545:25, 578:5, 606:14
**full** [6] - 617:5, 617:7, 617:9, 619:6, 633:5, 633:7
**fumes** [1] - 596:13
**funny** [1] - 536:1

**G**

**garage** [1] - 630:6, 633:18, 633:19
**garbage** [5] - 595:20, 603:13, 612:9, 612:17, 617:1
**Gardoka** [15] - 517:2, 536:11, 538:3, 538:5, 538:11, 540:1, 540:3, 540:10, 546:14, 547:11, 548:13, 550:12, 552:19, 558:9, 559:25
**gas** [2] - 588:17, 588:18
**Gene** [1] - 498:22
**general** [2] - 518:8, 543:2
**generally** [13] - 526:2, 541:5, 542:5, 544:7, 544:8, 577:20, 578:23, 579:3, 583:12, 583:16, 585:4, 586:2, 608:10
**generated** [1] - 612:13
**gentleman** [1] - 554:3
**gentlemen** [2] - 573:11, 595:22
**Georgiadis** [9] - 506:1, 506:6, 511:25, 516:15, 522:13, 575:21, 604:8, 642:18, 646:3
**GEORGOULIS** [168] - 498:19, 499:23, 499:25, 501:11, 502:12, 502:17, 503:18, 504:20, 504:23, 505:5, 505:9, 506:17, 507:14, 511:10, 511:12, 511:15, 511:20, 511:24, 513:5, 515:5, 515:20, 516:7, 517:12, 517:22, 518:1, 518:6, 518:9, 518:22, 519:7, 520:21, 521:1, 521:12, 521:16, 521:20, 524:6, 524:25, 525:17, 526:16, 527:5, 527:19, 528:7, 528:10, 528:13, 528:22, 529:2, 529:4, 533:8, 534:11, 534:13, 536:22, 537:7, 537:14, 537:17, 537:23, 538:3, 539:8, 541:25, 546:9, 546:13, 546:19, 546:25, 547:3, 547:5, 547:9, 547:10, 550:8, 556:7, 558:2, 558:23, 559:15, 559:20, 560:24, 563:15, 564:13, 568:8, 568:10, 568:21, 569:1, 569:3, 569:6, 569:17, 569:19, 569:23, 569:25, 570:3,

570:16, 571:6, 572:9, 572:18, 574:3, 574:5, 574:21, 578:11, 579:12, 579:16, 579:19, 581:5, 585:21, 587:8, 587:14, 587:19, 588:13, 588:23, 589:15, 589:20, 589:23, 590:14, 590:17, 591:1, 591:4, 591:6, 592:9, 593:8, 593:12, 593:19, 594:6, 594:25, 596:9, 596:15, 597:24, 599:11, 600:2, 600:9, 601:1, 601:2, 601:17, 601:21, 601:23, 602:1, 606:24, 616:15, 616:18, 618:6, 621:15, 625:14, 626:4, 627:25, 628:18, 628:21, 629:2, 629:12, 631:4, 631:8, 632:6, 632:22, 635:16, 635:19, 635:22, 636:2, 636:6, 636:14, 636:22, 637:4, 637:8, 638:20, 639:9, 640:8, 640:11, 640:23, 641:1, 641:5, 641:13, 641:21, 642:25, 644:8, 644:12, 645:17, 646:14
**gift** [1] - 518:13
**gifts** [1] - 518:21
**given** [13] - 516:9, 519:4, 545:1, 546:16, 548:19, 558:14, 605:10, 617:16, 618:3, 619:25, 640:21, 640:25
**God** [1] - 589:21
**government** [8] - 499:25, 500:8, 500:11, 500:12, 501:1, 501:2, 539:23, 616:11
**governmental** [1] - 637:13
**graduate** [1] - 632:20
**graduated** [4] - 632:11, 632:14, 632:16, 632:17
**granted** [2] - 534:5, 573:8
**Granted** [1] - 635:23
**great** [1] - 640:25
**Greek** [1] - 527:5
**Green** [6] - 527:1, 527:2, 589:4, 589:8, 589:24, 590:6
**greeted** [3] - 600:4, 600:19, 600:20
**gross** [1] - 544:15
**grossed** [1] - 506:19
**ground** [8] - 585:2, 585:4, 585:13, 585:18, 595:2, 595:6, 595:14, 595:16
**group** [2] - 524:12, 528:19
**guess** [4] - 569:7, 615:21, 618:1, 618:18
**guidance** [1] - 643:17
**guide** [1] - 621:1
**Gustavo** [2] - 529:7, 599:18
**guys** [4] - 585:19, 621:5, 622:10, 644:17

**H**

**half** [14] - 523:4, 523:15, 540:17, 580:5, 580:6, 586:22, 610:20, 622:11, 623:3, 624:21, 642:13, 642:16, 642:23
**hammer** [1] - 582:15
**hammers** [1] - 582:15
**hand** [5] - 529:23, 566:22, 566:24, 574:13, 574:16

**handwriting** [4] - 532:16, 532:21, 532:22

**happy** [2] - 536:12, 561:20

**hard** [5] - 541:19, 547:3, 571:8, 612:12, 635:1

**harder** [1] - 571:7

**hate** [1] - 644:17

**Hatzis** [5] - 507:1, 529:9, 575:21, 604:7, 642:17

**Haven** [6] - 527:1, 527:2, 589:4, 589:8, 589:24, 590:6

**head** [1] - 556:25

**hear** [8] - 507:7, 516:19, 517:2, 538:4, 540:1, 559:19, 567:18, 581:2

**heard** [4] - 499:23, 533:20, 533:21, 539:6, 561:11, 629:17

**held** [2] - 499:14, 502:18

**hello** [1] - 600:16

**help** [2] - 523:7, 539:9

**helpers** [1] - 605:6

**helping** [1] - 603:13

**HERNANDEZ** [1] - 498:4

**Hernandez** [35] - 510:10, 510:20, 511:9, 512:1, 512:13, 512:18, 512:24, 513:13, 514:2, 515:15, 515:16, 516:9, 531:15, 532:8, 543:16, 552:22, 562:7, 575:15, 576:3, 587:3, 587:12, 587:19, 593:2, 593:4, 593:9, 593:23, 601:4, 615:10, 616:23, 617:7, 618:12, 618:16, 632:4, 634:14

**Hernandez's** [1] - 531:22

**high** [2] - 518:12, 522:3

**higher** [3] - 516:17, 538:25, 539:1

**hired** [1] - 603:8

**hoist** [2] - 584:25, 617:2

**home** [5] - 580:20, 586:17, 634:1, 634:2, 634:8

**Home** [1] - 601:13

**homes** [2] - 581:11, 614:12

**honest** [1] - 536:5

**Honor** [74] - 499:2, 500:12, 501:11, 502:17, 502:20, 503:18, 505:5, 505:20, 515:5, 515:12, 517:1, 517:22, 526:23, 528:5, 534:4, 534:11, 536:17, 536:22, 537:12, 537:14, 538:6, 539:8, 539:22, 539:24, 546:18, 546:21, 547:22, 550:8, 554:17, 559:15, 559:22, 563:15, 563:20, 568:8, 569:9, 570:5, 572:18, 572:23, 573:24, 574:6, 574:9, 577:25, 579:9, 580:22, 587:6, 588:13, 589:10, 589:15, 590:14, 591:2, 596:9, 596:11, 600:24, 601:17, 601:18, 616:3, 621:15, 625:11, 626:2, 626:8, 635:20, 636:1, 636:6, 637:15, 637:21, 638:1, 638:13, 639:16, 640:4, 640:13, 642:25, 644:9, 644:16, 645:19

**HONORABLE** [1] - 498:12

**hook** [2] - 622:3, 622:6

**hoping** [1] - 641:20

**hot** [1] - 604:3

**hotel** [2] - 589:13

**hour** [31] - 502:15, 510:11, 511:9, 511:14, 512:1, 512:24, 514:2, 519:20, 520:2, 529:12, 529:16, 535:5, 562:19, 562:22, 580:4, 580:5, 580:6, 586:22, 587:23, 590:23, 592:13, 610:17, 610:20, 620:12, 622:11, 623:19, 624:21, 642:14

**hour-and-a-half** [2] - 580:5, 580:6

**hourly** [7] - 510:21, 513:12, 515:8, 515:9, 529:9, 529:14, 529:14

**hours** [66] - 509:2, 519:11, 519:15, 519:16, 519:17, 519:18, 519:19, 519:20, 519:21, 519:24, 520:1, 520:2, 520:4, 520:5, 520:17, 520:20, 521:23, 522:6, 523:4, 523:14, 525:7, 525:10, 525:13, 525:19, 526:15, 531:16, 531:24, 532:7, 532:9, 532:11, 532:12, 533:8, 533:13, 542:8, 542:21, 544:13, 545:13, 545:17, 545:18, 545:20, 545:21, 545:22, 561:25, 562:3, 562:5, 562:14, 562:18, 562:19, 562:20, 563:2, 563:5, 571:5, 583:16, 586:5, 586:6, 586:8, 590:9, 590:13, 618:21, 618:23, 618:25, 622:16, 623:11, 642:16

**house** [1] - 607:8

**housekeeping** [2] - 568:8, 636:7

**huge** [2] - 503:11

**Hugo** [4] - 574:17, 609:15, 609:16, 646:8

**hum** [2] - 613:14, 629:25

**I**

**idea** [4] - 551:13, 567:19, 583:23, 585:24

**identified** [1] - 551:19

**imagine** [2] - 550:8, 558:12

**immigration** [1] - 600:22

**impacted** [2] - 586:9, 586:12

**impeach** [2] - 579:14, 579:16

**impeachment** [2] - 579:13, 579:18

**important** [2] - 521:18, 607:25

**impossible** [1] - 504:4

**INC** [1] - 498:8

**inclined** [1] - 642:5

**include** [4] - 545:11, 545:13, 567:23, 625:4

**included** [2] - 560:15, 568:16

**including** [4] - 536:8, 537:2, 567:8, 585:16

**income** [1] - 518:7

**inconsistencies** [5] - 533:12, 533:16, 534:2, 534:15, 539:16

**inconsistent** [1] - 504:3

**incorporated** [1] - 556:18

**incorrect** [1] - 537:5

**indicated** [1] - 513:13

**indicating** [1] - 639:14

**individual** [4] - 563:19, 638:11, 639:15, 642:17

**information** [26] - 509:6, 537:5, 542:14, 542:16, 548:19, 548:20, 548:21, 548:23, 549:6, 549:24, 551:19, 551:20, 552:4, 552:9, 552:10, 553:3, 553:4, 554:14, 554:25, 557:3, 557:19, 568:12, 568:14, 568:24, 569:20

**Information** [1] - 551:22

**initial** [3] - 567:24, 572:18, 611:24

**inputted** [1] - 560:4

**insert** [1] - 561:19

**inside** [5] - 581:25, 590:10, 611:4, 611:11

**insist** [1] - 539:22

**insolvent** [1] - 645:15

**inspection** [4] - 623:14, 623:24, 623:25, 625:10

**inspector** [10] - 624:8, 626:16, 626:19, 626:22, 627:4, 627:8, 627:13, 627:15, 627:20

**inspectors** [4] - 624:4, 626:13, 626:18, 627:21

**install** [4] - 584:9, 584:10, 584:20, 604:2

**installation** [2] - 618:24, 624:5

**installed** [2] - 576:19, 584:12

**installing** [2] - 605:8, 605:9

**instead** [1] - 616:22

**instruction** [1] - 561:8

**instructions** [1] - 542:18

**insulation** [1] - 584:9

**intake** [1] - 541:10

**intakes** [4] - 541:9, 550:3, 550:9

**intended** [2] - 539:17, 572:2

**interest** [4] - 548:8, 558:15, 643:16

**interested** [1] - 575:17

**interesting** [1] - 580:24

**interim** [2] - 524:17

**internal** [12] - 501:6, 513:20, 532:11, 533:2, 533:5, 533:13, 544:10, 544:14, 549:7, 549:13, 554:5, 564:7

**international** [1] - 543:7

**interpreter** [11] - 506:3, 513:6, 520:23, 525:17, 537:24, 574:6, 574:7, 574:8, 574:12, 574:14, 574:18

**INTERPRETER** [17] - 509:19, 510:16, 513:3, 514:5, 521:5, 521:8, 521:19, 526:7, 529:20, 529:24, 531:17, 531:20, 537:10, 574:9, 574:11, 587:21, 593:15

