# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

------------------------

No. 09-CV-4812 (RER)

------------------------

EDGAR HERNANDEZ AND FREDIS ALFARO,

individually and on behalf of all others similarly situated,

Plaintiffs,

VERSUS

NJK CONTRACTORS, INC., NICK HATZIS, AND KOSTAS GEORGIADIS,

Defendants.

------------------------

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

May 1, 2015

------------------------

**Ramon E. Reyes, Jr., U.S.M.J.:**

Plaintiffs Edgar Hernandez ("Hernandez") and Fredis Alfaro ("Alfaro"), along with opt-in Plaintiffs José M. Agustin[1] ("Agustin"), Nelson Melgar ("N. Melgar"), Gustavo Top ("Top"), Miguel A. Melgar ("M. Melgar"), Francisco Rafeal Cetino ("Cetino"), and Wilfredo Lazo ("Lazo") (collectively, "Plaintiffs") bring this collective action against NJK Contractors, Inc. ("NJK"), Nick Hatzis ("Hatzis"), and Kostas Georgiadis

("Georgiadis") (collectively, "Defendants") for violations of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 207, 216(b), New York Labor Law ("NYLL"), §§ 191, 198, 663, New York Codes, Rules, and Regulations ("NYCCR") title 12, § 142-2.2, and New Jersey Statutes §§ 34:11-56a4, 34:11-56a25, 34:11-56.40 ("NJWHL"). Specifically, Plaintiffs allege that Defendants failed to pay them wages, as well as prevailing wages, supplemental benefits, and overtime compensation, on publicly financed and privately funded projects.

A bench trial was held on February 25, 26, 27, and 28, 2014. Plaintiffs and individual

---

[1] Agustin is sometimes referred to as "Castenada" in some of the parties' records because his full name is "Jose Melvin Agustin Castenada." (Tr. 314:23-25; 315:1-4.)

1

Defendants testified, as well as non-party witnesses Hugo Enamorado ("Enamorado") and Mikeljan Agolli ("Agolli").[2]

## **BURDEN OF PROOF**

Plaintiffs must prove by a preponderance of the evidence that Defendants did not adequately compensate them as employees as required by the respective state and federal laws. *See Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 391-92 (E.D.N.Y. 2013). Under the FLSA, NYLL, and NJWHL, an employer must maintain accurate records of an employee's hours worked and wages paid. 29 U.S.C. § 211(c); N.Y. COMP. CODES R. & REGS. tit. 12, § 142-2.6; N.J.S.A. § 34:11–56a20. When an employer has "inaccurate or inadequate" records, the plaintiff "has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds*, 29 U.S.C. § 252.

---

[2]  A voir dire of Izabel Gardoka ("Gardoka"), paralegal for Plaintiffs' counsel's firm, was also conducted regarding Plaintiffs' proposed damage calculations, which the Court did not accept into evidence. (Tr. 566:14-16.) In light of the Court's order on Plaintiffs' motion *in limine*, the testimony of Agolli and Enamorado was only permitted to the extent of the contents of their affidavits submitted in connection with the summary judgment motions in this case because these witnesses were not disclosed during discovery. (Dkt. No. 108.)

The employee's burden "is not high," so "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011). There must be, however, "at least some credible evidence that plaintiff performed overtime work." *Daniels v. 1710 Realty LLC*, 497 Fed. App'x 137, 139 (2d Cir. 2012). Once an employee satisfies his burden, the employer may rebut with "evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88.

The NYLL mirrors the FLSA with regard to the burden of proof where an employer has failed to keep proper employment records. N.Y. LAB. LAW § 196-a (where an employer fails "to keep adequate records . . . the employer in violation shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements"); *see also Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 332 (S.D.N.Y. 2005).

The NJWHL overtime compensation and record-keeping requirements are modeled after, and nearly identical to, their analogous FLSA regulations. Judicial interpretations construing the FLSA are applicable. *See Crisostomo v. Exclusive Detailing, Inc.*, No. 08-CV-1771 (MAS), 2010 WL 2640183, at *5 (D.N.J. 2010); *see also Marx v. Friendly Ice Cream Corp.*, 695 A.2d 1301, 1314 (N.J. Super. App. Div. 2005) (construing similar "executive employee" provisions); *see, e.g.*, N.J.S.A. § 34:11-56a20 ("Every employer of employees subject to this act shall keep a true and accurate record of the hours worked and the wages paid by him to each").

On February 12, 2013, the Honorable Allyne R. Ross issued an opinion and order on the parties' cross-motions for summary judgment. (Dkt. No. 77.) Judge Ross held that "[b]ecause of the undisputed inadequacy of [D]efendants' records, [P]laintiffs here will enjoy the benefit of the *Mt. Clemens Pottery* burden shift at trial." (Dkt. No. 77 at 15.) Consequently, Plaintiffs must prove that they have in fact performed work for which they were improperly compensated, and they must produce sufficient evidence for the Court to draw a "just and reasonable inference" as to the amount and extent of that work. *Anderson*, 328 U.S. at 687. It is then up to Defendants to rebut Plaintiffs' evidence with the precise amount of work performed and/or evidence to negate the reasonableness of the inference to be drawn from Plaintiffs' evidence. *Id.* at 687-88.

The Court's Findings of Fact and Conclusions of law pursuant to Federal Rule of Civil Procedure 52(a)(1) are set forth below and also in later sections of this Opinion. These findings are drawn from witness testimony at trial, my careful observation of the witnesses' demeanor and candor, the parties' trial exhibits, and stipulated facts. At trial Plaintiffs testified from their own recollection as to the hours they worked, the job sites that they worked at, the type of work they performed, as well as other information. They also submitted to the Court evidence, in the form of manual logs, payroll reports, certified payroll reports, Hernandez' calendar, affidavits, pay stubs, paychecks, and bank statements. Giving this evidence, as well as Plaintiffs' testimony, its deserved weight, Plaintiffs produced sufficient evidence for the Court to draw a just and reasonable inference as to the amount and extent of the work performed.

The burden then shifted to Defendants to rebut Plaintiffs' evidence. Defendants challenged Plaintiffs' assertions on cross-examination, attempted to impeach them with their previous interrogatories, as well as produced evidence, including, but not limited to NJK bank statements, in order to negate the reasonableness of the inference to be drawn from Plaintiffs' case. The result of same is the findings of fact and conclusions of law as follows.

## FINDINGS OF FACT

### I. Parties

#### A. Defendants

NJK is construction company that provides labor on roofing installation projects. (Dkt. No. 103, Joint Pretrial Order Stipulations of Fact and Law ("JPTO") ¶ 1.) NJK contracts with state and local governments in New York and New Jersey to provide construction services, primarily roofing installation. (*Id.* ¶ 2.) NJK performs roofing work on both private and public projects. (Pls.' Exh. 51.) Hatzis, NJK's president, and Georgiadis, NJK's vice-president, each own fifty percent of NJK's outstanding stock. (JPTO ¶¶ 3,4; T. 358:14; 479: 15.)

#### B. Plaintiffs

Plaintiffs performed work for various public and privately funded projects in New York and New Jersey. (*See generally* JPTO.)

3

Hernandez worked for NJK from 1993 (Tr. 17:4) through December 30, 2008 (Tr. 71:7-13; Pls.' Exh. 25 at 98).[3]

Cetino worked for NJK from October 1993 (Tr. 166:25) through approximately September 2005 (Tr. 167:4).[4]

Alfaro began working for NJK at the end of 2001. (Tr. 118:20.) He testified that he worked to the end of 2004 (Tr. 126:2-4), however the last job site that Alfaro testified to working at during his first stint of employment at NJK was the Monmouth County Courthouse in June or July 2004. (Tr. 129:23-25; 130:1-3; 131:6-8.) He testified that he worked at this job site for two months. (Tr. 130:9.) Accordingly, I find July 2004 to be Alfaro's end date of this first period of employment. (*See also* Pls.' Exh. 15 at 51 (last check stub issued to Alfaro in 2004 dated June 27, 2004.)) Alfaro's second period of employment with NJK began in September 2008 and ended in December 2008. (Tr. 131:10-12; 135:21-24; 136:18-20.)

---

[3] Plaintiffs' exhibits include a check stub showing a payment to Hernandez on January 9, 2009. (Pls.' Exh. 17 at 154.) However, Hernandez testified that "[n]obody worked January [2009] . . . ." (Tr. 71:12.) I, therefore find that this check was payment for work prior to January 2009 and that Hernandez' employment ended December 30, 2008.

[4] While the Court acknowledges that Cetino's testimony was inconsistent with his affidavit (Pls.' Exh. 36), the Court credits Cetino's testimony at trial, which results in a shorter period of employment with NJK. (Tr. 201:5-7.)

Top began working for NJK in February or March 1999 (Tr. 213:24; 214:8-10) and worked for NJK for almost six years (Tr. 214:1). Top testified that Bronx Two Buildings Parkchester North ("Bronx Two") was the last job site that he worked at for NJK. (Tr. 231:18-19.) He further testified that he worked there until Summer 2004. (Tr. 231:6-8.) On cross examination, however, he testified that he worked at this job site for less than one month in March 2004. (Tr. 245:7, 9-11.) This latter March 2004 time frame comports with Top's payroll documents submitted into evidence by Plaintiffs. (Pls.' Exh. 58 at 13, 15-17.) Based on the weight of the evidence, I find that Top was employed by NJK through the end of March 2004.

M. Melgar began working for NJK at the end of July 2007 (Tr. 268:23) and continued working for NJK through mid-December 2008 (Tr. 283:16, 18; 284:4).

N. Melgar testified that he began to work for NJK in 2006, but failed to specify a month. (Tr. 340:16.) The earliest check written to N. Melgar in evidence was dated October 20, 2006. (Pls.' Exh. 61 at 2.) Based on this evidence I find that N. Melgar was first employed by NJK on or around October 14, 2006, the start of that week's pay period.[5] N. Melgar testified that his last job for NJK was at the HSBC Bank/Shopping Center ("HSBC Shopping Center"). (Tr. 348:18-20.) He finished his work there around December 5, 2008, which also serves as his last date of employment. (Pls.' Exh. 56 at 65; Pls.' Exh. 61 at 48.)

---

[5] The first job site that N. Melgar seeks damages for is the Starrett City Power Plant ("Starrett City"). (Tr. 343:13-14.)

Agustin worked for NJK from 1998 to approximately 2005. (Tr. 305:3, 5.) The last job that Agustin worked at for NJK was the Monmouth County Court, which began in June 2004. (Tr. 314:14; Pls.'s Exh. 53 at 179.) Agustin testified that he worked at this project for three months (Tr. 312:11), therefore, his employment ceased around August 31, 2004.

Lazo worked for NJK from mid-August 2008 (Tr. 252:4; 253:21) through December 30, 2008 (Tr. 261:2-3; 262:12-15; 264:23-25).

## II. Work in General

### A. Average Work Day

#### 1. *Meeting at the Shop*

It is undisputed that Plaintiffs met at NJK's storefront (the "Shop"), located at 320 Sunset Park on 37th Street in Brooklyn, at six o'clock in the morning. (Tr. 18:21-25; 19:1-6; 274:1-8; Dkt. No. 114 at ¶ 18; Dkt. No. 115 at 8 ("Defendants do not dispute that NJK's employees met at 6 a.m. at NJK's shop . . . .").) The parties dispute, however, whether Plaintiffs were *required* to meet at the Shop at 6:00 a.m.

Plaintiffs testified that they were required to meet at the Shop at 6:00 a.m. (*See* Tr. 255:3 (Lazo testified that place to meet was always Shop); 341:6 (N. Melgar testified that Plaintiffs had to report at Shop at six in morning).) Hernandez testified that it was demanded of Plaintiffs to arrive at the Shop at 6:00 a.m. (Tr. 116:24-25; 117:1), but if a worker arrived at the Shop after 6:00 a.m. or ten to fifteen minutes late, they would not be allowed to go to the job site (Tr. 117:7-9). Agustin also testified that it was mandatory that they showed up at the Shop in the

morning "[b]ecause whoever did not show up at the [S]hop would not work." (Tr. 128:17-18.) Lending further support to this requirement was Centino, who testified that Plaintiffs were not allowed to drive themselves directly to the job sites. (Tr. 175:19-20.)

Defendants' testimony on this issue was inconsistent at best. Hatzis' testimony was initially that "[arriving at the Shop] wasn't demanded, it was that whoever was there at 6:00 a.m. would go into the van and get a ride to the job site. If they were not there, they would just have to find a means of getting there." (Tr. 427:25; 428:1-6.) However, his later testimony suggested that arriving at the Shop at 6:00 a.m. was a requirement:

> Q: Now, Mr. Hernandez testified that if you didn't show up at 6:00 in the morning as it was demanded upon employees, and you left without him, that he couldn't work the next day or employees couldn't work the next day. Is that true?
>
> A: Yes, it is correct, and this applied the same way to everyone.
>
> Q: So if you are not on the job site at the right time, you might leave without him? I mean at the [S]hop.
>
> A: Yes.
>
> Q: And that applied to everybody?
>
> A: Yes.

(Tr. 448:13-24.)

Hatzis, however, then testified that it was not true that employees were not allowed to

go directly to the job sites.  (Tr. 455:19-21.) Defendants' witnesses, Enamorado and Agolli, also testified that at times they drove to the job sites in their own vehicles. Specifically, Enamorado testified that he drove his own car to the job sites because Plaintiffs would smoke inside of the van, which irritated his asthma.  (Tr. 581:17-25.) Agolli testified that he drove himself to job sites while he was taking college classes.  (Tr. 609:23-25; 610:1-6.)  Agolli testified that he had to be at school after 5:00 p.m., so he drove directly from the job site to school.  (Tr. 633:13-21.)  This testimony appears to be the exception rather than the rule as both witnesses had specific reasons that necessitated them driving to the job sites.

Further, this testimony is directly contradicted by Top's testimony regarding a specific instance where he went directly to a job site, bypassing the Shop, because he woke up late.  (Tr. 218:17-24.)  When Top arrived at Starrett City Hatzis told him that he was to arrive at the Shop and not the job site and if he showed up directly at the site again he would be sent home.  (Tr. 218:21-25; 219:1-2.)  The weight of the evidence and testimony supports the finding that Plaintiffs were required to meet at the Shop at 6:00 a.m.

## 2. *At the Job Site*

Plaintiffs would depart the Shop for the job sites in one of two vans.  (Tr. 18:21-25; 19:1-6; JPTO ¶¶ 22-23.)  Work on the roof commenced between 7:30 a.m. and 8:00 a.m. (Tr. 23:1-5; 169:3; 341:19.)  During the course of the day Plaintiffs were given a fifteen minute coffee break and a thirty minute lunch break.  (Tr. 157:20-23; 178:13-14; 219:22-23; 256:17-18; 272:23-24; 347:6-7.) Plaintiffs also spent an average of fifteen minutes dressing and undressing.  (Tr. 112:6-

10; 219:16-17.)  They further testified that they would finish work at the job sites around 4:30 p.m.  (Tr. 23:8; 169:5; 341:21.) Plaintiffs, therefore, would work an average of eight hours on the roof per day.[6]

---

[6]  As will be discussed below, Hernandez kept a contemporaneous calendar while working for NJK.  It is undisputed that no other Plaintiff, besides Hernandez, kept a record of the days and hours that he worked for NJK.  (JPTO ¶ 21.)  Hernandez testified that he would mark down the hours that he worked at the job site every day when he returned from work.  (Tr. 22:25; 23:1-5.)  For reasons that will be discussed later,  this calendar is not useful to extrapolate the days and jobs sites that other Plaintiffs worked, however it is competent evidence as to the average number of hours Plaintiffs spent at job site on a given day.

Taking Hernandez' calendar as a whole, it further supports the finding that Plaintiffs spent an average of eight hours per day working at the job site.  For example, on September 23, 2005, Hernandez recorded on his calendar that he was at the job site from 7:30 a.m. until 5:00 p.m., which is nine and one-half hours, but eight and one-half hours of that time is compensable after accounting for the coffee break, lunch break, and dressing/undressing.  (Pls.' Exh. 25 at 57.) On July 11, 2006, Hernandez recorded on his calendar that he was at the job site from 7:30 a.m. until 4:30 p.m., which is nine hours, but only eight of which are compensable after accounting for time spent during the coffee break, lunch break, and dressing/undressing. (Pls.' Exh. 25 at 68.)  Then, on June 26, 2007, Hernandez recorded that he was at the job site from 7:30 a.m. until 4:00 p.m., which is eight and one-half hours, but only seven and one-

6

### 3. *Leaving the Job Site*

Plaintiffs testified that after they finished their work the job site they went back into the vans and returned to the Shop. (Tr. 83:4-18; 122:7-9; 170:10-14, 17; 256:21-23; 273:17-20; 306:25; 307:1-4; 313:19-20; 341:1-3.) The parties dispute whether all Plaintiffs were brought back to the Shop. Plaintiffs testified that they all returned to the Shop and then left for the day. (Tr. 222:7-9; 257:1; 273:23.) Defendants presented testimony that Plaintiffs did not all return to the Shop, but rather were dropped off during the return trip either near their homes or public transportation.[7] (Tr. 359:24-25; 360:1-2; 432:3-5; 581:12-13; 614:5-6, 11-14; 615:4.)

The Court credits Plaintiffs' version of the events over Defendants' altruistic, albeit improbable, series of events. The weight of the evidence supports the finding that Plaintiffs all returned to the Shop afer completing their daily work at the job site and left the Shop for their homes around 5:30 p.m.[8]

### 4. *At the Shop*

The parties dispute what happened at the Shop before Plaintiffs left for the job site in the vans and after they returned from same.

Plaintiffs testify that they spent approximately thirty minutes in the morning at the Shop gathering tools to load into the van and bring to the job site. (Tr. 88:23; 255:11; 271:24; 306:1; 341:8-11, 13-14.) Additionally, there is testimony to suggest that Plaintiffs received their job assignments at the Shop in the morning. Plaintiffs testified that Defendants worked two different job sites when they could. (Tr. 271:12-14; 286:13-23; 306:3-5.) Sometimes Plaintiffs were sent to other job sites to do repairs or other small jobs. (Tr. 32:2-5; 243:9-14.) M. Melgar testified that sometimes the foreperson would split the Plaintiffs into two crews to go in two vans to two different job sites. (Tr. 286:13-23.) Top testified that while they loaded the vans in the morning "[Foremen] would decide who would go to the different jobs." (Tr. 218:1-3.) Further, Plaintiffs testified that they loaded the vans with items based on a list that the foreperson had of what was needed that day on the particular job site. (Tr. 25:16-25;

---

half hours are compensable after subtracting the time for the coffee break, lunch break, and dressing/undressing. (Pls.' Exh. 25 at 79.)

[7] Agolli also testified to picking some employees up at their houses who were along the route that he drove from his house to the Shop. (Tr. 607:3-8.) This course of events does not contradict evidence that Plaintiffs were required to meet at the Shop at 6:00 a.m., but rather bolsters that claim because Agolli testified to picking people up on his way to the *Shop* not the job site. Agolli also testified that "everyone ha[d] to be there by six." (Tr. 607:24.)

[8] Some Plaintiffs testified that they left the Shop around 6:00 p.m. (Tr. 30:23-24; 170:16-17; 307:5-6.) Plaintiffs, however, in their post-trial submissions appear to concede, and calculate their proposed damages based on, 5:30 p.m. as the average end of the workday. (Dkt. No. 114 ¶ 262.) Absent argument to the contrary, the Court will calculate Plaintiffs' workday as ending at 5:30 p.m. daily.

26:1-2; 193:6-20; 305:21-24; 341:8-11, 13-14.)

They further testified that they spent approximately thirty minutes in the evening unloading tools and materials from the van at the Shop before leaving to go home at night. (Tr. 222:7-9; 257:1; 273:23.) Hernandez testified that when Plaintiffs were done for the day at a job site they would "load certain tools or certain things that were going back to the [S]hop, because there were locations where [Hatzis] did not want to leave tools because he was afraid that they would be stolen. So [Plaintiffs] would go to the [S]hop when we unloaded the tools. Then every—each person would go to their house." (Tr. 30:18-22.) He further testified that his happened "[a]lmost always." (Tr. 82:2.) Further, Cetino testified that while some materials were stored at the job site, some items, such as the machine for the hoist, had to be taken back to the Shop daily because of fear it would be stolen. (Tr. 170:8-14.) Furthermore, Agustin testified that "sometimes [Plaintiffs] would go to the [S]hop to drop off materials, sometimes [Hatzis] was at another job, he would call and say I need this for this job, so we would have to again load it in the back, take it back to the [S]hop so that he could use it the following day." (Tr. 306:25; 307:1-4.)

Defendants present evidence to suggest that the majority of materials and tools were brought directly to the job sites and stored there for the duration of the work. (*See, e.g.*, Defs.' Exh. H (sampling of invoices and correspondence pertaining to NJK's use of storage facilities); Defs.' Exh. J (sampling of shipping and/or delivery receipts regarding materials and supplies shipped to job sites).) Defendants further testify that the tools and materials needed for daily work at the job sites were stored at the job sites, such that

there was nothing for Plaintiffs to load or unload for a half hour in the morning and evening at the Shop. (Tr. 458:4-10.)

Hatzis testified that materials and tools would not be loaded in the van and taken back to the Shop at the end of the day of work on the roof. (Tr: 432: 11-15.) He claimed that everything that was brought to the job site would be left at the job site for the duration of the job in either a space provided by the job site or in a rented trailer. (Tr. 432:19-25; 433:1-13.) Defendants specifically detailed a process of "mobilization" at the beginning of work at a job site and "demobilization" at the end of work at the job site where the majority of the tools and materials would be brought to and from the job site. (Tr. 429:3-7; 583:8-11.) Hatzis testified that after mobilization "very few items had to be brought to the job site." (Tr. 430:14-15.) While Hatzis conceded that mobilization "did not necessarily happen in one day" and could be "repeated again, all depending on how huge this job was" he did not agree that loading and unloading happened daily as Plaintiffs contend. (Tr. 458:13-15.)

Agolli also testified that tools were not brought back to the Shop at night. (Tr. 614:24-25; 615:1-6.) He further testified that he rarely brought Plaintiffs back to the site, only "[i]f we had a reason to go there. But most of the time we didn't have a reason to go in the [S]hop." (Tr. 614:19-23.)