**interrogatories** [8] - 534:18, 535:21, 536:3, 543:19, 543:20, 568:15, 568:17, 568:24

**introduction** [1] - 559:16

**invoices** [1] - 638:9

**involved** [1] - 542:12

**irrelevant** [1] - 632:23

**irritated** [2] - 596:2, 596:13

**Isabel** [1] - 540:3

**Island** [2] - 610:16, 614:8

**issue** [7] - 502:1, 502:2, 504:7, 569:10, 569:15, 642:18, 644:19
**issued** [1] - 516:9
**issues** [9] - 501:23, 503:4, 503:23, 504:8, 516:25, 567:19, 643:15, 643:16, 645:2
**item** [1] - 501:7
**itself** [1] - 501:2

## J

**January** [1] - 637:19
**Jay** [5] - 602:20, 631:16, 631:18, 631:20, 632:18
**Jersey** [4] - 560:13, 560:14, 610:18, 614:7
**job** [101] - 508:6, 508:8, 508:16, 509:6, 524:9, 525:22, 526:4, 526:11, 527:1, 527:2, 527:6, 527:16, 531:11, 531:14, 545:12, 549:21, 577:21, 579:2, 580:10, 580:12, 580:21, 581:15, 581:18, 582:2, 582:4, 582:6, 582:12, 583:5, 583:8, 583:10, 583:13, 583:14, 583:15, 584:2, 586:1, 586:6, 592:11, 592:12, 592:13, 598:5, 598:24, 599:5, 599:10, 600:20, 605:1, 605:2, 605:5, 605:7, 605:8, 608:6, 609:24, 610:5, 610:12, 610:14, 611:5, 611:15, 611:17, 612:6, 612:7, 612:14, 614:24, 614:25, 615:19, 621:12, 621:24, 622:2, 622:12, 623:6, 623:10, 624:6, 624:10, 624:11, 624:16, 624:18, 624:23, 625:18, 625:20, 626:18, 626:20, 626:22, 626:25, 627:9, 627:11, 627:21, 628:12, 629:11, 629:16, 629:20, 629:21, 629:22, 630:5, 631:10, 631:12, 633:17, 633:20, 635:1
**jobs** [26] - 506:12, 506:14, 506:16, 506:22, 506:23, 506:25, 507:2, 507:8, 523:11, 523:12, 538:17, 571:4, 580:4, 580:5, 581:17, 608:1, 612:8, 618:18, 619:17, 619:24, 620:4, 620:6, 624:2, 624:3
**jogs** [1] - 536:8
**John** [5] - 602:20, 631:16, 631:18, 631:20, 632:18
**Jose** [3] - 561:12, 561:13, 561:14
**JR** [1] - 498:12
**judge** [16] - 507:14, 511:10, 511:15, 516:1, 522:4, 524:3, 524:25, 578:11, 579:12, 589:20, 606:24, 636:14, 638:20, 641:21, 644:12, 645:17
**JUDGE** [1] - 498:12
**Judge** [31] - 499:23, 500:6, 515:21, 518:23, 521:2, 521:12, 526:17, 527:5, 527:20, 528:23, 534:5, 556:25, 569:7, 569:19, 581:5, 585:22, 587:9, 587:21, 588:23, 591:1, 591:4, 593:8, 594:6, 597:3, 600:9, 601:21, 616:20, 625:14, 631:4, 639:10, 641:5

**judgment** [7] - 535:23, 589:18, 639:22, 644:22, 644:25, 645:8, 645:13
**judgments** [1] - 644:22
**Julio** [2] - 609:15, 609:19
**July** [9] - 510:13, 510:14, 511:6, 514:2, 514:5, 514:6, 514:10, 563:19, 602:11
**jump** [1] - 599:2
**June** [5] - 509:23, 531:16, 531:21, 572:13, 597:21
**jurisdiction** [9] - 499:12, 499:14, 501:14, 502:4, 503:6, 503:8, 503:15, 538:16, 643:5
**jurisdictions** [3] - 500:19, 501:17, 501:20
**jury** [1] - 643:14

## K

**keep** [3] - 579:20, 611:3, 612:18
**keeping** [1] - 642:6
**key** [1] - 609:18
**keys** [2] - 609:4, 609:6
**kind** [21] - 534:2, 541:11, 542:19, 551:14, 572:21, 576:16, 576:19, 582:14, 583:20, 583:21, 584:24, 587:5, 603:25, 606:9, 606:17, 612:13, 616:24, 619:10, 621:22, 625:4, 631:2
**kinds** [5] - 501:11, 503:23, 503:24, 504:3, 533:23
**Kingsborough** [7] - 602:18, 610:4, 631:15, 631:16, 631:21, 632:17, 633:4
**knowledge** [3] - 514:18, 568:15, 604:6
**known** [1] - 557:3, 561:12, 630:23
**knows** [4] - 509:1, 509:2, 535:5, 576:24
**Kosos(ph)** [1] - 609:13
**Kostas** [6] - 506:1, 575:21, 604:6, 604:8, 609:11, 646:13

## L

**labeled** [1] - 616:8
**Labor** [5] - 499:4, 499:22, 500:14, 539:4, 643:13
**labor** [5] - 501:18, 508:11, 603:9, 603:10, 618:14
**laborer** [22] - 499:4, 500:4, 594:14, 601:5, 604:13, 604:14, 604:23, 615:19, 616:1, 616:6, 616:8, 616:9, 616:13, 618:12, 618:18, 625:24, 627:9, 642:23, 643:4
**laborer's** [4] - 501:24, 502:14, 601:4, 629:11
**laborers** [11] - 569:16, 587:13, 605:11, 612:2, 612:21, 612:22, 613:6, 616:21, 625:19, 625:20, 628:7
**laborers"** [1] - 628:5
**LaDonna** [2] - 498:16, 563:3

**Lambro** [4] - 595:5, 595:6, 595:8, 595:10
**large** [3] - 550:20, 550:23, 612:17
**larger** [1] - 560:2
**last** [11] - 502:5, 502:7, 547:16, 550:17, 552:25, 553:13, 553:14, 559:9, 575:9, 576:13, 644:17
**latest** [1] - 551:6
**law** [12] - 503:21, 504:11, 517:25, 519:12, 519:15, 521:24, 540:15, 567:9, 641:17, 642:4, 642:7, 643:18
**LAW** [1] - 505:3
**lawsuit** [1] - 594:11
**leading** [3] - 560:24, 560:25, 579:9
**learn** [1] - 592:23
**learned** [2] - 605:1, 605:2
**learning** [1] - 592:16
**least** [5] - 534:19, 551:2, 576:11, 596:5, 617:18
**leave** [7] - 579:2, 581:10, 582:20, 603:19, 608:4, 608:18, 608:23, 611:9, 613:11, 614:10, 614:11, 619:5, 619:6, 621:6, 622:15, 622:23, 623:2, 633:20, 642:15
**leeway** [4] - 579:13, 579:20, 580:23, 589:20
**left** [2] - 620:24, 635:12
**legal** [8] - 504:8, 519:15, 616:5, 616:6, 616:14, 616:15, 629:10
**LEONOR** [1] - 498:16
**less** [7] - 516:10, 524:8, 533:6, 538:22, 539:3, 619:19, 629:6
**liable** [1] - 642:18
**license** [3] - 581:4, 581:6, 606:6
**licensed** [2] - 522:15, 522:16
**life** [2] - 571:6, 642:21
**light** [1] - 644:18
**likely** [4] - 505:7, 644:2, 644:4, 645:16
**Limitations** [1] - 644:3
**limited** [2] - 567:12
**line** [3] - 531:22, 580:23, 618:4
**liquidated** [8] - 548:7, 548:22, 559:6, 559:14, 561:6, 566:24, 567:1, 567:2
**list** [9] - 502:8, 507:1, 568:11, 636:17, 637:1, 637:10, 640:20, 640:25, 641:9
**listed** [2] - 550:19, 550:22
**listen** [1] - 598:2
**litigation** [1] - 536:24
**live** [6] - 607:9, 614:5, 614:9, 634:11, 634:18, 634:19
**lived** [1] - 614:8
**lives** [1] - 532:18
**living** [1] - 500:6
**LLP** [1] - 498:17
**load** [11] - 579:8, 579:22, 582:25, 599:2, 599:4, 615:1, 622:1, 622:8, 622:10, 623:16
**loaded** [1] - 588:21
**loading** [4] - 598:7, 598:19, 598:21,

642:10
**loads** [2] - 598:14, 598:17
**local** [2] - 503:1, 644:23
**Local** [9] - 499:7, 499:13, 503:8, 505:17, 572:6, 572:7, 572:25, 573:6, 573:7
**locality** [2] - 501:15, 502:4
**located** [4] - 577:2, 577:11, 602:14, 605:19
**logs** [4] - 541:9, 543:7, 560:15, 560:19
**look** [35] - 499:8, 508:4, 509:15, 510:3, 511:15, 511:16, 514:1, 516:24, 517:7, 517:10, 519:6, 520:10, 525:5, 526:20, 529:23, 529:25, 531:7, 537:2, 537:6, 542:5, 542:7, 545:24, 548:18, 550:3, 556:20, 563:10, 563:17, 563:21, 564:8, 567:3, 641:25, 643:11, 644:5, 644:24
**looked** [12] - 500:21, 508:1, 531:6, 547:18, 550:2, 551:3, 551:6, 551:12, 551:14, 551:25, 554:11, 558:5
**looking** [10] - 509:13, 509:24, 529:24, 542:6, 542:15, 548:10, 560:1, 560:2, 637:5
**looks** [7] - 499:18, 503:7, 510:9, 511:12, 511:22, 512:21, 553:14
**lose** [4] - 525:24, 525:25, 588:3, 619:7
**losing** [1] - 516:1
**loss** [1] - 554:4
**lost** [3] - 507:15, 521:4, 600:8
**lower** [4] - 516:18, 535:11, 538:19, 563:3
**lowest** [1] - 643:8
**Lunch** [1] - 571:23
**lunch** [6] - 537:24, 545:15, 568:7, 586:19, 586:23, 642:14
**LUSHER** [34] - 498:16, 499:2, 499:7, 499:10, 500:12, 502:20, 502:23, 504:15, 504:17, 504:19, 504:25, 505:14, 535:13, 535:15, 538:6, 538:11, 539:7, 539:20, 565:21, 570:5, 570:12, 570:17, 570:20, 570:23, 571:3, 571:12, 571:14, 571:20, 578:9, 637:3, 639:5, 639:8, 641:3, 645:20
**lying** [1] - 518:20

## M

**machine** [1] - 585:1
**MAGISTRATE** [1] - 498:12
**main** [1] - 605:4
**maintains** [1] - 577:9
**majoring** [1] - 540:21
**Mammoth** [1] - 610:18
**Manhattan** [1] - 540:19
**manual** [2] - 560:15, 560:19
**manufacturer** [1] - 625:2
**manufacturer's** [3] - 623:25, 626:16, 626:17
**March** [1] - 518:16