Enamorado testified that Plaintiffs did not "have to load any materials in the morning on a typical day . . ." and would never bring materials back from the job site to the Shop.[9]

---

[9] At one point during his testimony, Enamorado provides an alternate explanation

8

(Tr. 579:22-24; 581:14-16.)  He testified that tools would be brought to the job site during mobilization and brought back to the Shop during demobilization.    (Tr.  583:8-11.) Enamorado testified that they would leave tools on the roofs at the job sites daily.  (Tr. 582:12-20.)

With respect to Defendants' testimony regarding on-site storage, Plaintiffs do not seem to claim that they brought and took back all of the materials and tools for a job site daily, but rather only some.  For example, Hernandez testified that while larger supplies would be delivered directly to the job sites and certain tools would be stored at the job sites, Plaintiffs still loaded and transported some supplies and tools back and forth to the Shop. (Tr. 82:10-12, 21.)  He further testified that even when materials were delivered to the job sites they would sometimes take the material back to the Shop.  (Tr. 83:4-9.)  The weight of the evidence and testimony supports the finding that daily Plaintiffs loaded some materials and tools into the vans before going

---

of how the vans were utilized.  He testified that one of the NJK vans was to transport people and the other one was used to transport materials that he loaded himself.  (Tr. 598:8-24.)  He testified that he loaded the materials at 6:00 a.m., while Plaintiffs got into the other van and were driven to the job site.  (Tr. 598:19-25;  599:1-5.)    Enamorado later testified that he did not have to take materials outside of the Shop daily, but he would pick up small materials from Home Depot or the Shop once or twice a week.  (Tr. 601:7-16.) The Court finds Enamorado's testimony that he was singularly responsible for loading materials onto the vans improbable and not credible.

to the job sites and out of the vans after returning to the Shop after working at the job site.

5.  *Green Haven*

These  findings  regarding  Plaintiffs' average workday apply to all job sites except Green Haven Correctional Facility ("Green Haven").    Plaintiffs'  average  workday  at Green Haven was different than at the other job  sites  because  Defendants  provided Plaintiffs with hotel accommodations, due to the job site's distance from Brooklyn.  (Tr. 42:10-13; 277:3-5.)  Plaintiffs testified that they all left the hotel at 6:00 a.m. to be transported to the job site (Tr. 280:25; 281:1), but there is no evidence in the record that the time from the hotel to the job site was anything but commuting time which Plaintiffs are not entitled compensation.  (*See infra* Conclusions of Law; Tr. 352:9-10 (testimony that  nothing  was  transported  from  Green Haven to hotel in morning or at night).) Plaintiffs testified that they arrived at the job site  around  6:15  a.m.,  where  they  then unloaded a storage container, were cleared through security, and then unloaded a second storage  container.    (Tr.  281:1-10.)    This process took about forty-five minutes and Plaintiffs were on the roof at approximately 7:00 a.m.    (Tr.  281:14-17,  19;  345:2.) Plaintiffs then worked at the job site until approximately  4:00  p.m.    (Tr.  282:1-2; 345:14.)  Plaintiffs further testified that they were provided with the same coffee and lunch breaks as they were on other job sites.  (Tr. 281:22-24.)  They then had to go through security,  which  took  another  forty-five minutes.  (Tr. 282:5-13; 345:20.)  Plaintiffs were then transported back to the hotel and arrived there after 5:00 p.m.  (Tr. 282:16.)

Based on the foregoing, I find that Plaintiffs' workday at Green Haven was from when they arrived at the job site, approximately 6:15 a.m., until approximately 4:45 p.m., when they were cleared through security to leave the job site at night. This is ten and one-half hours, but after subtracting time for the coffee break, lunch break, and donning/doffing, I find that Plaintiffs were entitled to be compensated for nine and one-half hours for work performed at Green Haven.

## B. Days and Hours Worked

As noted above, no other Plaintiff, besides Hernandez, kept a record of the days and hours that he worked for NJK.  (JPTO ¶ 21.) With respect to Plaintiffs Alfaro, Agustin, N. Melgar, Top, M. Melgar, Cetino, and Lazo the Court makes the following just and reasonable inferences under *Mt. Clemens Pottery Co.*

These Plaintiffs testified that during the summer months[10] they worked between five and six days a week (Tr. 171:10, 13; 220:17; 275:6-7; 307:9, 313:14; 328:14) and between three and four days a week during the winter months[11] (Tr. 171:18-19; 307:11).  The Court will, therefore, calculate damages for these Plaintiffs for work performed in the summer based on five days a week and will credit Plaintiffs with a sixth day of work on specific job sites where the testimony supports such a finding.   The Court will also calculate damages for these Plaintiffs regarding work during the winter months based on three days a week, unless the testimony supports a specific determination otherwise.

Hernandez is in a different position than the other Plaintiffs because he kept a contemporaneous record of the days and hours that he worked at the job sites.  The calendar contains times and job site references.  (*See* Pls.' Exh. 25.)  Hernandez testified that he would mark down the hours that he worked on the roof every day when he returned from work.  (Tr. 22:25; 23:1-5.)  The Court finds that Hernandez' calendar is the best evidence of the hours and days that he worked at a particular job site.  The Court will, therefore, use this calendar in the calculation of Hernandez' damages.

## C. Classification of Plaintiffs' Work

With respect to Plaintiffs' prevailing wage claim, Plaintiffs must be classified as doing the work of a laborer or roofer in order to determine the rate to which they were entitled.  "[D]efendants do no take issue with the Court's preliminary findings with respect to the job classification of [P]laintiffs, which is as follows: Within three years of [P]laintiffs' work with NJK, they became roofers; and there is a 50/50 split between laborer and roofer, after the three-year period." (Dkt. No. 115 at 5; *see also* Dkt. No. 114 ¶¶ 273-74 (Plaintiffs adopting same for proposed calculations).)   The Court will use the weighted average of the laborer and roofer prevailing wage rate, as well as the laborer and roofer supplemental benefits rate in calculating the damages for those Plaintiffs who qualify for the laborer/roofer rate.

---

[10]   The summer months will be calculated to include work done from May through October.

[11]   The winter months will be calculated to include work done from November through April.

The Court makes the following findings regarding each Plaintiffs' prevailing wage rate:

- Hernandez began working for NJK in 1993, such that he is entitled to the laborer/roofer rate for the whole duration of his prevailing wage claim.
- Cetino began working for NJK in October 1993, such that he is entitled to the laborer/roofer rate for the whole duration of his prevailing wage claim.
- Alfaro worked for NJK from the end of 2001 until July 2004 and then from September 2008 through December 2008. Alfaro's first period of employment will be calculated at the laborer rate and his second period will be calculated at the laborer/roofer rate.
- Top began working for NJK in February or March 1999 and was employed through March 2004. Prior to March 2002, Top's prevailing wage rate will be calculated at the laborer rate. From March 2002 onward, Top's prevailing wage rate will be calculated at the laborer/roofer rate.
- M. Melgar began working for NJK in July 2007 and continued working for NJK through mid-December 2008, such that his hours will be calculated at the laborer rate for his prevailing wage claim.
- N. Melgar testified that he began to work for NJK in 2006 and stopped working for NJK in December 2008, such that all of his prevailing wage claim will be calculated using the laborer rate.
- Agustin worked for NJK from 1998 to 2004. He is entitled to the laborer/roofer rate for the whole duration of his prevailing wage claim.
- Lazo worked for NJK from mid-August 2008 through December 2008, such that his hours will be calculated at the laborer rate for his prevailing wage claim.

## III.   PROJECTS

Following Judge Ross' summary judgment opinion, Plaintiffs removed all federal job sites from this action and filed their claims relating to work performed on these job sites in state court. (Dkt. No. 111, 30:21-25; *see, e.g.*, Tr. 44:3-4 ("The Court: So [Fort Hamilton] is not part of this case? [Plaintiffs' Counsel]: That's not part of this case.").) Accordingly, there will be no findings of fact or award of unpaid wages, overtime compensation, or prevailing wage wages for work performed on federal job sites.

### A.  Starrett City

Throughout the trial there was reference to a potential dispute as to whether Starrett City was a public or private project. In Plaintiffs' post-trial submissions, they do not directly address whether this site is a public or private project, but they do claim that Plaintiffs who worked at this site are entitled to prevailing wage and supplemental benefits (dkt. no. 114 ¶ 89) and designated it as a "prevailing wage project" (dkt. no. 114, exh. D). Plaintiffs, therefore, take the position, without any citation to any support in the record that Starrett City was a public project. Defendants post-trial submissions dispute Plaintiffs' contentions. (Dkt. No. 115 at 45-47.)

The root of this dispute derives from the parties' cross-motions for summary judgment as it pertains to Plaintiffs' prevailing wage claim. Therein Plaintiffs submitted a spreadsheet, originally prepared by Defendants and described as "[a]n index with

11

a description of the documents produced by defendants to plaintiffs . . ." which identified *thirty-six* NJK projects. (Dkt. No. 59, exh. K ("Spreadsheet")). The thirty-six projects were denoted by Defendants as either private or public, but did not indicate whether they were federally- or state-funded.

In ruling on the cross-motions, Judge Ross stated that "[h]ere, there is no dispute that the contracts at issue are public works contracts subject to state prevailing wage laws. Defendants' own spreadsheet identified *twenty-five* state-funded projects and [D]efendants concede these were subject to state prevailing wage laws." (Dkt. No. 77 at 20 (emphasis added).)

At trial, Plaintiffs' counsel represented to the Court that "[t]he Starrett City power plant job is one of the jobs which Judge Ross found was concededly a public job based on documentation the defendants filed in the court." (Tr. 385:11-13.) Plaintiffs' counsel further argued that "Judge Ross found, it's our position that it's law of the case, that she identified that the public parties referred to on the exhibit that we identified, I think it was [fifty-one], and she recognized that in her decision and the defendants never appealed that." (Tr. 451:20-25.) Alternatively, Plaintiffs argue that Judge Ross' statement constitutes a binding "finding of fact." (Tr. 452:3.)

Defendants claim, however, to have made a clerical error on the Spreadsheet. The Reply Affidavit of Hatzis, filed in connection with the cross-motions for summary judgment, states that "[t]he project known as Spring Creek Towers/Starrett City Power Plant is a private project." (Dkt. No. 74 ¶ 72.) Defendants in their post-trial submissions dispute Plaintiffs' representation that Judge

Ross found that Starrett City was a public site. Defendants argue that they sought to correct with Plaintiffs and the Court the mislabeling of this job site as public. (Dkt. No. 115 at 46.) Further, Defendants argue that it is Plaintiffs' burden to show that Starrett City was a public job site. (*Id.* at 46-47.)

It is true that Judge Ross did not explicitly list which of the thirty job sites classified by Defendants as public were subject to prevailing wage laws. Taking the Spreadsheet and working through the list with Judge Ross' opinion appears to arrive at the conclusion that the twenty-five job sites to which she refers do not include Starrett City and take into account Defendants' contention that they made an error in its original Spreadsheet designation.

The Spreadsheet originally designated twenty-nine jobs as "public." Footnote two of the Hatzis Affidavit noted that "Miller Field Hanger # 38" was also a public job, which brings the total to thirty job sites deemed public by Defendants. (Dkt. No. 66 at 3 n.2.) Judge Ross held that job sites receiving federal monies would not be subject to state prevailing wage claims. (Dkt. No. 77 at 31.) She found evidence that 500 Gorge Road, Cliffside Park was federally funded, but could not find similar evidence in the record regarding Monmouth Building No. 114 and Fort Hamilton Army Base. (Dkt. No. 77 at 31.) Those three sites were designated as "public" on the Spreadsheet and Fort Hamilton was listed twice, which brings the list of public job sites subject to state prevailing wage law to twenty-six. (*See* Dkt. No. 66 n.2.) Defendants' Reply Affidavit of Hatzis, as well as the documents annexed to Attorney Barron's Reply Declaration, put the Court on notice that there was a dispute as to the classification of Starrett City. (*See* Dkt.

No. 73; Dkt. No. 74.)  This dispute brought the remaining twenty-six job sites to twenty-five concededly public job sites, just as Judge Ross wrote in her opinion. (*See* Dkt. No. 77 at 20.)

In any event, Plaintiffs' "law of the case" and "finding of fact" arguments also fail.  The "law of the case" doctrine "posits that when a court decides upon a *rule of law*, that decision should continue to govern the same issues in subsequent stages in the same case. *See* 1B J. MOORE & T. CURRIER, MOORE'S FEDERAL PRACTICE [hereinafter Moore], ¶ 0.404 (1980). Law of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618-19 (1983) (emphasis added) (footnote omitted).  Here, the law of the case doctrine is inapplicable.  Judge Ross was not deciding upon a rule of law, but rather whether there were factual disputes that necessitated a trial for resolution.  She found such a dispute in whether Starrett City was subject to state prevailing wage law as a public job site not funded with federal monies.

However, even if such a statement by Judge Ross was subject to the law of the case doctrine, the doctrine is also very clear that such a decision does not tie the Court's hands for the pendency of the litigation. "Under law of the case doctrine, as now most commonly understood, it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice." *Arizona*, 460 U.S. at 618 n.8.  It is clear from the cross-motions for summary judgment that there was a material factual dispute as to whether Starrett City was a public or private job site, such that the Court is not bound by the "finding" in the decision on the cross-motions for summary judgment, to the extent that there was one, that Starrett City was a public job site subject to the state prevailing wage law.

It is, therefore, Plaintiffs' burden to prove their breach of contract claim, specifically the failure to pay the prevailing wage. *See Ramos v. SimplexGrinnell LP* (*Ramos I*), 796 F. Supp. 2d 346, 362 (E.D.N.Y. 2011.)  Plaintiffs were on notice from Defendants, if not from the Court, that Starrett City was disputed as a public job site.  A plain reading of Defendants' submissions, as well as simple computation utilizing the Spreadsheet and Judge Ross' opinion, and any ambiguity in "twenty-five state-funded projects" should have alerted Plaintiffs that Starrett City was not concededly public.

Judge Ross' summary judgment decision entitled Plaintiffs to assume that the "the twenty-five state-funded projects . . . were subject to state prevailing wage laws." (Dkt. No. 77 at 20.)  While this alleviates Plaintiffs' burden with respect to concededly public job sites, it does not lift the burden from Plaintiffs to show that a disputed project was in fact a public job site.

There was testimony from Hernandez that Starrett City was a private job. (Tr. 100:13-14.)  Hatzis also testified that Starrett City was a private job.[12] (Tr. 383:20-21; 384:3-4.)  Interestingly, the same Spreadsheet at the

_____

[12]  It should be noted, however, that both Hatzis and Hernandez testified that they did not see the contract for this project, such that they could not be sure whether it was public or private.  (Tr. 92:18-20; 385:3-4.)  Alfaro and Lazo similarly testified that they had no knowledge of whether the job sites were private.  (Tr. 134:22-25; 267:2-3, 5-6.)

center of this dispute lists bid documents, the scope of work, and project specifications for Starrett City as being produced by Defendants to Plaintiffs during discovery. (*See* Spreadsheet.) These documents were not submitted during trial and are not part of the trial record. Plaintiffs failed to produce any evidence to show that a public agency was a party to this contract, that the contract was paid for with public funds, and that the primary objective was for the use and benefit of the general public. The Court, therefore, finds that Plaintiffs have failed to sustain their burden to prove that Starrett City was a public job and subject to state prevailing wage laws.

Hernandez, Alfaro,[13] Cetino, Top, M. Melgar, N. Melgar, and Agustin[14] performed work at Starrett City. (Tr. 64:19-21; 65:10; 120:10-13; 168:5-9; 179:22-25; 180:1-3; 228:6-8; 268:23; 274:16; 275:1-2; 310:3-4; 343:18; Pls.' Exh. 56 at 175.)

Hernandez' calendar and testimony reflect that he worked at this job site in July 2007 and continued through September 2007. (Pls.' Exh. 53 at 80-82; Tr. 64:19-21, 65:10.) Hernandez' paystubs reflect that he was paid $28.00 an hour at this job site. (Exh. 17 at 115-122.)

---

[13] Alfaro worked at this job site in 2002, which is outside of the relevant time period of this lawsuit, both under the FLSA and NYLL. (Tr. 120:10-13.)

[14] Agustin testified that he worked at this job site for four years beginning in 2000. (Tr. 310:3-4, 8, 13.) He testified that he did not work at Starrett City in 2003 or 2004, such that he did not work there during the relevant period of this lawsuit. (Tr. 310:16-17.)

Cetino testified that he worked at this job site from the end of 2003 through approximately September 2004. (Tr. 168:5-9; 179:22-25; 180:1-3.) The earliest period for which Cetino can recover, based on the applicable statutes of limitations as discussed below, is January 15, 2004. Cetino, therefore, is credited as working at this job site from January 15, 2004 through September 30, 2004, or thirty-seven weeks. He testified that he worked "up to six days a week" during the summer (Tr. 175:4-8), however he did not estimate the number of weeks that he worked six days. The Court, therefore, finds that he worked for thirty-seven weeks at this job site, twenty weeks of which were during the summer, and that he also worked five Saturdays during the summer. Cetino was paid $140.00 a day. (Tr. 173:18.)

Top testified that he worked at this job site from November 2003 (Tr. 227:10) until February 2004 (Tr. 228:6-8). He further testified that he did not work in December 2003. (Tr. 239:4.) Top testified that he was working between four different job sites, including Starrett City, during this time period. (Tr. 227:17-19; 239:24-25; 240:7-8; 243:22-25.) The Court, therefore, finds that Top worked a total of six weeks at this job site, consisting of the whole month of November 2003, as well as one week during both January 2004 and February 2004. Top was paid $100.00 a day. (Tr. 220:6-10.)

M. Melgar worked at this job site for four months, from approximately July 30, 2007 until the beginning of December 2007. (Tr. 268:23; 274:16; 275:1-2.) He testified to working Saturdays when the weather was good. (Tr. 275:6-10.) The Court finds that M. Melgar worked for sixteen weeks at this at

this job site, including twelve Saturdays during the summer. M. Melgar was paid $20.00 an hour. (Tr. 269:22; 275:24-25.)

N. Melgar began working at Starrett City on July 17, 2007. (Pls.' Exh. 56 at 134.) N. Melgar testified that he worked there for three months, "[s]ometimes five, sometimes six" days a week throughout his employment. (Tr. 342:5; 343:18.) The Court finds that N. Melgar worked for twelve weeks at this job site, including six Saturdays during the summer. N. Melgar was paid $20.00 per hour. (Tr. 343:23-25.)

B. Queens College

This was a public project in Queens County. (Tr. 398:20-23.) Top worked there in 2004. (Tr. 239:4-7.) Top testified that during January and February 2004, this was one of four job sites at which he worked. (Tr. 239:24-25; 243:22-25.) As such, the Court finds that Top worked at this job site for two weeks. Top was paid $100.00 per day. (Tr. 220:9-10.)

C. Bronx Two

NJK performed roofing work at Bronx Two, a privately funded project. (JPTO ¶ 8.) Hernandez, Alfaro, Cetino, Top, and Agustin worked there. (JPTO ¶ 9; Tr. 231:2-8.)

Hernandez' calendar and testimony reflect that he worked at this job site in December 2003, February 2004, March 2004, June 2005, September 2005, October 2005, and November 2005. (See Pls.' Exh. 25; Tr. 30:1-3, 6-9, 11; 32:24-25; 33:1-5; 35:5-8; 46:7-9; 48:12-15.) Hernandez testified that he was initially paid $21.00 an hour at this job site (Tr. 31:1; 35:12), but when he returned to

work there in 2005, he was paid $25.00 an hour (Tr. 51:18).

Alfaro testified that he worked at this job site for two or three weeks after working at Katonah. (Tr. 125:7-8, 11-12; 129:16-18.) He further testified that he typically worked one or two Saturdays a month during his employment by NJK. (Tr. 123:9-12.) The Court finds that Alfaro worked three weeks in May 2004 at this job site, as well as one Saturday. (See Tr. 129:11-12, 15.) During this time, Alfaro was paid $17.50 an hour. (Tr. 125:15.)

Cetino testified that he worked in the Bronx in 2004 after he finished working at Katonah. (Tr. 180:21.) He further testified that he worked at this job site for four months. (Tr. 181:6.) Cetino testified that he worked during the weekend at this job site. (Tr. 181:14-15.) The Court, therefore, finds that Cetino worked for sixteen weeks at this job site beginning January 2005, as well as sixteen Saturdays. Cetino was paid $140.00 per day. (Tr. 181:13.)

Top testified that he worked at this job site for less than one month in March 2004. (Tr. 245:7, 9-11.) The Court, therefore, finds that he worked at this job site for three weeks. Top was paid $100.00 a day. (Tr. 231:15-17.)

Agustin testified that he worked at this job site for two weeks after Katonah. (Tr. 310:22.) He began at this job site around the middle of March 2004. Agustin was paid $120.00 a day. (Tr. 310:13-15.)

D. Katonah

Hernandez, Alfaro, Cetino, and Agustin performed work for NJK at a public job site in Katonah, New York, beginning in February

15

2004.  (Tr. 34:1; 34:3-5; 121:5-6; 180:5, 17, 19; 309:1-6; 309:15-19.)

Hernandez testified that he began at this job site in February 2004.  (Tr. 33:24; 34:1.)  The days during which he worked at this job site are denoted in his calendar.  (*See* Pls.' 25.)  Hernandez testified that during this period he was paid $21.00 an hour.  (Tr. 35:12-13.)

Alfaro testified that he began working at this job site in February 2004.  (Tr. 120:19-24.)  Alfaro testified that he worked there for "approximately some four or five, six weeks." (Tr. 121:11.)  He testified that he worked one or two Saturdays a month at this job site.  (Tr. 123:9-12.)  The Court finds that Alfaro worked at this job site for five weeks, as well at two Saturdays.  Alfaro was paid $17.50 an hour.  (Tr. 122:14.)

Cetino testified that he worked at this job site between three and four months after completing work at Starrett City.  (Tr. 180:5, 19.)  The Court finds that Cetino worked for fourteen weeks at this job site from October 2004 until January 2005.  Cetino was paid $140.00 per day.  (Tr. 180:13-14.)

Agustin testified that he worked at this job site for six weeks after working at West Point at the end of 2003.  (Tr. 309:5-6.)  He testified that he worked there between four and five days a week.  (Tr. 309:24.)  Therefore, Agustin worked four days a week for six weeks during Winter 2004 at this job site.  Agustin was paid $120.00 a day.  (Tr. 310:2.)