**marked** [10] - 505:16, 537:9, 545:24, 637:17, 637:24, 639:12, 639:18, 639:25, 640:7, 641:7
**Mary** [1] - 561:22
**mask** [1] - 597:1
**Masonry** [1] - 643:22
**match** [5] - 513:19, 515:16, 515:18, 546:5
**material** [1] - 582:4
**materials** [21] - 579:8, 579:22, 581:15, 582:1, 582:8, 582:10, 588:21, 598:11, 598:13, 598:14, 599:4, 601:9, 601:12, 611:7, 613:7, 614:25, 624:25, 625:1, 625:4, 625:7, 625:10
**math** [6] - 516:24, 524:25, 533:17, 534:25, 535:3, 536:15
**mathematical** [1] - 515:3
**matter** [2] - 568:8, 645:21
**matters** [1] - 607:1
**mean** [13] - 508:5, 519:17, 547:15, 548:21, 557:10, 557:24, 571:17, 577:4, 605:16, 608:3, 627:5, 638:19, 638:24
**meaning** [3] - 526:3, 604:23, 638:17
**means** [3] - 541:2, 583:23, 608:4
**meat** [1] - 546:1
**mechanical** [1] - 498:25
**meet** [4] - 578:15, 578:23, 607:6, 621:12
**meeting** [2] - 550:24, 607:4
**meetings** [2] - 551:1, 551:3
**Melgar** [7] - 525:10, 563:10, 563:18, 564:1, 565:4, 566:23, 570:7
**Melgar's** [1] - 524:12
**member** [1] - 573:6
**members** [6] - 569:12, 569:13, 572:7, 572:12, 573:7, 573:17
**membership** [1] - 572:6
**memories** [1] - 536:6
**memory** [1] - 536:9
**men** [1] - 569:15
**mentioned** [3] - 560:21, 618:14, 618:19
**merely** [1] - 537:3
**met** [1] - 578:25
**methodology** [2] - 564:25, 566:18
**MICHAEL** [1] - 498:15
**middle** [3] - 509:24, 510:6, 525:5
**might** [9] - 502:17, 503:19, 512:21, 513:23, 539:13, 539:22, 616:11, 632:20
**MIKELJAN** [2] - 601:24, 646:13
**mind** [3] - 505:8, 557:11, 642:6
**mine** [1] - 532:22
**minimal** [1] - 539:20
**minimum** [3] - 527:19, 541:4, 542:20
**minute** [3] - 502:7, 532:19, 585:23
**minutes** [14] - 538:7, 569:7, 586:22, 590:3, 591:2, 608:17, 608:24, 611:23, 622:11, 626:2, 636:14, 636:21, 642:14
**missing** [2] - 565:24, 570:12

**mistake** [20] - 510:16, 510:17, 513:17, 513:23, 513:24, 514:20, 515:1, 515:25, 524:21, 524:24, 527:3, 527:6, 527:7, 527:15, 532:25, 638:5
**mistakes** [4] - 515:2, 533:17, 533:23, 567:7
**mobilization** [3] - 579:6, 607:5, 621:22
**mobilized** [1] - 611:15
**moment** [6] - 528:4, 528:17, 544:7, 558:22, 559:25, 575:25
**MONICA** [1] - 498:20
**month** [2] - 570:15, 604:16
**monthly** [1] - 558:16
**months** [2] - 538:24, 572:20
**morning** [21] - 506:6, 506:7, 540:10, 540:11, 546:14, 546:15, 572:19, 573:3, 578:4, 578:20, 578:24, 579:1, 579:22, 580:10, 586:22, 588:21, 610:13, 615:2, 621:10, 621:13, 630:24
**mornings** [2] - 588:6, 589:25
**most** [12] - 502:14, 502:15, 505:7, 540:24, 542:8, 543:14, 544:1, 605:13, 605:14, 606:10, 608:1, 614:22, 623:13, 625:20
**motel** [1] - 589:6
**motion** [4] - 535:22, 589:18, 639:21, 645:9
**mount** [1] - 583:4
**move** [16] - 515:11, 518:25, 530:3, 533:22, 536:20, 564:13, 576:15, 579:5, 597:3, 599:17, 607:5, 621:21, 623:4, 623:9, 631:13, 635:22
**moves** [2] - 597:15, 597:16
**MR** [287] - 499:23, 499:25, 501:11, 502:12, 502:17, 503:18, 504:20, 504:23, 505:5, 505:9, 505:12, 505:20, 506:5, 506:17, 506:20, 507:14, 507:19, 508:19, 509:20, 511:10, 511:12, 511:15, 511:18, 511:20, 511:24, 513:2, 513:5, 513:7, 514:6, 515:5, 515:12, 515:20, 516:5, 516:7, 516:12, 516:14, 516:25, 517:9, 517:12, 517:13, 517:22, 518:1, 518:2, 518:6, 518:9, 518:22, 519:7, 519:8, 520:14, 520:21, 521:1, 521:4, 521:12, 521:16, 521:20, 523:2, 524:6, 524:25, 525:17, 526:16, 526:22, 527:5, 527:19, 527:24, 528:4, 528:7, 528:10, 528:11, 528:13, 528:22, 528:25, 529:2, 529:4, 529:6, 531:1, 533:8, 533:19, 534:11, 534:13, 536:13, 536:22, 537:7, 537:12, 537:14, 537:17, 537:20, 537:23, 537:25, 538:3, 539:8, 540:3, 540:9, 541:25, 546:9, 546:13, 546:18, 546:19, 546:21, 546:25, 547:3, 547:5, 547:9, 547:10, 547:22, 550:8, 554:17, 555:5, 555:18, 556:7, 558:2, 558:19, 558:23, 559:15, 559:20, 559:22, 559:23, 560:24, 563:15, 563:16, 564:13, 568:1, 568:8, 568:10, 568:21, 569:1, 569:3, 569:6, 569:9,

569:17, 569:19, 569:23, 569:25, 570:3, 570:16, 571:6, 572:4, 572:8, 572:9, 572:10, 572:15, 572:17, 572:18, 572:23, 573:19, 573:21, 573:24, 574:1, 574:3, 574:5, 574:21, 577:25, 578:7, 578:11, 579:9, 579:12, 579:14, 579:16, 579:19, 580:22, 581:3, 581:5, 585:21, 587:6, 587:8, 587:10, 587:14, 587:19, 588:13, 588:23, 589:10, 589:12, 589:15, 589:17, 589:20, 589:23, 590:14, 590:17, 591:1, 591:2, 591:4, 591:6, 592:2, 592:3, 592:9, 593:8, 593:12, 593:19, 594:6, 594:25, 596:9, 596:11, 596:15, 596:18, 597:8, 597:24, 599:11, 599:14, 599:16, 600:2, 600:9, 600:24, 601:1, 601:2, 601:17, 601:18, 601:21, 601:23, 602:1, 606:22, 606:24, 606:25, 615:24, 616:3, 616:15, 616:18, 618:6, 621:15, 625:11, 625:14, 626:2, 626:4, 626:8, 626:9, 627:25, 628:18, 628:19, 628:21, 629:2, 629:12, 631:4, 631:8, 632:6, 632:22, 635:16, 635:19, 635:22, 635:24, 636:2, 636:6, 636:12, 636:14, 636:22, 636:23, 637:4, 637:8, 637:15, 637:22, 638:1, 638:5, 638:12, 638:15, 638:20, 638:23, 639:9, 639:16, 639:23, 640:4, 640:8, 640:11, 640:13, 640:18, 640:20, 640:23, 640:24, 641:1, 641:2, 641:4, 641:5, 641:9, 641:12, 641:13, 641:18, 641:21, 641:24, 642:25, 644:8, 644:9, 644:12, 644:16, 644:21, 645:1, 645:7, 645:17, 645:19, 646:6, 646:10, 646:14

**MS** [45] - 499:2, 499:7, 499:10, 500:12, 502:20, 502:23, 504:15, 504:17, 504:19, 504:25, 505:14, 535:13, 535:15, 538:6, 538:11, 539:7, 539:20, 565:21, 568:23, 570:5, 570:12, 570:17, 570:20, 570:23, 571:3, 571:12, 571:14, 571:20, 572:12, 578:9, 637:3, 637:12, 637:18, 637:21, 637:25, 638:4, 638:7, 638:9, 639:5, 639:8, 639:13, 639:19, 640:1, 641:3, 645:20

**multiplaintiff** [1] - 643:14
**multiple** [1] - 555:22
**must** [2] - 549:10, 642:13

## N

**N.Y** [2] - 498:18, 498:21
**name** [3] - 574:10, 574:11, 603:4
**named** [1] - 595:5
**names** [2] - 574:21, 575:12
**Nassau** [1] - 538:23
**nature** [2] - 560:24, 629:3
**necessary** [1] - 625:13
**need** [17] - 507:7, 509:3, 521:13, 526:21, 527:3, 527:4, 568:18, 582:17, 585:22, 598:15, 598:16, 605:7, 611:18, 627:8, 637:6, 644:9, 644:11

**needed** [5] - 583:1, 603:14, 612:8, 622:2, 625:5
**needs** [4] - 502:6, 598:8, 625:18
**Nelson** [4] - 524:12, 563:10, 564:1, 566:23
**never** [15] - 513:15, 529:12, 557:7, 585:20, 587:10, 587:11, 594:7, 615:5, 615:6, 629:17, 633:19, 634:25, 638:16, 640:15
**NEW** [1] - 498:1
**new** [6] - 560:6, 569:19, 613:5
**New** [28] - 498:7, 498:18, 498:21, 498:23, 500:13, 500:19, 504:1, 538:13, 538:18, 538:25, 539:2, 539:3, 560:11, 560:13, 560:14, 565:4, 565:10, 565:12, 565:13, 565:15, 566:3, 566:7, 566:12, 567:2, 570:9, 571:18, 610:18, 614:7
**newest** [2] - 560:8, 617:25
**next** [18] - 505:21, 512:11, 513:25, 522:20, 530:6, 532:4, 532:24, 533:10, 537:25, 553:15, 591:8, 601:21, 611:16, 611:22, 611:23, 615:2, 620:16, 624:23
**Nica** [2] - 634:9, 634:13
**Nick** [4] - 575:21, 604:6, 604:7, 604:10
**nickname** [1] - 634:15
**Nico** [3] - 609:7, 609:8, 609:9
**night** [1] - 633:8
**nineties** [1] - 576:5
**NJK** [56] - 498:8, 508:1, 508:12, 523:3, 523:14, 543:13, 545:14, 557:23, 558:6, 564:17, 575:4, 575:8, 575:23, 575:24, 576:7, 580:14, 582:6, 584:11, 585:2, 587:24, 588:10, 588:25, 589:13, 592:5, 592:8, 592:14, 592:20, 592:21, 592:24, 594:4, 594:9, 594:12, 603:5, 603:6, 603:17, 603:19, 603:20, 603:25, 604:5, 605:15, 607:16, 610:7, 616:8, 617:5, 619:15, 620:6, 622:20, 627:3, 631:18, 632:24, 633:5, 634:20, 635:10, 635:12, 639:14, 642:21
**NJK's** [3] - 525:9, 638:10, 640:15
**non** [3] - 570:18, 613:21, 613:22
**normally** [2] - 598:8, 599:25
**note** [2] - 606:22, 616:12
**noted** [1] - 516:15
**notes** [1] - 563:12
**nothing** [13] - 537:12, 566:14, 573:24, 591:1, 599:22, 599:23, 600:24, 601:17, 601:18, 635:25, 636:1, 636:2, 641:12
**notice** [2] - 536:18, 645:12
**November** [3] - 557:25, 603:23, 604:16
**number** [14] - 503:1, 505:10, 505:11, 512:19, 525:5, 535:11, 546:5, 546:6, 549:1, 554:8, 577:5, 578:8
**numbers** [4] - 527:22, 531:13, 561:16, 562:4
**numerous** [1] - 533:12
**NYPD** [2] - 602:7, 602:8