E.  West Orange Project[15]

Hernandez worked at this job site on Friday, February 27, 2004 and Saturday, February 28, 2004.  (Pls.' Exh. 25 at 32.)  There is no indication in the record that this job site was public.  Hernandez was paid $21.00 an hour.  (Tr. 35:12.)

F.  Monmouth County Courthouse

This was a public project in Monmouth County, New Jersey.  (Tr. 42:4-7.)  Work at this job site began around June 2004.  (Dkt. 114 ¶ 55.)  Hernandez, Alfaro, Cetino, and Agustin worked at this job site.

Hernandez began to work at this site beginning the week of June 14, 2004.  (Tr. 36:15-16.)  His calendar reflects the days and hours that he worked.  (*See* Pls.' Exh. 25.)  Hernandez testified was paid $21.00 an hour. (Tr. 42:9.)

Alfaro testified that he worked at this job site in June, July, or September 2004.  (Tr. 129:25; 130:1-3.)  He further testified that he worked at this job site for about two months. (Tr. 130:9.)  Despite any specific testimony from Alfaro regarding Saturday work at this job site, he testified that he generally worked one or two Saturdays a month during the entire time of his employment at NJK.  (Tr. 123:11-15.) Accordingly, the Court finds that

---

[15]  Despite Plaintiffs' counsel's representation at trial that this job site was removed from the case because it was a federal job site (Tr. 34:21-23), both Plaintiffs and Defendants included this job site in their post-trial submissions and calculations (*see* dkt. no. 114 ¶¶ 51-54; dkt no. 115, exh. E).  As such, the Court will include this job site in the present lawsuit and requisite calculations.

he worked at this job site for eight weeks in June and July 2004, as well as three Saturdays. Alfaro was paid $17.50 an hour. (Tr. 130:15.)

Cetino testified that he worked at this job site for three months after working at Bronx Two. (Tr. 181:16-17, 21.) I find that Cetino worked at this job site for twelve weeks beginning in June 2004. Having testified that he worked "up to six days a week" during the summer (Tr. 175:4-8) and without any testimony as to how many Saturdays he worked at this job site, I find that he worked three Saturdays at the Monmouth County Courthouse. Cetino was paid $140.00 per day. (Tr. 182:4-5.)

Agustin testified that he worked at this job site for three months. (Tr. 312:11.) He also testified that he did not remember working Saturdays. (Tr. 312:16-17.) Accordingly, the Court finds that Agustin worked twelve weeks at this job site beginning June 2004 and was paid $130.00 a day. (Tr. 312:13.)

G. Green Haven

NJK performed roofing work at Green Haven, a publicly funded project in Dutchess County, New York. (JPTO ¶ 5; Pls.' Exh. 9.) Hernandez, Alfaro, M. Melgar, and N. Melgar performed work at Green Haven. (JPTO ¶ 7; Tr. 344:17.)

Hernandez worked at this job site during two periods. The first period was from August 2004 through February 2005. (Dkt. No. 114 ¶ 61.) The second was from about mid-July 2008 (Tr. 67:19-23) until mid-August 2008 (Tr. 68:16). Hernandez was paid $23.00 an hour for his work at this job site

during 2004 and 2005. (Tr. 42:3.) He was then paid $49.50 an hour for his work in 2008. (Tr. 68:11.)

Alfaro worked at Green Haven for seven days in Summer 2008. (Tr. 131:10-11; 133:6-7.) Alfaro was paid $41.00 an hour. (Tr. 131:18-19.)

M. Melgar worked here for approximately two weeks in October 2008. (Tr. 278:11-19; 279:1-3.) M. Melgar was paid $25.00 an hour. (Tr. 280:10.)

N. Melgar worked at Green Haven for approximately four months. (Tr. 346:1.) He testified to working "[s]ometimes five, sometimes six" days a week throughout his employment. (Tr. 342:5.) I find that N. Melgar worked at this job site for sixteen weeks in Summer 2004, as well as eight Saturdays. N. Melgar was paid $25.00 an hour. (Tr. 346:7.)

H. Orange County Project

This is a public works project in Orange County, New York. (Spreadsheet; Dkt. No. 115, exh. E.) Hernandez worked at this job site in October and November 2004 on the specific days reflected in his calendar. (Pls.' Exh. 25 at 44, 46.) Hernandez was paid $23.25 an hour. (Pls.' Exh. 17 at 49-53.)

Cetino testified that he worked at this job site "between three and four months" after the Monmouth County Courthouse. (Tr. 182:6-9.) The Court credits Cetino for working at this job site for fourteen weeks beginning in September 2004. Cetino was paid $140.00 a day. (Tr. 182:14-16.)

## I.  Work at the Shop

Hernandez testified that on April 9, 10, 16, and 17, 2005 he went to the Shop and cleaned it.  (Tr. 44:13-16; 45:2-6.)  This testimony is consistent with entries on his calendar.  (Pls.' Exh. 25 at 52.)  Hernandez was paid $24.00 an hour for work done at job sites during this time period and the Court will credit him that same rate for this work.  (Pls.' Exh. 25 at 61-62.)

## J.  Private Building

Hernandez testified that he worked at a private building.  (Tr. 45:8-9, 20-23.)  His calendar, shows that after May 3, 2005 he worked for the remainder of the month of May at a private building.  (Pls.' Exh. 25 at 53.)  The Court credits Hernandez' time and job sites as written contemporaneously in his calendar.  Hernandez was paid $24.00 an hour for work done at during this time period.  (Pls.' Exh. 25 at 63-64.)

## K.  Elmont Fire District[16]

By Defendants' admission in their post-trial submissions, this was a public works project in Nassau County.[17]  (Dkt. No. 115,

---

[16]  Plaintiffs fail to identify this job in their post-trial submissions and Defendants identify a public job in Long Island where Hernandez worked during the relevant time period as "Elmont Fire District Nassau County."  (Dkt. No. 115, exh. E.)

[17]  Because Defendants concede that this job site was public, it will be subject to the prevailing wage.  However, Plaintiffs fail to provide the Court with the relevant prevailing wage schedule for this county and time period and such a schedule is not

exh. E.)  Hernandez testified that he worked at a job in Long Island in June of 2005 "for a couple of days."  (Tr. 46:6-7.)  Although Plaintiffs fail to identify this job site in their proposed findings of fact, the Court credits Hernandez' testimony to find that for days prior to June 29, 2005 denoted on his calendar as "Long Island" were spent at this job site.  (See Pls.' Exh. 25 at 54.)  Further, there was no direct testimony from Hernandez regarding his rate on this job, but the Court finds that he was paid $24.00 an hour at this job site because that was the rate that he was paid at the following job site during the same time period.  (See Tr. 47:10.)

## L.  South Huntington Silas Wood School Sixth Grade Center[18]

This was a public works project installing a rubber roof in Suffolk County, New York.  (Tr. 46:14-15; 183:18, 20; Pls.' Exh. 13.)  Hernandez testified that he worked on this job during June and July 2005, and returned in September 2005 for repair work.  (Tr. 46:9-13;  47:15-21;  48:23-25;  50:19-23.)

---

archived nor available online.  Due to the proximity of the dates that Hernandez worked at this job site and the prevailing wage schedule for this county effective July 1, 2005, the Court will use those rates for the relevant prevailing wage calculations.

[18]  Plaintiffs only identify this site in their post-trial submissions as "Long Island School."  (Dkt. No. 114 ¶¶ 70-72.)  Based on the time frame for the work provided by Hernandez and Cetino and certified payroll documents in the record, I find that this job site was South Huntington Silas Wood School Sixth Grade Center.  (See Pls.' Exh. 55 at 37; Tr. 46:9-13; 47:15-21; 48:23-25; 50:19-23; 183:16-18, 22.)

According to his testimony and calendar, he began this job on June 29, 2005. (Tr. 46:9-10; Pls.' Exh. 25 at 54.)  Hernandez further testified that this job took one and one-half months to two months to complete.  (Tr. 49:4.)  The Court, therefore, credits him with working at this job site on the days denoted on his calendar that are consistent with his testimony.  Hernandez was paid $24.00 an hour.  (Tr. 47:10.)

Cetino testified that he worked at this job site for one month sometime after working at the Orange County Project.  (Tr. 183:16-18, 22.)  Evidence in the record suggests that Cetino worked some hours on Saturdays at this job site.  (Pls.' Exh. 55 at 37.)  Accordingly, the Court credits Cetino with having worked for four weeks in July 2005 at this job site, as well as two Saturdays.  Cetino was paid $140.00 a day.  (Tr. 182:17-20.)

## M. New Jersey Projects

In September 2005, Hernandez worked at several buildings in New Jersey.  (Tr. 50:11-18.)  Hernandez testified that this job lasted six weeks and was housing for elderly people, but he did not know whether it was public or private.  (Tr. 49:12-16.)  Plaintiffs failed to meet their burden to show that this was a public job site.  They also failed to link this testimony to any other record with a precise name or location for these buildings.  Accordingly, the Court will credit the entries on Hernandez' calendar during this time period that indicate "Jersey City" or "Bergenline" as the jobs to which Plaintiffs refer as "New Jersey Project."  (Dkt. No. 114 ¶¶ 73-74.) The Court further finds that there is not enough support in the record to find that

these were public jobs.[19] (*See* Dkt. No. 114 ¶¶ 73-74;  Tr. 49:12;  Pls.' Exh. 25 at 57.) Hernandez was paid $25.00 per hour.  (Tr. 51:15-18.)

---

[19]  Defendants' post-trial spreadsheets seem to suggest that these job sites were McGowan and FDR Buildings West New York ("McGowan"), a federal job site, and West Monmouth Utility Authority, Monmouth County ("WMUA"), a public job site.  (Dkt. No. 115, exh. E.)  Defendants' spreadsheet credits Hernandez at McGowan for thirty-five hours during the month of September 2005 and fifty-seven hours at WMUA.    (*Id.*)  Hernandez' calendar has him at "Bergenline" or "Jersey City" for ninety-two hours in September 2005. (Pls.' Exh. 25 at 57.) While both Hernandez' calendar and Defendants' spreadsheets credit Hernandez for the same amount of hours, *i.e.* ninety-two, the record is unclear as to where Hernandez worked and whether the job site or sites were private, public, or federal.  Accordingly, the Court will credit Hernandez for ninety-two hours of work during this period, as there is seemingly no dispute there, but classify this work as work done on private job sites.

19

N. Oakwood School South Huntington Silas Wood[20]

Beginning in June 2006, Hernandez worked at this public job site located in Suffolk County, New York.  (Tr. 55:11-14; *see* Dkt. No. 114 ¶¶ 75-79; Dkt. No. 115, exh. E.)  He testified that he worked at there for approximately six weeks. (Tr. 55:6-14; 56:3.)  The Court credits the specific days on Hernandez' calendar.  He was paid $26.00 an hour.  (Tr. 55:19.)

O. DPW Complex Jersey City

In late September and early October 2006, Hernandez worked at what he described as "a project for the police and the firemen."  (Tr. 57:11.)  He further testified that this site was on Route 440 in New Jersey.  (Tr. 57:13.)  Plaintiffs only designate this job site as the "Firehouse Projects."  (Dkt. No. 114 ¶¶ 80-83.)  Defendants identify this job site as the "DPW Complex Jersey City" with the address of 575 Route 440, Jersey City, New Jersey 07305.  (Dkt. No. 115, exh. E.)  The Court finds that this job site was the DPW Complex Jersey City located in Hudson County, New Jersey.  This job site was previously denoted as public.  (Spreadsheet; Tr. 58:5-6.)  The Court credits Hernandez the days that he worked at this job site as it is reflected in his

calendar.  Hernandez was paid $28.00 an hour at this project.  (Tr. 58:8.)

P. Melville Estates[21]

This was a public works job in Suffolk County, New York through the Long Island Developmental Disabilities Service Office ("LIDDSO").  (Spreadsheet; Pls.' Exh. 53 at 372-397; Tr. 61:16-17; 394:7-11; *see also* Dkt. No. 115, exh. E.)  Hernandez testified that he started at this job site on December 21, 2006 and continued for six weeks.  (Tr. 61:11-12, 14-15.)  Hernandez also testified, and the record reflects, that he returned to this job site in February and March 2007.  (Tr. 63:19-25; Pls.' Exh. 25 at 75-76; Pls.' Exh. 53 at 372-397.)  The Court credits the specific days during this time period listed in Hernandez'

---

[20]  Plaintiffs only identify this site in their post-trial submissions as "Long Island School." (Dkt. No. 114 ¶¶ 75-79.) The Court finds based on the time frame for the work provided by Hernandez and Defendants' post-trial submissions that this site was "Oakwood School South Huntington Silas Wood." (Dkt. No. 115, exh. E.) Further, in this submission Defendants concede that it was a public job in Suffolk County. (*See id.*)

---

[21]  Plaintiffs refer to this job site as "Long Island Job" in their proposed findings of fact and conclusions of law (dkt. no. 114 ¶¶ 101-103) and also create a separate and subsequent entry for "Long Island Nursing Home" (dkt. no. 114 ¶¶ 104-106).  Plaintiffs cite Hernandez' testimony that the job lasted six weeks beginning December 21, 2006 for the "Long Island Job" but then cite his subsequent testimony that he worked all of January 2007 at the "Long Island Nursing Home."  (Dkt. No. 114 ¶¶ 101-106).  Hernandez also testified that this January job was at the same location. (Tr. 62:1-12.)  Additionally, the certified payroll sheets submitted by Plaintiffs for this December 2006 to March 2007 time period identify Hernandez as working at a single job site—"Melville Estates."  (Pls.' Exh. 53 at 372-397.)  The Court, therefore, credits Hernandez' testimony and calendar dates for this period to work to the same job site—Melville Estates.

calendar as the days that he worked at this job site. He was paid $28.00 an hour. (Tr: 62:2.)

### Q. Morris County Juvenile Detention Center

This was a public works project in Morris County, New Jersey. (Tr. 64:14-15; 394:12-16; *see also* Pls.' Exh. 11.) Hernandez testified that he worked at this job for about six weeks beginning in June 2007. (Tr: 64:5-7.) The Court credits the days that Hernandez recorded in his calendar as the days that he worked at this job site. He was paid $41.00 per hour. (Tr. 64:9.)

### R. Valley Stream School

This was a public works project in Suffolk County, New York. (Spreadsheet; Tr. 65:3-4; *see also* Pls.' Exh. 53 at 445; Dkt. No. 115, exh. E.) Hernandez testified that he worked at this job for one or two weeks in July 2007. (Tr. 64:22-25; 65:1-2.) His calendar reflects that he was at this job site for two weeks, and the Court credits the specific days as noted in same. He was paid $41.00 per hour. (Tr. 65:6.)

### S. Jersey City

This was a public works project in Hudson County located on Newark Avenue in Jersey City. (Pls.' Exh. 53 at 160-74; Dkt. No. 115, exh. E.) Although Hernandez did not testify as to working at this job site, his calendar reflects that he worked here on or around February 2008. (Pls.' Exh. 25 at 88.) The Court credits the dates specified in Hernandez' calendar as the exact days that he worked at this job site. Hernandez testified that his rate was $49.50 per hour in 2008 and it stayed at this amount through the remainder

of his employment, such that his rate for this job site was $49.50. (Tr. 67:13-16.)

### T. Rainbow Commons[22]

This was a public works project for the LIDDSO located in Suffolk County. (Spreadsheet; Tr. 66:20-21; Pls.' Exh. 12.) Hernandez worked at this job site beginning in November 2007 and continuing through mid-April 2008. (Tr. 66:8-11, 15-19; 67:5-6, 18-20.) Hernandez is credited as working the dates specified in his calendar at this job site. He was paid $49.50 per hour at this job. (Tr. 67:8, 13-15.)

### U. 40 Nassau Avenue

At trial Plaintiffs failed to elicit testimony from Hernandez regarding this job site. However, Plaintiffs submitted to the Court a copy of the contract for a public job site

---

[22] Plaintiffs' post-trial submissions identify two job sites that include work on November 2007: "Long Island Project" (dkt. no. 114 ¶¶ 116-119) and "Long Island Center" (dkt. no. 114 ¶¶ 114-115). Hernandez testified that he first worked at a building for sick people on Long Island for two weeks in November 2007 and then at another public project in Long Island in that same month. (Tr. 66:11-19.) Plaintiffs submitted payroll records for Hernandez as part of their evidence. (Pls.' Exh. 53.) The whole month of November 2007 places Hernandez at a job site called "Rainbow Commons." (Pls.' Exh. 53 at 270-282.) Further, Hernandez' calendar for this period does not indicate that he was working at two different job sites, but at the same job site. (Pls.' Exh. 25 at 97.) Therefore, the Court finds that during this period Hernandez worked at a job site known as Rainbow Commons.

located on 40 Nassau Avenue, Islip, New York. (Pls.' Exh. 10.) They also submitted certified payroll records for this job site. (Pls.' Exh. 28.) Based on this evidence and Hernandez' calendar the Court finds that Hernandez worked at this public job site in Suffolk County, New York in late April and May 2008. (*See* Pls.' Exh. 28 at 4-10.) Because Hernandez testified that this was his rate was $49.50 per hour in 2008 and it stayed at this amount through the remainder of his employment, the Court finds that his rate at this job site was $49.50. (Tr. 67:13-16.)

V. Oceangate Buildings[23]

NJK performed roofing work at the Oceangate Buildings in Coney Island, a privately funded project.[24] (JPTO ¶¶ 10, 16.)

_____

[23] The Spreadsheet contains two entries related to Coney Island, "Coney Island Building 2955 West 29th Street" and "Oceangate Buildings – Coney Island." (Spreadsheet.) The JPTO also has separate paragraphs for the work at the Oceangate Buildings and Coney Island Building 2955 West 29th Street. (JPTO ¶¶ 11, 17.) Plaintiffs submitted time sheets for both of these buildings and they cover the same time period. (*See* Pls.' Exh. 31; Pls.' Exh. 32.) Further, Alfaro testified that this job was two buildings, but one project. (Tr. 134:12-13.) The Court finds that the two buildings in Coney Island that NJK worked on are part of the single job site denoted by Plaintiffs as "Coney Island" and to which the Court refers as "Oceangate Buildings."

[24] It should be noted that Hernandez testified that this job site was public housing, but the weight of the evidence suggests that this statement was in error and the Oceangate Buildings are private. (Tr. 68:21; 100:15-17.)

Hernandez, Alfaro, M. Melgar, N. Melgar, and Lazo performed work at Oceangate for NJK. (JPTO ¶¶ 9, 11.) Plaintiffs began to work at this job site in August 2008. (Tr. 67:18-19; 253:21; 255:18-19; Pls.' Exh. 56 at 74.)

Hernandez began working at this job site in mid-August 2008. (Tr. 67:18-19.) He continued to work there through September 2008 as specified in his calendar. Hernandez was paid $49.50 an hour. (Tr. 68:24.)

Alfaro worked at this job site for six weeks in September and October of 2008. (Tr. 134:6-7, 10-11, 14-16.) Alfaro testified that his schedule was typical at this job site (Tr. 135:7-9), which included sometimes working on Saturdays (Tr. 160:9-10; *see also* Pls.' Exh. 52 at 2-12). Alfaro is credited with working at this job site for six weeks, as well as three Saturdays. Alfaro was paid $32.00 an hour. (Tr. 134:19.)

M. Melgar worked at this job site beginning September 2008 and continuing for approximately two months.[25] (Tr. 277:13-14; 278:12-13.) During these two months, however, he testified that he also worked on a white roof in Cliffside, New Jersey for one week (Tr. 277:18-20; 278:1-3; 289:8) and

_____

The Spreadsheet, which was submitted by Plaintiffs as an exhibit at trial, denotes the two Coney Island projects as private. (Spreadsheet.)

[25] M. Melgar testified that he began to work at this job site in October 2008 (Tr. 278:12-13), however, the time sheets submitted by Plaintiffs into evidence shows that the two months that M. Melgar worked at this job site were September and October 2008 (*see, e.g.*, Pls.' Exh. 57 at 6-7).

Green Haven for two weeks (Tr. 279:1-3). M. Melgar testified that his hours were the same at this job site as they were at Starrett City, such that when the weather was good he worked Saturdays. (Tr. 279:22-23.) The Court, therefore, credits M. Melgar with working five weeks, as well as three Saturdays at this job site. M. Melgar was paid $25.00 an hour. (Tr. 280:10.)

N. Melgar then testified that he worked at this job site "between two and three weeks." (Tr. 344:7, 9.) He testified to working "[s]ometimes five, sometimes six" days a week throughout his employment. (Tr. 342:5.) The Court credits N. Melgar with working at this job site for three weeks, as well as one Saturday during Summer 2008. (See Pls.' Exh. 56 at 83.) N. Melgar was paid $20.00 per hour. (Tr. 344:11.)

Lazo testified that he began working at this job site from mid-August 2008 until mid-October 2008. (Tr. 253:21; 255:12-23.) He further testified that he would work here between five and six days a week, the sixth day being a Saturday. (Tr. 257:4-7.) However, Lazo also testified that he only worked more than forty hours per week "[a] few times . . . ." (Tr. 259:5.) The Court credits Lazo with working at this job site for eight weeks, as well as three Saturdays. Lazo was paid $25.00 an hour. (Tr. 257:14.)

W. New Jersey Building Repair

Plaintiffs' proposed findings of fact and conclusions of law include a job site described as "New Jersey Building" for roof repair. (Dkt. No. 114 ¶ 97.) Hernandez and M. Melgar testified regarding this repair. (Tr. 69:16-17, 20-21; 277:25; 278:1-4.) Hernandez testified that he worked here for a few days. (Tr. 70:5-6, 10-12.) M. Melgar

also testified that he worked at this job site in October 2008 for one week. (Tr. 277:18-20; 278:1-3.) Plaintiffs' Exhibits 53 and 57, which consists of miscellaneous payroll documents for Hernandez and M. Melgar, evinces that this work was performed at Cliffside Park, a federal job site that was removed from this lawsuit. (Pls.' Exh. 53 at 462-75; Pls.' Exh. 57 at 14-16; see Dkt. No. 77 at 31.) Accordingly, the Court finds that Hernandez and M. Melgar cannot recover for work performed at this job site under this lawsuit.