## O

**o'clock** [9] - 498:9, 568:7, 570:3, 578:24, 578:25, 586:3, 586:4, 588:22, 642:9
**O-2** [2] - 639:19, 646:24
**O-4** [2] - 639:19, 646:24
**O-5** [2] - 639:19, 646:24
**O-6** [2] - 639:19, 646:24
**O-8** [2] - 639:19, 646:24
**object** [6] - 536:22, 546:9, 560:24, 587:6, 599:11, 638:15
**objected** [4] - 593:9, 625:11, 637:9, 638:21
**objection** [56] - 504:20, 515:10, 516:22, 517:22, 518:22, 520:21, 521:12, 533:8, 536:23, 541:25, 547:22, 554:17, 555:5, 555:18, 559:16, 564:13, 572:18, 577:25, 578:13, 579:9, 580:22, 587:20, 589:10, 592:9, 593:8, 593:19, 594:6, 594:25, 596:9, 596:22, 597:5, 597:24, 599:14, 600:2, 600:9, 606:22, 616:3, 616:12, 627:25, 628:18, 628:21, 629:2, 629:12, 631:4, 631:8, 632:6, 632:22, 635:16, 635:19, 637:15, 637:22, 638:12, 639:16, 639:23, 640:5, 641:5
**objections** [2] - 636:18, 641:13
**observed** [5] - 615:14, 616:19, 616:21, 616:23, 616:24
**obvious** [1] - 597:20
**obviously** [3] - 503:25, 641:14, 644:13
**occasion** [5] - 580:8, 581:17, 605:21, 608:20, 615:1
**occasionally** [2] - 620:2, 620:3
**October** [7] - 539:1, 564:12, 570:16, 570:17, 570:21, 571:1
**OF** [2] - 498:1, 498:11
**offer** [3] - 499:20, 636:11, 637:2
**offered** [2] - 573:3, 636:11
**office** [14] - 500:13, 500:24, 503:5, 503:7, 508:13, 509:1, 540:15, 576:25, 577:2, 577:5, 605:17, 605:19, 605:21, 635:4
**Officer** [1] - 616:17
**officer** [4] - 602:9, 602:10, 602:16, 636:3
**often** [12] - 523:25, 541:8, 545:8, 552:16, 581:20, 597:10, 601:15, 608:14, 608:15, 609:20, 609:22
**oftentimes** [2] - 532:16, 532:20
**old** [6] - 517:19, 590:20, 603:6, 603:12, 628:11, 628:13
**oldest** [1] - 564:9
**OLEO** [1] - 584:10
**once** [15] - 542:4, 542:14, 586:1, 586:7, 590:9, 607:22, 610:23, 611:14, 613:24, 614:1, 618:21, 620:14, 624:18
**one** [83] - 501:12, 503:21, 505:13,

506:25, 508:21, 514:8, 515:7, 515:17,
515:24, 516:15, 516:25, 518:15,
518:16, 519:20, 527:18, 531:9, 532:2,
535:9, 535:11, 538:22, 546:6, 546:16,
547:12, 547:13, 547:18, 547:20, 548:4,
548:5, 548:9, 550:2, 550:18, 550:23,
555:22, 556:14, 560:25, 566:22, 568:8,
578:7, 585:18, 588:1, 589:3, 595:4,
595:6, 595:14, 595:17, 595:18, 596:20,
598:1, 598:8, 598:9, 598:10, 598:12,
598:21, 601:16, 605:24, 606:4, 606:10,
607:24, 614:6, 614:15, 616:17, 618:1,
619:24, 622:3, 623:19, 630:23, 631:11,
634:10, 640:8, 641:18, 643:23, 644:2,
644:16, 644:17, 644:18
  **one-more-thing** [1] - 644:17
  **one-page** [5] - 546:16, 547:13, 547:18,
547:20, 548:9
  **ones** [4] - 543:24, 550:17, 575:13,
598:23
  **ongoing** [1] - 614:25
  **open** [6] - 538:9, 588:8, 609:2, 613:7,
619:3, 642:6
  **opening** [3] - 533:21, 534:13, 534:14
  **opportunity** [1] - 567:6
  **opposed** [2] - 500:4, 616:9
  **opposite** [2] - 515:19, 628:15
  **opted** [4] - 565:21, 570:7, 570:23,
571:11
  **option** [1] - 589:1
  **order** [6] - 532:19, 578:1, 578:21,
622:21, 644:19, 645:2
  **ordered** [2] - 504:6, 537:24
  **original** [2] - 505:2, 638:2
  **otherwise** [2] - 509:11, 568:18
  **ourselves** [1] - 576:10
  **outlining** [1] - 546:16
  **outside** [9] - 567:6, 579:10, 584:14,
584:15, 587:7, 601:9, 601:23, 606:22,
625:12
  **overall** [1] - 588:2
  **overlapping** [1] - 501:20
  **overnight** [1] - 506:8
  **overrule** [1] - 578:12
  **overruled** [16] - 533:11, 542:1, 554:18,
561:1, 564:14, 592:10, 593:14, 594:8,
597:25, 600:3, 600:10, 607:2, 628:3,
629:4, 629:14, 632:7
  **overslept** [1] - 608:12
  **overtime** [27] - 504:1, 519:10, 519:18,
519:21, 519:24, 520:1, 520:5, 520:8,
520:20, 521:22, 522:1, 523:3, 523:9,
523:14, 523:15, 523:24, 524:6, 524:7,
525:11, 525:14, 525:20, 526:4, 526:8,
526:17, 541:4, 634:21, 634:22
  **owed** [4] - 516:11, 542:25, 562:19,
571:4
  **own** [15] - 537:6, 543:7, 579:14,
581:17, 581:18, 588:11, 588:17, 589:1,
597:13, 609:24, 610:6, 610:9, 630:8,

630:9
  **owned** [1] - 519:23
  **owner** [7] - 508:16, 509:6, 515:2,
609:8, 609:9, 611:6, 611:11
  **owners** [1] - 604:5

**P**

  **P-1** [3] - 640:1, 646:25
  **P-2** [3] - 640:1, 640:2, 646:25
  **page** [71] - 502:24, 504:22, 505:21,
509:17, 509:19, 509:21, 509:22,
509:24, 510:1, 510:4, 510:24, 510:25,
513:25, 514:1, 514:9, 517:10, 517:12,
517:14, 517:15, 518:15, 519:6, 519:7,
520:10, 520:14, 522:10, 523:17,
523:19, 525:2, 527:21, 527:23, 527:24,
528:16, 530:6, 531:5, 531:9, 532:4,
546:8, 546:16, 547:13, 547:18, 547:20,
548:4, 548:5, 548:9, 551:16, 551:19,
552:18, 552:24, 553:8, 553:10, 553:15,
555:23, 558:9, 558:10, 563:14, 563:22,
564:3, 564:4, 564:23, 565:3, 565:6,
565:7, 591:8, 640:22, 640:23, 641:1
  **pages** [8] - 505:4, 524:15, 527:10,
527:14, 528:20, 555:22, 563:17, 563:19
  **paid** [70] - 511:8, 511:13, 512:1,
512:12, 512:18, 513:13, 517:3, 517:16,
521:11, 522:1, 522:4, 522:5, 523:9,
524:4, 525:11, 525:12, 525:13, 525:14,
525:19, 525:21, 526:4, 526:7, 526:9,
526:8, 526:18, 527:16, 529:8, 529:9,
529:12, 529:15, 533:2, 533:6, 535:5,
535:7, 541:12, 541:13, 542:9, 544:16,
544:20, 544:22, 544:25, 545:4, 545:20,
549:4, 549:10, 552:12, 554:6, 562:17,
562:18, 562:21, 586:24, 587:1, 587:23,
592:8, 610:9, 619:6, 620:8, 620:12,
620:14, 623:3, 627:6, 627:13, 632:24,
632:25, 633:1, 634:21, 634:22
  **paperwork** [1] - 536:8
  **paragraph** [5] - 501:22, 578:11,
587:14, 588:13, 588:23
  **paralegal** [1] - 540:24
  **pardon** [1] - 504:17
  **Park** [1] - 634:10
  **part** [10] - 500:2, 503:16, 538:15,
565:14, 565:15, 565:19, 569:22,
573:11, 611:10, 637:10
  **particular** [9] - 525:10, 544:9, 588:2,
615:3, 622:12, 625:8, 626:24, 627:16,
643:9
  **partner** [3] - 532:6, 532:18, 590:18
  **party** [1] - 645:9
  **passed** [2] - 605:1, 623:14
  **passenger** [4] - 606:11, 606:12,
606:13, 606:14
  **passengers** [1] - 606:16
  **past** [1] - 544:2

  **patterns** [1] - 501:6
  **pause** [2] - 585:25, 590:19
  **Pause** [3] - 531:10, 596:21, 621:18
  **pay** [21] - 508:8, 512:1, 514:1, 520:11,
520:17, 523:4, 523:5, 523:14, 524:12,
526:16, 543:8, 544:15, 549:8, 551:19,
552:1, 553:4, 588:11, 588:17, 588:18,
610:7, 635:4
  **paycheck** [2] - 510:9, 510:10
  **paying** [1] - 592:5
  **payment** [1] - 512:24
  **payments** [3] - 535:17, 535:18, 543:3
  **payroll** [25] - 508:13, 509:5, 511:4,
512:12, 512:18, 512:20, 512:25,
513:10, 513:16, 513:19, 513:20,
514:10, 514:17, 515:1, 515:9, 516:10,
516:18, 533:6, 544:14, 549:7, 549:13,
553:4
  **payrolls** [11] - 514:9, 515:15, 516:24,
533:13, 541:9, 542:25, 543:8, 544:10,
554:5, 564:7
  **penalty** [1] - 524:10
  **people** [29] - 519:1, 522:3, 550:22,
577:20, 579:3, 584:16, 585:4, 585:11,
585:13, 585:14, 588:19, 595:2, 595:3,
601:8, 605:10, 607:19, 608:20, 609:14,
612:7, 612:9, 614:11, 615:7, 616:21,
621:25, 622:13, 625:23, 627:11, 629:7
  **per** [12] - 502:15, 510:11, 511:9,
511:14, 512:1, 512:24, 514:2, 562:19,
562:22, 592:13, 601:16
  **percent** [12] - 542:13, 548:7, 559:7,
559:8, 559:9, 561:6, 564:11, 566:25,
567:1, 625:22, 628:4, 628:7
  **percentage** [2] - 501:14, 625:21
  **perform** [3] - 587:5, 615:18, 615:19
  **performed** [1] - 538:17
  **performing** [1] - 616:24
  **performs** [1] - 541:12
  **perhaps** [1] - 567:15
  **period** [58] - 502:22, 502:23, 506:14,
507:4, 507:9, 520:11, 520:18, 535:7,
535:23, 536:4, 538:23, 551:10, 553:2,
554:3, 555:8, 556:13, 563:18, 564:9,
564:18, 565:4, 565:10, 565:12, 565:13,
565:14, 565:16, 565:19, 566:1, 566:2,
566:7, 566:8, 566:13, 566:24, 567:2,
570:10, 570:18, 570:22, 571:11,
571:18, 572:20, 573:2, 573:8, 576:3,
577:15, 577:18, 577:21, 584:12, 592:7,
593:22, 594:11, 595:12, 603:22,
605:11, 606:4, 615:25, 618:10
  **periodically** [1] - 624:8
  **periods** [2] - 556:11, 564:19
  **permitting** [3] - 546:23, 617:9, 617:10
  **person** [5] - 519:14, 535:4, 549:3,
595:4, 595:6, 595:14, 595:17
  **personal** [4] - 519:2, 519:3, 519:4
  **pertaining** [1] - 638:10
  **phrase** [1] - 527:5