X. HSBC Shopping Center[26]

NJK performed roofing work at a shopping center and HSBC bank in Starrett City, a privately funded project. (JPTO ¶ 12.) Hernandez, Alfaro, M. Melgar, N. Melgar, and Lazo performed work at this job site. (JPTO ¶ 13.)

Hernandez began this job after the Oceangate Buildings in October 2008. (Tr. 69:6-7; Pls.' Exh. 25 at 96.) He testified that he worked at the mall portion of this job site for one or two weeks (Tr. 69:24-25), was then sent to New Jersey to repair a building (Tr. 69:16-17), and then worked at the supermarket part of this job in November 2008 for one month (Tr. 70:21-24; 71:1). The Court credits the specific dates within this time period, as noted on Hernandez' calendar, that are consistent with his testimony. Hernandez was paid $49.50 an hour. (Tr. 70:9.)

Alfaro testified that worked at this job site for four weeks in November and December of

_____

[26] Some Plaintiffs referred to this job site as the "Starrett City Mall." (See, e.g., Tr. 70:8.)

2008. (Tr. 135:18-24.) He further testified that his schedule was the same as what he testified was typical during his employment, *i.e.*, sometimes he worked Saturdays. (Tr. 123:9-10; 136:13-14.) The Court credits Alfaro with four weeks at this job site, as well as two Saturdays. Alfaro was paid $32.00 an hour. (Tr. 136:10.)

M. Melgar testified that he began working at this job site in October 2008[27] (Tr. 282:20-22) and concluded the work in mid-December (Tr. 283:16). M. Melgar testified Plaintiffs typically worked six days a week when the weather was good (Tr. 282:23-25; 283:1-2), but that he only worked two days a week at this job site when the weather was bad (Tr. 283:21-22). The Court finds that M. Melgar worked at this job site for six weeks, as well as one Saturday in the summer. M. Melgar was paid $25.00 an hour. (Tr. 270:1.)

N. Melgar testified to beginning to work at this job site after Green Haven. (Tr. 346:4, 21.) N. Melgar, therefore, began to work at this job site in late October 2008. He testified that he worked for two weeks on the bank portion of this job (Tr. 346:21) and four weeks on the shopping center portion of this job (Tr. 346:23, 25), which is a total of six weeks at this job site. N. Melgar was paid $25.00 an hour. (Tr. 346:11.)

---

[27] Taking into account the time credited to M. Melgar for Oceanside Buildings, as well as an NJK internal payroll sheet that indicates that the first week of work at this job site for M. Melgar began October 29, 2008 (Pls.' Exh. 57 at 5, 31), the Court will calculate one week of M. Melgar's time at this job site as work done during the summer, while the balance should be treated as work during the winter season.

Lazo testified that beginning in October 2008 and continuing for two and one-half months, through December 2008, he worked at the HSBC Shopping Center. (Tr. 255:12-23; 261:1-3.) Lazo further testified that he worked at this job site for five to six days a week. (Tr. 262:13-15.) The Court doubts the credibility of Lazo's testimony regarding the number of days he worked at this job site because it runs contrary to the internal payroll sheets for this job site submitted by Plaintiffs into evidence. (*See, e.g.*, Pls.' Exh. 59 at 38 (listing three days of work), 40 (listing four days of work).) The Court finds Lazo's testimony unpersuasive so as to deviate from the approximate days per week based on the season schema, as explained above. Accordingly, the Court will credit Lazo with working at this job site for ten weeks, two weeks during the summer season and eight weeks during the winter season. Lazo was paid $25.00 per hour. (Tr. 262:4-5.)

Y. Newark Avenue, Jersey City (Department of Public Works)

This was a public job in Hudson County, New Jersey. (Spreadsheet.) The work at this job site was performed in December 2008. (Tr. 263:11-13; Pls.' Exh. 53 at 167-70.) Hernandez did not testify about this job site, but his calendar and payroll sheets reflect that he worked for two days at this job site. (Pls.' Exh. 25 at 98; Pls.' 35 at 167-70.) The Court will credit Hernandez December 2 and 3, 2008 at this job site. Hernandez testified that during this time period he was paid $49.50 an hour. (Tr. 70:13-17.)

Lazo testified that he worked here at the end of December 2008 for about two weeks. (Tr. 263:11-15.) He testified that he worked about four to five days a week at this location because of the weather. (Tr. 264:9-10.) The

Court, therefore, finds that Lazo worked two weeks at this job site, each consisting of four days per week. Lazo was paid $25.00 per hour. (Tr. 264:2-3.)

### Z. Sylvia Street

NJK performed roofing work at 44 Sylvia Street in Glenn Head ("Sylvia Street"), a private residence. (JPTO ¶ 18.) Hernandez worked at this job during December 2008, except for the days that he did not work because of the cold. (Tr. 71:3-5, 7-8.) Hernandez' calendar reflects that he worked at this job site on December 4, 5, 6, 15, 18, and 30, 2008, and the Court credits that he worked those days at this job site. (Pls.' Exh. 25 at 98.) He was paid $49.50 per hour for work during this time period. (Tr. 70:16-18.)

## CONCLUSIONS OF LAW

### I. Preliminary Legal Arguments

#### A. Unnamed Plaintiffs

Defendants argue that Lazo, Agustin, Cetino, M. Melgar, N. Melgar, and Top cannot maintain state law claims because, as opt-in Plaintiffs, they never "properly joined the action." (Dkt. No. 115 at 48.) Additionally, class certification under Federal Rule of Civil Procedure 23 was never approved. Defendants argue that all Plaintiffs, excepting named Plaintiffs, Hernandez and Alfaro, should not recover under their state law claims because the complaint was never amended to include the opt-in Plaintiffs. (*Id.*)

Federal Rule of Civil Procedure 20 allows persons to join in an action as plaintiffs if: "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action." FED. R. CIV. P. 20(a)(1). Federal Rule of Civil Procedure 21 allows the Court at any time to add a party. FED. R. CIV. P. 21.

All Plaintiffs, including the opt-in Plaintiffs, seek relief arising out of the same series of occurrences relating to their employment by NJK. Further, the facts that give rise to all of Plaintiffs' claims, under state or federal law, are the same and the law is not substantially different between jurisdictions. Common questions of law and fact abound.

Furthermore, there is no prejudice to Defendants in joining these opt-in Plaintiffs with the named Plaintiffs' state law claims. The parties had a full and fair opportunity to perform discovery regarding all Plaintiffs' claims, including opt-in Plaintiffs—whether based in state or federal law. Moreover, it would be grossly inefficient and a waste of judicial resources to not address the opt-in Plaintiffs' state law claims. These opt-in Plaintiffs participated and testified in the trial. Evidence was submitted by both Plaintiffs and Defendants regarding these Plaintiffs. Refusal to address their state law claims in this action only to have them adjudicated in separate proceedings at a later date would cause undue delay to these Plaintiffs. *See Anderson v. Francis I. duPont & Co.*, 291 F. Supp. 705, 711 (D. Minn. 1968) ("Rule 20 is intended primarily to promote trial convenience through the avoidance of multiple lawsuits, extra expense to the parties, and loss of time to the Court and the parties. By Rule 20 the Court is given wide discretion to shape the trial to the necessities of the particular situation. Thus, where it will foster—instead of avoid—delay, confusion and inconvenience

of witnesses, separate trials should be avoided." (citations omitted)). Accordingly, the Court will join the claims of those opt-in Plaintiffs with the named Plaintiffs' state law claims under Rules 20 and 21.

With respect to Lazo, Agustin, and Top, the issue of whether the Court will exercise supplemental jurisdiction over their state claims was already addressed by Judge Ross on summary judgment. Judge Ross held that despite Plaintiffs' concession that Agustin and Top's FLSA claims were time-barred, the Court would exercise supplemental jurisdiction on their state law claims. (Dkt. No. 77 at 25-26.) Judge Ross also held that the Court would exercise supplemental jurisdiction over Lazo's state law claims despite him never filing an opt-in form. (Dkt. No. 77 at 29.) The Court recognizes Judge Ross' decision to exercise supplemental jurisdiction over Agustin, Top, and Lazo's state law claims as the law of the case and absent argument or citation to case law showing that the prior holding "is clearly erroneous and would work a manifest injustice," the Court refuses to depart from this holding. *See Arizona*, 460 U.S. at 618 n.8.

Defendants argue for the first time that the Court should refuse to exercise supplemental jurisdiction over the state law claims of N. Melgar, M. Melgar, and Cetino. (Dkt. No. 115 at 47-49.)

Federal courts exercise supplemental jurisdiction over state law claims through 28 U.S.C. § 1367. Subsection (a) of that statute states:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any

civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Subsection (b) of 28 U.S.C. § 1367 does not apply here because the Court's jurisdiction is not founded solely on the diversity of the parties.

Subsection (c) of 28 U.S.C. § 1367 states:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if —
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

Here, the state law claims do not raise novel or complex issues of state law. N. Melgar's, M. Melgar's, and Cetino's state law claims are straightforward wage and hour claims. Further, these state law claims do not substantially predominate over the federal

claims—those over which the Court has original jurisdiction. At most, these state law claims coexist with the federal law claims, but since both concern Defendants' continuous payment practices, the state law claims cannot be said to "substantially predominate." Furthermore, the Court has not dismissed all claims over which it has original jurisdiction. Finally, there is no other compelling reason to decline jurisdiction. Thus, 28 U.S.C. § 1367(c) does not provide the Court with a reason to decline the exercise of supplemental jurisdiction over N. Melgar's, M. Melgar's, and Cetino's state law claims.

Further, as noted by Judge Ross, "the FLSA and New York Labor Law actions here 'clearly derive from . . . a common nucleus of operate facts since they arise out of the same compensation policies and practices' of NJK." (Dkt. No. 77 at 26 (quoting *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).) Furthermore, "[s]ection 216 (b) [of the FLSA] gives [workers who filed consents to be party-plaintiffs to the FLSA claims] the status of parties and, as parties, they should have the same rights as the named [p]laintiffs to have all their related claims adjudicated in the same forum." *Ansoumana v. Gristede's Operating Corp.*, 201 F.R.D. 81, 90 (S.D.N.Y. 2001).

The Court, therefore, finds no reason to decline jurisdiction over N. Melgar's, M. Melgar's, or Cetino's state law claims under 28 U.S.C. § 1367(b) or (c). Thus, the Court exercises supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a) over the state law claims of Agustin, Top, Lazo, N. Melgar, M. Melgar, and Cetino.

## B. Travel Time Compensation

The central dispute in this case is whether Plaintiffs should have been compensated for the time prior to commencing and after stopping their work on the various job sites. It is not disputed that Plaintiffs were paid only for work that they performed at the various job sites. Plaintiffs contend, however, that they should be compensated for the time before and after working at the job site, while Defendants argue that this time is not compensable under the Portal-to-Portal Act, 29 U.S.C. § 254(a), which removes employers' obligation to compensate employees for:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

An employee's "[n]ormal travel from home to work is not worktime," 29 C.F.R. § 785.35, and not compensable, *Kavanagh v. Grand Union Co.*, 192 F.3d 269, 272 (2d Cir. 1999), unless the employee performs work while commuting that is "integral and indispensible" to a principal employment activity, *Singh v. City of N.Y.*, 524 F.3d 361, 367 (2d Cir. 2008). The Portal-to-Portal Act has "no effect on the computation of hours that are worked 'within' the workday." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 28 (2005); *see*

*also* 29 C.F.R. § 790.6(a) ("to the extent that activities engaged in by an employee occur after the employee commences to perform the first principal activity on a particular workday and before he ceases the performance of the last principal activity on a particular workday, the provisions of [§ 254(a)] have no application").

The issue before the Court is whether the time Plaintiffs spent at the Shop before and after their commute to the job sites was the first and last principal activities of their workday. If so, Plaintiffs would be entitled to compensation from the time they arrived at the Shop at the morning until they left the Shop at night.

As the Court found above, Defendants required Plaintiffs to report for work at the Shop in the morning where they loaded tools and small materials into the vans and were directed to job sites. Plaintiffs rode in NJK's vans to the job site or sites and after finishing their work there for the day, returned to the Shop in these vans to unload tools and materials before heading to their houses.

Defendants argue that this time at the Shop before and after commuting to and from the job sites does not constitute the first and last principal activities of Plaintiffs' workday. Defendants contend that Plaintiffs did not perform any principal activity when they were at the Shop. They further argue that even if Plaintiffs did load and unload tools at the Shop it was *de minimis* and, therefore, not a principal activity. Finally, Defendants contend that the transportation to and from the job sites was actually primarily beneficial to Plaintiffs and, therefore, not compensable. The Court will address each of these arguments in turn.

### 1. *Principal Activities*

The regulations that inform the FLSA define "principal activities" as those the employee is employed to perform. *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 590 (2d Cir. 2007) (citing 29 C.F.R. § 790.8(a)), *cert. denied*, 552 U.S. 1093 (2008). Further, the Supreme Court reasoned that "any activity that is 'integral and indispensable' to a 'principal activity' is itself a 'principal activity' under . . . the Portal-to-Portal Act." *Alvarez*, 546 U.S. at 36. Furthermore, the regulations direct that:

> Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice. If an employee normally finishes his work on the premises at 5 p.m. and is sent to another job which he finishes at 8 p.m. and is required to return to his employer's premises arriving at 9 p.m., all of the time is working time. However, if the employee goes home instead of returning to his employer's premises, the travel after 8 p.m. is home-to-work travel and is not hours worked.

29 C.F.R. § 785.38. Conversely, "[a]ctivities are classified as preliminary or postliminary if they are 'undertaken for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer.'" *Hellmers v. Town of Vestal, N.Y.*, 969 F. Supp. 837 (N.D.N.Y. 1997) (quoting

28

*Dunlop v. City Elec., Inc.*, 527 F.2d 394, 398 (5th Cir. 1976)).

Defendants' main contention is that the time at the Shop was not compensable because Plaintiffs did not perform any principal activity when they were there. This is a very fact specific analysis.

In *Dole v. Enduro Plumbing*, No. 88-CV-7041, 1990 WL 252270 (C.D. Cal. Oct. 16, 1990), the district court found the time the employees spent at the shop prior to leaving for the job site was compensable under the FLSA. The *Dole* court found that because the employees were required by the employer to meet at the shop and (2) "[t]he performance of other work at such a designated meeting place (even merely picking up needed tools or materials) . . . trigger[ed] at the designated meeting place the start of the employee's workday, with the same effect on subsequent travel." *Id.* at *5.

Furthermore, in *O'Brien v. Encotech Constr.*, No. 00-CV-1133, 2004 WL 609798 (N.D. Ill. Mar. 23, 2004), employees of a construction company sought compensation for time spent traveling from the construction company yard to the job site and back at the end of the day. Unlike this case and *Dole*, the employees in *O'Brien* were not required to report to the yard before reporting to the job site. *Id.* at *2. Despite it not being required, many workers went to the yard to pick up work orders, fill water tanks, hook up trailers needed for work, and perform checks and minor repairs on work vehicles. *Id.* At the end of the day, the employees would return to the yard, unhook the trailers, clean up equipment, and complete and turn in paperwork at the office. The *O'Brien* court explained that the employees were entitled to compensation if the preparation and clean-up

were considered an "integral part of the employee's work." *Id.* at *4 (citing 29 C.F.R. §§ 785.24, 790.8(b)).

> An activity is integral to a principal activity if the activity is made necessary by the nature of the work performed, it fulfills mutual obligations between the employer and the employees, the activity directly benefits the employer in the operation of his business, and the activity is closely related to the other duties performed by the employees.

*Id.* at *5 (quoting *Hiner v. Penn-Harris-Madison Sch. Corp.*, 256 F. Supp. 2d 854, 859 (N.D. Ind. 2003) (citing *Steiner v. Mitchell*, 350 U.S. 247, 252 (1956)).

The *O'Brien* court found the chores performed at the yard prior to leaving for and upon return from the job site were integral to the work.

> [T]he predominant activity of Encotech's employees was cutting concrete. Having tools, supplies, and equipment available and properly functioning, having water necessary for performing the cutting process, unloading debris, cleaning equipment, and completing paperwork are all activities necessary for the predominant activity of concrete cutting. All these activities benefitted Encotech. These are integral activities that qualify as principal activity, not preliminary or postliminary activity.

*Id.*

As in *Dole* Plaintiffs were required by Defendants to meet at the Shop in the morning

and were also returned by Defendants to the Shop in the evening. At the Shop Plaintiffs gathered at least some tools and supplies needed at the job sites in the morning and returned some tools and supplies in the evening. Under *Dole* the mere "picking up" of "needed tools or materials" in conjunction with mandatory attendance was enough to trigger the start, and presumably the end, of Plaintiffs' day. *See Dole*, 1990 WL 252270, at *5.

Further, the activities performed at the Shop are activities integral to a principal activity and, thus, principal activities entitled to compensation. *See Alvarez*, 546 U.S. at 36; *O'Brien*, 2004 WL 609798, at *4. The predominant activity of NJK's employees was roofing. Having the appropriate tools, supplies, and equipment available was necessary for this predominant activity of roofing. This activity benefitted NJK because this activity was what the business was paid for. These activities were closely related to the Plaintiffs' duties at the job sites because without performing these activities at the Shop they could not properly perform their duties at the job sites. Under *O'Brien*, as well as the Code of Federal Regulations, these activities were integral activities that qualified them as principal activities, thus entitling Plaintiffs to compensation for said activities.

Defendants' reliance on *Smith v. Aztec Well Servicing Co.*, 321 F. Supp. 2d 1234 (D.N.M. 2004), *aff'd*, 462 F.3d 1274 (10th Cir. 2006), to support their position that Plaintiffs' time at the Shop was not compensable is unavailing. Simply put, meeting up at a convenience store prior to beginning the day's work is far different than what occurred with NJK's workers. *See Smith*, 462 F.3d at 1289-90 (holding loading personal safety equipment, purchasing food

and drinks, and *occasionally* transporting essential tools and paperwork not"integral and indispensable part[s] of their principal activities"). At the Shop Plaintiffs received necessary instructions regarding the day's work ahead, including job site assignments and directions to load or unload specific tools and materials needed for that day. *Cf. Id.* at 1289-90. (Tr. 217:25; 218:1-3; 286:13-23.) Unlike buying food and drink for the day, here Plaintiffs' activities of loading and unloading tools and materials were necessary to NJK's business. Such activities were so closely related to their work that Plaintiffs were to perform, *i.e.* roofing, and was in the ordinary course of NJK's business. *See Dunlop*, 527 F.2d at 401 (holding activity integral and indispensable to principal activity if work is necessary to employer's business and performed in ordinary course of that business). The time spent on these activities is compensable.

### 2. *De Minimis*

Defendants next argue that the activities in which Plaintiffs engaged at the Shop were *de minimis*. (Dkt. No. 115 at 32.) Specifically, the Code of Federal Regulations states that:

[I]nsubstantial or insignificant periods of time beyond the scheduled working hours, which cannot as a practical administrative matter be precisely recorded for payroll purposes, may be disregarded. The courts have held that such trifles are *de minimis*. This rule applies only where there are uncertain and indefinite periods of time involved for a few seconds or minutes duration, and where the failure to count such time is due to considerations justified by industrial realities. An employer may not

arbitrarily fail to count as hours worked any part, however small, of the employee's fixed or regular working time or practically ascertainable period of time he is regularly required to spend on duties assigned to him.

29 C.F.R. § 785.47. The *de minimis* doctrine "provides a limiting principle to compensation for trivial calculable quantities of work," *De Asencio v. Tyson Foods, Inc.*, 500 F.3d 361, 373 (3d Cir. 2007), and permits employers to disregard compensable work "[w]hen the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours," *Anderson*, 328 U.S. at 692. "It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved." *Id.*

The Second Circuit considers three factors in determining whether otherwise compensable time should be considered *de minimis*: "(1) the practical administrative difficulty of recording additional time; (2) the size of the claim in the aggregate; and (3) whether the claimants performed the work on a regular basis." *Singh*, 524 F.3d at 371.

No evidence or testimony was elicited regarding the difficulty of recording this additional time. Just looking at the circumstances, however, there does not seem to be a high practical administrative difficulty. Plaintiffs were required to meet at the Shop in the morning and were taken back to the Shop in the evening where they performed these disputed *de minimis* tasks. Because foremen were present while such tasks were occurring and because Plaintiffs were all at one location, the practical administrative difficulty in recording who was performing

these tasks on a given day and for how long does not seem high or burdensome.

Turning to the size of the claim in the aggregate, it is large. The time spent performing these tasks at the Shop before and after working on the roof represents a substantial portion of Plaintiffs' claim. First, the size of the claim relating to the tasks performed at the Shop is large. Plaintiffs each spent approximately thirty minutes at the Shop in the morning and thirty minutes at the Shop in the evening. In *Smith*, the Tenth Circuit also rejected the plaintiffs' claim that being required to load their personal safety equipment into the vehicles triggered the start of their workday because "when an employee's activity 'takes all of a few seconds and requires little or no concentration,' then the activity is 'properly considered not work at all.'" *Smith*, 462 F.3d, at 1289 (quoting *Reich v. IBP, Inc.*, 38 F.3d 1123, 1126, n.1 (10th Cir. 1994)). Unlike in *Smith*, Plaintiffs spent a total of an hour per day performing these tasks, not merely a few seconds, and it was necessary for them to go through the Shop looking for needed tools and materials.

Beyond the actual time performing the tasks being large, the implications of such tasks not being *de minimis* also makes the size of the claim in the aggregate even larger because such tasks in the morning would trigger the start of each Plaintiff's work day and such time in the evening would signal the end of each Plaintiff's work day. The consequence of these triggering events, practically speaking, is that it would entitle Plaintiffs to compensation for their commute, which happened after the first task at the Shop in the morning and before the last task at the Shop in the evening. *See Singh*, 524 F.3d at 372 n.8 (quoting 29 C.F.R. § 790.6(a))

31

(explaining that continuous workday rule requires "time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday" to be compensated).

Finally, turning to the third consideration, whether Plaintiffs performed the work on a regular basis. (Dkt. No. 115 at 32-33.) In the version of events that the Court credits, Plaintiffs performed these tasks daily in the morning and in the evening. This is a regular basis. Thus, after considering the factors cited by the Second Circuit, the Court concludes that Plaintiffs' compensated time loading and unloading the vans was not *de minimis*.