**physically** [1] - 606:12
**pick** [11] - 601:11, 601:12, 605:22, 607:12, 607:13, 607:14, 607:19, 608:5, 608:13, 631:10
**picked** [3] - 589:13, 600:19, 608:7
**picks** [1] - 598:12
**pity** [1] - 641:23
**place** [1] - 519:22
**plain** [1] - 535:3
**plaintiff** [13] - 536:2, 541:12, 541:14, 542:9, 542:23, 544:13, 544:16, 544:20, 544:25, 545:4, 546:17, 557:16, 637:12
**plaintiff's** [4] - 500:2, 569:22, 600:22, 637:18
**Plaintiffs** [2] - 498:5, 498:15
**plaintiffs** [19] - 505:12, 516:9, 534:6, 540:3, 543:10, 550:9, 568:25, 569:12, 572:4, 575:22, 576:11, 588:19, 595:22, 627:23, 630:24, 633:23, 634:4, 642:8, 642:20
**plaintiffs'** [5] - 573:11, 639:20, 640:2, 641:9
**planning** [1] - 567:14
**plans** [1] - 599:9
**Plaza** [1] - 498:23
**plus** [1] - 545:22
**plywood** [1] - 598:16
**pm** [1] - 642:10
**Point** [2] - 626:24, 627:1
**point** [23] - 515:23, 523:9, 526:13, 526:25, 528:3, 533:15, 533:17, 534:6, 534:9, 536:15, 539:8, 556:24, 557:2, 565:24, 567:8, 569:9, 572:24, 604:22, 612:24, 617:13, 627:9, 638:21, 644:17
**pointed** [1] - 517:1
**points** [1] - 630:4
**Police** [1] - 603:2
**police** [4] - 602:9, 602:10, 602:16, 631:3
**position** [1] - 556:10
**possession** [1] - 558:6
**possible** [1] - 619:4
**post** [2] - 537:7, 548:18
**posted** [1] - 568:16
**posture** [1] - 533:24
**potential** [1] - 541:14
**potentially** [2] - 638:19, 639:1
**practice** [1] - 517:25
**preamble** [4] - 499:11, 500:14, 500:15, 503:2
**Precinct** [1] - 602:13
**preliminary** [3] - 643:20, 644:18, 645:2
**preparation** [3] - 546:24, 547:1, 554:23
**prepare** [7] - 514:17, 542:17, 542:19, 555:11, 555:25, 556:2, 556:4
**prepared** [17] - 508:13, 533:24, 536:18, 536:24, 541:17, 546:4, 547:12, 547:16, 548:1, 548:10, 548:16, 550:18, 551:13, 555:12, 556:8, 557:14, 557:19

**preparing** [7] - 502:8, 541:6, 548:14, 548:17, 558:14, 629:6, 642:3
**preponderance** [1] - 642:8
**preprinted** [2] - 508:16, 509:6
**present** [1] - 547:16
**pretrial** [2] - 536:12, 638:22
**prevailing** [27] - 499:10, 499:19, 502:25, 503:3, 503:12, 507:24, 508:2, 538:13, 538:14, 538:19, 541:4, 542:12, 542:22, 562:3, 562:7, 562:15, 562:22, 563:5, 565:5, 565:9, 572:1, 573:1, 573:5, 642:19, 643:4, 643:8, 643:14
**prevent** [1] - 619:10
**previous** [6] - 524:4, 528:19, 560:16, 597:2, 619:19, 619:22
**previously** [4] - 506:1, 534:5, 560:3, 618:13
**printed** [1] - 500:13
**prison** [3] - 589:4, 590:11, 590:12
**private** [12] - 500:10, 506:25, 524:2, 526:4, 526:11, 527:16, 527:17, 562:3, 562:10, 562:15, 562:18, 592:13
**problem** [7] - 521:14, 523:7, 524:25, 527:15, 535:1, 535:3, 536:15
**problems** [1] - 555:7
**procedure** [1] - 613:1
**proceed** [3] - 515:13, 534:10, 558:19
**Proceedings** [1] - 498:25
**process** [4] - 552:21, 611:16, 621:6, 621:7
**produced** [8] - 498:25, 535:9, 535:16, 551:22, 552:4, 552:7, 555:15, 566:10
**producing** [1] - 573:6
**products** [1] - 565:5
**project** [21] - 501:18, 562:10, 562:15, 562:18, 562:22, 563:5, 579:7, 580:3, 582:21, 582:22, 590:22, 590:23, 604:9, 610:13, 615:3, 621:20, 621:21, 630:25, 638:11, 639:15, 643:6
**projects** [6] - 499:14, 560:13, 562:3, 562:7, 565:10, 639:5
**proper** [1] - 522:1
**proposal** [1] - 556:5
**proposed** [9] - 503:20, 504:11, 567:7, 567:9, 567:10, 567:24, 642:3, 642:6, 643:19
**Prospect** [1] - 634:10
**proved** [1] - 642:8
**proven** [1] - 534:23
**provided** [4] - 545:8, 547:6, 552:1, 568:13
**PTA** [1] - 576:20
**public** [3] - 522:21, 524:1, 527:6
**pulled** [1] - 538:19
**purpose** [6] - 500:8, 536:25, 539:14, 539:17, 568:2, 605:4
**purposes** [3] - 536:24, 579:13, 644:21
**pursuant** [2] - 644:19, 644:23
**put** [29] - 508:4, 508:5, 514:25, 516:13, 532:24, 544:25, 558:10, 558:20,

568:24, 582:13, 583:25, 584:9, 585:7, 611:4, 611:7, 611:8, 613:7, 613:8, 613:9, 617:2, 622:18, 622:22, 624:19, 631:20, 638:2, 638:3, 643:24, 645:12

**Q**

**questioning** [1] - 536:16
**questions** [17] - 503:4, 503:5, 518:10, 523:20, 537:14, 537:16, 537:17, 541:11, 546:9, 558:11, 560:25, 566:17, 566:18, 567:25, 568:1, 577:14, 629:3
**quite** [1] - 636:15
**quitting** [1] - 612:25

**R**

**rain** [1] - 619:12
**rained** [2] - 586:13, 586:15
**rains** [1] - 613:4
**raise** [3] - 503:16, 574:13, 574:15
**RAMON** [1] - 498:12
**range** [1] - 610:15
**rate** [31] - 499:19, 500:16, 500:17, 502:25, 510:10, 510:21, 512:1, 512:8, 513:12, 514:2, 514:11, 515:8, 515:9, 516:16, 522:1, 526:5, 526:8, 526:19, 527:17, 529:8, 529:9, 529:11, 529:14, 538:17, 538:25, 539:22, 545:3, 545:5, 545:7, 563:3, 643:8
**rates** [10] - 539:2, 539:4, 541:4, 542:21, 542:22, 545:7, 545:8, 560:12, 560:13, 562:16
**rather** [3] - 525:6, 616:22, 630:5
**reaching** [1] - 638:22
**read** [13] - 500:7, 501:21, 521:6, 521:7, 558:24, 559:1, 581:8, 581:9, 587:14, 587:18, 593:16, 599:8, 629:10
**reading** [1] - 578:3
**ready** [3] - 535:18, 584:3
**really** [7] - 533:16, 534:25, 570:5, 594:7, 604:15, 614:19, 625:12
**reason** [9] - 503:10, 503:16, 532:17, 538:15, 568:21, 575:5, 614:19, 614:21, 614:22
**reasonable** [1] - 534:7
**rebut** [1] - 534:8
**rebuttal** [4] - 569:10, 569:18, 570:1, 574:1
**recalling** [1] - 572:3
**receipts** [1] - 639:14
**receive** [5] - 504:13, 519:10, 521:22, 537:1, 639:3
**received** [14] - 505:17, 510:20, 513:16, 520:20, 521:23, 543:9, 544:4, 561:8, 635:14, 636:20, 637:16, 637:23, 639:24, 641:6
**recently** [1] - 599:18
**recess** [5] - 538:8, 571:23, 591:7,

626:6, 636:24

**recognize** [3] - 509:22, 511:2, 531:6
**Record** [2] - 581:9, 587:18
**record** [8] - 511:21, 528:14, 533:12, 534:16, 534:24, 539:23, 589:17, 597:7
**recorded** [1] - 498:25
**recordkeeping** [2] - 526:24, 534:1
**records** [5] - 525:23, 544:4, 544:23, 544:25, 638:20
**red** [2] - 606:11, 606:21
**redirect** [1] - 600:25
**REDIRECT** [2] - 601:2, 646:11
**redo** [1] - 571:15
**reduced** [1] - 536:2
**refer** [6] - 499:11, 499:13, 500:16, 503:8, 563:12, 563:13
**reference** [2] - 529:11, 529:13
**referenced** [2] - 573:1, 573:5
**references** [1] - 504:7
**referencing** [3] - 534:15, 534:20, 534:23
**referred** [5] - 499:8, 499:9, 501:2, 503:6, 543:15
**referring** [6] - 503:2, 512:25, 513:1, 513:9, 527:19, 548:3
**refers** [1] - 500:15
**reflect** [4] - 510:20, 511:25, 532:8, 539:10
**reflected** [3] - 512:8, 512:15, 526:2
**reflecting** [2] - 510:10, 512:23
**reflects** [2] - 514:1, 517:15
**regard** [13] - 501:13, 501:17, 501:20, 501:25, 504:7, 504:9, 522:3, 534:23, 559:12, 612:12, 612:14, 634:4, 638:22
**regarded** [1] - 518:12
**regarding** [3] - 543:18, 569:13, 572:5
**regardless** [1] - 562:14
**regular** [9] - 519:11, 519:19, 520:1, 520:2, 526:19, 582:15, 606:4, 607:5, 621:19
**regularly** [2] - 562:18, 609:22
**reject** [1] - 539:18
**relations** [1] - 519:1
**relative** [1] - 556:10
**relevance** [2] - 638:16, 639:6
**relevant** [2] - 506:14, 639:1
**remaining** [1] - 527:10
**remember** [51] - 506:18, 518:20, 518:23, 519:5, 519:21, 523:6, 529:17, 555:2, 555:8, 556:13, 556:14, 556:16, 568:10, 576:3, 595:13, 597:11, 603:4, 604:16, 605:13, 605:14, 606:3, 606:6, 607:10, 616:2, 618:5, 618:11, 620:25, 624:18, 626:23, 627:1, 627:10, 627:14, 627:15, 627:18, 627:20, 627:22, 627:23, 632:1, 632:2, 632:3, 632:4, 632:9, 632:11, 632:20, 632:24, 632:25, 633:1, 633:16, 635:13
**remove** [1] - 612:22
**removing** [1] - 585:14

**rendered** [2] - 645:10, 645:11
**renew** [1] - 559:16
**rep** [1] - 500:3
**repeat** [8] - 514:14, 514:15, 521:15, 524:20, 525:12, 526:6, 554:20, 584:18
**rephrase** [1] - 548:17, 616:20
**report** [2] - 511:4, 549:7
**Reporter** [2] - 498:22, 559:1
**Reporter.)** [1] - 593:16
**reporting** [1] - 630:5
**reports** [1] - 509:5
**represent** [1] - 562:4
**request** [1] - 644:19
**requesting** [1] - 507:17
**required** [3] - 503:4, 514:12, 588:10
**resign** [1] - 603:20
**resolved** [2] - 567:20, 642:19
**respect** [1] - 528:24
**respective** [3] - 514:14, 524:3, 525:25
**respond** [3] - 534:11, 535:13, 644:7
**response** [2] - 499:2, 499:21
**responses** [1] - 640:3
**responsibility** [1] - 514:25
**responsible** [1] - 524:21
**responsive** [1] - 597:7
**rest** [1] - 606:17
**resulted** [1] - 535:10
**results** [1] - 533:5
**resumes** [1] - 506:2
**return** [1] - 524:11
**reverse** [1] - 642:12
**review** [9] - 504:10, 524:14, 541:6, 541:8, 543:6, 543:19, 543:22, 558:7, 636:15
**reviewed** [6] - 506:24, 507:1, 507:8, 543:7, 543:24, 560:18
**reviewing** [2] - 506:11, 523:8
**REYES** [1] - 498:12
**ride** [2] - 596:1, 596:12
**rides** [2] - 633:25, 634:5
**Ridge** [2] - 602:15, 607:11
**rode** [1] - 588:11
**rolls** [1] - 616:13
**roof** [34] - 501:23, 503:12, 503:14, 569:14, 582:13, 584:3, 585:14, 590:6, 590:9, 595:3, 595:4, 595:15, 595:23, 596:14, 598:1, 604:3, 604:4, 605:8, 611:8, 612:13, 612:14, 613:5, 613:9, 613:10, 617:2, 619:4, 622:24, 623:22, 624:5, 625:5, 625:8, 628:8, 629:5, 642:22
**roofer** [43] - 499:4, 499:15, 500:4, 502:25, 569:11, 584:8, 592:15, 592:19, 592:20, 593:7, 593:18, 593:23, 593:25, 594:2, 594:12, 594:14, 596:6, 596:7, 596:8, 599:6, 605:2, 605:3, 605:4, 615:20, 616:2, 616:5, 616:13, 617:2, 617:13, 617:16, 618:4, 618:9, 618:11, 618:12, 618:14, 618:15, 618:16,