### 3. Benefit

Finally, Defendants argue that Plaintiffs' time spent at the Shop is not compensable because the primary beneficiaries were Plaintiffs. (Dkt. No. 115 at 32-33.) Defendants argue Plaintiffs saved on transportation costs to the job sites and back again. Defendants cite the Court to *Gilligan v. City of Emporia, Kan.*, 986 F.2d 410, 412 (10th Cir. 1993), in support of their argument. In *Gilligan* the Tenth Circuit stated that "the test for whether an employee's time constitutes working time is whether the 'time is spent predominantly for the employer's benefit or for the employee's.'" *Gilligan*, 986 F.2d at 412 (quoting *Boehm v. Kan. City Power & Light Co.*, 868 F.2d 1182, 1185 (10th Cir. 1989)). Defendants argue that Plaintiffs only met at the Shop so they could get a ride because not all of them had driver's licenses or automobiles. (Dkt. No. 115 at 33 n.42.) The test in *Gilligan*, however, arose in the context of examining "on-call" time, which is not at issue in this case. *Gilligan*, 986 F.2d at 412.

Further, Defendants' argument is undercut by the fact that Plaintiffs not only were required to meet at the Shop in the morning, but also required to load tools and materials onto the vans. While it is arguable that a ride to and from the job sites benefitted Plaintiffs, Defendants received benefits as well. Defendants received labor loading the vans and also were able to control where Plaintiffs went and at what time.

The Court, therefore, concludes that Plaintiffs' activities at the Shop prior to departing for the job sites and after returning from same were principal activities under the Portal-to-Portal Act. Pursuant to the Department of Labor's "continuous workday rule, . . . the 'workday' is generally defined as 'the period between the commencement and completion on the same workday of an employee's principal activity or activities.'" *Alvarez*, 546 U.S. at 29 (quoting 29 C.F.R. § 790.6(b)). The rule "provides that '[p]eriods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked to the same extent as would be required if the Portal Act had not been enacted.'" *Singh*, 524 F.3d at 372 n.8 (quoting 29 C.F.R. § 790.6(a)). Therefore, under the continuous workday rule Plaintiffs were entitled to be compensated from the time they arrived at the Shop and began loading the tools and materials through the time it took to then unload the tools and materials after returning to the Shop in the evening. *See also Kalloo v. Unlimited Mech. Co. of N.Y.*, 977 F. Supp. 2d 187, 202-03 (E.D.N.Y. 2013) (quoting *Kuebel*, 643 F.3d at 359) (citing *Hajny v. Best Roofing of N.J., Inc.*, 11-CV-173 (LLS), 2011 WL 2493737, at *2, *4 (S.D.N.Y. 2011)) (finding time between commencement of first principal activity and

completion of last principal activity must be included in computation of hours worked under FLSA and NYLL).

### C. Rule 37 is Not a Bar to Plaintiffs' Recovery

Couched in Defendants' post-trial submissions is a request for Rule 37 sanctions due to Plaintiffs' alleged failure to comply with Rule 26(a) mandatory disclosures. (Dkt. No. 115 at 36.)  Defendants seek to preclude Plaintiffs "from relying upon *any* evidence of damages produced at trial because they failed to include a calculation of damages in their [initial] Rule 26(a) disclosure." (Dkt. No. 115 at 36 (emphasis added).)  Defendants also separately seek to preclude Plaintiffs from recovering FLSA liquidated damages or prevailing wage damages because Plaintiffs allegedly failed to identify these categories of damages in their subsequent, yet untimely, Rule 26(a) disclosures.[28] (Dkt. No. 115 at 36, 44.)  Defendants' argument is rejected.

Rule 26(a) of the Federal Rules of Civil Procedure directs that a party provide to the other parties "a computation of each category of damages claimed by the disclosing party. . . ." FED. R. CIV. P. 26(a)(1)(A)(iii). Pursuant to Rule 37, "[i]f a party fails to provide

information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

"The burden to prove substantial justification or harmlessness rests with the dilatory party." *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002) (citing *Wright v. Aargo Sec. Servs., Inc.,* No. 99-CV-9115 (CSH), 2001 WL 1035139, at *2 (S.D.N.Y. Sept. 7, 2001)).  In determining whether the district court acted within its discretion under Rule 37, the Second Circuit considers: (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new evidence; and (4) the possibility of a continuance.  *Patterson v. Balsamicao*, 440 F.3d 104, 117 (2d Cir. 2006).

As to the first consideration, Plaintiffs do not offer an explanation as to why their damage calculations were produced after the close of discovery.  As to the second consideration, the importance of the evidence, liquidated damages under both NYLL and FLSA, as well as prevailing wage damages, are a substantial component of this case. Defendants argue that this evidence is "important to [P]laintiffs proving their case . . . ." (Dkt. No. 115 at 41.)  Turning to the third consideration, and tied directly to the issue of harm, the Court finds that Defendants have not suffered prejudice flowing from the alleged failure to disclose.

Among the harms and prejudice Defendants claim, they accuse Plaintiffs of

---

[28]    Plaintiffs' initial Rule 26(a) discovery dated January 28, 2010 did not include a damage calculation.  (*See* Defs.' Exh. E.)  Plaintiffs' subsequent Rule 26(a) disclosure, dated August 2, 2013, and served after the close of discovery on April 2, 2012, did include a damage calculation, along with an explanation of how it was computed.  (*See* Defs.' Exh. F.)  Plaintiffs also provided Defendants with two additional damage calculations in connection with settlement discussions.  (Dkt. No. 115 at 39, n.44.)

"sandbagging" them with these three damage categories and calculations. (Dkt. No. 115 at 37.) Defendants argue that Plaintiffs' February 12, 2014 spreadsheets were "the first time that [P]laintiffs disclosed the specific legal theories under which they would be seeking recovery." (Dkt. No. 115 at 39.) They further claim that "[b]y not having [P]laintiffs' calculations during discovery, [P]laintiffs were deprived of an opportunity to conduct discovery on the damage calculations, including questioning of [P]laintiffs as fact witnesses in depositions." (Dkt. No. 115 at 42.)

Firstly, the Court finds Defendants' claim that the February 12, 2014 spreadsheets were the *first*[29] time that Plaintiffs disclosed these

_____

[29] Plaintiffs' amended Rule 26 disclosures, which, although served after the close of discovery, include columns related to prevailing wage and liquidated damages. (*See* Defs.' Exh. F, Attachment D.) As will be discussed below, Defendants were on notice through the amended complaint that Plaintiffs were seeking liquidated damages and prevailing wage damages. Further, as part of settlement negotiations, Defendants admit that Plaintiffs produced to them damage calculation spreadsheets, which Defendants admit were similar Plaintiffs' Exhibit 23. (Dkt. No. 115 at 39 n.44.) As Plaintiffs' Exhibit 23 included NYLL and FLSA liquidated damage calculations, as well as prevailing wage damages, the 2012 spreadsheet most likely included those calculations as well, such that Plaintiffs' Exhibit 23 was not the first time Plaintiffs disclosed the specific legal theories under which they would be seeking recovery. While Defendants are correct that such a production at a settlement conference does not satisfy the Rule 26 discovery obligation, *see Richmond v.*

damages theories unpersuasive. Defendants were put on notice through the complaint that Plaintiffs were seeking FLSA liquidated damages (Dkt. No. 25 ¶ 49) and prevailing wage damages (Dkt. No. 25 ¶¶ 79-83).[30] While it is true that the inclusion of the prayer for these damages in the compliant did not relive Plaintiffs of their duty to disclose damage calculations, it does demonstrate notice to Defendants and an opportunity for Defendants to mitigate any potential prejudice. *See Grant v. Shaw Envtl., Inc.*, 3:08-CV-350, 2012 WL 1059947 (E.D. Tenn. Mar. 1) (finding failure to disclose damages earlier was harmless because defendant put on notice though complaint that such damages were sought and defendant had opportunity to mitigate potential prejudice), *adopted by*, 2012 WL 1059944 (E.D. Tenn. Mar. 28, 2012).

Defendants' reliance on *Curcio v. Roosevelt Union Free Sch. Dist.*, 10-CV-5612 (SJF) (AKT), 2012 WL 6641715, at *4 (E.D.N.Y. Dec. 19, 2012), for the proposition that "the failure to state even the theories of liability until the eve of trial cannot be excused, even if they were listed in the complaint," is inapposite. (Dkt. No. 115 at 41.) The facts of *Curcio* are easily distinguishable. In *Curcio*, the plaintiff's amended complaint included "all other emoluments of employment, including pension credits." *Curcio*, 2012 WL 6641715,

_____

*Gen. Nutrition Ctrs. Inc.*, No. 08-CV-3577 (PAE) (HBP), 2012 WL 762307, at *8 (S.D.N.Y. Mar. 9, 2012), Defendants were not "sandbagged" that Plaintiffs were seeking such damage categories.

[30] It should be noted that Plaintiffs did not list NYLL liquidated damages in the amended complaint. (*See* Dkt. No. 25.)

at *4.  The court read this statement as a general demand and held that "a general demand in a complaint fails to satisfy the requirement of Rule 26(a) . . . ."  *Id.*  Here, the two demands in Plaintiffs' amended complaint were not general and specifically sought FLSA liquidated damages and prevailing wage damages.  Therefore, Defendants' claim that they were "sandbagged" by the inclusion of these damages and that the February 12, 2014 spreadsheet was the first time Plaintiffs disclosed these specific legal theories is unpersuasive.

I also find unpersuasive Defendants' claim of prejudice "[b]y not having [P]laintiffs' calculations during discovery." (Dkt. No. 115 at 42.)  Defendants were clearly not "deprived of an opportunity to conduct discovery on the damage calculations, including questioning of [P]laintiffs as fact witnesses in depositions."  (Dkt. No. 115 at 42.)

It is unclear what discovery Defendants claim they were prejudiced by not being able to obtain.  With respect to FLSA liquidated damages, the FLSA places the burden on the employer to show good faith and reasonableness in his conduct through "plain and substantial evidence" in order to challenge an award of such damages.  *Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997).  "To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them."  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999).  As this is Defendants' burden regarding Defendants' conduct, Defendants were not prejudiced by a lack of discovery needed from Plaintiffs as to this damage category.

Defendants had a full opportunity to conduct discovery regarding willfulness in the context of both the FLSA and NYLL.  Since the standard for willfulness in the context of the FLSA statute of limitation is the same as the standard for willfulness in the context of NYLL liquidated damages, *see Padilla v. Malapaz*, 643 F. Supp. 2d 302, 313 n.18 (E.D.N.Y. 2009), the Court is unpersuaded, and Defendants fail to further elaborate, what additional discovery was needed for NYLL liquidated damages that they did not have access to, nor considered obtaining, while conducting discovery for FLSA willfulness.

Regarding the prevailing wage damages, the Court is unclear as to what additional discovery Defendants are claiming they would have conducted.  As discussed above, there is evidence in the record that Defendants were on notice of Plaintiffs' prevailing wage claim, at least from Plaintiffs' amended complaint.  Such notice appears to have manifested in discovery regarding prevailing wage.  (*See* Spreadsheet (detailing Defendants' document production including "private" and "public" designations).)  The parties even briefed issues related to prevailing wage at the summary judgment stage. (Dkt. Nos. 58-76.)  Further, outside of discovery regarding whether job sites were subject to prevailing wage or not, it is unclear what discovery, including depositions of Plaintiffs, was needed but was not conducted based on the presentation of other damage theories.  The hours Plaintiffs worked and which job sites they worked was discovery needed for the calculation of other damage categories which Defendants do not claim a similar prejudice.  Furthermore, discovery regarding whether a job site was public and subject to prevailing wage laws is discovery that Defendants would have been in the best position to produce because the company arranged for the work.

Accordingly, the Court does not find that Defendants were prejudiced regarding discovery related to prevailing wage damages.

Defendants' argument regarding the reopening of discovery in order to depose Plaintiffs is not an argument new to this case. This issue was brought before the Honorable Roanne L. Mann at the April 13, 2012 settlement conference where she denied the parties' request. (*See* Dkt. No 44 at 5: 7-14.) Defendants then made a motion for reconsideration to reopen discovery on April 26, 2012 (dkt. no. 45), which Judge Mann subsequently denied (dkt. no. 50.)

In their motion for reconsideration, filed after the production of the spreadsheet with damage categories and calculations, on or about April 16, 2012,[31] Defendants represented to the Court that "paper discovery . . . has been completed."[32] (Dkt. No. 45.) It is, therefore, unclear what additional paper discovery Defendants are *now* claiming to have been prejudiced by not obtaining. The only additional discovery could be depositions.

The Court is left with the impression that Defendants' current argument in their post-

trial submissions is actually a collateral attack on Judge Mann's denial to reopen discovery made over two years ago. Defendants never appealed this decision to Judge Ross nor filed a Rule 37 sanctions motion in 2012. Their motion for reconsideration sought the same depositions that Defendants now argue prejudice them in conjunction with Rule 37. This timing leaves the Court highly suspicious that Defendants are only trying another legal argument because they failed to obtain what they sought under other legal avenues. Examining the circumstances as a whole, Defendants have not been prejudiced by the alleged failure of Plaintiffs to include in their calculations FLSA and NYLL liquidated damages, as well as prevailing wage damages.

Turning to the fourth consideration, the possibility of a continuance, the Court begins by reiterating that Defendants raise this issue in their post-trial submissions. The trial has already been held and both sides have submitted proposed damage calculations. Therefore, there is no possibility of a continuance at ths late stage.

The Court, therefore, finds that to the extent that Plaintiffs' may have failed to timely fully comply with Rule 26(a) it was harmless and does not warrant the Rule 37 sanction of exclusion.

D. Falsus in Uno

Pursuant to the doctrine of *falsus in uno*, Defendants claim that certain representations made by Plaintiffs in their answers to interrogatories, affidavits, and declarations are contrary to their trial testimony and, thus, should cause the Court to completely discount their credibility. (Dkt. No. 115 at 26-27.) Specifically the doctrine of *falsus in uno* allows that "if [a fact finder] find[s] that a

---

[31] The Court notes that this production most likely occurred on or about April 13, 2012, as that was the date of the settlement conference before Judge Mann. (Minute Entry dated 4/13/2012.)

[32] It should be noted that Defendants were also dilatory in their document production. Defendants did not complete paper discovery until approximately April 27, 2012, which was after the close of discovery and after the production of the spreadsheet at the settlement conference. (Dkt. No. 45.)

witness wilfully falsely testified to a material fact, [a fact finder is] privileged to reject all his testimony, or . . . elect to . . . believe part of it and accept that part of it which appealed to [a fact finder's] reason, or which was corroborated by other credible evidence and reject the rest." *United States v. Foster*, 9 F.R.D. 367, 389 (S.D.N.Y. 1949); *see also United States v. Weinstein*, 452 F.2d 704, 713-14 (2d Cir. 1971).

It is clear that over the course of the litigation, and through their various submissions, Plaintiffs narrowed the time periods for which they are seeking damages. Defendants allege that "[t]he catalyst for the change was the undisputed information contained in NJK's bank records." (Dkt. No. 115 at 27.) Accordingly, Defendants ask the Court to disregard "testimony regarding time periods worked that [are] not consistent with NJK's bank records . . ." under the principal of *falsus in uno*. (Dkt. No. 115 at 28.)

Defendants represent that "[i]t is without dispute that all [P]laintiffs were paid by a company check and that each employee was paid weekly, which results in the inference that if there was no weekly check for a specific week, then an employee did not work that week." (Dkt. No. 115 at 27.) However, Defendants' representation does not conform to the testimony at trial.

At trial Cetino testified that he sometimes received cash in a small envelope and was not always paid with a check.[33] (Tr. 202:1-2; 204:12.) Further, Cetino testified that while

some of his checks were from NJK, he also received checks out of other accounts, specifically for a company called "Dynamics." (Tr. 176:19-21.) He also testified that the checks did not reflect the hours he actually worked. (Tr. 183:13-15.) Agustin testified that he was paid by check and "a little bit of cash." (Tr. 306:16-17.) Further, an examination of the evidence presented at trial shows that Plaintiffs sometimes received more than one check for a week. (*See, e.g.*, Pls.' Exh. 17 at 64.)

The Court finds that Plaintiffs were not paid solely out of NJK's bank account, such that these statements are not the only record of Plaintiffs' work. The Court, therefore, cannot make the inference that Defendants ask the Court to make: only crediting Plaintiffs as working during the weeks where NJK's bank statements reflect a check being paid to them.

The Court also cannot disregard the fact that Plaintiffs' claims regarding when they worked have diminished throughout the litigation. For example, Alfaro's affidavit claims seven years of employment with NJK, *see* Pls.' Ex. 35, while his trial testimony was that he worked for NJK during two separate periods, from the end of 2001 until July 2004 and then from September 2008 through December 2008. The Court, in its discretion as the finder of fact, refuses to completely discount Plaintiffs' credibility. *See Diesel Props. S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) ("It is within the province of the district court as the trier of fact to decide whose testimony should be credited. The court is also entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." (citations omitted)). Accordingly, the Court will place greater weight on Plaintiffs' sworn, in-court

_____

[33] Cetino claims that he did not put the receipt of cash as part of his interrogatory answers because he did not remember receiving cash when he answered the question. (Tr. 206:2-4.)

37

testimony than their interrogatory answers, affidavits, and declarations.

### E. Statute of Limitations

Since the FLSA, NYLL, and NJWHL are compensatory in nature, double recovery may result if unpaid wages are awarded for the same hours worked under both the federal and the state laws. *Blue v. Finest Guard Servs., Inc.*, No. 09-CV-133 (ARR) (CLP), 2010 WL 2927398, at *6 n.11 (E.D.N.Y. June 24), *adopted by*, 2010 WL 2927403 (E.D.N.Y. Jul. 19, 2010). The statute of limitations for each claim will thus dictate under which law a claimant will be entitled to recovery.

The statute of limitations for the FLSA is two or three years depending upon whether the violation was willful. 29 U.S.C. § 255(a). Here Defendants concede willfulness, such that the statute of limitations for the FLSA claims will be three years. (Dkt. No. 115 at 35.) A cause of action under the FLSA accrues on the regular payday immediately following the work period for which services were rendered and not properly compensated. *Doo Nam Yang*, 427 F. Supp. 2d at 337.

Under the FLSA, an action is commenced as to an individual employee "on the date when the complaint is filed if he is specifically named as a party plaintiff in the complaint, or if his name did not so appear, on the subsequent date on which his name is added as a party plaintiff in such action." 29 U.S.C. § 216(c). The NYLL statute of limitations is six years. N.Y. LAB. LAW §§ 198(3), 663(3). The NJWHL has a two-year statute of limitations. N.J. Stat. Ann. § 34:11-56a25.1. Seeing as the Court has allowed joinder of the non-named Plaintiffs, their state claims will relate back to the date on which each Plaintiff filed their consent form. *See*

*e.g.*, *Wood v. Trivita, Inc.*, No. CV-08-0765-PHX-SRB, 2009 WL 2106291, at *2 (D. Ariz. 2009). Courts have held that the FLSA preempts "claims directly covered by the FLSA (such as overtime) . . . ." *Moeck v. Gray Supply Corp.*, No. 03-1950 (WGB), 2006 WL 42368, at *2 (D.N.J. Jan. 6, 2006) (citing *Chen v. St. Beat Sportswear Inc.*, 364 F. Supp. 2d 269 (E.D.N.Y. 2005)).

Plaintiffs bring their prevailing wage claims under New York and New Jersey law as third-party beneficiaries to the contracts executed between NJK and the public entities. (*See* Dkt. No. 25 ¶¶ 79-83, 96-101.) The relevant statute of limitations for their New York prevailing wage claim is six years. N.Y. C.P.L.R. 213(2); *see also Eldred v. Comforce Corp.*, 3:08-CV-1171 (LEK/DEP), 2010 WL 812698, at *7 (N.D.N.Y. Mar. 2, 2010). The statute of limitations for a private right of action for the prevailing wage on a public project is also six years in New Jersey. *Goodman v. Port Auth.*, 850 F. Supp. 2d 363, 376 (S.D.N.Y. 2012) (citing *Troise v. Extel Communs.*, 784 A.2d 748, 752-53 (N.J. Super. Ct. App. Div. 2001)).

Hernandez and Alfaro filed the original complaint in this action as named Plaintiffs on November 5, 2009. (Dkt. No. 1.) Their FLSA period runs from November 5, 2006 through November 5, 2009. Their NJWHL period runs from November 5, 2007 through November 5, 2009. Their NYLL period runs from November 5, 2003 through November 5, 2009. This is also the same period for their prevailing wage claims under both New York and New Jersey law.

Cetino and M. Melgar's consent forms to join this action were filed on January 15, 2010. (Dkt. No. 9, exh. A.) Their FLSA period runs from January 15, 2007 through

January 15, 2010. Their NJWHL period runs from January 15, 2008 through January 15, 2010. Their NYLL period, as well as their prevailing wage claims under both New York and New Jersey law, runs from January 15, 2004 through January 15, 2010.

Top, Agustin, and N. Melgar's consent forms to join this action were filed on August 19, 2010. (Dkt. No. 12, exh. A.) Their FLSA period runs from August 19, 2007 through August 19, 2010. Their NJWHL period runs from August 19, 2008 through August 19, 2010. Their NYLL period runs from August 19, 2004 through August 19, 2010. This is also the same period for their prevailing wage claims under both New York and New Jersey law.

It should be noted that because the Court found that Top was employed by NJK through March 2004 and the earliest he was covered by the NYLL in this lawsuit is August 19, 2004, his NYLL claims are time barred. Top also does not have claims that accrued within the FLSA or NJWHL period. Additionally, because Agustin stopped working for Defendants in 2004, he does not have claims that accrued within the FLSA or NJWHL period. (*See* Dkt. No. 77 at 25.) Finally, based on the time periods and job sites that the Court found Agustin to have worked, only approximately two weeks of summer work at the Monmouth County Courthouse falls within the NYLL and respective state prevailing wage periods.

As Judge Ross noted in her summary judgment decision, no consent form was ever filed for Lazo. (Dkt. No. 77 at 26.) Despite this deficiency, Judge Ross held that Lazo was allowed to proceed with his state law claims. (Dkt. No. 77 at 29.) There is no dispute that Lazo worked from mid-August 2008 through

December 2008. This time period falls wholly within the NYLL statute of limitations, as well as the six-year statute of limitations for his New York and New Jersey prevailing wage claims. The only remaining question is whether Lazo's claim under the NJWHL is barred by the two-year statute of limitations.