625:24, 628:9, 629:18, 642:23, 642:24, 643:4
**roofer's** [6] - 501:23, 502:13, 503:15, 569:12, 569:13, 629:11
**roofers** [16] - 569:11, 569:16, 572:6, 584:11, 587:12, 592:23, 603:13, 605:11, 611:25, 613:3, 616:22, 625:19, 625:23, 628:12, 629:7, 642:21
**roofing** [18] - 499:18, 576:18, 576:19, 582:1, 583:22, 583:24, 584:16, 592:22, 601:6, 604:1, 610:24, 611:17, 618:23, 621:23, 623:25, 624:25, 625:7, 625:17
**roofs** [10] - 582:11, 582:20, 583:25, 584:12, 603:12, 604:2, 604:3, 604:4, 605:9, 616:25
**room** [1] - 611:11
**rooms** [2] - 611:6, 611:13
**Ross** [1] - 534:5
**round** [2] - 524:16, 527:22
**route** [4] - 607:7, 607:12, 607:13, 607:15
**routine** [2] - 565:3, 566:6
**row** [4] - 561:16, 563:10, 563:24, 563:25
**rubber** [3] - 584:10, 604:3
**Rudolph** [1] - 498:22
**rule** [6] - 501:9, 518:8, 543:2, 559:18, 642:5, 645:1
**Rule** [7] - 536:12, 539:9, 546:19, 559:17, 566:20, 637:18, 640:2
**rules** [2] - 644:23, 644:24
**Rules** [1] - 644:24
**ruling** [3] - 567:17, 639:17, 644:18
**run** [2] - 599:18, 636:20
**running** [1] - 643:15

**S**

**safe** [1] - 619:4
**safety** [2] - 613:3
**sake** [2] - 562:21, 618:10
**sampling** [2] - 638:9, 639:13
**sanctions** [3] - 533:22, 534:16, 536:2
**Santino** [1] - 556:20
**Satino** [2] - 594:4, 594:12
**satisfaction** [1] - 643:8
**Saturday** [7] - 523:15, 523:24, 524:5, 524:8, 532:2, 532:24, 533:9
**Saturdays** [5] - 508:23, 523:14, 523:25, 524:1, 524:7
**save** [1] - 527:9
**saw** [2] - 514:14, 615:17
**schedule** [7] - 500:22, 501:21, 508:2, 538:18, 538:20, 573:1, 573:5
**schedules** [4] - 499:10, 503:3, 538:13, 538:14
**school** [13] - 610:2, 610:3, 626:19, 630:18, 630:20, 631:23, 633:3, 633:4, 633:6, 633:8, 633:10, 633:17, 633:20

GR    OCR    CM    CRR    CSR

**scolding** [1] - 566:15
**scope** [9] - 584:14, 584:15, 587:7, 589:11, 592:9, 599:12, 599:15, 606:23, 625:12
**screen** [2] - 558:20, 558:22
**screwhand** [1] - 582:15
**screws** [2] - 582:15, 625:4
**seated** [3] - 538:10, 540:7, 574:19
**seats** [3] - 606:13, 606:15, 606:17
**second** [4] - 596:20, 640:22, 640:23, 641:1
**section** [1] - 510:6
**secure** [1] - 623:1
**secured** [1] - 622:22
**security** [4] - 589:9, 589:24, 589:25
**see** [52] - 503:9, 508:7, 510:6, 510:14, 510:18, 512:7, 512:17, 512:18, 514:4, 514:7, 514:11, 514:13, 514:14, 517:14, 520:15, 520:17, 523:8, 525:6, 525:7, 525:21, 529:15, 529:19, 531:11, 531:13, 531:15, 531:17, 531:19, 531:20, 531:22, 531:24, 532:2, 539:16, 549:1, 550:9, 551:17, 551:19, 551:23, 552:19, 562:8, 563:19, 563:21, 563:24, 564:5, 571:19, 608:11, 624:6, 640:25, 642:6
**self** [1] - 501:4
**send** [1] - 500:25
**sense** [2] - 539:5, 596:19
**sentence** [1] - 515:20
**separate** [1] - 544:14
**separated** [1] - 565:17
**September** [1] - 552:25
**series** [1] - 506:11
**serve** [1] - 539:17
**serves** [1] - 536:24
**set** [1] - 549:24
**settlement** [2] - 556:5, 635:15
**seven** [3] - 519:20, 551:21, 590:13
**seventh** [1] - 552:18
**Seventh** [2] - 577:3, 577:6
**seventy** [1] - 542:13
**several** [4] - 506:12, 538:16, 556:19, 643:4
**sheet** [10] - 532:11, 539:15, 541:11, 546:16, 550:22, 552:18, 555:23, 556:2, 558:10, 560:1
**sheetrock** [1] - 576:20
**sheets** [10] - 540:25, 541:1, 541:7, 541:8, 541:17, 541:19, 541:23, 542:11, 546:6, 558:14
**shift** [2] - 520:2, 534:6
**shingle** [1] - 604:4
**shingles** [1] - 576:20
**shipped** [2] - 625:1, 625:2
**shipping** [1] - 639:14
**shoddy** [3] - 526:24, 534:2
**shop** [35] - 563:2, 563:6, 577:8, 578:19, 579:8, 579:23, 582:25, 583:11, 583:14, 588:7, 588:8, 588:21, 597:14,

597:19, 597:22, 598:1, 598:6, 598:15, 598:25, 599:4, 601:9, 601:13, 608:7, 609:2, 609:4, 609:6, 614:17, 614:19, 614:23, 615:2, 623:15, 624:12, 633:23, 634:6, 642:10
**short** [1] - 604:15
**shorter** [2] - 534:20, 556:17
**shot** [1] - 567:11
**shovels** [1] - 582:16
**show** [16] - 509:12, 512:12, 515:14, 516:4, 526:23, 527:11, 528:6, 534:7, 535:18, 552:11, 572:25, 579:3, 608:18, 608:20, 627:8
**showed** [7] - 501:20, 506:15, 528:5, 528:12, 545:6, 545:19, 559:5
**shown** [2] - 502:9, 531:13
**shows** [5] - 512:14, 516:10, 527:14, 536:5, 559:17
**side** [14] - 504:8, 504:11, 510:23, 521:13, 558:11, 563:21, 563:22, 594:15, 615:14, 618:17
**side's** [1] - 567:10
**sided** [1] - 502:7
**sides** [2] - 502:3, 567:6
**sign** [5] - 514:24, 541:9, 626:21, 626:25, 627:4
**sign-in** [1] - 541:9
**signature** [1] - 514:22
**signed** [3] - 511:4, 514:21, 568:13
**significance** [2] - 638:18, 638:25
**signing** [1] - 627:2
**similarly** [1] - 527:9
**simple** [3] - 532:17, 535:3, 561:18
**single** [2] - 555:23, 560:18
**site** [35] - 545:12, 579:2, 580:3, 580:10, 580:12, 580:21, 581:15, 582:2, 582:4, 582:12, 583:5, 583:15, 586:1, 586:6, 598:5, 598:24, 599:5, 604:11, 607:22, 608:6, 610:23, 612:6, 618:21, 618:22, 621:6, 621:24, 622:2, 622:15, 622:17, 623:17, 625:1, 631:10, 631:12, 633:17
**sites** [13] - 581:18, 582:6, 596:25, 604:9, 609:24, 610:5, 610:21, 611:5, 626:18, 630:5, 638:11, 639:15, 642:11
**sitting** [1] - 597:23
**six** [10] - 551:16, 551:19, 551:20, 590:21, 607:24, 607:25, 618:8, 621:25, 633:13, 633:14
**Sixth** [1] - 634:11
**sixty** [1] - 542:13
**size** [2] - 612:14, 612:16
**slam** [1] - 645:16
**sleep** [1] - 590:25
**slightly** [1] - 533:23
**slow** [1] - 508:18
**slowly** [1] - 513:4
**small** [5] - 506:25, 519:23, 598:16, 598:17, 601:11
**smoke** [5] - 581:24, 588:16, 596:13,

596:23, 597:10
**smokers** [1] - 596:2
**snow** [1] - 619:12
**sofa** [1] - 606:17
**soft** [1] - 613:20
**solely** [1] - 548:18
**solicit** [1] - 616:15
**someone** [7] - 518:11, 520:4, 545:19, 588:25, 595:16, 607:12, 614:8
**someplace** [1] - 626:19
**sometime** [3] - 562:7, 618:3, 618:4
**Sometimes** [1] - 580:11
**sometimes** [20] - 501:18, 513:17, 536:8, 542:20, 542:21, 545:5, 554:4, 562:10, 580:4, 580:5, 582:11, 584:25, 585:5, 595:18, 595:19, 611:3, 611:8, 620:7, 622:17
**somewhere** [2] - 620:24, 640:24
**soon** [2] - 603:20, 618:2, 619:4
**sorry** [36] - 504:25, 508:19, 509:17, 509:21, 509:24, 510:17, 513:22, 514:5, 517:5, 517:12, 518:6, 522:17, 522:19, 522:23, 523:18, 523:22, 526:6, 526:14, 530:1, 553:11, 554:4, 555:21, 555:23, 558:4, 563:20, 565:6, 579:19, 609:15, 612:15, 628:17, 629:21, 632:15, 638:1, 641:2, 644:16
**sort** [2] - 567:23, 573:6
**sorts** [4] - 501:19, 501:24, 541:6, 543:5
**sought** [1] - 636:12
**source** [1] - 518:7
**Spanish** [2] - 537:24, 574:11
**speaking** [6] - 507:4, 513:5, 541:6, 542:5, 544:8
**specifically** [4] - 503:14, 577:15, 602:12, 618:15
**specifications** [1] - 506:11
**specifics** [1] - 541:5
**spend** [1] - 618:23
**spent** [3] - 545:12, 642:10, 642:11
**split** [3] - 564:19, 611:24, 642:22
**sponsor** [1] - 639:2
**sponsored** [2] - 638:16, 638:25
**spread** [8] - 540:24, 541:1, 541:7, 541:17, 541:19, 541:23, 542:11, 550:22
**spreadsheet** [24] - 547:11, 547:19, 548:14, 548:18, 548:19, 550:10, 550:18, 550:20, 550:21, 551:14, 554:23, 555:15, 555:17, 555:22, 555:24, 555:25, 556:8, 556:19, 558:10, 560:8, 560:10, 560:19, 560:20, 561:5, 563:21
**spring** [1] - 604:21
**stamp** [1] - 551:16
**stand** [4] - 506:2, 534:19, 574:15, 601:24
**standards** [1] - 518:12
**Standards** [1] - 643:13
**Starret** [1] - 611:13

**start** [28] - 520:22, 531:5, 569:5, 570:22, 575:10, 575:23, 576:6, 577:24, 578:16, 583:8, 583:13, 584:3, 586:2, 594:21, 603:5, 611:17, 611:18, 611:19, 611:20, 617:4, 618:23, 621:6, 621:9, 621:10, 621:20, 621:21, 631:25, 643:15

**started** [29] - 564:16, 577:23, 579:7, 582:21, 582:22, 584:20, 586:7, 592:20, 593:4, 594:17, 594:19, 603:6, 603:8, 603:17, 604:13, 604:16, 604:20, 606:7, 611:14, 614:24, 617:20, 627:19, 630:18, 630:19, 631:24, 632:3, 632:9, 633:13, 633:14