Lazo's last claim of unpaid work relates to work he performed at Newark Avenue, Jersey City job site in December 2008. In order for Lazo to recover for NJWHL violations in December 2008, he would have had to have filed his consent to join by December 2010. Plaintiffs' counsel did not apprise the Court of their intention, however unfulfilled, to file his consent to join until November 3, 2011 and did not obtain Defendants' consent to file same until November 2, 2011. (Dkt. No. 34.) Accordingly, it does not seem possible that Lazo's NJWHL claim could, therefore, be timely and within the statute's two year limitations period.

## II.  Liability and Damages

### A.  Parties' Post-Trial Submissions

At the close of the trial, the Court instructed the parties to file proposed damage calculations, in addition to their proposed findings of fact and conclusions of law, as a summary of the evidence presented at trial. (Tr. 567:5-17.)

#### 1.  *Plaintiffs*

Plaintiffs' damages were calculated after a review of manual logs, payroll reports, certified payroll reports, calendars, affidavits, pay stubs, paychecks, and bank statements. (Dkt. No. 114 at 47.)   After careful examination of Plaintiffs' damage calculation

spreadsheets, the Court finds them replete with inaccuracies. For example, for the week ending December 21, 2003, Plaintiffs credit Hernandez with working Tuesday, Friday, and Saturday on a prevailing wage job. (Dkt. No 114, exh. D at 12.) This, however, does not reflect the evidence adduced at trial. Hernandez testified, and his calendar reflects, that he worked at Bronx Two those three days. (Pls.' Exh. 25 at 26; Tr. 30:1-3, 11; 33:2, 5), which is a private job and not subject to prevailing wage. (JPTO ¶ 8.) Further, this same spreadsheet calculates and includes damages for Hernandez relating to the week ending April 25, 2004. (Dkt. No. 114, exh. D at 12.) Hernandez' calendar, however, records him at Fort Hamilton (Pls.' Exh. 25 at 34), which is a federal job site, which was removed from this lawsuit. (Tr. 43:12-13.) Furthermore, Plaintiffs credit Hernandez with working four days during the week ending March 20, 2005, which are clearly denoted on Hernandez' calendar as time worked at federal job sites, which, again, is not part of this lawsuit. (Dkt. No. 114, exh. D at 12; Pls.' Exh. 25 at 51.) As a result of these errors and in an abundance of caution, the Court cannot credit Plaintiffs' proposed damage calculations.

As mentioned above, the Court finds that Hernandez' calendar is the best evidence of the days and times that he worked at the various job sites. The Court finds that Hernandez' calendar was a contemporaneous record that he kept while working for NJK. Hernandez testified that he would mark down the hours that he worked on the roof every day when he returned from work. (Tr. 22:25; 23:1-5.)

The problem arises where Plaintiffs seek to impute Hernandez' calendar onto the other Plaintiffs as evidence of the days and hours they worked at the various job sites. Plaintiffs wrote that "[w]hen there were no documents to review for a particular time period, Plaintiffs used Edgar Hernandez' calendar to calculate the days the Plaintiffs worked." (Dkt. No. 114 at 49.) The Court finds that such methodology is flawed and Hernandez' calendar cannot be used as evidence as to when and where the other Plaintiffs worked for three reasons.

First, Plaintiffs' testimony indicates that not all Plaintiffs would be at the same job site on a given day because they would sometimes be split into two crews and sent to two different job sites. (*See* Tr. 218:1-3; 286:13-23.) Further, some Plaintiffs also testified that they would be sent to other job sites with a single foreman and not in the van. (Tr. 243:1-14.) Furthermore, Hernandez testified that Plaintiffs were sometimes sent to some job sites where the work was substantially done, but needed repairs or other work performed separate from the primary job sites where Plaintiffs were working for that period of time. (Tr. 32:2-5.) Because Plaintiffs did not all work together at the same job sites on the same days and for the same hours, Hernandez' calendar is not good evidence as to where and when the other Plaintiffs worked.

Second, this was Hernandez' *personal* calendar. There were times where he was not at work for various reasons, such that it would be inaccurate as to other Plaintiffs who were at the job sites. The calendar includes, for example, his vacations to Switzerland, when he did not work, but it is unclear whether other Plaintiffs worked during this time and where. (Pls.' Exh. 25 at 56, 83; Tr. 49:6-9.) Further, Hernandez' calendar includes days where he was not at work for personal reasons, such as doctor's appointments. (Pls.' Exh. 25 at 60, 66.)

Third, Hernandez' testimony indicates that he may have been given less work than other workers. Specifically, Hernandez testified that he was given less work and hours because of his age. (Tr. 71:18-24.) It is, therefore, unclear whether other Plaintiffs actually worked more hours or days than he did.[34] For these three reasons the Court finds that Hernandez' calendar is insufficient to calculate the days, hours, and job sites worked by Plaintiffs other than Hernandez.

## 2. *Defendants*

In their post-trial submissions, Defendants ask the Court to rely on NJK's bank statements in order to determine the dates when Plaintiffs worked and did not work. (Dkt. No. 115 at 8.) Defendants claim that they produced the "complete, un-redacted, monthly statements for each year with copies of all checks made payable to each of the [P]laintiffs." (*Id.*) Just as with Plaintiffs' proposal of using Hernandez' calendar in order to determine the days, hours, and job sites worked by other Plaintiffs, there are issues raised by using these bank statements as the measure of Plaintiffs' damages.

The main problem with relying wholly on these bank statements is that there was testimony presented at trial that raises questions as to the completeness of these payment records. While it may be that Defendants' bank statements introduced in trial are complete as to the NJK account, there is testimony that this was not the only method or account from which Plaintiffs were paid. For example, Cetino testified that he received checks from accounts other than NJK, namely from a company called "Dynamics." (Tr. 176:19-21.) Top also produced a copy of one such check for $455.00 written from the account of "Dynamics, Inc."[35] (Pls.' Exh. 20 at 17.)

Further, Plaintiffs testified to receiving cash in addition to checks. (Tr. 202:1-2; 204:12; 306:16-17.) Despite this testimony being to the contrary of Plaintiffs' interrogatory answers that stated they were only paid by check (*see, e.g.*, Pls.' Exh. 42 at 10), the Court credits Plaintiffs' in-court testimony as credible. The reliability of such answers to interrogatories was called into question by Defendants because they were not signed by Plaintiffs and only contained a signature line for one of Plaintiffs' attorneys. (*See* Pls.' Exhs. 41-47.) Rule 33 of the Federal Rules of Civil Procedure requires interrogatories to be answered by the party to whom they are directed and signed by same. FED. R. CIV. P. 33(b)(1), (5). The Court, therefore, credits Plaintiffs' testimony under oath over such unsigned answers to interrogatories.

---

[34] Specifically Hernandez testified: "In July, I was at a funeral home. And Hugo Enamorado, I met him at the funeral home and told me, man, why don't you go to work? . . . So I told him there is no work. Of course we're already working. I called Niko, and I asked him that if they were working? He told me that, yes, and why don't I go to work? Because I already have the people complete. When I go to open more or I need more people, I am going to call you. And you are already very old to be working, he said to me." (Tr. 71:13-24.)

---

[35] It should be noted that while this check was dated in 2000, the copy of the check still corroborates Cetino's testimony that Plaintiffs were paid from accounts other than the NJK checking account.

Furthermore, the evidence presented to the Court shows that Plaintiffs were sometimes issued multiple checks for the same week without any indication what compensation the checks represented. For example, Cetino received two checks for the week ending September 4, 2005. (Pls.' Exh. 16 at 24.) One pay stub annexed to this check represents that the check is payment for twenty-two hours of work at $23.75 an hour, while the other check issued for the same week is a nondescript lump sum of $60.26. (*Id.*) The evidence also includes two checks issued to Alfaro for the week ending March 28, 2004. (Pls.' Exh. 15 at 47-48.) The first check is for sixteen hours at $17.50 an hour, but the second check is, again, just a lump sum amount with no reference as to what it is meant to compensate. (*Id.*)

Accordingly, the absence of a check written from the NJK bank account does not conclusively prove that Plaintiffs did not work during a specific period. Therefore, Defendants' bank statements for the relevant period are an unreliable and incomplete record from which to calculate the days, hours, and job sites where Plaintiffs worked at a given time.

### 3. *What Remains*

Outside of Plaintiffs' testimony, the Court is left with a smattering of handwritten logs, certified payroll reports, other payroll reports, pay stubs, and paychecks in order to determine the days, hours, and job sites each Plaintiff, save Hernandez, worked. None of these records are complete. The Court is, therefore, left with the Plaintiffs' trial testimony. "As courts have found, a plaintiff can meet [his] burden [under *Mt. Clemens*] 'by relying on recollection alone.'" *Santillan v. Henao*, 822 F. Supp. 2d 284, 294 (E.D.N.Y.

2011) (quoting *Doo Nam Yang,* 427 F. Supp. 2d at 335).

The Court finds the testimony of all Plaintiffs to be sufficient evidence from which the Court may make just and reasonable inferences as to the days, hours, and job sites Plaintiffs worked. However, with respect to Hernandez, the Court finds that his calendar presents a more complete and contemporaneous picture as to the days, hours, and job sites that he worked. Accordingly, with respect to Hernandez the Court will credit the days, hours, and job sites as recorded on Hernandez' calendar and supplemented by his testimony when calculating his damages.

### B. Employer Liability

#### 1. *NJK*

##### a. FLSA

FLSA liability applies to "employers," which the statute defines broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). Under the FLSA, employers have an obligation to pay overtime compensation to employees who are "engaged in commerce or the production of goods for commerce" or "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a). Defendants do not seem to contest the satisfaction of these requirements, which the Court will, nevertheless, briefly address.

Under the latter classification of qualified employees, a defendant is an "[e]nterprise engaged in commerce or in the production of goods for commerce" if the defendant is an

enterprise (1) that has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (2) whose annual gross volume of sales made or business done is not less than $500,000.00. 29 U.S.C. § 203(s)(1)(A).

There is evidence in the record that NJK's employees work with materials that were moved in commerce in satisfaction of the first prong of this test. For example, Defendants submitted an invoice for materials that were shipped from a supplier in Pennsylvania (Defs.' Exh. J at 5712) and two invoices from a New York supplier who shipped materials to New Jersey (Defs.' Exh. J at 5345-46). With regards to the second prong of this test, Defendants stipulated that NJK did no less than $500,000.00 in annual gross volume of business done. (Tr. 493:24; 506:17-19.) Taken together, NJK is an enterprise engaged in commerce. Accordingly, Plaintiffs qualify under the FLSA as covered employees and NJK is an employer within the meaning of the statute.

b.  State Law Claims

Courts have held that the FLSA preempts "claims directly covered by the FLSA (such as overtime . . . ." *Moeck*, 2006 WL 42368, at *2 (citing *Chen*, 364 F. Supp. 2d 269). Consequently, the NYLL and NJWHL only applies to Plaintiffs' overtime claims to the extent that they are not preempted by the FLSA. As discussed above, Plaintiffs' FLSA claims are subject to a three year statute of limitations. Consequently, the NYLL will apply to Plaintiffs' overtime claims from the end of the FLSA's three year period to the end of the NYLL's six year statute of limitations.

Because overtime claims under the NJWHL only have a two year statute of limitations, Plaintiffs' NJWHL period is fully subsumed by the FLSA period, such that all of Plaintiff's NJWHL overtime claims are preempted.[36] *See Moeck*, 2006 WL 42368, at *2.

"'New York law adopts a similarly broad definition of "employer" in the context of its minimum wage and overtime laws,'" *Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048 (GEL), 2007 WL 313483, at *12 (S.D.N.Y. Feb. 1, 2007) (quoting *Moon v. Kwon*, 248 F. Supp. 2d 201, 236 (S.D.N.Y. 2002)), *abrogated on other grounds by*, *Barenboim v. Starbucks Corp.*, 698 F.3d 104 (2d Cir. 2012), but under the NYLL an employer need not "show either a nexus with interstate commerce or that the employer has any minimum amount of annual sales," *Chun Jie Yin v. Kim*, No. 07-CV-1236 (DLI) (JO), 2008 WL 906736, at *4 (E.D.N.Y. April 1, 2008). New York defines an employer as a "person employing any" employee, N.Y. LAB. LAW § 2(6), and defines an employee as "any individual employed, suffered or permitted to work by an employer . . .", N.Y. COMP. CODES R. & REGS. tit. 12 § 142-2.14(a).

---

[36]  There are a few instances where Plaintiffs worked at job sites in New Jersey outside of the FLSA statute of limitations period. During those weeks, however, Plaintiffs also performed work at the Shop in New York before and after working on the roofs in New Jersey. As discussed below, it is this time at the Shop that was not compensated and caused Plaintiffs' compensable workday to be expanded. Consequently, the Court will award Plaintiffs' time for these weeks under the NYLL because Plaintiffs performed work in the Shop, subject to the NYLL.

Accordingly, NJK is an employer and Plaintiffs are employees under the NYLL.

## 2. *Individual Defendants*

Plaintiffs seek to have Hatzis and Georgiadis held jointly and severally liable with NJK, the corporate Defendant, because each Defendant can be considered an "employer" under the FLSA and NYLL.

Persons liable under the FLSA include individuals and corporations. 29 U.S.C. § 203(a). The Supreme Court has emphasized the "expansiveness" of the FLSA's definition of employer. *Falk v. Brennan*, 414 U.S. 190, 195 (1973). Because the FLSA is to be "construed . . . liberally to apply to the furthest reaches consistent with congressional direction," *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 296 (1985) (internal quotation marks omitted), the Second Circuit has determined that, under the statute, an employer may include an individual owner who exercises a sufficient level of operational control in the company's employment of employees. *Irizarry v. Catsimatidis*, 722 F.3d 99, 104-111 (2d Cir. 2013).

In order to determine whether the alleged employer possessed the power to control a worker, the "economic reality" test is employed,[37] which examines factors,

including: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984) (quoting *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983) (internal quotation marks omitted)). None of these factors alone, however, are dispositive. *See Brock v. Superior Care*, 840 F.2d 1054, 1059 (2d Cir. 1988).

### a. Hatzis

Hatzis is the president and fifty percent owner of NJK. (JPTO ¶ 3; Tr. 358:11-14.) First, there is evidence in the record that Hatzis had the power to hire and fire employees. Hatzis hired Plaintiffs (Tr. 370:19; 374:20-21; 379:22; 381:17; 386:18) and, on at least one occasion, Hatzis fired Cetino (Tr. 197:5-6). Secondly, Hatzis supervised and controlled employee work schedules. He was responsible for scheduling the work crews. (Tr. 369:11-12.) On a daily basis he supervised Plaintiffs at the job site. (Tr. 359:7-12.)

With regards to Plaintiffs' rate and method of payment, there is evidence in the record that Hatzis set their rate of pay (Tr. 370:20-25; 381:8; 382:3; 386:20-22), and would distribute the checks at the job site if Plaintiffs did not pick up same at NJK's office (Tr. 370:3-8). Finally, he was responsible for submitting the hours Plaintiffs worked at a job

---

[37] The question of whether "the tests for 'employer' status are the same under the FLSA and the NYLL . . . has not been answered by the New York Court of Appeals." *Irizarry*, 722 F.3d at 117. Nonetheless, district courts in this Circuit have consistently interpreted the definition of "employer" under the New York Labor Law coextensively with the definition used by the FLSA. *See, e.g.*, *Yu Y. Ho v. Sim Enters., Inc.*,

No. 11 Civ. 2855 (PKC), 2014 WL 1998237, at *10-11 (S.D.N.Y. May 14, 2014) (applying the "economic reality" test to NYLL claims); *Moon*, 248 F. Supp. 2d at 236-37 (same).

site to the NJK office. (Tr. 369:15-16.) He, therefore, helped to maintain the records of the hours, days, and job sites that Plaintiffs worked. Under these facts and the totality of the circumstances, Hatzis satisfies the "economic reality" test and is properly considered an employer under the FLSA and NYLL.

### b. Georgiadis

Georgiadis is the vice-president and fifty percent owner of NJK. (JPTO ¶ 4; Tr. 479:13-18.) He testified that he is responsible for finding work for NJK and attending meetings, such as pre-bid and pre-construction meetings. (Tr. 479:22-25; 485:1-3.) Georgiadis is also responsible for preparing bids for work, including preparing the estimates, proposals, and submittals. (Tr. 479:22-25; 485:17; 509:3.) Georgiadis was responsible for signing the contracts on behalf of NJK. (Tr. 405:4-9.)

Regarding the first factor in the "economic reality" test, there is evidence in the record that Georgiadis had the power, though not exercised frequently, to hire employees. (*See* Tr. 17:20-22.) Further, when Hatzis fired Cetino, Georgiadis spoke to Hatzis and allowed Cetino back to work. (Tr. 197:5-9.) With regards to the third factor, there is testimony to suggest that Georgiadis had the power to determine the rate of pay. Hernandez testified that Georgiadis "told [Hernandez] that with time he would give [Hernandez] a raise." (Tr. 52:22-23.) Further, Georgiadis testified that he generally signs the payroll checks and company tax returns. (Tr. 480:10-14.) For some time Georgiadis was responsible for handing Plaintiffs their checks at the NJK office. (Tr. 73:16; 127:6-8.) This is illustrative of the method of Georgiadis' ability to determine the method of

payment in satisfaction of the third factor. Finally, Georgiadis would sign the certified payrolls—an employment record. (Tr. 482:15; 511:4-5.) Based on the totality of the circumstances, Georgiadis satisfies the "economic reality" test and also qualifies as an employer under the FLSA and NYLL.

### C. Unpaid Compensation

Plaintiffs are not claiming, and do not seek, unpaid wages for time spent at the job sites. With respect to all job sites, Plaintiffs seek to be compensated for the time spent before and after their work at the job sites. This compensation is sought by Plaintiffs as overtime compensation, where applicable, and unpaid wages.

### 1. *Overtime Compensation*

The FLSA requires that employees who work more than forty hours in a workweek "receive[ ] compensation for his employment in excess of [forty] hours . . . at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The NYLL incorporates and restates the FLSA, such that the analysis of overtime claims under the NYLL is generally the same as under the FLSA. *See* N.Y. COMP. CODES R. & REGS. tit. 12 § 142-2.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 *et seq.*, the Fair Labor Standards Act of 1938, as amended . . . .").

In an action to recover unpaid overtime wages under the FLSA, a plaintiff must show that: "(1) he was an employee who was eligible for overtime ([*i.e.*,] not exempt from

the [FLSA]'s overtime pay requirements); and (2) that he actually worked overtime hours for which he was not compensated." *Hosking v. New World Mortg., Inc.*, 602 F. Supp. 2d 441, 447 (E.D.N.Y. 2009). The FLSA sets forth a broad civil enforcement scheme, pursuant to which "[a]ny employer who violates the provisions of . . . section 207 of this title shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . ." 29 U.S.C. § 216(b). This enforcement is echoed in the NYLL. *See* N.Y. Lab. Law § 663(1) ("If any employee is paid by his or her employer less than the wage to which he or she is entitled . . . he or she shall recover in a civil action the amount of any such underpayments . . . .").

As discussed above, Plaintiffs have shown that they were employees eligible for overtime under both the FLSA and NYLL. Defendants do not dispute that "[P]laintiffs did not receive overtime wages on limited occasions when they performed overtime work on behalf of NJK." (Dkt. No. 115 at 2.) Defendants and Plaintiffs testified that Plaintiffs were never paid over their regular rate. (Tr. 41:20-24; 63:11-12; 133:18-20; 220:14-19; 259:13-15; 314:4-8; 342:6-12; 521:22-24.)

The real dispute lies with how much overtime Plaintiffs worked. Defendants characterize the frequency with which Plaintiffs worked overtime as "limited occasions," while Plaintiffs testified that they worked overtime consistently. Plaintiffs' testimony and Hernandez' calendar as a whole reflects that they worked more than forty hours per week on more than "limited occasions." Plaintiffs have, therefore, satisfied their burden under *Mt. Clemens*.

This leaves Defendants to rebut with "evidence of the precise amount of work

performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Anderson*, 328 U.S. at 687-88. Defendants fail to meet this burden. They did not keep adequate records of the hours Plaintiffs worked, including the time prior to and after working at the job sites. The record before the Court does not negative the reasonable inference that it has drawn from Plaintiffs' testimony and Hernandez' calendar. Accordingly, the Court holds that Plaintiffs were not properly compensated for the hours that they worked in excess of forty under both the FLSA and NYLL. Plaintiffs are, therefore, entitled to overtime compensation where appropriate and consistent with the Court's findings.

Based on the Court's findings for all Plaintiffs except Hernandez, their work weeks ranged from three days a week to six days a week. For those weeks in which Plaintiffs worked three days, they are not entitled to overtime compensation because in those weeks they did not work in excess of forty hours. For those weeks in which Plaintiffs worked four days, they are entitled to two hours of overtime compensation. For those weeks in which Plaintiffs worked five days, they are entitled to twelve and one-half hours of overtime compensation. Finally, for those weeks in which Plaintiffs worked six days, they are entitled to twenty-three hours of overtime compensation.[38]

_____

[38] Plaintiffs' overtime compensation is slightly different for weeks that they worked at Green Haven. Plaintiffs would only be entitled to seven and one half hours of overtime compensation for the weeks in which they worked five days at this job site or seventeen hours of overtime compensation for the weeks in which they worked six days at this job site.

Because the Court is relying on Hernandez' calendar for the days, hours, and job sites that he worked during the course of his employment, Hernandez is entitled to overtime compensation for hours worked in excess of forty. On some weeks Hernandez' calendar reflects that he worked at multiple job sites during a pay period. A complication arises when calculating his overtime compensation for weeks where he worked at both federal job sites, which were removed from this lawsuit, and other job sites.

For weeks where Hernandez worked solely at federal job sites not in this lawsuit, he will not be awarded overtime compensation. For weeks where Hernandez worked solely at job sites that are the subject of this lawsuit, such overtime compensation will be awarded where he is entitled, *i.e.* for weeks where he worked in excess of forty hours. For weeks where Hernandez split his time between sites that are included and excluded from this lawsuit, the Court will use all hours that he worked, regardless of the job site, to determine whether he is eligible for overtime compensation for that week. If Hernandez has worked in excess of forty hours that week, the Court will only award him overtime compensation for overtime accrued at job sites included in this lawsuit.