**starts** [1] - 510:1

**State** [12] - 500:13, 565:4, 565:10, 565:12, 565:13, 565:16, 566:3, 566:8, 566:12, 567:2, 570:10, 571:18

**state** [6] - 506:22, 568:23, 616:10, 626:19, 627:20, 644:24

**statement** [3] - 549:2, 640:2, 640:3

**statements** [10] - 535:9, 535:12, 552:3, 552:7, 552:10, 557:16, 557:23, 558:5, 558:8, 640:15

**Staten** [1] - 614:8

**STATES** [2] - 498:1, 498:12

**States** [2] - 498:7, 616:11

**station** [2] - 614:12, 614:13

**Statistics** [1] - 499:4

**status** [3] - 600:13, 600:22, 604:22

**Statute** [1] - 644:3

**stay** [5] - 517:5, 586:13, 586:14, 589:6, 599:4

**stayed** [1] - 589:13

**stenography** [1] - 498:25

**still** [5] - 557:20, 567:18, 574:25, 597:6, 631:18

**stipulate** [5] - 506:17, 516:7, 528:13, 528:22, 534:1

**stipulated** [1] - 529:5

**stipulates** [1] - 533:19

**stipulation** [1] - 568:12

**stop** [7] - 507:16, 607:13, 613:18, 618:21, 621:5, 621:7, 621:8

**stopped** [3] - 576:8, 618:1, 618:2

**stops** [1] - 589:13

**storage** [4] - 582:6, 611:6, 611:10, 638:10

**store** [4] - 582:8, 582:10, 583:14, 607:16

**stored** [2] - 582:12, 582:19

**story** [1] - 555:4

**straight** [6] - 511:20, 522:7, 525:14, 525:20, 526:4, 526:7

**Street** [8] - 498:20, 577:4, 577:6, 605:20, 607:10, 607:18, 624:13, 634:18

**street** [1] - 634:12

**streets** [1] - 634:11

**stricken** [1] - 597:3

**strike** [3] - 564:13, 635:22, 635:25

**structure** [1] - 611:10

**stub** [3] - 549:8, 551:20, 553:4

**stubs** [5] - 524:12, 524:16, 529:7, 543:8, 552:1

**student** [1] - 540:19

**stuff** [4] - 534:14, 605:7, 623:11, 625:4

**subject** [2] - 515:1, 517:23

**subjected** [1] - 518:2

**submissions** [2] - 644:6, 644:7

**submit** [3] - 539:23, 567:7, 589:15

**submitted** [4] - 533:9, 535:22, 538:13, 639:21

**subpoenas** [1] - 637:13

**substance** [1] - 501:6

**substantive** [2] - 502:6, 559:11

**subway** [1] - 614:12

**suddenly** [1] - 533:22

**sufficient** [2] - 539:18, 558:21

**sufficiently** [1] - 525:11

**Suffolk** [1] - 538:24

**suggest** [3] - 503:18, 503:22, 535:7

**suggesting** [1] - 645:3

**summary** [22] - 535:22, 536:21, 537:3, 537:4, 539:11, 546:3, 546:16, 547:14, 547:15, 547:19, 547:20, 548:9, 555:23, 556:2, 558:10, 558:20, 560:1, 565:7, 567:13, 567:14, 589:18, 639:21

**summations** [1] - 504:12

**summer** [3] - 544:1, 544:2, 558:8

**Sunday** [1] - 524:8

**Sundays** [3] - 508:24, 508:25, 524:7

**supervisor** [2] - 604:11, 612:5

**supplemental** [3] - 512:11, 514:12, 638:3

**supplementals** [1] - 502:15

**supplemented** [1] - 552:10

**supplies** [2] - 601:14, 639:14

**support** [2] - 535:22, 639:21

**supposed** [4] - 500:24, 519:12, 522:5, 571:6

**surely** [2] - 523:5, 524:19

**surveys** [1] - 501:15

**sustain** [3] - 516:22, 587:20, 596:22

**Sustained** [1] - 555:6

**sustained** [18] - 515:10, 524:23, 528:2, 554:18, 584:13, 593:9, 593:12, 595:1, 597:5, 599:13, 615:23, 628:16, 628:22, 631:5, 631:13, 632:21, 635:21

**swear** [1] - 556:25

**sworn** [3] - 506:2, 540:5, 601:24

**sworn/affirmed** [2] - 574:14, 574:17

**systems** [3] - 576:19, 582:2, 625:8

## T

**tags** [1] - 616:22

**tail** [1] - 617:20

**tailers** [1] - 622:3

**talks** [5] - 499:11, 499:14, 501:3, 501:22, 589:12

**tar** [2] - 596:14, 604:3

**task** [1] - 569:11

**tasks** [3] - 583:24, 615:17, 616:23

**taught** [1] - 631:2

**tax** [2] - 517:25, 518:2

**taxed** [1] - 518:8

**taxes** [1] - 513:16

**tearing** [2] - 503:11, 503:14

**Ted** [1] - 512:15

**ten** [13] - 516:16, 527:10, 527:14, 528:6, 538:19, 539:20, 576:9, 576:12, 576:13, 594:10, 627:23, 628:12, 642:16

**ten-and-a-half** [1] - 642:16

**terminology** [1] - 525:19

**terms** [10] - 552:1, 559:18, 579:13, 605:10, 611:25, 612:14, 612:16, 615:21, 616:19, 629:15

**terrible** [1] - 511:10

**testified** [20] - 503:25, 508:12, 508:21, 529:8, 535:21, 540:6, 564:16, 565:25, 573:13, 592:14, 595:2, 595:25, 596:23, 597:9, 599:6, 601:25, 628:4, 630:3, 630:4, 634:1

**testifies** [1] - 506:2

**testify** [1] - 569:13

**testifying** [3] - 628:25, 629:1, 629:5

**testimony** [23] - 504:2, 504:3, 506:8, 527:12, 533:8, 534:24, 535:2, 535:10, 543:18, 554:23, 556:9, 556:10, 559:1, 559:15, 561:11, 572:5, 572:19, 572:24, 578:1, 592:5, 593:16, 596:3, 596:25

**TH** [1] - 529:24

**THE** [355] - 498:12, 499:1, 499:6, 499:9, 499:24, 502:10, 502:13, 502:18, 502:21, 504:13, 504:16, 504:18, 504:21, 504:24, 505:1, 505:3, 505:4, 505:7, 505:11, 505:15, 505:17, 507:18, 507:20, 508:18, 509:19, 510:16, 511:11, 511:22, 513:3, 514:5, 515:10, 515:14, 515:18, 515:22, 516:3, 516:8, 516:13, 516:22, 517:8, 517:25, 518:4, 518:7, 518:10, 518:25, 520:13, 520:25, 521:3, 521:5, 521:6, 521:8, 521:15, 521:19, 521:22, 521:23, 521:25, 522:2, 522:11, 522:15, 522:18, 522:19, 522:20, 522:22, 522:24, 524:23, 525:18, 526:7, 526:18, 526:25, 527:23, 528:2, 528:8, 528:24, 529:1, 529:3, 529:5, 529:20, 531:17, 531:20, 533:11, 534:12, 535:14, 536:14, 537:1, 537:10, 537:13, 537:16, 537:18, 538:4, 538:7, 538:10, 539:6, 540:1, 540:7, 542:1, 543:15, 543:17, 546:11, 546:23, 547:1, 547:4, 547:6, 547:7, 547:8, 547:24, 547:25, 548:4, 548:9, 548:11, 548:12, 550:13, 550:20, 550:23, 552:15, 554:18, 555:6, 555:25, 556:1, 556:2, 556:3, 556:4, 556:5, 558:1, 558:3, 558:25, 559:19, 559:21, 561:1, 561:3, 561:4, 561:5, 561:7, 561:8, 561:10,

561:11, 561:17, 561:21, 561:23,
561:24, 562:1, 562:2, 562:4, 562:6,
562:9, 562:10, 562:12, 562:13, 562:16,
562:21, 562:24, 562:25, 563:1, 563:8,
563:11, 563:12, 563:17, 563:20,
563:23, 563:24, 563:25, 564:1, 564:2,
564:3, 564:5, 564:6, 564:8, 564:11,
564:14, 564:15, 564:16, 564:19,
564:22, 564:24, 564:25, 565:2, 565:3,
565:6, 565:7, 565:8, 565:9, 565:11,
565:12, 565:17, 565:18, 565:24, 566:4,
566:5, 566:9, 566:11, 568:3, 568:5,
568:7, 568:9, 568:20, 569:2, 569:4,
569:8, 569:18, 569:21, 569:24, 570:2,
570:4, 570:11, 570:14, 570:18, 570:21,
570:25, 571:8, 571:13, 571:17, 571:22,
572:2, 572:7, 572:14, 572:16, 572:22,
573:10, 573:20, 573:22, 573:25, 574:4,
574:7, 574:9, 574:10, 574:11, 574:13,
574:15, 574:19, 578:5, 578:10, 578:12,
579:18, 579:20, 581:2, 581:4, 581:8,
584:13, 585:16, 585:17, 585:18,
585:20, 585:24, 587:16, 587:20,
587:21, 587:22, 589:11, 589:19,
589:22, 589:24, 590:16, 591:3, 591:5,
592:1, 592:10, 593:11, 593:13, 594:1,
594:8, 595:1, 596:17, 596:20, 596:22,
597:5, 597:25, 599:13, 599:15, 599:17,
600:3, 600:10, 600:25, 601:19, 601:22,
607:2, 613:21, 613:22, 615:23, 616:17,
617:12, 617:14, 617:15, 617:18,
618:5, 621:17, 625:13, 625:15, 625:16,
625:17, 625:20, 625:21, 625:22,
625:23, 625:25, 626:1, 626:3, 626:5,
626:7, 628:3, 628:16, 628:22, 629:4,
629:14, 631:5, 631:13, 631:14, 632:7,
632:21, 632:23, 635:21, 635:23, 636:3,
636:5, 636:9, 636:16, 637:1, 637:6,
637:11, 637:14, 637:16, 637:20,
637:23, 638:6, 638:8, 638:14, 639:3,
639:7, 639:11, 639:17, 639:24, 640:6,
640:10, 640:12, 640:17, 640:19,
640:22, 641:6, 641:8, 641:11, 641:15,
641:22, 641:25, 643:2, 644:1, 644:2,
644:11, 644:15, 644:20, 644:23, 645:6,
645:8, 645:18

**themselves** [1] - 569:14
**thinking** [3] - 567:15, 567:16, 570:6
**thinks** [1] - 628:21
**Third** [1] - 577:13, 607:18
**thirty** [1] - 531:16, 585:10
**thirty-two** [1] - 531:16
**three** [21] - 501:15, 503:24, 507:13,
519:21, 527:17, 527:22, 534:19,
557:11, 559:8, 559:9, 565:15, 570:24,
592:18, 592:21, 607:21, 617:19, 621:7,
642:20, 642:25, 643:2, 644:4
**threshold** [1] - 519:24
**throughout** [5] - 500:15, 503:1, 515:4,