The parties also dispute, but do not fully brief, how overtime compensation under the FLSA and NYLL should be calculated on public jobs sites subject to the prevailing wage. Defendants argue that Plaintiffs should only be awarded overtime under the FLSA and NYLL for the time spent on public jobs in the amount of one and one-half times the rate actually paid, not one and one-half times the prevailing wage rate. (Dkt. No. 115 at 50.) Plaintiffs, however, calculate their proposed overtime award under the FLSA and NYLL at

one and one-half times the prevailing wage rate for all overtime hours for days worked on public job sites. (*See* Dkt. No. 114, exh. D.)

Both the FLSA and NYLL entitle an employee to "a rate [of pay] not less than one and one-half times the regular rate at which he is employed" for all hours worked in excess of forty hours per week. 29 U.S.C. § 207(a)(1); *see also* N.Y. COMP. CODES. R. & REGS. tit. 12 § 142-2.2; *Brown v. Tomcat Elec. Sec., Inc.*, No. 03-CV-5175 (FB) (JO), 2007 WL 2461823, at *2 (E.D.N.Y. Aug. 27, 2007). "[T]he regular rate refers to the hourly rate actually paid [to] the employee for the normal, non-overtime workweek for which he is employed."[39] *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945). "Where an employee is entitled to prevailing wages . . . and does not receive such wages, however, overtime wages should be calculated using the prevailing wage as the regular rate." *Hapanowicz v. Alexandria Tile Co., Inc.*, No. 11-CV-0127 (ERK) (JO), 2014 WL 1311441, at * 10 (E.D.N.Y. Mar. 31, 2014) (citing *Sobczak v. AWL Inuds., Inc.*, 540 F. Supp. 2d 354, 360-61 (E.D.N.Y. 2007)).

The Court, therefore, will use the prevailing wage rate as the regular rate when calculating overtime owed under the

---

[39] Defendants cite to the case of *Grochowski v. Pheonix Const.*, 318 F.3d 80, 83 (2d Cir. 2003), in further support of their position that FLSA and NYLL overtime damages should be calculated based on the rate that Plaintiffs were actually paid by Defendants. This case, however, is inapplicable and distinguishable from the instant case because *Grochowski* addresses prevailing wage on federal job sites, which implicates the Davis-Bacon Act, and not state law prevailing wage claims.

prevailing wage schedule, as will be discussed below. The Court will use the rate actually paid by Defendants as the regular rate when calculating overtime owed under either the FLSA or the NYLL.

Accordingly, the Court awards $17,722.13 in unpaid overtime compensation under the FLSA as follows:[40]

- Hernandez: $5805.38
- Cetino: $0.00
- Alfaro: $2844.25
- Top: $0.00
- M. Melgar: $4410.00
- N. Melgar: $4662.50
- Agustin: $0.00
- Lazo: $0.00

The Court also awards $14,298.23 in unpaid overtime compensation under the NYLL to Plaintiffs as follows:

- Hernandez: $3846.97
- Cetino: $6011.25
- Alfaro: $1570.63
- Top: $0.00
- M. Melgar: $0.00
- N. Melgar: $710.00
- Agustin: $203.13
- Lazo: $1956.25

2. *Uncompensated Time*

Beyond unpaid overtime compensation, Plaintiffs alleged, and the Court found, that

---

[40] These amounts reflect an offset for overtime compensation for work performed at public job sites under the applicable prevailing wage schedules. This offset analysis is further explained in the below section regarding overtime compensation on prevailing wage projects.

the time that they spent before and after their compensated time at the job sites was also compensable. There is no dispute among the parties that Plaintiffs were never paid for this time. The FLSA, however, only addresses overtime compensation and minimum wage violations; it does not address unpaid compensation. Recovery for unpaid compensation is addressed by state wage and hour laws.

Preliminarily, the Court notes that because the NYLL lacks a clear statement of intended extraterritorial effect, there is doubt as to whether it may apply to labor performed outside the state of New York. *See O'Neill v. Mermaid Touring Inc.*, 968 F. Supp. 2d 572, 578-79 (S.D.N.Y. 2013); *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 469-70 (S.D.N.Y. 2013); *Hammell v. Banque Paribas*, No. 90-CV-4799 (JSM), 1993 WL 426844, at *1 (S.D.N.Y. Oct. 22, 1993). Plaintiffs' unpaid compensation claim primarily relates to labor performed at the Shop, which is inside the state of New York. As a consequence of the continuous workday rule, Plaintiffs' commute time between the Shop and the job sites is also compensable. The commute between the Shop and job sites in New Jersey inevitably includes some time spent traveling in New Jersey, which was never quantified or addressed by either party.[41] Accordingly, the Court will allow compensation for this time

---

[41] Neither Plaintiffs nor Defendants in their post-trial submissions and proposed damage calculations categorize such commute time by state. (*See* Dkt. No. 114; Dkt. No. 115.) In fact, the parties lump this commute time with the time spent at the Shop and perform their unpaid compensation calculations based on a lump sum of hours. (*See* Dkt. No. 114; Dkt. No. 115.)

under the NYLL because, as explained above, this New Jersey travel was incident to Plaintiffs' labor performed in New York at the Shop. *See O'Neill*, 968 F. Supp. 2d at 579 ("The crucial issue is where the employee is 'laboring' . . . .); *see also Hammell*, 1993 WL 426844, at *1 ("[T]he law appears in an article of the labor law clearly aimed at regulating the conduct of actors within the state's boundaries. The purpose of this area of the labor law is clearly to protect workers laboring in New York."). Plaintiffs' unpaid compensation claim, therefore, falls within the purview of the NYLL.

The NYLL expressly provides that employees are entitled to recover all unpaid wages. *See* N.Y. LAB. LAW § 198(3); *Santillan*, 822 F. Supp. 2d at 293. Employers are required to pay employees their wages that are earned.[42] *See* N.Y. LAB. LAW § 191(1). Defendants, therefore, were required to pay Plaintiffs wages to which they were entitled.

In calculating these damages, the Court takes into account its factual findings above and holds that for all sites, except Green Haven, Plaintiffs are entitled to recover two and one-half hours in unpaid compensation per day for every day that Plaintiffs worked. With respect to Green Haven, Plaintiffs are entitled to one and one-half hours in unpaid

compensation for every day that Plaintiffs worked at this job site. This unpaid compensation should be calculated at Plaintiffs' regular rate. *Chun Jie Yin*, 2008 WL 906736, at *4 ("[A] plaintiff who prevails on a cause of action under the state law is entitled to the full amount of wages owed, not just the statutory minimum wage for the hours worked."); *see also* N.Y. LAB. LAW § 198(3) ("All employees shall have the right to recover full wages . . . accrued during the six years previous to the commencing of such action").[43] Accordingly, the Court awards $85,411.38 in unpaid compensation to Plaintiffs as follows:

- Hernandez:   $36,323.88
- Cetino:   $17,718.75
- Alfaro:   $9237.50
- Top:   $0.00
- M. Melgar:   $7637.50
- N. Melgar:   $8775.00
- Agustin:   $406.25
- Lazo:   $5312.50

D.   Regular Rate

The Court must determine the regular rate for those Plaintiffs who testified that they were paid a day rate. The regular rate of pay is the hourly rate paid to the employee for a typical week. *See* 29 U.S.C. § 207(e); *Walling*, 325 U.S. at 424. "If the employee is paid a flat sum for a day's work . . . his regular rate is determined by totaling all the

---

[42] This article defines employers as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service," N.Y. LAB. LAW § 190(3), and employee as "any person employed for hire by an employer in any employment," N.Y. LAB. LAW § 190(2). Accordingly, the Court finds Plaintiffs were employees and Defendants were employers within these definitions of the NYLL.

[43] It should be noted that Plaintiffs do not seek to be compensated at the prevailing wage rate for this uncompensated time for days that they worked at public job sites. (Dkt. No. 114 ¶ 268.) Plaintiffs seek to be compensated at their regular rate as paid by Defendants.

sums received at such day rates . . . in the workweek and dividing by the total hours actually worked." 29 C.F.R. § 778.112.

In this calculation, however, the Court finds that the "total hours actually worked" includes only the hours Plaintiffs worked at the job site. *See Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944) (calculating regular rate by "dividing the wages received for each tour by the number of hours in that tour" and then applying that to the first forty hours regularly worked where employees were paid specific wage per tour). Defendants concede that they only paid Plaintiffs for the time that they worked at the job sites. Defendants never intended to compensate Plaintiffs for time at the Shop and there was no understanding that Plaintiffs' day rate would cover same. Defendants told Plaintiffs "that the work started from when [Plaintiffs] went up [the roof] to when [Plaintiffs] came down." (Tr. 47:3-4.)

Further, including the "total hours actually worked" to include the time before and after work at the job sites would necessitate a finding that such day rate was intended to include overtime. Such a finding "in the absence of proof of an agreement so stating, would be the sort of 'narrow, grudging' FLSA application that the [Supreme] Court rejected soon after enactment." *Giles v. City of N.Y.*, 41 F. Supp. 2d 308, 317 (S.D.N.Y. 1999) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).

Thus the Court has calculated the regular rates for Plaintiffs who received a day rate by totalling the sums received at such day rates for the week and dividing that product by the total number of hours worked at the job sites that week. This regular rate was used to

calculate the amount of overtime wages owed to Plaintiffs who testified that they received a day rate, as well as their unpaid compensation for the time they worked away from the job site, as explained above.

E. Prevailing Wage

1. *Unpaid Prevailing Wage Wages*

a. New York

NYLL § 220 requires a contractor who undertakes a public works project to pay its employees prevailing wages and pay or provide prevailing supplemental benefits. N.Y. LAB. LAW § 220(3); *see also Chesterfield Assocs. v. N.Y. State Dep't of Labor*, 830 N.E.2d 287, 288-89 (N.Y. 2005). An employee of the contractor may commence "a common law breach of contract claim as the intended third-party beneficiary of a public works contract." *Ramos I*, 796 F. Supp. 2d at 352. As noted above, Plaintiffs bring their prevailing wage claim under New York law as third-party beneficiaries to the contracts executed between NJK and the public entities. (Dkt. No. 25 ¶¶ 79-83.)

The two conditions precedent for a plaintiff to recover as a third-party beneficiary in the context of NYLL § 220 are: (1) "that they are laborers, workmen, or mechanics" within the meaning of NYLL [§] 220" and (2) the work was "entitled to prevailing wages under the statute." *Ramos v. SimplexGrinnell LP* (*Ramos II*), 740 F.3d 852, 856 (2d Cir. 2014) (quoting *Erie Cnty. Indus. Dev. Agency v. Roberts*, 465 N.Y.S.2d 301, 305 (4th Dep't 1983), *aff'd*, 482 N.Y.S.2d 267 (1984)) (internal quotation marks omitted). To plead a viable claim for breach of contract under New York law, "a complaint need only allege (1) the existence of an agreement, (2)

50

adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation omitted).

"Whether a contractor pays a prevailing wage is easy enough to figure out, as wages are received by employees as hourly cash payments or are easily converted into the equivalent." *Chesterfield Assocs.*, 830 N.E.2d at 289. Determining whether a contractor has provided prevailing wage supplemental benefits, however, is less straightforward because supplements may be provided in any form or combination, including cash, benefits, or a combination of both. *Id.* at 288-89. Supplemental benefits include, but are "not limited to, health, welfare, non-occupational disability, retirement, vacation benefits, holiday pay, life insurance, and apprenticeship training." N.Y. LAB. LAW § 220(5).

It is clear from the record that Plaintiffs were laborers and/or workmen within the meaning of § 220. There is also no dispute that NJK worked on public projects and Defendants were required to pay prevailing wages for state funded projects. (Dkt. No. 77 at 18; Tr. 380:24-25; 381:1.) Plaintiffs are therefore entitled to recover as third-party beneficiaries under NYLL.

Having satisfied this condition precedent, the Court turns to the breach of contract prongs. Judge Ross previously held that the first two prongs, *i.e.*, the existence of an agreement and performance by Plaintiffs, are not disputed by Defendants. (Dkt. No. 77 at 21.) As to the third prong, Defendants do not dispute that "[P]laintiffs were not properly

paid prevailing wages for their work performed on public works projects."[44] (Dkt. No. 115 at 2 n.4.)

The only remaining prong is damages. Defendants do not dispute that Plaintiffs were not paid the prevailing wage for their work on public job sites, which damaged Plaintiffs. Defendants, however, contest the hours worked and dates allegedly worked by Plaintiffs, and thus contest the extent of Plaintiffs' damages. It is clear from the record that Plaintiffs satisfied their burden to prove their common law breach of contract

---

[44] It is unclear from the record whether Defendants dispute that they paid the supplemental benefits required in addition to the hourly prevailing wage. To the extent that Defendants claim that the supplemental benefits were included in Plaintiffs' paychecks (Tr. 382:23-25), an examination of the paychecks and pay stubs in evidence show that claim to be false. For example, Cetino's pay stub from NJK dated December 24, 2004 shows that he was paid $22.50 an hour for his work. (Pls.' Exh. 16 at 15.) During this time period Cetino was working at the Orange County Project, which was a pubic job site. For this time period, the laborer prevailing wage was $29.05 and the laborer supplemental benefits amount was $14.94. (Dkt. No. 114, exh. C.) Even if the Court were to suppose that Defendants were rightfully paying Cetino as a laborer under the prevailing wage schedule, the $22.50 an hour wage is less than the laborer prevailing wage, individually, and when totaled with the laborer supplemental benefit amount. The Court finds that Defendants did not pay Plaintiffs their prevailing wage supplemental benefits. The Court will calculate Plaintiffs' unpaid prevailing wage damages to include their supplemental benefits owed as well.

51

claim as the intended third-party beneficiaries of public works contracts. Incorporating the Court's findings, Plaintiffs are entitled to $82,731.77 in unpaid prevailing wage wages, including supplemental benefits, for the public job sites in New York as follows:[45]

- Hernandez:  $32,194.25
- Cetino:  $28,408.08
- Alfaro:  $7062.24
- Top:  $0.00
- M. Melgar:  $1568.00
- N. Melgar:  $13,499.20
- Agustin:  $0.00
- Lazo:  $0.00

b.  New Jersey

As Judge Ross held in her summary judgment decision, despite New Jersey law not explicitly recognizing a common law breach of contract claim for failure to pay prevailing wages, the Court is unaware of a New Jersey case holding that the New Jersey Prevailing Wage Act, N.J.S.A. § 34:11-40, supersedes the common law cause of action or that common law claims should be dismissed as duplicative. (Dkt. No. 77 at 22-23.)

---

[45]  Plaintiffs, at trial and in their post-trial submissions, failed to provide the Court with a copy of New York States's prevailing wage schedule for the 2004 to 2005 time period. While the 2003 to 2004 prevailing wage schedule includes the laborer prevailing wage and supplemental benefit amounts for the 2004 to 2005 time period, it did not include the same for roofers. Because the 2004 to 2005 prevailing wage schedule is not archived or readily available, the Court will use the prevailing wage schedule for the 2003 to 2004 time period in substitution for the 2004 to 2005 roofer prevailing wage and supplemental benefit amounts.

In order to establish a breach of contract under New Jersey law, a plaintiff must prove four elements, which are analogous to the elements under New York law: "(1) the existence of a valid contract with the defendant; (2) that the defendant breached that contract; (3) the damages resulting from that breach; and (4) that plaintiff performed its obligations under the contract." *Vonage Holdings Corp. v. Hartford Fire Ins. Co.*, No. 11-CV-6187, 2012 WL 1067694, at *2 (D.N.J. Mar. 29, 2012). Plaintiffs satisfied their burden to prove these analogous elements in connection with their New York prevailing wage claim. The Court finds Plaintiffs also have proven common law breach of contract under New Jersey law with regards to the prevailing wage. Incorporating the Court's findings, Plaintiffs are entitled to $31,829.52 in unpaid prevailing wage wages, including supplemental benefits, for the public job sites in New Jersey as follows:

- Hernandez:  $8138.08
- Cetino:  $13,240.08
- Alfaro:  $6955.68
- Top:  $0.00
- M. Melgar:  $0.00
- N. Melgar:  $0.00
- Agustin:  $2201.60
- Lazo:  $1294.08

2.  *Overtime Compensation on Prevailing Wage Projects*

There are two ways that Plaintiffs can potentially recover for overtime work on public job sites. First, they can recover under the FLSA and NYLL as explained above. Second, they can recover in accordance with the prevailing wage schedules. The prevailing wage schedules set, not only the prevailing wage rates for the various job classifications, but also what constitutes overtime for same.

52

These two methods of recovery yield three different recovery outcomes for Plaintiffs' work week: (1) overtime recovery solely under the FLSA or NYLL; (2) overtime recovery solely under the prevailing wage schedule; and (3) overtime recovery under both the FLSA or NYLL and the prevailing wage schedule. In the first two scenarios the Court will award Plaintiffs the overtime accordingly. The problem arises with respect to the third scenario because it would lead to double recovery.

To prevent such double recovery, Plaintiffs' overtime recovery under the FLSA or NYLL for a particular week should be offset by Plaintiffs' overtime recovery under the prevailing wage schedule for the same week. Effectively, Plaintiffs will be awarded the higher of the two overtime awards for any given week where such double recovery would occur.[46]

With regards to what constitutes overtime under the prevailing wage schedules, the Court notes that respective prevailing wage schedules for the controlling jurisdiction of each public job site defines overtime work and directs how such compensation should be computed. Generally these prevailing wage schedules measure overtime on a daily basis, *i.e.* based on how many hours were worked per day. Plaintiffs concede that the prevailing wage rates, and by extension prevailing wage schedules, only apply to the work Plaintiffs performed at the job site on a given day.

(Dkt. No. 114 ¶ 268.) They do not seek prevailing wage compensation for the time Plaintiffs did not spend at the pubic job sites and the Court will not utilize this time when computing prevailing wage overtime.

The Court notes that on occasion the prevailing wage schedules define overtime differently for laborers and roofers. The Court will calculate what time constitutes overtime for Plaintiffs who qualify for the laborer/roofer classification by taking the average of the two overtime requirements. For example, in Suffolk County for work performed between July 1, 2007 and June 30, 2008, time worked after seven hours constituted overtime for a laborer and time worked after eight hours constituted overtime for a roofer. (*See* Dkt. No. 114, exh. C). In that instance, the Court finds that hours worked after seven and one-half require overtime compensation.

Such complication is also occasionally present with regards to overtime supplemental benefits. Supplemental benefits on overtime are either awarded per hour worked, meaning at the straight rate with no additional compensation, or at a one and one-half premium. Occasionally, these prevailing wage schedules differ with regard to how overtime supplemental benefits are calculated for laborers and roofers. In these occasions, the Court will calculate such overtime supplemental benefits as a weighted average. For example, in Monmouth County for the period including June 2004, laborers are awarded supplemental benefits at the one and one-half premium and roofers are awarded supplemental benefits at the straight rate. (Dkt. No. 114, exh. B.) Accordingly, the Court will award Plaintiffs who are classified

---

[46] Although this method may be inexact, the Court finds this award method reasonable. *See S. New Eng. Telecomms. Corp.*, 121 F.3d at 70 n.3 ("It simply points out the difficulty of precisely determining damages when the employer has failed to keep adequate records.").

as laborers/roofers the laborer overtime supplemental benefit premium for half of the qualifying overtime time.[47]

Accordingly, the Court awards a total of $7147.26 in prevailing wage overtime compensation to Plaintiffs as follows:[48]

Under the New York Prevailing Wage Schedule, $5454.68 to be divided among Plaintiffs as follows:

- Hernandez:     $4816.97
- Cetino:        $305.18
- Alfaro:        $332.53
- Top:           $0.00
- M. Melgar:     $0.00
- N. Melgar:     $0.00
- Agustin:       $0.00
- Lazo:          $0.00

Under the New Jersey Prevailing Wage Schedule, $1938.97 to be divided among Plaintiffs as follows:

- Hernandez:     $1938.97
- Cetino:        $0.00
- Alfaro:        $0.00
- Top:           $0.00
- M. Melgar:     $0.00
- N. Melgar:     $0.00
- Agustin:       $0.00
- Lazo:          $0.00

F.   Christmas Bonuses

It is not disputed that Defendants paid Plaintiffs Christmas bonuses during their employment.  (*See* Dkt. No. 114 ¶ 270.)  In the post-trial submissions, Plaintiffs credited the amounts of these bonus checks against the damages that Plaintiffs claim to be owed by Defendants.  (*See* Dkt. No. 114, exh. D.) Defendants produced the checks evincing the payment of these bonuses as their Exhibit A during trial. (Defs.' Exh. A.)

---

[47]     The roofer's straight rate supplemental benefits would already have been awarded at the per hour worked rate in the Court's calculation of that Plaintiff's prevailing wages as described above.

[48]  Please note that these amounts are after the Court performed its offset analysis for those weeks where Plaintiffs qualified for overtime compensation under either the FLSA or NYLL and under the applicable prevailing wage schedule.

According to Defendants' Exhibit A, Plaintiffs were paid the following in Christmas bonuses over the course of their employment:

- Hernandez:   $14,000.00
- Cetino:   $2500.00
- Alfaro:   $1100.00
- Top:   $0.00
- M. Melgar:   $500.00
- N. Melgar:   $1000.00
- Agustin:[49]   $1400.00
- Lazo:   $500.00

Under the Code of Federal Regulations such Christmas bonuses are excluded from the regular rate calculation. 29 C.F.R. § 778.212. Additionally NYLL § 193 does not protect bonuses that are "payable at the discretion of the employer," *Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 252 (S.D.N.Y. 2013) (quoting *Weiner v. Diebold Grp., Inc.*, 568 N.Y.S. 2d 959, 960 (1st Dep't 1991) (internal quotation marks omitted)). "[B]onuses may be considered 'wages' for the purposes of [§] 193 when their payment is 'guaranteed and non-discretionary as a term and condition of [plaintiff's] employment.'" *Esmilla*, 936 F. Supp. 2d at 252 (quoting *Ryan v. Kellogg Partners Inst. Servs.*, 968 N.E.2d 947, 956 (N.Y. 2012)). There is not sufficient evidence in the record that these bonuses qualify as wages under either the FLSA or NYLL,

however Plaintiffs did credit Defendants these amounts in their post-trial submissions. The Court agrees with this methodology and accordingly will credit the total amounts owed by Defendants to each Plaintiff the above Christmas Bonus amounts.