606:17, 615:12
**throw** [2] - 584:23, 584:24
**tie** [1] - 573:6
**tiling** [1] - 603:4
**time-and-a-half** [2] - 523:4, 523:15
**title** [1] - 617:17
**today** [6] - 557:5, 567:16, 592:5,
608:12, 615:8, 616:5
**together** [4] - 501:7, 573:6, 617:2,
643:24
**tolls** [1] - 588:17, 588:18
**tomorrow's** [1] - 598:9
**tonight** [1] - 613:4
**took** [11] - 519:22, 544:24, 548:21,
552:21, 568:12, 590:23, 601:24,
617:18, 622:9, 628:20, 634:8
**tools** [29] - 582:12, 582:14, 582:16,
582:25, 583:1, 583:14, 583:15, 588:8,
611:3, 611:7, 611:8, 611:18, 613:7,
614:25, 615:1, 621:24, 622:1, 622:8,
622:9, 622:12, 622:18, 622:22, 622:23,
623:7, 623:16, 623:22, 624:17, 624:19
**Top** [1] - 599:18
**top** [5] - 514:1, 514:8, 515:13, 556:25,
582:11
**Top's** [2] - 529:7, 529:13
**torch** [1] - 576:22
**torching** [1] - 576:23
**totally** [1] - 569:19
**Touchdown** [1] - 576:21
**toward** [1] - 614:6
**toxic** [1] - 596:13
**traffic** [4] - 608:4, 610:20, 613:23,
621:11
**trailer** [7] - 583:6, 611:4, 613:8, 613:9,
622:1, 622:3, 622:18
**trailers** [2] - 611:3, 611:8
**train** [1] - 614:12
**TRANSCRIPT** [1] - 498:11
**transcript** [3] - 498:25, 504:6, 504:7
**transcription** [1] - 498:25
**translated** [1] - 507:16
**translation** [1] - 507:15
**transport** [1] - 578:21, 598:10
**transportation** [1] - 588:11
**transported** [1] - 601:8
**travel** [2] - 545:11, 563:3
**traveling** [2] - 618:21, 642:11
**TRIAL** [1] - 498:15
**trial** [9] - 502:5, 503:23, 543:18,
555:16, 559:7, 560:3, 561:12, 567:15,
643:14
**trials** [3] - 541:24, 641:19, 641:21
**tried** [2] - 556:16, 593:8
**trier** [1] - 511:22
**trouble** [1] - 568:20
**trucks** [1] - 582:4
**true** [16] - 534:23, 547:18, 593:4,
595:3, 595:14, 595:21, 596:5, 600:7,

608:21, 628:6, 632:14, 632:16, 634:4,
635:9, 635:11, 635:14
**truncate** [1] - 536:15
**try** [3] - 515:25, 549:19, 567:21
**trying** [12] - 500:14, 507:14, 531:11,
535:24, 555:8, 564:25, 568:20, 570:5,
579:14, 579:16, 587:16, 616:15
**turn** [13] - 509:16, 509:17, 510:23,
513:25, 518:15, 519:6, 522:9, 523:19,
525:2, 527:21, 528:15, 531:5, 581:13
**twelve** [6] - 605:15, 632:4, 632:8
**twenty** [7] - 532:9, 532:19, 538:19,
548:7, 586:22, 608:24, 611:23
**twenty-five** [1] - 548:7
**twenty-four** [1] - 532:9
**twenty-minute** [1] - 532:19
**twice** [2] - 560:4, 560:9
**two** [49] - 506:25, 507:13, 508:22,
509:15, 511:12, 511:13, 511:16,
511:19, 518:15, 519:20, 527:16,
531:16, 540:17, 545:13, 545:22, 546:8,
551:2, 551:3, 557:11, 562:5, 562:13,
563:5, 564:19, 569:5, 569:11,
572:4, 585:5, 585:19, 591:2, 592:18,
595:19, 598:9, 601:16, 602:19, 606:10,
606:13, 617:18, 620:4, 620:6, 620:15,
621:2, 622:16, 623:7, 626:2, 635:9,
641:21, 643:23
**type** [2] - 499:16, 621:22
**types** [1] - 604:2
**typical** [9] - 577:21, 577:23, 578:14,
579:23, 607:4, 612:14, 618:20, 619:5,
625:17
**typically** [17] - 550:3, 580:2, 595:15,
607:23, 607:24, 608:16, 609:2, 610:11,
610:12, 612:20, 614:1, 619:24, 620:1,
621:4, 621:21, 622:11, 623:3

# U

**unclear** [1] - 558:4
**under** [9] - 500:9, 501:3, 501:9,
503:15, 525:9, 539:17, 559:17, 570:9,
573:4
**underlying** [1] - 549:6
**underpayments** [1] - 572:21
**understood** [3] - 519:25, 528:8,
537:10
**undressing** [1] - 642:15
**unfortunately** [1] - 561:17
**union** [8] - 499:13, 500:3, 500:11,
569:12, 569:14, 572:6, 572:12, 573:17
**unions** [1] - 503:13
**UNITED** [2] - 498:1, 498:12
**United** [2] - 498:7, 616:10
**unless** [3] - 624:16, 644:9, 644:11
**unload** [1] - 624:19
**unloading** [2] - 624:15, 624:16
**unpaid** [7] - 541:3, 541:4, 561:24,

562:2, 562:5, 562:20

**up** [49] - 502:5, 502:18, 503:10, 503:11, 503:14, 505:7, 506:10, 509:18, 511:16, 511:17, 515:16, 523:3, 538:18, 538:21, 538:24, 538:25, 540:1, 545:19, 546:5, 558:20, 559:24, 579:3, 582:11, 584:3, 589:13, 598:12, 600:19, 601:11, 601:12, 605:23, 607:12, 607:13, 607:14, 607:19, 608:5, 608:7, 608:13, 608:18, 608:20, 613:1, 615:1, 621:6, 622:4, 622:6, 623:17, 631:10, 637:1, 641:19

**updated** [1] - 544:1

**upper** [2] - 529:23, 529:25

**upset** [1] - 521:17

**urge** [1] - 643:11

**US** [2] - 499:4, 499:21

## V

**van** [44] - 578:21, 579:4, 580:8, 580:14, 581:12, 581:25, 583:5, 583:6, 588:22, 589:1, 590:24, 596:1, 597:11, 598:6, 598:19, 598:21, 598:23, 598:25, 599:2, 599:3, 601:7, 601:8, 605:25, 606:9, 606:11, 606:12, 606:13, 606:16, 606:25, 607:3, 607:8, 609:21, 609:23, 613:13, 613:15, 613:17, 622:4, 622:6, 622:8, 622:10, 623:17, 642:10

**vans** [1] - 588:12, 598:9, 606:10

**various** [2] - 536:19, 643:16

**vehicle** [4] - 581:18, 610:6, 630:8, 630:9

**verdict** [2] - 645:9, 645:10

**versus** [3] - 534:21, 616:13, 643:12

**view** [1] - 515:23

**viewed** [1] - 629:7

**VIRGINIA** [1] - 498:17

**Virginia** [3] - 540:15, 540:23, 541:18

**virtually** [1] - 504:4

**vis-à-vis** [1] - 536:18

**visit** [1] - 605:21

**voir** [3] - 546:10, 546:22, 546:23

**VOIR** [2] - 546:12, 646:5

## W

**wage** [34] - 499:10, 499:19, 500:16, 500:17, 501:21, 502:14, 502:25, 503:3, 508:2, 508:9, 511:14, 527:19, 538:13, 538:14, 538:18, 538:19, 541:4, 542:20, 542:22, 562:3, 562:7, 562:15, 562:22, 563:5, 565:5, 565:10, 571:2, 573:1, 573:5, 635:15, 642:19, 643:4, 643:8, 643:14

**wages** [5] - 503:12, 507:24, 541:4, 542:12, 565:5

**wait** [5] - 512:5, 608:10, 608:13, 608:16, 608:23

**waited** [1] - 578:21

**waiting** [3] - 608:8, 608:14, 608:15

**waive** [1] - 504:12

**walk** [1] - 638:19

**Wall** [1] - 498:20

**wants** [1] - 536:1

**warehouse** [5] - 577:8, 607:16, 622:1, 623:8, 631:10

**waste** [2] - 525:24, 526:12

**wasting** [3] - 516:2, 524:2, 527:13

**water** [1] - 613:4

**weather** [10] - 586:9, 588:1, 588:4, 604:21, 617:9, 617:10, 618:2, 619:1, 619:8, 619:10

**week** [30] - 508:22, 510:13, 510:15, 510:21, 511:6, 512:2, 514:2, 514:10, 514:12, 520:5, 525:6, 525:10, 531:16, 532:9, 532:24, 533:10, 533:20, 542:23, 543:1, 544:15, 544:17, 544:20, 545:1, 552:17, 554:6, 554:7, 564:7, 601:16, 620:14, 620:16

**week's** [1] - 520:6

**weeks** [5] - 548:25, 549:9, 552:11, 557:11, 620:15

**weight** [5] - 504:16, 504:18, 537:5, 639:4, 639:7

**welcome** [1] - 643:21

**West** [2] - 626:24, 627:1

**white** [1] - 546:5

**whole** [6] - 501:22, 539:8, 614:17, 614:21, 623:4, 638:21

**wife** [6] - 508:17, 508:20, 508:21, 509:8, 513:23, 522:13

**willfulness** [1] - 564:18, 644:3

**windy** [2] - 619:12

**winter** [1] - 604:20

**wintertime** [1] - 575:6

**wise** [1] - 625:21

**withdraw** [2] - 504:4, 576:15

**withdrawn** [4] - 517:6, 557:18, 580:7, 585:12

**WITNESS** [59] - 507:20, 515:18, 515:22, 516:13, 521:23, 522:12, 522:15, 522:19, 522:22, 543:17, 547:7, 547:25, 548:11, 556:1, 556:3, 556:5, 561:4, 561:7, 561:10, 561:17, 561:23, 562:1, 562:4, 562:9, 562:12, 562:16, 562:24, 563:1, 563:11, 563:20, 563:24, 564:1, 564:3, 564:6, 564:11, 564:15, 564:19, 564:24, 565:2, 565:6, 565:8, 565:11, 565:17, 566:4, 566:9, 568:5, 585:17, 585:20, 613:22, 617:14, 617:18, 617:22, 617:25, 618:5, 625:16, 625:20, 625:22, 625:25, 631:14

**witness** [14] - 506:2, 513:11, 537:10, 546:10, 568:6, 568:11, 574:3, 574:17, 579:15, 596:18, 601:20, 601:21, 636:4, 639:2

**witness'** [1] - 616:7

**witnesses** [4] - 534:19, 573:23,

579:17, 636:5

**woman** [1] - 600:19

**wonderful** [1] - 569:8

**wood** [1] - 598:16

**words** [3] - 507:13, 519:3, 598:4

**workday** [3] - 642:9, 642:13, 642:15

**worker** [2] - 519:18, 604:22

**workers** [12] - 577:20, 585:2, 587:12, 587:13, 596:1, 597:14, 598:10, 605:22, 608:5, 608:7, 608:8, 614:3

**works** [4] - 508:23, 508:25, 519:11, 519:14

**writes** [1] - 532:7

**writing** [3] - 539:10, 539:11

**written** [2] - 561:13, 567:3

**wrote** [1] - 643:15

## Y

**Yani** [2] - 609:9, 609:11

**yards** [2] - 581:1, 585:10

**year** [21] - 502:19, 506:19, 529:16, 531:11, 539:13, 559:12, 572:11, 588:3, 593:5, 604:15, 619:7, 621:2, 627:16, 630:11, 630:12, 630:13, 630:16, 630:23, 631:11, 632:1, 632:2

**years** [44] - 501:16, 515:4, 519:23, 522:23, 532:15, 540:17, 559:8, 559:9, 565:15, 570:24, 575:9, 576:1, 576:2, 576:9, 576:12, 576:13, 577:16, 592:15, 592:18, 592:21, 593:6, 593:24, 594:10, 594:22, 596:5, 596:16, 601:3, 604:24, 605:1, 606:2, 617:19, 618:8, 619:15, 619:20, 619:22, 620:23, 621:3, 627:23, 632:4, 632:8, 642:21, 643:1, 643:2, 644:4

**yesterday** [12] - 499:2, 500:21, 506:10, 506:18, 506:24, 507:1, 507:9, 507:23, 517:1, 522:13, 557:12, 563:15

**YORK** [1] - 498:1

**York** [24] - 498:7, 498:18, 498:21, 498:23, 500:13, 500:20, 504:1, 538:13, 538:18, 538:25, 539:2, 539:3, 560:11, 565:4, 565:10, 565:12, 565:13, 565:15, 566:3, 566:8, 566:12, 567:2, 570:9, 571:18

**yourself** [8] - 585:16, 596:24, 597:10, 597:13, 598:3, 598:5, 630:5, 630:25