## G.  Liquidated Damages

Plaintiffs seek liquidated damages under both the FLSA and the NYLL. Plaintiffs are entitled to liquidated damages under both the FLSA and the NYLL, subject to the respective statutes of limitations, because the liquidated damages provision of each statute seeks to vindicate a different type of wrong. *See Eschmann v. White Plains Crane Serv., Inc.*, 11-CV-5881 (KAM) (VVP), 2014 WL 1224247, at *7 (E.D.N.Y. Mar. 24, 2014) (FLSA liquidated damages are compensatory whereas NYLL liquidated damages are punitive). Effectively, for the three year time period where Plaintiffs' FLSA claims run concurrently with their NYLL claims, they are entitled to collect liquidated damages on each of their claims under the respective statutes.

### 1. *FLSA*

Under the FLSA, "[a]ny employer who violates the provisions of . . . section 207 . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The FLSA further provides that "if the employer shows . . . that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that [it] was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated

---

[49]  It should be noted that Defendants' post-trial submissions reflect two bonus checks issued to Agustin for $1400.00 and $1300.00 respectively. (*See* Dkt. No. 115, exh. E.)  At trial, however, Defendants only submitted one bonus check into evidence for Agustin in the amount of $1400.00, such that the Court finds that Agustin was only paid that singular amount in Christmas bonuses. (Defs.' Exh. A7.)

damages or award any [lesser] amount . . . ." *Id.* § 260.

It is Defendants' burden to establish a good faith defense through "plain and substantial evidence." *Brock v. Wilamowsky*, 833 F.2d 11, 19 (2d Cir. 1987). This good faith defense is evinced when an "employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA." *Barfield v. N.Y. City Health & Hosps. Corp.*, 537 F.3d 132, 150 (2d Cir. 2008) (citing 29 U.S.C. § 260). "To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act to comply with them.'" *Barfield*, 537 F.3d at 150 (quoting *Herman*, 172 F.3d at 142)).

Plaintiffs would, therefore, be entitled to liquidated damages under the FLSA unless Defendants successfully established a good faith defense. Georgiadis testified that he had knowledge that an employee is entitled to overtime when he works over the regular amount of hours set by law. (Tr. 519:9-12.) Despite this knowledge he further testified that he did not comply on the occasions where Plaintiffs worked overtime. (Tr. 520:4-8.) At trial Georgiadis was shown a check evincing forty-five hours of work in a week and he testified that this Plaintiff should have been paid overtime, but was not paid in compliance with the law. (Tr. 521:22-24.)

Defendants may have took steps to ascertain the dictates of the FLSA because they knew that overtime was to be paid. However, they failed to act to comply with this knowledge. Defendants did not offer an objectively reasonable ground for believing

that their omission to pay overtime did not violate the FLSA.

Therefore, the Court finds that Plaintiffs are entitled to liquidated damages on their FLSA claims. Accordingly, the Court awards $17,722.13 in FLSA liquidated damages to Plaintiffs as follows:

- Hernandez:    $5805.38
- Cetino:    $0.00
- Alfaro:    $2844.25
- Top:    $0.00
- M. Melgar:    $4410.00
- N. Melgar:    $4662.50
- Agustin:    $0.00
- Lazo:    $0.00

### 2.  *NYLL*

Under the applicable section of the NYLL for the period when the violations occurred, *i.e.* prior to November 24, 2009 when the standard for liquidated damages changed, a prevailing employee is entitled to "an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due" "upon a finding that the employer's failure to pay the wage required by this article was willful . . . ." N.Y. LAB. LAW § 198(1-a) (McKinney 2009). "Under the pre-amendment provision of the NYLL, the willfulness standard 'does not appreciably differ from the FLSA's willfulness standard' relating to the applicable statute of limitations." *Eschmann*, 2014 WL 1224247, at *9 (citing *Kuebel*, 643 F.3d at 366). "The test for willfulness in the context of liquidated damages under the [NYLL] parallels that employed in determining willfulness for limitation purposes under the FLSA." *Padilla,* 643 F. Supp. 2d at 313 n.18 (internal quotation marks and citation omitted)).

"[T]he burden is on the plaintiff to prove willfulness in order to obtain liquidated damages under New York law." *Bauin v. Feinberg*, 800 N.Y.S.2d 342, 2005 WL 636700, at *6 (Civ. Ct. 2005) (citing *Epelbaum v. Nefesh Achath B'Yisrael, Inc.*, 654 N.Y.S.2d 812, 814 (2d Dep't 1997)). The standard for willfulness is "that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "A violation of the New York Labor Law is willful . . . where the employer 'knowingly, deliberately, [or] voluntarily' disregards its obligation to pay wages." *Ayres v. 127 Rest. Corp.*, 12 F. Supp. 2d 305, 309 (S.D.N.Y. 1998) (quoting *P & L Grp., Inc. v. Garfinkel*, 541 N.Y.S.2d 535, 537 (2d Dep't 1989)); *see also Yu G. Ke v. Saigon Grill*, 595 F. Supp. 2d 240, 261 (S.D.N.Y. 2008) (defining willfulness as knowledge by employer that his conduct is illegal or reckless disregard for whether it is statutorily prohibited). The plaintiff need not show malice or bad faith to establish willfulness. *Ayres*, 12 F. Supp. 2d at 309 (citing *In re CIS Corp.*, 206 B.R. 680, 689 (S.D.N.Y. Bankr. 1997)).

At the very least Defendants showed no regard for the legal requirements in connection with their wage policies. *See Yu G. Ke*, 595 F. Supp. 2d at 261. They had ample reason to know, and provided testimony that suggests that, in fact, they did know of the existence of their overtime responsibilities. (*See, e.g.*, Tr. 519:9-12 ("Q: Now, as you understand it, sir, when would an employee be entitled to receive overtime?; A: When he works over the regular amount of hours that you are supposed to work by law.").) Defendants testimony suggests that they made no effort to comply with those requirements and they concede that they did

not pay overtime compensation to Plaintiffs. (*See, e.g.*, Tr. 522:4-6 ("But what the judge is saying is correct. He wasn't paid what he—what he was supposed to get paid but he got paid for 45 hours.").)

Further, the testimony reflects that Defendants did not compensate Plaintiffs for the time that they worked before and after the job site, *i.e.* time spent working at the Shop and the related commute. (Tr. 47:3-4 ("Mr. Hatzis would say that the work started from when we went up to when we came down. The rest was not work.").) This was a practice throughout Plaintiffs' employment that shows a reckless disregard for whether such practice was statutorily prohibited. *See Yu G. Ke*, 595 F. Supp. 2d at 261; *see also Consol. Masonry Contractors, Inc. v. Angello*, 770 N.Y.S.2d 134, 136 (App. Div. 2003) ("A finding of willfulness is warranted if substantial evidence tend[s] to demonstrate that petitioner knew or should have known that it was violating the law."). Accordingly, such conduct is willful within the meaning of the statute and qualifies for an award of liquidated damages. *See Kalloo*, 977 F. Supp. 2d at 207 (awarding liquidated damages on unpaid straight time travel time where defendant told plaintiff "he did not pay for travel time, and it is fair to infer that this practice was consistent throughout the time plaintiffs worked at [defendant company].").

It should be noted that Plaintiffs are only entitled to NYLL liquidated damages for their claims under the NYLL. This includes their unpaid overtime claim and unpaid wages claim. Plaintiffs' prevailing wage claim, however, is not subject to liquidated damages because the recovery is under a theory of contracts and not the statute. *See Gurung v. Malhotra*, 851 F. Supp. 2d 583, 593 (S.D.N.Y. 2012) ("[Plaintiff] is not further entitled to

twenty-five percent of her prevailing wage damages because, as noted above, those damages are recoverable only under a contract theory, not under the NYLL.").

Accordingly, the Court awards $29,357.93 in NYLL liquidated damages to Plaintiffs as follows:

- Hernandez:     $11,494.05
- Cetino:        $5932.50
- Alfaro:        $3413.09
- Top:           $0.00
- M. Melgar:     $3011.88
- N. Melgar:     $3536.88
- Agustin:       $152.34
- Lazo:          $1817.19

## H. Interest

### 1. *Prejudgment Interest*

Plaintiffs seek prejudgment interest. While prejudgment interest may not be awarded in addition to liquidated damages for violations of the FLSA, *Superior Care*, 840 F.2d at 1064 (citing *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 714-16 (1945)), the Second Circuit has awarded prejudgment interest for violations of state wage laws, *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999). Plaintiffs are, therefore, entitled to an award of prejudgment interest on any unpaid compensation, both overtime and wages, where FLSA liquidated damages were not assessed. *See Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 92-93 (E.D.N.Y. 2012) (awarding Plaintiff "prejudgment interest only as to her claims for which no FLSA liquidated damages were awarded . . . ."). Plaintiffs are also entitled to prejudgment interest on their New York prevailing wage claim. *See Artica v. J.B. Custom Masonry & Concrete* (*Artica II*), 09-

CV-3796 (RER), 11-CV-0842 (RER), 2012 WL 11945654, at *16 (E.D.N.Y. Jul. 16, 2012) (awarding prejudgment interest on New York prevailing wage damages stemming from breach of contract claim).

With regards to prejudgment interest on the New Jersey prevailing wage claim, "[New Jersey Court Rule 4:42-11(b)] regarding the award of prejudgment interest generally applies only to tort actions." *Devine v. Advanced Computer Concepts Inc.*, No. 08-CV-875 (GEB), 2009 WL 78158, at *2 (D.N.J. Jan. 9, 2009).

> [T]he award of prejudgment interest on contract and equitable claims is based on equitable principles . . . . In awarding prejudgment interest, [t]he basic consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question; and the value of the sum awarded for the prejudgment period during which the defendant had the benefit of monies to which the plaintiff is found to have been earlier entitled. The allowance of prejudgment interest is a matter of discretion for the trial court.

*Cnty. of Essex v. First Union Nat'l Bank*, 891 A.2d 600, 608 (N.J. 2006) (citations omitted).

Plaintiffs' New Jersey prevailing wage claim sounds in New Jersey contract law as a breach of contract claim. As such, the allowance of prejudgment interest on this award is within the discretion of the Court. *See id.* at 608. Considerations weigh in favor of awarding Plaintiffs prejudgment interest on this award. Plaintiffs have been deprived of the use of these monies that they were entitled to under the contracts. Plaintiffs performed

work on New Jersey prevailing wage job sites, but were not paid accordingly. Consequently, Defendants have enjoyed the use of these monies interest free. Accordingly, the Court will award Plaintiffs prejudgment interest on their New Jersey prevailing wage claim damages. *See Devine*, 2009 WL 78158, at *2 (awarding prejudgment interest on New Jersey breach of contract claim because plaintiff deprived of use of funds).

### a. New York

Section 5001 of New York's Civil Practice Law and Rules ("N.Y. C.P.L.R.") governs the calculation of prejudgment interest and § 5004 of N.Y. C.P.L.R. sets a statutory interest rate of nine percent per annum. Prejudgment interest may be calculated from "the earliest ascertainable date the cause of action existed . . . ." N.Y. C.P.L.R. § 5001(b). However, "[w]here . . . damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date." *Id.* Courts, therefore, have "wide discretion in determining a reasonable date from which to award pre-judgment interest." *Conway v. Icahn & Co.*, 16 F.3d 504, 512 (2d Cir. 1994).

Plaintiffs' damages were incurred at various times. The Court will use a reasonable intermediate date in calculating Plaintiffs' prejudgment interest because the damages were accrued at a steady rate over each Plaintiff's employment period and because a simple, rather than compound, interest rate is utilized, which produces a similar result to calculating prejudgment interest owed on each week's damages. *See Hutera v. Victoria Bakery*, No. 10-CV-4754 (RJD) (JO), 2012 WL 1100647, at *13

(E.D.N.Y. Feb. 17) (employing reasonable intermediate date "[b]ecause the damages here accrued at an essentially regular rate over the entire period of each plaintiff's employment, and because the interest rate is simple rather than compounded, such methodology is appropriate, and produces a result virtually identical to a laborious calculation of interest owed on each week's unpaid wages"), *adopted in part by*, 2012 WL 1107655 (E.D.N.Y. Mar. 30, 2012). A single reasonable intermediate date is the median date between the earliest and latest each Plaintiffs' NYLL claim accrued. *See Hutera*, 2012 WL 1100647, at *13; *Chun Jie Yin*, 2008 WL 906736, at *8; *see also Artica v. J.B. Custom Masonry & Concrete* (*Artica I*), 09-CV-3796 (RER), 11-CV-0842 (RER), at *6 (E.D.N.Y. Jun. 4, 2012) (calculating midpoint using period subject to NYLL under lawsuit for each plaintiff).

The reasonable intermediate dates for Plaintiffs are as follows:

- Hernandez: June 3, 2006
- Cetino:[50] October 22, 2004
- Alfaro: June 3, 2006
- Top: June 9, 2004
- M. Melgar: April 7, 2008
- N. Melgar: November 9, 2007
- Agustin: August 25, 2004
- Lazo: October 22, 2008

Accordingly, the Court awards New York prejudgment interest at a rate of nine percent per year, *see* CPLR § 5004, in the amount of $152,400.61 through May 1, 2015, with *per diem* interest continuing to accrue until entry of final judgment. This amount is to be divided among Plaintiffs as follows:

- Hernandez:     $61,927.50
- Cetino:          $49,688.20
- Alfaro:          $14,605.20
- Top:             $0.00
- M. Melgar:      $5856.21
- N. Melgar:      $15,469.00
- Agustin:        $586.15
- Lazo:           $4268.35

---

[50]     When calculating Cetino's reasonable intermediate date, the Court used July 31, 2005 as the latest date his claim accrued because that was the last instance where Cetino performed work in this lawsuit. While Cetino testified that the he was employed by Defendants through September, 2005, the last job site that is subject to this lawsuit, and to which he testified working, is South Huntington Silas Wood School Sixth Grade Center. As the Court found previously, Cetino worked here for the month of July, 2005.

b.   New Jersey

Neither Plaintiffs nor Defendants in their post-trial submissions discuss the appropriate accrual date for the prejudgment interest on their New Jersey prevailing wage claim nor the appropriate interest rate. Instead, the parties seemingly calculate all prejudgment interest according to New York law. (*See* Dkt. No. 114; Dkt. No. 115.) Plaintiffs use the "Midterm of Employment" to calculate prejudgment interest and do so on all of their proposed damages, which includes New Jersey prevailing wage damages, at nine percent per year. (*See* Dkt. No. 114, exh. D.) Defendants calculate interest owed for work at public New Jersey job sites weekly at nine percent per year. (*See* Dkt. No. 115, exh. E.) Unfortunately, both parties' calculations fail to comport with New Jersey law regarding prejudgment interest.

"[T]he rate at which prejudgment interest is calculated is within the discretion of the court." *Devine*, 2009 WL 78158, at *3. However, because prejudgment interest is "be[ing] awarded on the basis of what is solely a state claim, it is appropriate to use the state interest rate." *McLean v. Garage Mgmt. Corp.*, 09-CV-9325 (DLC), 10-CV-3950 (DLC), 2012 WL 1358739, at *11 (S.D.N.Y. Apr. 19, 2012) (internal quotation marks omitted). Despite parties calculating such interest at the same nine percent per year provided for under New York law, the Court does not find this rate to be appropriate under New Jersey law.

Absent unusual circumstances, trial courts should refer to New Jersey Court Rule 4:42-11(b) when determining the rate of prejudgment interest. *Napp Techs., LLC v. Kiel Labs., Inc.,* No. 04-CV-3535, 2008 WL 5233708, at *9 (D.N.J. Dec. 12, 2008). The

parties fail to raise, and the Court does not find there to be, any unusual circumstances in this case that would warrant deviating from New Jersey Court Rule 4:42-11(b).  New Jersey Court Rule 4:42-11(b) provides that "[p]rejudgment interest shall be calculated in the same amount and manner provided for by paragraph (a) of this rule . . . ."  Pursuant to New Jersey Court Rule 4:42-11(a)(iii), "[f]or judgments exceeding the monetary limit of the Special Civil Part," which is $15,000.00, prejudgment interest shall be calculated "at the rate provided in subparagraph (a)(ii) plus 2% per annum."  N.J. Ct. R. 4:42-11(a)(iii).  For judgments that do not exceed the monetary limit, "the annual rate of interest shall equal the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Cash Management Fund . . . but the rate shall be not less than 0.25% ."  N.J. Ct. R. 4:42-11(a)(ii).

Under New Jersey law, "in contract cases, it is within the trial court's discretion to determine the date on which prejudgment interest starts to accrue."  *Devine*, 2009 WL 78158, at *4; *see also Unihealth v. U.S. Healthcare, Inc.*, 14 F. Supp. 2d 623, 642-43 (D.N.J. 1998).  Although New Jersey Court Rule 4:42-11(b) applies to tort actions, it is an instructive place to begin for contract actions.  Under that section, prejudgment liability runs "from the date of the institution of the action or from a date six months after the date the cause of action arises, whichever is later . . . ."  N.J. Ct. R. 4:42-11(b); *see also J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1267 (3d Cir. 1994).  Taking this subsection, as well as case law, into consideration, the Court will calculate Plaintiffs' prejudgment interest on their New Jersey prevailing wage claim from the date of

the filing of the complaint for the named Plaintiffs or when the other Plaintiffs became parties to this action.  *See Talsania v. Kohl's Dept. Store, Inc.*, No. 05-CV-3892, 2009 WL 2905449, at *2 (D.N.J. Sept. 10, 2009) ("In this case, the applicable starting date is the date of the Complaint, July 6, 2005."); *see also Miller v. Butler*, No. 12-CV-1004 (RBK) (JS), 2014 WL 585409 (D.N.J. Feb. 14, 2014) (measuring prejudgment interest from time complaint filed, not time of breach); *Salvatore v. Viking Sport Cruisers, Inc.*, No. 09-CV-4817 (NLH) (KJM), 2012 WL 6112072 (D.N.J. Dec. 10, 2012) (same).

Therefore, the prejudgment interest rates used in the calculations are as follows:

| Year | Rule 4:42-11(a)(ii) | Rule 4:42-11(a)(iii) |
|------|------|------|
| 2009 | 4.00% | 6.00% |
| 2010 | 1.50% | 3.50% |
| 2011 | 0.50% | 2.50% |
| 2012 | 0.50% | 2.50% |
| 2013 | 0.25% | 2.25% |
| 2014 | 0.25% | 2.25% |
| 2015 | 0.25% | 2.25% |

As a final matter, it should be noted that prejudgment interest is calculated as simple interest.  *See Munich Reinsurance Am., Inc. v. Tower Ins. Co.*, No. 09-CV-2598, 2012 WL 1018799, at *6-7 (D.N.J. Mar. 26, 2012).  Consequently, for years that Plaintiffs were not parties to this action for the whole year and for 2015, the Court will prorate their awards consonant with the numbers of days in the year that qualify for such interest.  Accordingly, the Court awards $1094.68 in

61

prejudgment interest under New Jersey through May 1, 2015, which will continue to accrue until entry of final judgment. This amount is to be divided among Plaintiffs as follows:

- Hernandez:    $373.54
- Cetino:    $400.47
- Alfaro:    $257.84
- Top:    $0.00
- M. Melgar:    $0.00
- N. Melgar:    $0.00
- Agustin:    $47.05
- Lazo:    $15.78

### 2. *Post-judgment Interest*

Plaintiffs are entitled to post-judgment interest on all money awards as a matter of right. *See Holness v. Nat'l Mobile Television, Inc.*, No. 09-CV-2601 (KAM) (RML), 2012 WL 1744847, at *7 (E.D.N.Y. Feb. 14), *adopted as modified by*, 2012 WL 1744744 (E.D.N.Y. May 15, 2012); *see also* 28 U.S.C. § 1961(a) ("Interest *shall* be allowed on any money judgment in a civil case recovered in a district court." (emphasis added)). Whereas prejudgment interest is governed by state law, an award of post-judgment interest is governed by the federal rate as set forth in 28 U.S.C. § 1961. *See Cappiello v. ICD Publ'ns*, 868 F. Supp. 2d 55, 63-64 (E.D.N.Y. 2012). Accordingly, the Court awards Plaintiffs post-judgment interest on all sums awarded; commencing when judgment is entered and running until the date of payment. *See Gamble v. E. Bronx N.A.A.C.P. Day Care Ctr., Inc.*, No. 04-CV-1198 (KMW) (HBP), 2008 WL 2115237, at *2 (S.D.N.Y. May 15, 2008).

### I. Reasonable Attorneys' Fees and Costs

Plaintiffs seek attorneys' fees and costs, but "reserve[d] the right to submit a fee application . . . ." (Dkt. No. 114 at 58.) Accordingly, Plaintiffs shall submit their motion for attorneys' fees, including legal basis, supporting exhibits, and evidence, no later than June 1, 2015. Defendants shall file any response thereto no later than June 15, 2015.

# CONCLUSION

For the reasons contained herein, the Court hereby finds Defendants Nick Hatzis, Kostas Georgiadis, and NJK Contractors, Inc. jointly and severally liable for:

(1)    $418,962.03 in unpaid wages, unpaid overtime compensation under the FLSA and NYLL, New York and New Jersey prevailing wage wages, New York and New Jersey prevailing wage overtime compensation, liquidated damages under the FLSA and NYLL, and prejudgment interest under New York and New Jersey law through May 1, 2015;

(2)    Prejudgment interest under New York law accruing after May 1, 2015 and continuing until entry of final judgment;

(3)    Prejudgment interest under New Jersey law accruing after May 1, 2015 and continuing until entry of final judgment; and

(4)    Post-judgment interest pursuant to 28 U.S.C. § 1961.

Plaintiffs' counsel shall make disbursements of the above amount to individual Plaintiffs as follows:

- Hernandez:      $158,664.97
- Cetino:          $119,204.51
- Alfaro:          $48,023.21
- Top:             $0.00
- M. Melgar:       $26,393.59
- N. Melgar:       $50,315.08
- Agustin:         $2196.52
- Lazo:            $14,164.15

The Court reserves entering final judgment until attorneys' fees and costs are determined through further briefing or agreement by the parties.

Dated: May 1, 2015
Brooklyn, New York

**SO ORDERED.**

*Ramon E. Reyes Jr.*

Ramon E. Reyes, Jr.
U.S. Magistrate Judge

63